## IN THE UNITED STATES BANKRUPTCY COURT
## FOR THE DISTRICT OF DELAWARE

| | |
|---|---|
| In re: | Chapter 11 |
| CYNERGY DATA, LLC, *et al.*,[1] | Case No. 09-_____ (        ) |
| Debtors. | Jointly Administered |

## MOTION OF THE DEBTORS FOR INTERIM AND FINAL ORDERS (I) AUTHORIZING USE OF CASH COLLATERAL, (II) AUTHORIZING POSTPETITION FINANCING, (III) GRANTING SENIOR PRIMING LIENS AND SUPERPRIORITY CLAIMS, (IV) GRANTING ADEQUATE PROTECTION TO THE PREPETITION SECURED PARTIES, AND (V) SCHEDULING A FINAL HEARING TO INCUR SUCH FINANCING ON A PERMANENT BASIS

The above-captioned debtors and debtors-in-possession herein (collectively, the "Debtors"), hereby respectfully move the Bankruptcy Court (the "Motion") for entry of an interim order (as attached to this Motion as **Exhibit A**, the "Interim Order") and a final order (the "Final Order" and, collectively with the Interim Order, the "Orders"), under sections 105(a), 361, 362, 363, and 364 of title 11 of the United States Code, 11 U.S.C. §101, et seq. (as amended, the "Bankruptcy Code") and Rule 4001 of the Federal Rules of Bankruptcy Procedure (the "Bankruptcy Rules") and Rule 4001-2 of the Local Rules for the United States Bankruptcy Court for the District of Delaware (the "Local Rules"), authorizing the Debtors to: (a) enter into the DIP Facility Documents (unless otherwise stated, all capitalized terms used but not otherwise defined shall have the meanings ascribed to them later in this Motion)); (b) use cash collateral; and (c) provide adequate protection to their prepetition secured lenders. The Debtors also

---

[1] The Debtors are the following entities (with the last four digits of their federal tax identification numbers in parentheses): Cynergy Data, LLC (8677); Cynergy Data Holdings, Inc. (8208); Cynergy Prosperity Plus, LLC (4265). The mailing address for the Debtors is 30-30 47th Avenue, 9th Floor, Long Island City, New York 11101.

request that the Bankruptcy Court schedule a final hearing with respect to the relief requested in this Motion. In support of this Motion, the Debtors respectfully state as follows:

**PRELIMINARY STATEMENT**

1.      The Bankruptcy Court should authorize the Debtors to enter into the DIP Facility Documents because the Debtors satisfy the standard in section 364 of the Bankruptcy Code: they are unable to obtain comparable unsecured credit elsewhere and have granted adequate protection to holders of primed liens.

2.      The Debtors are in need of additional financing. The DIP Facility Documents are fair and reasonable and provide significant new liquidity for the Debtors. The DIP Facilities will thus enable the Debtors to preserve their assets as a going concern, which will enable the Debtors to identify the optimum financial transaction, which may include a sale of all or substantially all of their assets pursuant to section 363 of the Bankruptcy Code. Without the financing provided for in the DIP Facility Documents, the Debtors would not be able to meet their direct operating expenses, would suffer irreparable harm, would jeopardize the prospects of completing a reorganization, including any future sale, and would probably have to liquidate their assets, which would benefit none of the constituents the Bankruptcy Code is designed to protect. Accordingly, the Bankruptcy Court should authorize the Debtors to enter into the DIP Facility Documents.

3.      The Bankruptcy Court should also authorize the use of cash collateral as requested in this Motion. The Debtors are indebted to the Prepetition Senior Lenders and the Prepetition Subordinated Lenders. The Prepetition Senior Lender Indebtedness is secured by all assets of the Debtors, Prosperity, and Holdings. The Prepetition Subordinated Indebtedness is secured by third priority and continuing pledges, liens, and security interests on and in the Prepetition Lender Collateral.

#11252668 v11

4.     The Prepetition Secured Parties are adequately protected.  The Prepetition Secured Parties consent to the Debtors' use of cash collateral as set forth in the Interim Order. As a condition to obtaining this consent and in satisfaction of section 363(e) of the Bankruptcy Code, the Debtors will adequately protect the Prepetition Secured Parties by giving them superpriority claims under section 507(b) of the Bankruptcy Code, as well as additional and replacement security interests in and liens upon all or substantially all of the Debtors' assets, including cash collateral, as well as currently owned and after-acquired real and personal property, assets and rights, of any kind or nature, wherever located (excepting avoidance actions), and the proceeds, products, rents and profits thereof.  Accordingly, the Bankruptcy Court should grant the Debtors' use of cash collateral as requested in this Motion.

## SUMMARY OF RELIEF REQUESTED AND LOCAL RULE 4001-2 DISCLOSURES

5.     The Debtors respectfully request the entry of an interim order:

a.     authorizing and approving, pursuant to sections 105, 361, 362, and 364 of Title 11 of the United States Code (the "Bankruptcy Code") and Rules 2002, 4001, and 9014 of the Federal Rules of Bankruptcy Procedure (the "Bankruptcy Rules"), (x) Debtors to obtain postpetition financing up to the Working Capital DIP Facility Cap (as defined below) (the "Working Capital DIP Facility") from Comerica Bank ("Comerica"), as agent to the Working Capital DIP Lenders (as defined below) (in such capacity, the "Working Capital DIP Agent"), and Comerica and Wells Fargo Foothill, LLC ("Wells Fargo"), in their respective capacities as lenders under the Working Capital DIP Facility (in such capacities, collectively, the "Working Capital DIP Lenders"), pursuant to the Working Capital DIP Facility Notes (as defined below) and the other Working Capital DIP Facility Documents (as defined below) and (y) Debtors to obtain postpetition financing in an aggregate principal outstanding amount of up to $7,500,000 (the "Interchange DIP Facility," and together with the Working Capital DIP Facility, the "DIP

Facilities") from Harris, N.A. and Moneris Solutions, Inc. (collectively, "Harris" or the "Interchange DIP Lenders"), pursuant to the Prepetition Harris Documents as supplemented or modified by this Order (the "Interchange DIP Facility Documents"), and together with the Working Capital DIP Facility Documents, the "DIP Facility Documents"), to (A) fund, among other things, Interchange and Network Reimbursement Fees (as defined below) and ongoing working capital, general corporate, and other financing needs of Debtors, (B) provide the Prepetition Senior Agent, First Out Banks and Harris (collectively, the "Prepetition Secured Parties") Adequate Protection (as defined below), and (C) pay fees and expenses owed under the DIP Facility Documents to the Working Capital DIP Agent, the Working Capital DIP Lenders and the Interchange DIP Lenders (other than attorney fees owed under the DIP Facility Documents, which, notwithstanding anything to the contrary in this Order, shall be accrued and included in the respective claims of those parties in accordance with their respective priority, but not paid (by transfer, setoff, recoupment or in any other manner) until the earlier of a Termination Event or the Termination Date;

b.  authorizing and empowering Debtors to execute and enter into the DIP Facility Documents and to perform such other and further acts as may be required in connection with the DIP Facility Documents;

c.  providing, pursuant to section 364(c) and (d) of the Bankruptcy Code, that the financing under the Working Capital DIP Facility:

(1)  has priority over any and all administrative expenses, including, without limitation, the kind specified in sections 105, 326, 328, 330, 331, 503(b), 506(c), 507(a), 507(b), 546(c), 726, 1113, or 1114 of the Bankruptcy Code, whether or not such expenses or claims may become secured by a judgment lien or other consensual or non-

consensual lien, levy or attachment, whether incurred in the Cases or any successor case (the "Working Capital DIP Facility Superpriority Claims"); provided, however, that the Working Capital DIP Facility Superpriority Claims shall be *pari passu* with the Interchange DIP Facility Superpriority Claims (as defined below) and shall be payable from and have recourse to all prepetition and postpetition property of Debtors, and

(2)     be and be deemed immediately secured by valid, binding, continuing, enforceable, fully perfected and unavoidable first priority senior priming security interests and liens (the "Working Capital DIP Facility Liens") in and on all prepetition and postpetition property and assets of Debtors, wherever located, whether real or personal, whether tangible or intangible, and whether now existing or hereafter acquired, including proceeds, products, offspring, rents and profits thereof, and including, without limitation, (i) the Prepetition Lender Collateral (as defined below); (ii) all accounts, accounts receivable, instruments, documents, drafts, notes, acceptances, chattel paper, general intangibles (including, without limitation, all goodwill, copyrights, patents, trademarks, trade names and franchises), software, contract rights, rights to payment evidenced by chattel paper, documents or instruments, deposit accounts, rights to payment for money or funds advanced or sold, causes of action, choses in action, commercial tort claims, letters of credit, letter of credit rights, supporting obligations, investment property or other property in possession or control of Working Capital DIP Lenders, all personal property received as returns and repossessions, all other forms of receivables, tax refunds of any form, all inventory, including all goods held for sale and documents evidencing inventory, all equipment (together with spare and repair parts, special tools and equipment and replacements), the proceeds of credit and other forms of insurance coverage of any of the foregoing and all books and records pertaining to all of the foregoing; and (iii) all interests in real

-5-

property and fixtures (collectively, the "Working Capital Collateral"), subject only to the Permitted Prior Liens (as defined below) and the Interchange DIP Facility Liens (as defined below) in the Interchange Collateral (as defined below); provided, however, that the Working Capital Collateral shall not include avoidance actions pursuant to sections 502(d), 544, 545, 547, 548, 549, 550 or 553 of the Bankruptcy Code (the "Avoidance Actions") or proceeds of any Avoidance Actions unless approved in the Final Order (terms used but not defined herein that are defined in the Michigan Uniform Commercial Code shall have the meaning set forth therein);

d.      providing, pursuant to section 364(c) and (d) of the Bankruptcy Code, that the financing under the Interchange DIP Facility:

(1)      has priority over any and all administrative expenses, including, without limitation, the kind specified in sections 105, 326, 328, 330, 331, 503(b), 506(c), 507(a), 507(b), 546(c), 726, 1113, or 1114 of the Bankruptcy Code, whether or not such expenses or claims may become secured by a judgment lien or other consensual or non-consensual lien, levy or attachment, whether incurred in the Cases or any successor case (the "Interchange DIP Facility Superpriority Claims," and together with the Working Capital DIP Facility Superpriority Claims, the "DIP Facility Superpriority Claims"); provided, however, that the Interchange DIP Facility Superpriority Claims shall be *pari passu* with the Working Capital DIP Facility Superpriority Claims and shall be payable from and have recourse to all prepetition and postpetition property of Debtors, and

(2)      be and be deemed immediately secured by valid, binding, continuing, enforceable, fully perfected and unavoidable first priority senior priming security interests and liens (the "Interchange DIP Facility Liens," and together with the Working Capital DIP Facility Liens, the "DIP Facility Liens") in and on all of Debtors' ISO Revenue (as such

term is defined in the Forbearance Agreement (as defined below)), the Reserve Account, the ISO Operating Account, the Merchant Suspense Account, the ISO Clearing Account and all other of Debtors' deposit accounts maintained with the Interchange DIP Lenders, wherever located, whether now existing or hereafter acquired (collectively, the "Interchange Collateral"), subject only to the Permitted Prior Liens (as defined below) to the extent any such Permitted Prior Liens were senior in priority to the Prepetition Harris Liens (as defined below). Terms used but not defined herein that are defined in the Interchange DIP Facility Documents shall have the meaning set forth in the Interchange DIP Facility Documents.

e. authorizing Debtors, pursuant to sections 361, 363(c) and (e), and 364(d)(1) of the Bankruptcy Code, to use "cash collateral" as defined under section 363 of the Bankruptcy Code (the "Cash Collateral") to pay, first, the Prepetition Senior Lender Forbearance Indebtedness (as defined below); second, the Prepetition Senior Lender Non-Forbearance Indebtedness (as defined below); and, third, the Working Capital DIP Facility Indebtedness (as defined below), and to provide Adequate Protection to the Prepetition Secured Parties on account of their claims under the Prepetition Loan Documents (as defined below) for any diminution to the Prepetition Collateral (as defined below) caused by the use of Cash Collateral and the terms of the financing being granted herein; provided, however, that with respect to Cash Collateral arising from ISO Revenue (the "Interchange Cash Collateral"), the application of Cash Collateral provided in this subparagraph shall be net of such Interchange Cash Collateral that is used to pay the indebtedness under the Prepetition Harris Documents with respect to the funding of Interchange and Network Reimbursement Fees and the Interchange DIP Facility Indebtedness (defined below);

#11252668 v11

f.        pending approval at the Final Hearing (as defined below), authorizing Debtors, pursuant to sections 363 and 364(d)(1) of the Bankruptcy Code, to borrow under the Working Capital DIP Facility in an aggregate outstanding principal amount at any one time of up to an amount equal to the lesser of (i) the amount of (A) $9,000,000 less (B) the amount of the outstanding Prepetition Senior Lender Forbearance Indebtedness as of the Petition Date plus (C) the aggregate amount of payments or proceeds of Collateral that are applied after the Petition Date to reduce the amount of Prepetition Senior Lender Indebtedness and (ii) $25,000,000 (the "Working Capital DIP Facility Cap") (together with interest, fees, charges and expenses payable under the Working Capital DIP Facility Notes (as defined below)), in each case, pursuant to the terms and conditions of the Working Capital DIP Facility Documents, and to use the amounts borrowed to fund Debtors' working capital and other general corporate needs, in accordance with the terms of the Working Capital DIP Facility Documents and this Order; and

g.        pending approval at the Final Hearing, authorizing Debtors, pursuant to sections 363 and 364(d)(1) of the Bankruptcy Code, to borrow under the Interchange DIP Facility to fund Debtors' Interchange and Network Reimbursement Fees in an aggregate outstanding principal amount at any one time of up to $7,500,000 (together with interest, fees, charges and expenses payable under the Interchange DIP Facility Documents) pursuant to the terms and conditions of the Interchange DIP Facility Documents and this Order;

h.        authorizing Debtors and the Interchange DIP Lenders, pursuant to sections 105, 363 and 365 of the Bankruptcy Code, to perform under the Interchange DIP Facility Documents in their entirety, including authorizing Interchange DIP Lenders to withhold amounts in accordance with the Interchange DIP Facility Documents regardless of whether such amounts pertain to prepetition or postpetition transactions;

i.       pending approval at the Final Hearing, authorizing the waiver by Debtors of any right to surcharge against the Working Capital Collateral and Interchange Collateral;

j.       scheduling, pursuant to Bankruptcy Rule 4001, a final hearing (the "Final Hearing") before this Court to consider entry of an order (a) approving the DIP Facilities and authorizing Debtors to borrow all amounts available under the DIP Facilities and use such borrowed amounts (i) from the Working Capital DIP Facility, to fund Debtors' working capital and other general corporate needs and pay such other amounts required or allowed to be paid pursuant to the Working Capital DIP Facility Documents, this Order and any other order of this Court, and (ii) from the Interchange DIP Facility, to fund Debtors' Interchange and Network Reimbursement Fees and pay such other amounts required or allowed to be paid pursuant to the Interchange DIP Facility Documents, this Order and any other order of this Court, (b) authorizing the use of Cash Collateral first to pay the Prepetition Senior Lender Indebtedness until paid in full and thereafter to pay the Working Capital DIP Facility Indebtedness; provided, however, that with respect to Interchange Cash Collateral, the application of Cash Collateral provided in this Order shall be net of such Interchange Cash Collateral that is used to pay the indebtedness under the Prepetition Harris Documents with respect to the funding of Interchange and Network Reimbursement Fees and the Interchange DIP Facility Indebtedness, and (c) authorizing the grant of Adequate Protection to the Prepetition Secured Parties, pursuant to the Final Order, as set forth in the Motion; and

k.       modifying the automatic stay imposed under section 362 of the Bankruptcy Code to the extent necessary to permit Debtors, the Working Capital DIP Agent, the

Working Capital DIP Lenders, and the Interchange DIP Lenders to implement the terms of this Order.

6.    Pursuant to Local Bankruptcy Rule 4001-2, the following provisions are highlighted[2]:

a.    Granting of Cross-Collateralization (Local Rule 4001-2(a)(i)(A):

None

b.    Limitations on Investigation (Local Rule 4001-2(a)(i)(B)):  None

c.    Waiver of Surcharge Rights under § 506(c) (Local Rule 4001-2(a)(i)(C)):  Upon entry of a Final Order, no cost or expenses of administration shall be imposed against the Working Capital DIP Agent, the Working Capital DIP Lenders, the Interchange DIP Lenders, any of their claims, or the Collateral under sections 105, 506(c) or 552 of the Bankruptcy Code, or otherwise, by Debtors or any other party in interest without the prior written consent of the Prepetition Senior Agent, the Working Capital DIP Agent and the Interchange DIP Lenders, and no such consent shall be implied from any action, inaction, or acquiescence by any party, including, but not limited to, funding of Debtors' ongoing operations by the Working Capital DIP Agent, Working Capital DIP Lenders and Interchange DIP Lenders. The "equities of the case" exception contained in section 552(b) of the Bankruptcy Code shall be deemed waived.  Neither the Working Capital DIP Agent, nor any of the Working Capital DIP Lenders, Interchange DIP Lenders or Prepetition Secured Parties, shall be subject to the

---

[2]    This summary is qualified in all respects by the terms of the Interim Order and the DIP Facility Documents (as applicable).

equitable doctrine of "marshaling" or any similar doctrine with respect to the Collateral. (Interim Order ¶ 8).

      d.     <u>Lien on Avoidance Actions (Local Rule 4001-2(a)(i)(D))</u>: The Working Capital Collateral shall not Avoidance Actions or proceeds of any Avoidance Actions unless approved in the Final Order (Interim Order, ¶ 3(b)).

      e.     <u>Limited "Roll-Over" Provision (Local Rule 4001-2(a)(i)(E))</u>: The Order does permit the Debtor to use up to $1,500,000 of cash collateral on a weekly basis to pay down certain prepetition indebtedness. (Interim Order, ¶ 2(a)(vi).

      f.     <u>Disparate Treatment of Professionals ((Local Rule 4001-2(a)(i)(F))</u>: None

      g.     <u>Priming of Secured Liens Without Consent (Local Rule 4001-2(a)(i)(G))</u>: None

      7.     Pursuant to Bankruptcy Rule 4001(c), the following provisions are highlighted[3]:

      a.     <u>Bankruptcy Rule 4001(c)(1)(B)(i). Grant of Priority or Lien on Property of Estate under section 364(c) or (d)</u>: Financing under the Working Capital DIP Facility: (1) has priority over any and all administrative expenses, whether or not such expenses or claims may become secured by a judgment lien or other consensual or non-consensual lien, levy or attachment, whether incurred in the Cases or any successor case (the "<u>Working Capital DIP Facility Superpriority Claims</u>"); <u>provided</u>, <u>however</u>, that the Working Capital DIP Facility Superpriority Claims shall be *pari passu* with the Interchange DIP Facility Superpriority Claims

---

[3]      This summary is qualified in all respects by the terms of the Interim Order and the DIP Facility Documents (as applicable).

and shall be payable from and have recourse to all prepetition and postpetition property of Debtors, and (2) is secured by valid, binding, continuing, enforceable, fully perfected and unavoidable first priority senior priming security interests and liens (the "Working Capital DIP Facility Liens") in and on all prepetition and postpetition property and assets of Debtors, wherever located, whether real or personal, whether tangible or intangible, and whether now existing or hereafter acquired, including proceeds, products, offspring, rents and profits thereof, subject only to the Permitted Prior Liens and the Interchange DIP Facility Liens in the Interchange Collateral . (Interim Order, ¶ 3 and 4).

Financing under the Interchange DIP Facility:  (1) has priority over any and all administrative expenses, whether or not such expenses or claims may become secured by a judgment lien or other consensual or non-consensual lien, levy or attachment, whether incurred in the Cases or any successor case (the "Interchange DIP Facility Superpriority Claims," and together with the Working Capital DIP Facility Superpriority Claims, the "DIP Facility Superpriority Claims"); provided, however, that the Interchange DIP Facility Superpriority Claims shall be *pari passu* with the Working Capital DIP Facility Superpriority Claims and shall be payable from and have recourse to all prepetition and postpetition property of Debtors, and (2) is secured by valid, binding, continuing, enforceable, fully perfected and unavoidable first priority senior priming security interests and liens (the "Interchange DIP Facility Liens," and together with the Working Capital DIP Facility Liens, the "DIP Facility Liens") in and on all of Debtors' ISO Revenue (as such term is defined in the Forbearance Agreement), the Reserve Account, the ISO Operating Account, the Merchant Suspense Account, the ISO Clearing Account, the ISO Settlement Account, and all other of Debtors' deposit accounts maintained with the Interchange DIP Lenders, wherever located, whether now existing

or hereafter acquired (collectively, the "Interchange Collateral"), subject only to the Permitted Prior Liens to the extent any such Permitted Prior Liens were senior in priority to the Prepetition Harris Liens.  (Interim Order, ¶ 5 and 6).

        b.      <u>Bankruptcy Rule 4001(c)(1)(B)(ii).  Adequate Protection or Priority for Prepetition Claims</u>:  Adequate Protection will be provided to the Prepetition Secured Parties on account of their claims under the Prepetition Loan Documents for any diminution to the Prepetition Collateral caused by the use of Cash Collateral and the terms of the financing being granted herein.  (Interim Order ¶ 9 through11)

        c.      <u>Bankruptcy Rule 4001(c)(1)(B)(iii).  Determination of Validity, Enforceability, and Priority of Prepetition Lien</u>:  The Interim Order provides that the Prepetition Senior Lenders' Liens are valid and enforceable against the estates.  (Interim Order ¶ D4).  The Interim Order further provides that the Prepetition Subordinated Lenders' Liens are valid and enforceable against the estates.  (Interim Order ¶ E(4)).  The Interim Order also provides that the Prepetition Harris Liens are valid and enforceable against the estates.  (Interim Order ¶ F(8)).  Pursuant to the Subordination Agreement, the Prepetition Senior Lender Indebtedness is senior in right to payment to the Prepetition Subordinated Lender Indebtedness and the Prepetition Senior Lenders' Liens are senior in priority to the Prepetition Subordinated Lenders' Liens on all of the Prepetition Collateral.  (Subordination Agreement ¶ 2).

        d.      <u>Bankruptcy Rule 4001(c)(1)(B)(iv).  Waiver of Automatic Stay</u>: The Interim Order provides that, to the extent necessary, Interchange DIP Lenders are granted relief from the automatic stay to set off, recoup or otherwise collect against the ISO Revenue or amounts maintained in Debtors' accounts at any Interchange DIP Lender, in the ordinary course of business, all Interchange DIP Facility Indebtedness as and when such amounts are due.

(Interim Order, ¶ 2(b)(iv).  Additionally, the Interim Order provides that the automatic stay is vacated and modified to the extent necessary to (a) permit Harris to perform under the Prepetition Harris Documents and, upon the occurrence of a Termination Event, to exercise all rights and remedies provided for in the Prepetition Harris Documents and (b) permit the Working Capital DIP Agent, Working Capital DIP Lenders and Interchange DIP Lenders, upon the occurrence of a Termination Event, to exercise all rights and remedies provided for in the DIP Facility Documents.  (Interim Order ¶ 15).  The Interim Order further provides that the Working Capital DIP Agent, any Working Capital DIP Lender, any Interchange DIP Lender, and/or any Prepetition Secured Party may, in their sole discretion, file confirm perfection of such liens, security interests, and mortgages, without seeking modification of the automatic stay.  (Interim Order ¶ 13).

        e.      <u>Bankruptcy Rule 4001(c)(1)(B)(v).  Wavier of Right to File Plan, Seek Extension of Time to File Plan, Request Use of Cash Collateral or Request Authority to Obtain Credit under Section 364 of the Bankruptcy Code</u>:  None.

        f.      <u>Bankruptcy Rule 4001(c)(1)(B)(vi).  Deadlines for Filing Plan, Approval of Disclosure Statement, Plan Confirmation</u>:  None.

        g.      <u>Bankruptcy Rule 4001(c)(1)(B)(vii).  Waiver or Modification of Applicability of Non-Bankruptcy Law Relating to Prepetition Lien or Foreclosure</u>:  None.

        h.      <u>Bankruptcy Rule 4001(c)(1)(B)(viii). Release, Waiver or Limitation on Claim or Cause of Action by the Debtors</u>:  None.

        i.      <u>Bankruptcy Rule 4001(c)(1)(B)(ix). Indemnification of any Entity</u>: None.

j.      Bankruptcy Rule 4001(c)(1)(B)(x).  Release, Waiver or Limitation on 506(c) Rights:  The Interim Order provides for a waiver of Section 506(c) surcharge rights against the Working Capital DIP Agent, the Working Capital DIP Lenders and the Interchange DIP Lenders under entry of the Final Order.  (Interim Order, ¶ 8).

k.      Bankruptcy Rule 4001(c)(1)(B)(xi).  Lien on Actions under sections 544, 545, 547, 548, 549, 553(b), 723(a), or 724(a):  The Working Capital Collateral shall not include Avoidance Actions or proceeds of any Avoidance Actions unless approved in the Final Order (Interim Order, ¶ 3(b)).

## JURISDICTION AND VENUE

8.      The Bankruptcy Court has jurisdiction over this Motion pursuant to 28 U.S.C. §§ 157 and 1334.  Venue in this District is proper pursuant to 28 U.S.C. §§ 1408 and 1409.  This is a core proceeding pursuant to 28 U.S.C. § 157(b).

9.      The statutory predicates for the relief requested are sections 105, 361, 362, 363 and 364 of the Bankruptcy Code, Bankruptcy Rules 2002, 4001 and 9014 and Local Rule 4001-2.

## BACKGROUND

10.      On September 1, 2009 (the "Petition Date"), the Debtors each filed a voluntary petition for relief under Chapter 11 of the Bankruptcy Code.  The Debtors continue to operate their businesses and manage their property as debtors-in-possession pursuant to sections 1107(a) and 1108 of the Bankruptcy Code.

11.      No creditors' committee has yet been appointed in these cases.  No trustee or examiner has been appointed.

12.      A full description of the Debtors' business operations, corporate structures, capital structures, and reasons for commencing these cases is set forth in full detail in

-15-

the declaration of Charles M. Moore in Support of chapter 11 petitions and various first-day motions (the "Moore Declaration"), which is filed concomitantly herewith and which is incorporated into this Motion by reference. Additional facts in support of the specific relief sought in this Motion are set forth below.

### DEBTORS' PREPETITION LIEN HOLDERS

13. Debtors are indebted to Comerica, as agent to the Prepetition Senior Lenders (as defined below) (in such capacity, the "Prepetition Senior Agent"), and to Comerica, Wells Fargo ("Comerica and Wells Fargo", in their capacity as Prepetition Senior Lenders, are referred to collectively as the "First Out Banks"), A3 Funding LP ("A3"), Ableco Finance LLC ("Ableco"), Garrison Credit Investments I, LLC ("GCI") and Garrison Credit Opportunities Holdings L.P. ("GCH", together with A3, Ableco and GCI, the "Term Loan B Banks" and together with First Out Banks, the "Prepetition Senior Lenders"), as follows:

a. under a certain Master Revolving Note executed by Cynergy to the order of Comerica on July 24, 2009 in the original principal amount of $4,316,807.50 ("Comerica Revolving Note #1"). The indebtedness under the Comerica Revolving Note #1 as of the Petition Date includes principal of $4,316,807.50, and interest of $28,509.70;

b. under a certain Master Revolving Note executed by Cynergy to the order of Wells Fargo on July 24, 2009 in the original principal amount of $4,683,192.50 ("Wells Fargo Revolving Note #1"). The indebtedness under the Wells Fargo Revolving Note #1 as of the Petition Date includes principal of $4,683,192.50, and interest of $30,929.44.

c. under a certain Revolving Credit Note executed by Cynergy to the order of Comerica on December 15, 2008 in the original principal amount of $10,704,245.28

("Comerica Revolving Note #2").  The indebtedness under the Comerica Revolving Note #2 as of the Petition Date includes principal of $10,514,549.09, and interest of $130,993.76;

        d.     under a certain Revolving Credit Note executed by Cynergy to the order of Wells Fargo on December 15, 2008 in the original principal amount of $8,195,754.72 ("Wells Fargo Revolving Note #2").  The indebtedness under the Wells Fargo Revolving Note #2 as of the Petition Date includes principal of $7,318,126.16, and interest of $91,171.66.  The Comerica Revolving Note #1, Comerica Revolving Note #2, the Wells Fargo Revolving Note #1 and the Wells Fargo Revolving Note #2 are identified collectively as the "Prepetition Revolving Notes";

        e.     under a certain Term Loan A Note executed by Cynergy to the order of Comerica on August 1, 2008 in the original principal amount of $11,695,754.71 ("Comerica Term Loan A Note").  The indebtedness under the Comerica Term Loan A Note as of the Petition Date includes principal of $9,155,772.78, and interest of $114,065.66;

        f.     under a certain Term Loan A Note executed by Cynergy to the order of Wells Fargo on August 1, 2008 in the original principal amount of $16,804,245.29 ("Wells Fargo Term Loan A Note").  The indebtedness under the Wells Fargo Term Loan A Note as of the Petition Date includes principal of $13,154,845.97, and interest of $163,887.45. The Comerica Term Loan A Note and the Wells Fargo Term Loan A Note are identified collectively as the "Prepetition Term Loan A Notes";

        g.     under a certain Term Loan B Facility in the original principal amount of $26,500,000 ("Term Loan B Facility").  The indebtedness under the Term Loan B Facility as of the Petition Date includes principal of $26,901,732.65, and interest of $429,867.28;

h.      under a Revolving Credit Note dated December 15, 2008 in the principal amount of $10,100,000 (the "Prosperity Note") executed by Prosperity to the order of Comerica, and guaranteed under a guaranty (the "Prosperity Guaranty") dated as of September 20, 2007 by Cynergy in favor of Comerica.  The indebtedness under the Prosperity  Note and Prosperity Guaranty as of the Petition Date includes principal of $9,050,000, and interest of $237,059.72; and

i.      in respect of each of the foregoing, accruing interest, costs, fees and expenses.

14.      As used herein, the Prepetition Revolving Notes, the Prepetition Term Loan A Notes, the Term Loan B Facility, and the Prosperity Notes are identified collectively as the "Prepetition Notes."  All of the Debtors' obligations to the Prepetition Senior Agent and the Prepetition Senior Lenders under the Prepetition Notes, the Prosperity Guaranty, and the other documents, instruments and agreements related to or executed in connection with the Prepetition Notes and the Prosperity Guaranty (collectively, the "Prepetition Senior Loan Documents," which includes, without limitation, that certain Amended and Restated Credit Agreement dated as of August 1, 2008 by and among Cynergy, the Prepetition Senior Agent and the Prepetition Senior Lenders (the "Cynergy Prepetition Credit Agreement"), that certain Credit Agreement dated as of September 20, 2007 between Comerica (as Agent and Lender) and Prosperity (the "Prosperity Prepetition Credit Agreement"), and that certain Forbearance Agreement dated as of July 24, 2009 (the "Forbearance Agreement") among the Credit Parties, the Prepetition Senior Agent, the Prepetition Senior Lenders, and Harris) including, without limitation, all principal, accrued interest, unpaid fees and expenses (including attorneys' fees) are identified as the "Prepetition Senior Lender Indebtedness."  All of Debtors' obligations to the Prepetition Senior

Lenders under Comerica Revolving Note #2, Wells Fargo Revolving Note #2, Comerica Term Loan A Note, Wells Fargo Term Loan A Note, and Prosperity Note including, without limitation, all principal, accrued interest, and unpaid fees and expenses (including attorneys' fees), are identified as the "Prepetition Senior Lender Non-Forbearance Indebtedness."

15. The Prepetition Senior Lender Indebtedness is guaranteed by Prosperity and Holdings. The Prepetition Senior Lender Indebtedness, except for the amounts advanced under Comerica Revolving Note #1 and Wells Fargo Revolving Note #1, is guaranteed by Marcelo Paladini. Debtors and Marcelo Paladini are identified collectively as the "Credit Parties."

16. The Prepetition Senior Lender Indebtedness is secured by all assets of Debtors, including without limitation, all of their respective now owned or after acquired:

a.     accounts;

b.     chattel paper (whether tangible chattel paper or electronic chattel paper);

c.     general intangibles (including, without limitation, payment intangibles);

d.     equipment;

e.     inventory and goods;

f.     documents;

g.     instruments (including, without limitation, promissory notes);

h.     deposit accounts and any other cash collateral, deposit or investment accounts, including all cash collateral, deposit or investment accounts established or maintained pursuant to the terms of the Security Agreement (as defined below) or the other

Prepetition Senior Loan Documents, together with all cash and other assets and property from time to time deposited therein and the monies, assets and properties in the possession or control of Prepetition Senior Agent or any Prepetition Senior Lender or any affiliate, representative, agent or correspondent of Prepetition Senior Agent or any Prepetition Senior Lender;

        i.      computer records and software, whether relating to the foregoing collateral or otherwise, but in the case of such software, subject to the rights of any non-affiliated licensee of software;

        j.      investment property;

        k.      commercial tort claims listed in the Prepetition Senior Loan Documents, if any; and

        l.      the proceeds, in cash or otherwise, of any of the property described in the foregoing clauses (a) through (k) and all liens, security, rights, remedies and claims of such debtor with respect thereto;

all as more particularly described in the Security Agreement executed by Debtors in favor of Prepetition Senior Agent dated April 16, 2007 (as amended "Security Agreement"). The Prepetition Senior Lender Indebtedness is also secured by (a) all of Andres Ordonez's shares of stock of Holdings, (b) all of Marcelo Paladini's shares of stock of Holdings, and (c) all of Gustavo Ceballos's shares of stock in Holdings. The collateral securing the Prepetition Senior Lender Indebtedness that is owned by Debtors is identified collectively as the "Prepetition Lender Collateral."

        17.      The Debtors are also obligated to Harris under a certain BIN Sponsor Agreement dated as of November 1, 2008, as amended, restated, supplemented or otherwise modified prior to the Petition Date and other agreements with respect to amounts advanced to

-20-

Debtors by Harris to fund Interchange and Network Reimbursement Fees for Debtors and Debtors' merchants (as such term is defined in the Forbearance Agreement) (collectively, "Prepetition Harris Documents"). The indebtedness under the Prepetition Harris Documents with respect to the funding of Interchange and Network Reimbursement Fees includes principal of $_____ and interest of $_____, both as of [August __, 2009], plus advances with respect to the funding of Interchange and Network Reimbursement Fees made after that date until the Petition Date. All of Debtors' obligations to Harris under the Prepetition Harris Documents, including, without limitation, all principal, accrued interest, unpaid fees and expenses (including attorneys' fees) are identified as the "Prepetition Harris Indebtedness". The Prepetition Senior Lender Indebtedness, and the Prepetition Harris Indebtedness and the indebtedness asserted by various holders of subordinated debt under the Financing Agreement with Debtors dated November 15, 2007, as amended, restated, supplemented or otherwise modified prepetition, and the documents, instruments and agreements executed in connection therewith are referred to, collectively, as the "Prepetition Indebtedness".

## BASIS FOR RELIEF

18. In order for Debtors to continue to operate their business, and preserve their goodwill and going concern value, it is necessary for Debtors to obtain immediate postpetition financing and use of Cash Collateral to enable them to pay normal operating expenses (including, without limitation, wages, salaries, insurance premiums, utilities, rent and taxes). Without such postpetition financing and use of Cash Collateral, the Debtors will be unable to operate their business. The ability of the Debtors to finance their operations and the availability to the Debtors of sufficient working capital and other financial and general corporate liquidity through postpetition financing and use of Cash Collateral is in the best interests of the Debtors and their estates. The interim financing and use of Cash Collateral authorized by this

-21-

Order is vital to avoid immediate and irreparable harm to the Debtors' business, property, and estates and to allow the orderly continuation of the Debtors' business.

19.     Debtors are unable to obtain sufficient financing from sources other than the Working Capital DIP Lenders and the Interchange DIP Lenders on terms more favorable than the DIP Facilities described in this Order and pursuant to the DIP Facility Documents. Debtors have been unable to obtain unsecured credit solely under section 503(b)(1) of the Bankruptcy Code as an administrative expense. New credit is unavailable to Debtors without (a) providing the Working Capital DIP Agent and the Working Capital DIP Lenders (i) the Working Capital DIP Facility Superpriority Claims and (ii) the Working Capital DIP Facility Liens as provided herein and in the Working Capital DIP Facility Documents, (b) providing the Interchange DIP Lenders (i) the Interchange DIP Facility Superpriority Claims and (ii) the Interchange DIP Facility Liens as provided herein and in the Interchange DIP Facility Documents, (c) providing for the Adequate Protection of the Prepetition Secured Parties' interests in the Prepetition Collateral on the terms and conditions as set forth herein, (d) permitting the Interchange DIP Lenders to setoff or recoup amounts advanced under the Interchange DIP Facility with respect to Interchange and Network Reimbursement Fees, and (e) authorizing Debtors and the Interchange DIP Lenders to continue to perform postpetition under the Interchange DIP Facility Documents in their entirety, including authorizing the Interchange DIP Lenders to withhold amounts in accordance with the Interchange DIP Facility Documents regardless of whether such amounts pertain to prepetition or postpetition transactions.

**A.     The Debtors' Decision to Enter Into the DIP Facility Documents**

20.     At the start of 2007, the Debtors' business was growing rapidly and appeared to be quite profitable. During 2007 and 2008, however, certain errors were made in the

internal accounting and financial reporting of the Debtors that had the effect of inflating their profitability and cash flow. These errors were discovered in March of 2009.

21. An investigation of those errors by FTI Consulting, Inc. resulted in the restatement of the Debtors' financials for both 2007 and 2008. While the operations of the Debtors were and remain profitable, the level of profitability is substantially less than previously reported and, as a result of their reliance on incorrect financial information, the management of Cynergy Data made certain decisions about the use of funds that, in hindsight, may not have been made. These expenditures have resulted in a severely strained cash flow.

22. Moreover, the errors in the financial statements have also resulted in a loss of confidence in the Debtors by the Prepetition Lenders. The Debtors hired a management consultant to perform a value assessment and also engaged financial advisors to provide investment banking services in conducting an organized process intended to identify the best financial transaction possible for the Debtors. However, due to the instability of the Debtors' business from certain errors made in the internal accounting and financing report of the Debtors, the Debtors were forced to file for relief under Chapter 11 of the Bankruptcy Code to afford themselves the opportunity to identify the optimum financial transaction.

23. Once the Debtors' business has been stabilized with the help of the DIP Facilities, the Debtors plan to pursue the effort already underway to sell substantially all of their assets pursuant to section 363 of the Bankruptcy Code.

**B.    Terms of the DIP Facility Documents**

24. The salient terms of the DIP Facility Documents are as follows:[4]

---

[4]    This summary is qualified in its entirety by reference to the provisions of the DIP Facility Documents. The DIP Credit Agreement will control in the event of any inconsistency between this Motion and the DIP Facility

(continued...)

| | |
|---|---|
| Borrower: | Cynergy Data, LLC as debtor and debtor in possession in a case filed under chapter 11 of the Bankruptcy Code in the Bankruptcy Court. |
| Guarantor: | Holdings and Prosperity acknowledge and agree that the Working Capital DIP Facility Indebtedness is guaranteed under their respective guaranties previously executed in favor of Prepetition Senior Agent and Prepetition Senior Lenders. Marcelo Paladini acknowledges and agrees that the Working Capital DIP Facility Indebtedness is guaranteed under his guaranty previously executed in favor of Prepetition Senior Agent and Prepetition Senior Lenders. |
| Lenders: | Comerica Bank; Wells Fargo Foothill, LLC; Harris, N.A.; Moneris Solutions, Inc.; |
| Commitment: | The Working Capital DIP Facility in an amount equal to the lesser of (i) the amount of (A) $9,000,000 less (B) the amount of the outstanding Prepetition Senior Lender Forbearance Indebtedness as of the Petition Date plus (C) the aggregate amount of payments or proceeds of Collateral that are applied after the Petition Date to reduce the amount of Prepetition Senior Lender Indebtedness and (ii) $25,000,000; and

The Interchange DIP Facility in an aggregate principal outstanding amount of up to $7,500,000 |
| Use of Proceeds: | All proceeds of the DIP Facilities shall be used solely for working capital, general corporate and other financing needs of the Debtors in accordance with the Budget and any subsequent budgets and Orders. |
| Application of Proceeds: | To fund working capital needs and to preserve asset value in anticipation of proposed Section 363 sale. |
| Term: | Upon entry of the Interim Order, the Debtors may immediately request advances under the Working Capital DIP Facility.

The Termination Date is the earlier of (A) the date of |

_____

(continued...)

Documents. Capitalized terms used in this summary but not otherwise defined in this Motion shall have the respective meanings ascribed to those terms in the DIP Facility Documents.

consummation of a sale of substantially all of the Debtors' assets, or October 16, 2009, 2009, unless other wise extended in writing by the Prepetition Senior Agent, Working Capital Lenders, and Interchange DIP Lenders.

Priority and Liens:

DIP Facility Liens grants to the Lenders a valid, perfected security interest in substantially all of the property of the Debtors pursuant to Sections 364(c)(2), 364(c)(3) and 364(d)(1) of the Bankruptcy Code. Additionally, the DIP Facility Superpriority Claims are granted pursuant to Section 365(c)(1).

Grant of Security Interest:

The Working Capital DIP Facility is secured by valid, binding, continuing, enforceable, fully perfected and unavoidable first priority senior priming security interests and liens (the "Working Capital DIP Facility Liens") in and on all prepetition and postpetition property and assets of the Debtors, wherever located, whether real or personal, whether tangible or intangible, and whether now existing or hereafter acquired, including proceeds, products, offspring, rents and profits thereof, and including, without limitation, (i) the Prepetition Lender; (ii) all accounts, accounts receivable, instruments, documents, drafts, notes, acceptances, chattel paper, general intangibles (including, without limitation, all goodwill, copyrights, patents, trademarks, trade names and franchises), software, contract rights, rights to payment evidenced by chattel paper, documents or instruments, deposit accounts, rights to payment for money or funds advanced or sold, causes of action, choses in action, commercial tort claims, letters of credit, letter of credit rights, supporting obligations, investment property or other property in possession or control of Working Capital DIP Lenders, all personal property received as returns and repossessions, all other forms of receivables, tax refunds of any form, all inventory, including all goods held for sale and documents evidencing inventory, all equipment (together with spare and repair parts, special tools and equipment and replacements), the proceeds of credit and other forms of insurance coverage of any of the foregoing and all books and records pertaining to all of the foregoing; and (iii) all interests in real property and fixtures (collectively, the "Working Capital Collateral"), subject only to the Permitted Prior Liens and the Interchange DIP Facility Liens in the Interchange Collateral; provided, however, that the Working Capital Collateral shall not include Avoidance Actions or proceeds of any Avoidance Actions.

The Interchange DIP Facility Liens are valid, binding, continuing, enforceable, fully perfected and unavoidable first priority senior priming security interests and liens in and on all of Debtors' ISO

Revenue (as such term is defined in the Forbearance Agreement), the Reserve Account, the ISO Operating Account, the Merchant Suspense Account, the ISO Clearing Account, the ISO Settlement Account, and all other of Debtors' deposit accounts maintained with the Interchange DIP Lenders, wherever located, and whether now existing or hereafter acquired (collectively, the "Interchange Collateral"), subject only to the Permitted Prior Liens to the extent any such Permitted Prior Liens were senior in priority to the Prepetition Harris Liens.

Fees:

Debtors shall reimburse the Working Capital DIP Agent, the Working Capital DIP Lenders and the Interchange DIP Lenders for their reasonable costs, fees (including, without limitation, reasonable attorneys' and financial advisors' fees and expenses), charges, and expenses incurred in connection with the Cases or under the DIP Facility Documents, whether incurred prepetition or postpetition.

To the extent provided in the Prepetition Senior Loan Documents, payments of the Comerica's reasonable fees and expenses for legal counsel, financial advisors, auditors and other professionals for services rendered prepetition or postpetition incurred as Prepetition Senior Agent, Working Capital DIP Agent, or in any other capacity, and payments of each of Wells Fargo's reasonable fees and expenses for legal counsel, auditors, financial advisors and other professionals for services rendered prepetition or postpetition whether incurred as Prepetition Senior Lender, Working Capital DIP Lender or in any other capacity.

The Budget shall provide for payment of (A) fees due and payable to the Clerk of the Court and the U.S. Trustee under 28 U.S.C. § 1930 and (B) fees and expenses incurred by professionals retained under an order of the Court capped at $3.4 million (the "Professional Fees") through the closing of the sale.

No Collateral, no amounts borrowed under the DIP Facilities no amounts provided for in the Budget, including, without limitation, amounts budgeted for Professional Fees, and no proceeds of any of the foregoing shall include, apply to, or be used or available for, the payment or reimbursement of any fees or expenses incurred by any party, including, without limitation, the Credit Parties or the Committee, in connection with the assertion, initiation or prosecution of, or joinder in, any claims, causes of action, adversary proceedings, contested matters or other litigation against the Working Capital DIP Facility Agent, any of the Working Capital DIP Lenders, any of the Interchange DIP Lenders, Prepetition Senior Agent or any of the Prepetition

-26-

Secured Parties.

| | |
|---|---|
| Interest Rate: | Either LIBOR Based Rate or Prime Based Rate plus, in each case, an applicable margin of 10%, all as further defined in the Working Capital DIP Facility Notes |
| Default Interest: | The non-default Interest Rate described above, plus 3% |
| Events of Default: | A "Termination Event" is defined as (i) a default by any Debtor under the Interim Order; (ii) default by any Debtor under the Working Capital DIP Facility Documents or the Interchange DIP Facility Documents, as amended (excluding any defaults existing as of the date of entry of this Order under the Prepetition Loan Documents of which the Working Capital DIP Agent has been notified in writing); (iii) default by any Debtor under the Forbearance Agreement; (iv) failure by Debtors to employ at any time a chief restructuring office acceptable to the Working Capital DIP Agent and Working Capital DIP Lenders; (v) appointment of a trustee, examiner with expanded powers, custodian, or receiver, (vi) conversion of any of the Cases to a case under Chapter 7 of the Bankruptcy Code, (vii) dismissal of any of the Cases, or (viii) with respect to the Interchange DIP Facility and use of Harris' Cash Collateral (a) the unfunded merchant reserve under the Prepetition Harris Documents and Interchange DIP Facility Documents exceeds $21,341,801, (b) a motion to reject the Prepetition Harris Documents is filed, or (c) Debtors accept a stalking horse bidder, qualified bidder, or winning bidder for a Sale that does not contemplate the assumption of the Prepetition Harris Documents.. |
| Remedies on Event of Default: | The Interim Order provides that, without further order of the Court, the automatic stay is vacated and modified to the extent necessary to (a) permit Harris to perform under the Prepetition Harris Documents and, upon the occurrence of a Termination Event, to exercise all rights and remedies provided for in the Prepetition Harris Documents and (b) permit the Working Capital DIP Agent, Working Capital DIP Lenders and Interchange DIP Lenders, upon the occurrence of a Termination Event, to exercise all rights and remedies provided for in the DIP Facility Documents. |

## **APPLICABLE AUTHORITY**

25.    If a debtor is unable to obtain unsecured credit allowable as an administrative expense under Bankruptcy Code section 503(b)(1), then the Court, after notice

#11252668 v11

and a hearing, may authorize the debtor to obtain credit or incur debt (a) with priority over any or all administrative expenses of the kind specified in Bankruptcy Code section 503(b) or 507(b); or (b) secured by a lien on property of the estate that is not otherwise subject to a lien; or (c) secured by a junior lien on property of the estate that is subject to a lien.  See 11 U.S.C. § 364(c).

26.     Further, if a debtor is unable to obtain credit under the provisions of Bankruptcy Code section 364(c), the debtor may obtain credit secured by a senior or equal lien on property of the estate that is already subject to a lien, commonly called a "priming lien."  11 U.S.C. § 364(d).

27.     Bankruptcy Rule 4001(c)(2) governs the procedures for obtaining authorization to obtain postpetition financing and provides, in relevant part:

> The court may commence a final hearing on a motion for authority to obtain credit no earlier than 15 days after service of the motion. If the motion so requests, the court may conduct a hearing before such 15 day period expires, but the court may authorize the obtaining of credit only to the extent necessary to avoid immediate and irreparable harm to the estate pending a final hearing.

Fed. R. Bankr. P. 4001(c)(2).

### A.     The DIP Facilities Should Be Approved

28.     Before the Petition Date, the Debtors attempted to identify potential sources of postpetition financing.  During that process, the Debtors contacted multiple parties, including the Prepetition Secured Parties.

29.     Based on discussions with these parties, including the Prepetition Secured Parties, the Debtors determined that it was not possible to obtain postpetition financing on an unsecured basis or on a junior priority basis to the Prepetition Secured Parties within the time period that the Debtors' current liquidity situation permitted.

-28-

30.     The Debtors negotiated the DIP Facility Documents with the Working Capital DIP Lenders and the Interchange DIP Lenders at arm's length and pursuant to their business judgment.  Provided that this judgment does not run afoul of the provisions of and policies underlying the Bankruptcy Code, courts grant a debtor considerable deference in acting in accordance with its business judgment.  See, e.g., Brav v. Shenandoah Fed. Sav. & Loan Ass'n (In re Snowshoe Co.), 789 F.2d 1085, 1088 (4th Cir. 1986) (approving debtor in possession financing necessary to sustain seasonal business); In re Ames Department Stores, 115 B.R. 34, 40 (S.D.N.Y. 1990) ("cases consistently reflect that the court's discretion under section 364 is to be utilized on grounds that permit reasonable business judgment to be exercised so long as the financing agreement does not contain terms that leverage the bankruptcy process and powers or its purpose is not so much to benefit the estate as it is to benefit parties in interest").

31.     The financing under the DIP Facility Documents provides significant new liquidity to the Debtors and thus will enable the Debtors, inter alia:  (a) to minimize disruption to the Debtors' businesses and on-going operations; (b) to preserve and maximize the value of the Debtors' estates for the benefit of all the Debtors' creditors; (c) to avoid immediate and irreparable harm to the Debtors, their creditors, their businesses, their employees, and their assets; and (d) to permit the Debtors to continue to pursue a financial transaction that will provide optimal value to the estates.

32.     Such financing is the sole means of preserving and enhancing the Debtors' going concern value.  Indeed, without the financing provided for in the DIP Facility Documents, the Debtors will not be able to meet their direct operating expenses, will suffer irreparable harm, and their entire reorganization effort will be jeopardized.

#11252668 v11

33.     The terms and conditions of the DIP Facility Documents are fair and reasonable and were negotiated by the parties in good faith and at arms' length.  Accordingly, the Working Capital DIP Lenders and the Interchange DIP Lenders should be accorded the benefits of Bankruptcy Code section 364(e) in respect of the DIP Facility Documents.

34.     Based upon the foregoing, the Debtors respectfully request that the Bankruptcy Court approve the DIP Facilities in accordance with the terms set forth in the Interim Order and the DIP Facility Documents.

**B.     The Court Should Authorize the Use of Cash Collateral**

35.     In addition to the need for debtor in possession financing, the Debtors' other pressing concern is the need for immediate use of the Cash Collateral pending a final hearing on this Motion.  The Debtors require the use of Cash Collateral to be able to pay operating expenses, including payroll, and to pay vendors to ensure a continued supply of goods and services essential to the Debtors' continued viability.

36.     Bankruptcy Code section 363(c)(2) provides that the Debtors may not use, sell or lease cash collateral unless "(a) each entity that has an interest in such cash collateral consents; or (b) the court, after notice and hearing, authorizes such use, sale, or lease in accordance with the provisions of this section."  11 U.S.C. § 363(c)(2).

37.     The reasons underlying the Debtors' need to use Cash Collateral during the course of these chapter 11 cases are compelling.  The Prepetition Secured Parties have prepetition liens on substantially all of the Debtors' assets.  Accordingly, the Debtors have no unencumbered cash and the use of Cash Collateral is required to fund day-to-day operating expenses, including payments to employees, and generally to sustain and operate the Debtors' businesses.  Unless the Bankruptcy Court authorizes the use of the Cash Collateral, the Debtors

will be unable to pay for services and expenses necessary to continue their business operations, pay their employees or to maintain, let alone maximize, the value of their estates. Indeed, absent sufficient funds to support the Debtors' business operations, the Debtors' ability to pursue and consummate a reorganization, including any possible sale, would be imperiled or, at the very least, the consideration the Debtors might receive could be substantially less than if at a sale contemplating anything other than a going concern. Therefore, the authority to use Cash Collateral during the interim period is in the best interests of the Debtors' estates and their creditors.

38.     The Debtors have prepared a budget, a copy of which is attached to this Motion as **Exhibit B** (the "Budget"). Pursuant to the Budget, the Debtors intend to use Cash Collateral, among other things, to: (a) continue operating their businesses while in chapter 11, including purchasing inventory, paying employees and employee related costs, rent, utilities and other overhead and all other expenses arising in the ordinary course of the Debtors' businesses; and (b) fund the professional and other fees (including fees payable to the Office of the United States Trustee) associated with administering and protecting these chapter 11 cases and pursuing the effort already underway to identify the optimum financial transaction, most likely a sale under section 363 of the Bankruptcy Code, and converting the Cases to cases under chapter 7 of the Bankruptcy Code (or otherwise winding down and closing the estates). Without the use of Cash Collateral, the Debtors will likely be forced to cease operations, lay off their employees, and liquidate their assets in a very short timeframe, which would ameliorate any possibility of maximizing the value of the Debtors' assets for the benefit of all creditors.

39.     As previously stated, section 363(c)(2) of the Bankruptcy Code provides that a debtor in possession may not use, sell or lease cash collateral unless "(a) each entity that

has an interest in such cash collateral consents; or (b) the court, after notice and a hearing, authorizes such use, sale or lease in accordance with the provisions of this section."  11 U.S.C. § 363(c)(2).  "Cash collateral" is defined as "cash, negotiable instruments, documents of title, securities, deposit accounts, or other cash equivalents whenever acquired in which the estate and an entity other than the estate have an interest …".  11 U.S.C. § 363(a).  The Debtors require the use of Cash Collateral to fund their day-to-day operations.  Absent such relief, the Debtors' business will be brought to an immediate halt, with significant and damaging consequences for the Debtors, their estates, and creditors.  The Prepetition Secured Parties will be protected by the adequate protection discussed in this Motion.  Therefore, the Bankruptcy Court should approve the Debtors' request to use Cash Collateral in the operation of their businesses and administration of these Cases.

### C.    The Bankruptcy Court should Authorize the Debtors to Provide Adequate Protection in Connection with the DIP Facilities and the Use of Cash Collateral

40.    Section 363(e) of the Bankruptcy Code provides that, "on request of an entity that has an interest in property used ... or proposed to be used ... by [a debtor in possession], the court, with or without a hearing, shall prohibit or condition such use ... as is necessary to provide adequate protection of such interest." 11 U.S.C. § 363(e).  Section 364(d) of the Bankruptcy Code requires that adequate protection be provided where the liens of secured creditors are being primed to secure the obligations under a debtor-in-possession financing facility.  Section 361 of the Bankruptcy Code delineates the forms of adequate protection, which include periodic cash payments, additional liens, replacement liens, and other forms of relief.  11 U.S.C. § 361.

41. According to the legislative history, a finding of adequate protection is "left to case-by-case interpretation and development. It is expected that the courts will apply the concept in light of facts of each case and general equitable principals." H.R. Rep. No. 595, 95th Cong., 2nd Sess. 339 (1977), reprinted in 1978 U.S.C.C.A.N. 5787, 6295. See In re O'Connor, 808 F.2d 1393, 1396-97 (10th Cir. 1987); In re Nashua Trust Co., 73 B.R. 423, 430-31 (Bankr. D. N.J. 1987). The purpose is to protect a secured creditor from diminution in the value of its interest in the particular collateral during the period of use. See In re Swedeland Dev. Group, Inc., 16 F.3d 552, 564 (3d Cir. 1994); In re Pursuit Athletic Footwear, Inc., 193 B.R. 713, 716 (Bankr. D. Del. 1996); In re Planned Sys., Inc., 78 B.R. 852, 861-62 (Bankr. S.D. Ohio 1987).

42. The proposed DIP Facility Liens, the DIP Facility Superpriority Claims, and the other protections granted pursuant to this Order and the DIP Facility Documents are sufficient to account for any diminution in the value of the Prepetition Secured Parties' interests and are fair and reasonable and thus, satisfy the standard in sections 363(c)(2)(B) and 364(d) of the Bankruptcy Code. Furthermore, the terms and conditions on which the Debtors may use Cash Collateral have been carefully designed to meet the goals of sections 361, 363 and 364 of the Bankruptcy Code and to avoid immediate and irreparable harm to the Debtors' estates during the Interim Period. Accordingly, based upon the foregoing, the Debtors respectfully request that the Bankruptcy Court authorize the Debtors to provide Adequate Protection to the Prepetition Secured Parties in accordance with the terms set forth in the Interim Order and DIP Facility Documents.

**D.      Modification of the Automatic Stay Is Appropriate**

43. Section 362 of the Bankruptcy Code provides for an automatic stay upon the filing of a bankruptcy petition. The proposed DIP Facility Documents contemplate a

modification of the automatic stay (as applicable), to the extent necessary to permit the Working Capital DIP Lenders and the Interchange DIP Lenders to perform any act authorized or permitted under or by virtue of the Interim Order or the DIP Facility Documents.

44.     Stay modification provisions of this kind are ordinary and standard features of postpetition debtor in possession financing facilities and, in the Debtors' business judgment, are reasonable under the present circumstances.  Accordingly, the Debtors respectfully request that the Bankruptcy Court authorize the modification of the automatic stay in accordance with the terms set forth in the Interim Order and DIP Facility Documents.

**E.     The Bankruptcy Court Should Grant Interim Approval of the DIP Credit Facilities**

45.     As stated above, Bankruptcy Rules 4001(b) and (c) provide that a final hearing on a motion to use cash collateral pursuant to section 363 of the Bankruptcy Code and to obtain credit under Bankruptcy Code section 364 may not be commenced earlier than 15 days after the service of the motion.  Upon request, however, the Bankruptcy Court is empowered to conduct a preliminary expedited hearing on the motion and authorize the use of cash collateral and the obtaining of credit to the extent necessary to avoid immediate and irreparable harm to the debtor's estate.

46.     The Debtors request that the Bankruptcy Court schedule and conduct a preliminary hearing on the Motion and authorize the Debtors from and after the entry of the Interim Order until the Final Hearing to obtain credit under the terms contained in the DIP Facility Documents and utilize Cash Collateral.  However, even with the ability to use Cash Collateral under the Interim Order, pending entry of the Final Order the Debtors will require approximately $9 million in available financing.  Such interim availability will avoid a disruption in the Debtors' operations pending the Final Hearing.

#11252668 v11

47. Accordingly, based upon the foregoing, the Debtors respectfully request that the Bankruptcy Court grant interim approval of the DIP Facilities in accordance with the terms set forth in the Interim Order and the DIP Facility Documents.

**F.     Establishing Notice Procedures and Scheduling Final Hearing**

48. The Debtors have provided notice of this Motion by facsimile, electronic transmission, overnight delivery, or hand delivery to: (a) the United States Trustee for the District of Delaware; (b) the Debtors' twenty-five (25) largest unsecured creditors on a consolidated basis; (c) counsel to Comerica Bank; (d) counsel to Wells Fargo Foothill LLC; (e) counsel to Dymas Funding Company LLC; (f) counsel to Ableco Finance LLC; (g) counsel to A3 Funding LP; (h) counsel to Garrison Credit Investments; (i) counsel to Harris, N.A. and (j) all other parties required to receive notice pursuant to Bankruptcy Rule 2002 (the "<u>Initial Notice Parties</u>").  The Debtors submit that, under the circumstances, no further notice of the hearing on the interim financing is necessary and request that any further noticed be dispensed with and waived.

49. The Debtors further respectfully request that the Bankruptcy Court schedule the Final Hearing and authorize them to mail copies of the signed Interim Order, which fixes the time, date and manner for the filing of objections, to the Initial Notice Parties and: (a) any party that has filed prior to such date a request for notices with the Bankruptcy Court; (b) counsel for any official committee(s) and (c) any known holders of liens.  The Debtors request that the Bankruptcy Court consider such notice of the Final Hearing, including without

limitation, notice that the Debtors will seek approval at the Final Hearing of to be sufficient notice under Bankruptcy Rule 4001 and Local Rule 2002-1.[5]

50.     No previous request for the relief sought herein has been made to the Bankruptcy Court or any other court.

## CONCLUSION

WHEREFORE the Debtors respectfully request that the Bankruptcy Court (i) enter an order substantially in the form of the proposed Interim Order attached hereto as Exhibit A; (ii) after the Final Hearing, enter the Final Order substantially in the form that shall be filed with the Bankruptcy Court; and (iii) grant such other and further relief as is just and proper.

Dated:  September 1, 2009
      Wilmington, Delaware

Respectfully submitted,

PEPPER HAMILTON LLP


/s/  Evelyn J. Meltzer
David B. Stratton (DE No. 960)
Evelyn J. Meltzer (DE No. 4581)
John H. Schanne, II (DE No. 5260)
Hercules Plaza, Suite 5100
1313 Market Street
P.O. Box 1709
Wilmington, DE 19899-1709
Telephone: (302) 777-6500
Facsimile: (302) 421-8390

-and-

---

[5]     Local Rule 2002-1(b) provides that "[i]n cases under chapter 11, all motions . . . shall be served only upon counsel for the debtor, the United States Trustee, counsel for all official committees, all parties who file a request for service of notices pursuant to Fed. R. Bankr. P. 2002(i), and on any party whose rights are affected by the motion.  If an official unsecured creditors' committee has not been appointed, service shall be made on the 25 largest unsecured creditors in the case in lieu of the committee."

#11252668 v11

NIXON PEABODY LLP
Mark N. Berman
Dennis J. Drebsky
Lee Harrington (DE No. 4046)
437 Madison Avenue
New York, New York  10022
Telephone:  (212) 940-3000
Facsimile:  (212) 940-3111

*Proposed Counsel for the Debtors
and Debtors in Possession*