# IN THE UNITED STATES BANKRUPTCY COURT
## FOR THE DISTRICT OF DELAWARE

| | |
|---|---|
| In re: | Chapter 11 |
| CYNERGY DATA, LLC, *et al.*,[1] | Case No. 09-_____ (          ) |
| Debtors. | Jointly Administered |

**DEBTORS' MOTION FOR AN ORDER PURSUANT TO SECTIONS 105, 363, 365, 503 AND 507 OF THE BANKRUPTCY CODE AND BANKRUPTCY RULES 2002, 6004, 6006, 9007 AND 9014 (I)(A) AUTHORIZING AND SCHEDULING AN AUCTION AT WHICH THE DEBTORS WILL SOLICIT HIGHER AND BETTER OFFERS IN CONNECTION WITH THE SALE OF CERTAIN ASSETS, (B) APPROVING THE BID PROCEDURES FOR SUCH ASSETS, (C) APPROVING BREAK-UP FEE AND EXPENSE REIMBURSEMENT AND (D) APPROVING THE FORM AND SCOPE OF NOTICE OF THE BID PROCEDURES AND AUCTION; (II) APPROVING THE SALE OF THE ASSETS FREE AND CLEAR OF ALL LIENS, CLAIMS, AND ENCUMBRANCES; (III) APPROVING PROCEDURES FOR ASSUMPTION AND ASSIGNMENT OF CERTAIN EXECUTORY CONTRACTS AND UNEXPIRED LEASES; AND (IV) GRANTING RELATED RELIEF AS REQUESTED HEREIN**

Cynergy Data, LLC ("Cynergy Data"), Cynergy Data Holdings, Inc. ("CDH") and

Cynergy Prosperity Plus, LLC ("Prosperity Plus" and, together with Cynergy Data and CDH, the

"Debtors"), as debtors and debtors in possession, submit this motion (the "Motion"), pursuant to

sections 105(a), 363, 365, 503 and 507 of title 11 of the United States Code (the "Bankruptcy

Code"), Rules 2002, 6004, 6006, 9007 and 9014 of the Federal Rules of Bankruptcy Procedure

(the "Bankruptcy Rules") and Rule 6004-1 of the Local Rules of Bankruptcy Practice and

Procedure of the United States Bankruptcy Court for the District of Delaware (the "Local Rules")

for entry of orders approving, among other things, Bid Procedures and the sale of substantially

all assets of the Debtors and the assumption of certain liabilities, free and clear of any and all

---

[1] The Debtors are the following entities (with the last four digits of their federal tax identification numbers in parentheses): Cynergy Data, LLC (8677); Cynergy Data Holdings, Inc. (8208); Cynergy Prosperity Plus, LLC (4265). The mailing address for the Debtors is 30-30 47th Avenue, 9th Floor, Long Island City, New York 11101.

claims, encumbrances and interests, except to the extent identified in the Purchaser's APA (as defined below). In support of this Motion, the Debtors respectfully represent as follows:

## BACKGROUND

1.      On September 1, 2009 (the "Petition Date"), each of the Debtors filed a voluntary petition for relief under chapter 11 of title 11 of the Bankruptcy Code in the United States Bankruptcy Court for the District of Delaware (the "Court"). On the Petition Date, the Debtors also jointly filed motions or application seeking certain "first day" relief, including entry of an order to have the Debtors' chapter 11 cases (the "Cases") jointly administered.

2.      The Debtors continue to operate their businesses and manage their respective properties as debtors-in-possession under Bankruptcy Code sections 1107(a) and 1108.

3.      No request has been made for the appointment of a trustee or examiner, and no official committee has yet been established in these Cases.

4.      As set fort in the declaration of Charles M. Moore filed in support of the Debtors' chapter 11 petition and various first day applications and motions (the "Moore Declaration"), which is incorporated by reference as if set forth herein in full, prior to the execution of the APA[2] (as defined below), and to maximize value to the Debtors' estates, the Debtors' management, along with Stifel, Nicolaus & Company, Incorporated ("Stifel, Nicolaus") and Peter J. Solomon Company L.P. and Peter J. Solomon Securities LLC ("PJSC") in their capacity as financial advisors to the Debtors, took a number of steps to explore a possible sale of the Debtors' assets. Specifically, the Debtors, with the advice of Stifel, Nicolaus and PJSC (i) assembled a comprehensive data room; (ii) prepared a "teaser" of the Debtors' businesses and the

---

[2]  Capitalized terms used but not defined herein shall have the meanings ascribed to such terms in the Asset Purchase Agreement dated August 26, 2009 (the "APA"), between the Debtors and Cynergy Holdings, LLC (the "Purchaser"), a copy of which is annexed hereto as Exhibit A.

parameters of a possible sale process that would be sent to all interested parties prior to execution of a confidentiality agreement; (iii) prepared a business presentation primer for delivery to parties that execute a confidentiality agreement; and (iv) utilized the extensive resources of Stifel, Nicolaus, PJSC and company management to contact a targeted group of forty-eight parties to determine potential interest in the assets and certain related liabilities. Among this identified group were thirty-three strategic parties with an existing, complementary business and the financial wherewithal to support such an acquisition and fifteen financial parties with an identified interest in the operating business of the Debtor and sufficient capital to support a transaction. In addition, the Debtors' management, Stifel, Nicolaus and PJSC identified a further universe of additional strategic and financial potential buyers in connection with the Debtors' prepetition marketing efforts. As a result of these efforts, as of the date of the Bankruptcy filing, the Debtors have circulated twenty-seven confidentiality agreements and received executed agreements from twenty-four interested parties, all of whom were invited to review the Debtors' detailed data room. From this group of interested parties, the Debtors received initial bids from eight potential acquirers. The Debtors' management, with the advice of Stifel, Nicolaus and PJSC selected three potential acquirers who performed final due diligence and with whom the Debtors negotiated over terms of a possible purchase of the subject assets. All three of these potential purchasers submitted final offers and a marked up asset purchase agreement.. All three expressed strong interest in the assets and have engaged in detailed negotiations with the Debtors, Stifel, Nicolaus and PJSC. As a result of these marketing efforts an Asset Purchase Agreement (the "APA") was finalized and signed on August 26, 2009 with the Purchaser.

      5.      Of the three, the Debtors, in consultation with Stifel Nicolaus and PJSC, believe that the Purchaser's offer to purchase the Transferred Assets and to assume the Assumed

Liabilities on the terms set forth in the APA provided the greatest value and the best offer for the Transferred Assets and Assumed Liabilities.

6.    In addition, the Purchaser agreed to move on a fast track to purchase the Transferred Assets and assume the Assumed Liabilities through a sale pursuant to section 363 of the Bankruptcy Code, which in the Debtors' management's view is the only viable long term solution to preserve the value of the Debtors' assets and their businesses.

7.    The Debtors, Stifel Nicolaus and PJSC intend to vigorously continue their marketing efforts following the entry of the Bid Procedures Order.

## JURISDICTION AND VENUE

8.    This Court has jurisdiction to consider this matter pursuant to 28 U.S.C. §§ 157 and 1334. This is a core proceeding pursuant to 28 U.S.C. § 157(b). Venue is proper before this Court pursuant to 28 U.S.C. §§ 1408 and 1409.

## RELIEF REQUESTED

9.    In an effort to maximize the Debtors' reorganization efforts, the Debtors, in their business judgment, have determined that a sale of the majority of their Assets pursuant to section 363 of the Bankruptcy Code will provide the best result to creditors. By this Motion, the Debtors seek entry of (a) an order (the "Bid Procedures Order," the form of which is annexed hereto as Exhibit B) approving: (i) the bid procedures (the "Bid Procedures," which are attached as Schedule 1 to the Bid Procedures Order); (ii) the Break-Up Fee of $1,620,000, payable to the Purchaser as set forth herein and in the APA; (iii) the Expense Reimbursement of no more than $648,000, payable to the Purchaser as set forth herein and in the APA; (iv) the notice of the Sale Hearing and the Auction (the "Sale Notice," the form of which is annexed to the Bid Procedures Order as Exhibit A), establishing the dates, times and locations of the deadline to bid on the Transferred Assets, the auction of the Purchased Assets (the "Auction") and the hearing to

-4-

approve the sale of the Transferred Assets (the "Sale Hearing") pursuant to the dates proposed in the Bid Procedures Order, subject to the Bankruptcy Court's availability; and (v) the procedures relating to the assumption and assignment of executory contracts and unexpired leases and the corresponding cure amounts required to be paid in connection with such assumption and assignment (the "Cure Procedures") and notice thereof (the "Cure Notice," the form of which is annexed to the Bid Procedures Order as Exhibit B); and (b) unless Purchaser is not the Successful Bidder, an order authorizing the sale of the Transferred Assets to the Purchaser on substantially the same terms and conditions set forth in the APA (the "Sale Order," the form of which is annexed to the Bid Procedures Order as Exhibit C), pursuant to sections 105(a), 363 and 365 of the Bankruptcy Code, Bankruptcy Rules 2002, 6004, and 6006, and Rule 6004-1 of the Local Rules.

## Bid Procedures

10.     As noted above, in order to maximize the value of the Transferred Assets, the Debtors seek to implement a competitive bidding process for the sale of the Transferred Assets pursuant to the APA subject to higher or better offers.  The Debtors believe the proposed Bid Procedures will maximize the value of the Transferred Assets for the benefit of the Debtors' estates, creditors and other interested parties.  The Bid Procedures contemplate an auction process pursuant to which the bids for the Transferred Assets will be subject to higher or otherwise better offers.  While the Bid Procedures afford the Purchaser some measure of protection for its "stalking horse" bid by virtue of the Break-Up Fee and Expense Reimbursement, the Bid Procedures primarily benefit the Debtors by ensuring, among other things: (a) procedural structure and certainty; (b) the Debtors' ability to compare the relative values of competing offers, if any; (c) the financial wherewithal of any bidder to timely consummate its purchase; and (d) meaningful bidding increments.  As described below and more

fully in the Bid Procedures, only Qualified Bidders who timely submit Qualified Bids will be eligible to participate in the Auction.  Specifically, the Bid Procedures provide, in relevant part, as follows:[3]

(a)  **Assets to Be Sold**: The Transferred Assets.

(b)  **Confidentiality Agreements**: Upon execution of a valid confidentiality agreement, in form and substance satisfactory to the Debtors, any party that wishes to conduct due diligence on the Transferred Assets may be granted access to all material information that has been or will be provided to the Purchaser and other bidders.

(c)  **Bid Deadline**: Any person or entity interested in participating in the Auction must submit a Qualified Bid (as defined below) on or before **[DATE]** at 4:00 p.m. (prevailing Eastern Time) (the "Bid Deadline") in writing, to (1) co-counsel to the Debtors, Nixon Peabody LLP, 437 Madison Avenue, New York, NY 10022, Attn: Dennis J. Drebsky, Esq.; (2) co-counsel to the Debtors, Pepper Hamilton LLP, 1313 North Market Street, Wilmington, DE 19801, Attn: David B. Stratton, Esq.; (3) counsel to any official committee of unsecured creditors appointed in these cases (the "Creditors Committee"); (4) counsel for each of (a) Comerica Bank ("Comerica"), Bodman LLP, 6th Floor at Ford Field, 1901 St. Antoine Street, Detroit, MI 48336, Attn:  Robert J. Diehl, Jr., Esq., (b) Wells Fargo Foothill LLC ("Wells"), Paul, Hastings, Janofsky & Walker LLP, 515 South Flower Street, 25th Floor, Los Angeles, CA 90071, Attn: Peter S. Burke, Esq., (c) Dymas Funding Company LLC, Ableco Finance LLC and A3 Funding LP (collectively, the "Dymas Group"), Milbank, Tweed, Hadley & McCloy LLP, 1 Chase Manhattan Plaza, New York, NY  10005, Attn:  Gregory A. Bray, Esq., and (d) Garrison Credit Investments ("Garrison"), Proskauer Rose LLP, 1585 Broadway, New York, NY 10036, Attn:  Peter J. Antoszyk, Esq. (Comerica, Wells, the Dymas Group and Garrison, together with any of their respective successors or assigns, the "Secured Lenders"); (5) counsel to Harris, N.A. and Moneris Solutions, Inc. (together, with Harris, N.A., "Harris"), Torys LLP, 237 Park Avenue, New York, NY 10017, Attn: Alison D. Bauer, Esq.; (6) counsel to the Purchaser, Akerman Senterfitt LLP, 335 Madison Ave., Suite 2600, New York, NY 10017, Attn: Susan F. Balaschak, Esq.; and (7) Office of the United States Trustee for the District of Delaware (the "U.S. Trustee"),

---

[3]  The following description of the Bid Procedures is a summary of the terms set forth in the Bid Procedures annexed to the form of Bid Procedures Order as <u>Schedule 1</u>.  Capitalized terms used in this paragraph 7 but not defined in the Motion have the meanings given to such terms in the Bid Procedures.  To the extent that this summary differs in any way from the terms set forth in the Bid Procedures, the terms of the Bid Procedures shall control.

844 King Street, Room 2313, Wilmington, DE 19801 (Attn: Thomas P. Tinker).

(d) **Qualified Bids**: In order to participate in the bidding process and be deemed a "Qualified Bidder," each potential bidder (other than the Purchaser) must submit a "Qualified Bid" by the Bid Deadline. To constitute a Qualified Bid, a bid must:

(1) be in writing;

(2) state that such bidder offers to purchase all or substantially all of the Transferred Assets, and provide for the payment and assumption of all or substantially all of the Assumed Liabilities, pursuant to an agreement that is substantially similar to the APA (or pursuant to an alternative structure that the Debtors determine, in consultation with the Secured Lenders and Harris, and in consideration of their respective views, is no less favorable to the Debtors than the terms and conditions of the APA);

(3) be a cash bid and must equal or exceed the sum of:

(A) The Purchase Price (as defined in the APA); plus,

(B) The "Minimum Initial Overbid Amount," which shall be $4,468,000. The Minimum Initial Overbid Amount represents:

(i) a break-up fee payable to the Purchaser in the amount of $1,620,000 (the "Break-Up Fee");

(ii) a reimbursement of actual, reasonable and necessary expenses of the Purchaser in the amount of $648,000 (the "Expense Reimbursement"); and

(iii) an initial overbid in the amount of $2,200,000.

provided, that a bid by any Secured Lender need not be in cash for any amount in excess of the aggregate amount outstanding under the postpetition financing facilities and the prepetition secured financing facilities if such bid otherwise complies with the bidding requirements of Section II of the Bid Procedures;

(4) include a clean and duly executed asset purchase agreement (the "Modified APA"), accompanied by a black-lined copy of the Modified APA, marked to reflect any variations from the APA;

(5) except for a bid submitted by any Secured Lender that constitutes a Qualified Credit Bid (as defined in the Bid Procedures), include a

-7-

cash deposit equal to ten (10%) percent of the amount offered to purchase the Transferred Assets (the "Good Faith Deposit").

(6)     provide that such bidder's offer is irrevocable until the closing of the purchase of the Transferred Assets if such bidder is the Successful Bidder or the Back-Up Bidder (as defined below);

(7)     state such bidder is financially capable of consummating the transactions contemplated by the Modified APA and demonstrate to the reasonable satisfaction of the Debtors, in consultation with the Creditors Committee, the Secured Lenders and Harris, and in consideration of their respective views, that such bidder has the financial ability to fund and consummate the acquisition of the Transferred Assets by the Closing;

(8)     include such financial and other information that will allow the Debtors, in consultation with the Creditors Committee, the Secured Lenders and Harris, and in consideration of their respective views, to make a reasonable determination as to the bidder's financial and other capabilities to consummate the transactions contemplated by the Modified APA;

(9)     identify with particularity each and every executory contract and unexpired lease that is to be assumed and assigned pursuant to the Modified APA including, without limitation, whether such bidder will require assumption and assignment of the Merchant Service Agreements and BIN Agreement (as defined in the Moore Declaration) and demonstrate to the reasonable satisfaction of the Debtors, in consultation with the Creditors Committee, the Secured Lenders and Harris, and in consideration of their respective views, that such bidder has the financial ability and can otherwise comply with all future obligations under all such executory contracts and unexpired leases, including requirements under the BIN Agreement if it is to be assigned;

(10)    not request or entitle the bidder to any transaction or break-up fee, expense reimbursement, or similar type of payment;

(11)    fully disclose the identity of each entity, applicable sponsor, if any and their representatives who are authorized to act on their behalf regarding the contemplated transaction and that will be bidding for the Transferred Assets or otherwise participating in connection with such bid, and the complete terms of any such participation;

(12)    not contain any due diligence, shareholder approval, or financing contingencies of any kind;

(13)     expressly provide that the Transferred Assets shall not include any (a) any rights or Claims against any current or former equity holder (other than Andres Ordonez) and any Persons in which they hold a material or controlling equity interest, including SignaPay, Ltd (b) any Claims of Seller that are not Transferred Claims, (c) any rights or Claims of Seller with respect to the residual amount of the Rolling Reserve as and when it becomes available for distribution., and (d) any rights or Claims of Seller against those Persons that are subject of Transferred Claims, to the extent arising out of either (i) counterclaims, setoffs, recoupment or other similar defensive rights (but in no event seeking affirmative recoveries), (ii) objections by such Persons to Seller's assertion of appropriate Cure Costs or (iii) or relating to the Excluded Assets as provided for in the APA at <u>Section 2.2(e)</u>; and

(14)     include evidence of authorization and approval from the bidder's board of directors (or comparable governing body) with respect to the submission, execution, delivery and closing of the Modified APA.

The Debtors, in consultation with any Creditors Committee (as defined below), the Secured Lenders and Harris, and in consideration of their respective views, shall make a determination regarding whether a bid is a Qualified Bid and shall notify bidders whether their bids have been determined to be Qualified Bids by no later than 4:00 p.m. (prevailing Eastern time) on **[DATE]**.  The Purchaser is deemed a Qualified Bidder, and the APA constitutes a Qualified Bid for all purposes.  The Debtors, in consultation with any Creditors Committee, the Secured Lenders and Harris, and in consideration of their respective views, shall make a determination regarding whether to consider any bid submitted after the Bid Deadline.

(e)     **Secured Lender Bids**:

(1)     The Secured Lenders (or any designee or assignee thereof) shall retain any right that they have, individually or together, to submit a credit bid at any time before or at the Auction in accordance with the requirements of the Bankruptcy Code (including, without limitation, Section 363(k) thereof), and any such bid will not fail to constitute a Qualified Bid solely because it contains a credit bid component so long as each of the requirements set forth in Section 7(d) above are satisfied.

(f)     **No Qualified Bids**: If no conforming Qualified Bids are received, the Debtors shall not hold an Auction and, instead, shall request at the Sale Hearing that the Court approve the APA with the Purchaser and the Purchaser shall be the Successful Bidder (as defined below, and the APA shall be the Successful Bid (as defined below), for all purposes.

(g) **Auction**: In the event that the Debtors receive one or more Qualified Bids other than the APA, the Debtors shall conduct the Auction with respect to the Transferred Assets. The Auction will be conducted on **[DATE]** at __:____ __.m. (prevailing Eastern Time) at the offices of Nixon Peabody LLP, 437 Madison Avenue, New York, NY 10022, or such other location and time as designated by the Debtors in a notice to all Qualified Bidders and the Creditors Committee. The Auction shall be governed by the following procedures:

(1) The Purchaser and the Qualified Bidders shall appear in person at the Auction, or through a duly authorized representative;

(2) The Auction shall be conducted openly and all creditors of the Debtors' estates shall be permitted to attend. Without limiting the foregoing, the Debtors, the Purchaser, Qualified Bidders, the Creditors Committee, the Secured Lenders and Harris, and each of their respective representatives, shall be entitled to be present at the Auction;

(3) Only the Purchaser and the other Qualified Bidders (or their duly authorized representatives) shall be entitled to make any subsequent bids at the Auction;

(4) The Purchaser shall receive a credit equal to the amount of the Break-Up Fee and Expense Reimbursement when bidding at the Auction;

(5) Each Qualified Bidder shall be required to confirm that it has not engaged in any collusion with respect to the bidding or the sale;

(6) Bidding shall commence at the amount of the highest or otherwise best Qualified Bid submitted by the Qualified Bidders prior to the Auction (the "Pre-Auction Successful Bid");

(7) Qualified Bidders may then submit successive bids in increments of at least the Minimum Bid Increment Amount above the previous highest bid;

(8) The Debtors shall not consider any subsequent bid in the Auction unless any bid after the Pre-Auction Successful Bid exceeds the previous highest bid, in the Debtors' view, by at least the Minimum Bid Increment Amount in value;

(9) All Qualified Bidders shall have the right to submit additional bids and make additional modifications to the APA or Modified APA, as applicable, at the Auction;

#11435231 v1

(10) The Auction may include individual negotiations with the Qualified Bidders and/or open bidding in the presence of all other Qualified Bidders;

(11) The Auction may be adjourned as the Debtors deem appropriate. Reasonable notice of such adjournment and the time and place for the resumption of the Auction shall be given to the Purchaser, all Qualified Bidders, any Creditors Committee, the Secured Lenders and Harris;

(12) The bidding at the Auction will be transcribed or videotaped; and

(13) The Auction shall continue until there is only one offer that the Debtors determine, in consultation with the Creditors Committee, the Secured Lenders and Harris and in consideration of their respective views, and subject to Court approval, is the highest or best offer from among the Qualified Bidders (including the Purchaser) submitted at the Auction (the "Successful Bid"). In making this decision, the Debtors, in consultation with the Creditors Committee, the Secured Lenders and Harris, may consider, without limitation, the amount of the purchase price, the form of consideration being offered, the likelihood of the Qualified Bidder's ability to close a transaction and the timing thereof, the number, type and nature of any changes to the APA requested by each Qualified Bidder, the net benefit to the Debtors' estates, and the views of the Creditors Committee, the Secured Lenders and Harris. The Qualified Bidder submitting such Successful Bid shall become the "Successful Bidder," and shall have such rights and responsibilities of a purchaser, as set forth in the applicable Modified APA.

Within three (3) days after adjournment of the Auction, but prior to the Sale Hearing, the Successful Bidder shall complete and execute all agreements, contracts, instruments or other documents evidencing and containing the terms and conditions upon which the Successful Bid was made and make and pay for all necessary filings with all applicable governmental or other authorities. Bids made after the close of the Auction shall not be considered by the Debtors, the Creditors Committee, the Secured Lenders or Harris.

(h) **Back-Up Bidder and Return of Good Faith Deposits**:

(1) If an Auction is conducted, the Qualified Bidder with the next highest or otherwise best Qualified Bid, as determined by the Debtors in the exercise of their business judgment in consultation with the Creditors Committee the Secured Lenders and Harris and in consideration of their respective views, at the Auction shall be required to serve as a Back-Up Bidder (the "Back-Up Bidder") and

keep such bid open and irrevocable until 24 hours after the closing of the sale transaction with the Successful Bidder. If, following entry of the Sale Order, the Successful Bidder fails to consummate an approved sale because of a breach or failure to perform on the part of such Successful Bidder, the Back-Up Bidder will be deemed to be the new Successful Bidder, and the Debtors will be authorized, but not required, to consummate the sale with the Back-Up Bidder without further order of the Court.

(2)     Except as otherwise provided herein, Good Faith Deposits shall be returned to each bidder not selected by the Debtors as the Successful Bidder or the Back-Up Bidder by no later than the fifth (5th) Business Day following the conclusion of the Auction. The Good Faith Deposit of the Back-Up Bidder shall be held by the Debtors until one (1) Business Day after the closing of the sale transaction with the Successful Bidder. The Good Faith Deposit of the Successful Bidder shall be held until the closing of the sale of the Transferred Assets and applied in accordance with the Successful Bid. If the Successful Bidder fails to consummate an approved sale because of a breach or failure to perform on the part of such Successful Bidder, the Successful Bidder's Good Faith Deposit shall be forfeited to the Debtors and the Debtors shall have the right to seek any and all other remedies and damages from the defaulting Successful Bidder.

(i)     **Sale Hearing**: The Successful Bid (or the APA, if no Qualified Bid other than that of the Purchaser is received or accepted) will be subject to approval by the Court. The Sale Hearing will take place on **[DATE]** at __:____ a.m. (prevailing Eastern Time) before the Honorable **[JUDGE]**, United States Bankruptcy Court, for the District of Delaware, 824 Market Street, 6th Floor, Courtroom #__, Wilmington, Delaware 19801. The Sale Hearing may be adjourned with the consent of the Successful Bidder from time to time without further notice to creditors or parties-in-interest other than by announcement of the adjournment in open court on the date scheduled for the Sale Hearing.

(j)     **Reservation of Rights**: The Debtors may adopt additional rules for the Auction at or prior to the Auction that, in their sole discretion, will better promote the goals of the Auction and that are not inconsistent with any of the provisions of the Bid Procedures Order or the APA. The Auction may be adjourned as the Debtors deem appropriate. Reasonable notice of such adjournment and the time and place for the resumption of the Auction shall be given to all Qualified Bidders, any Creditors Committee, the Secured Lenders and Harris.

(k)     **Expenses**: Any bidders presenting bids shall bear their own expenses in connection with the proposed sale, whether or not such sale is ultimately

approved. Notwithstanding the foregoing, the Purchaser may recover expenses in accordance with the APA.

11. The Debtors believe that the Bid Procedures are fair and reasonable and are not likely to dissuade any serious potential alternative purchaser from bidding on the Transferred Assets and assuming the Assumed Liabilities. As such, the Debtors respectfully request that the Bid Procedures attaches as <u>Schedule 1</u> to the proposed Bid Procedures Order be approved.

12. In accordance with Local Rule 6004-1, the Debtors respectfully represent the following with respect to the APA:

(a) **<u>Sale to an Insider</u>**: The Purchaser is an entity whose membership is unrelated to that of Debtors.

(b) **<u>Agreements with Management</u>**: No agreements with management have been entered into in connection with the sale of the Transferred Assets.

(c) **<u>Releases</u>**: No releases have been entered into in connection with the sale of the Transferred Assets.

(d) **<u>Private Sale/No Competitive Bidding</u>**: There is no provision preventing the Debtors from soliciting competing offers.

(e) **<u>Closing and Other Deadlines</u>**: As set forth in Section 10.1 of the APA, the closing is scheduled to occur on the third business day following the satisfaction of the conditions enumerated in Articles VIII and IX of the APA, which include, among other things, entry of the Bid Procedures Order and the Sale Order.

(f) **<u>Good Faith Deposit</u>**: Pursuant to Section 3.1(a) of the APA, the Purchaser has submitted a good faith deposit in the amount of $8,000,000.

(g) **<u>Interim Arrangements with Proposed Buyer</u>**: None.

(h) **<u>Tax Exemption</u>**: No tax exemptions under section 1146(a) of the Bankruptcy Code are contemplated in connection with the Asset Purchase Agreement.

(i) **<u>Record Retention</u>**: As set forth more fully in Section 7.8(b) of the APA, for a period of six years after the Closing Date (or such longer period as may be required by any Governmental Body or ongoing Claim), the Purchaser shall not dispose of or destroy any of the Books and Records.

-13-

(j) **Sale of Avoidance Actions**: Pursuant to Section 2.1(j) of the APA, the Purchaser is purchasing certain rights and Claims, including without limitation, claims under chapter 5 of the Bankruptcy Code that the Debtors have relating to the Assumed Contracts and against any counterparty to any Assumed Contracts if such counterparty is a merchant, independent sales organization or Harris Bank, N.A.

(k) **Requested Findings as to Successor Liability**: Pursuant to Section 2.3 of the APA, Purchaser shall, effective as of the closing date, in consideration for the sale, assignment, conveyance, transfer and delivery of the Transferred Assets to Purchaser, assume and pay, discharge, perform and otherwise satisfy when due, in accordance with their respective terms, all of the Assumed Liabilities related to its ownership of the Transferred Assets and its employment of the Transferred Employees relating to periods from and after the Closing Date, including all Liabilities arising from and after the Closing Date for future performance under each of the Assumed Contracts to the extent that each such Assumed Contract has been assigned to Purchaser pursuant to Section 365 of the Bankruptcy Code and the APA.

(l) **Sale Free and Clear of Liens**: Pursuant to Section 4.9 of the APA, the Purchaser shall acquire the Transferred Assets free and clear of all claims, liens, encumbrances and interests other than certain Permitted Encumbrances (as defined in the APA).

(m) **Relief from Bankruptcy Rule 6004(h)**: The Debtors are requesting relief from the ten-day stay imposed by Rule 6004(h).

13. Also, in accordance with Local Rule 6004-1, the Debtors respectfully represent the following with respect to the Auction:

(a) **Provisions Governing Qualifications of Bidders**: <u>See</u> Article II of the Bid Procedures.

(b) **Provisions Governing Qualified Bids**: <u>See</u> Article II of the Bid Procedures.

(c) **Provisions Providing Bid Protections to "Stalking Horse" or Initial Bidder**:

(1) **No-Shop or No-Solicitation Provisions**: Not applicable.

(2) **Break-Up/Topping Fees and Expense Reimbursement**: <u>See</u> Section 11.2 of the APA providing for a Break-Up Fee of $1,620,000 and Expense Reimbursement of $648,000.

(3) **Bidding Increments**: <u>See</u> Article III of the Bid Procedures.

-14-

(4)    **Treatment of Break-Up or Topping Fees and Expense Reimbursement at Auction**: <u>See</u> Articles II and III of the Bid Procedures.

(d)    **Modification of Bidding and Auction Procedures**: <u>See</u> Article III of the Bid Procedures.

(e)    **Closing with Alternative Backup Bidder**: <u>See</u> Article V of the Bid Procedures.

## The Sale Process

### A.    The Bid Procedures and the Auction

14.    Pursuant to Bankruptcy Rule 6004(f)(1), sales of property outside the ordinary course of business may be by private sale or by public auction. The Debtors believe a sale of the Transferred Assets pursuant to a public auction governed by the proposed Bid Procedures will maximize the sale proceeds received by the estates, which is the paramount goal in any proposed sale of property of the estate. <u>In re Dura Automotive Sys., Inc.</u>, Case No. 06- 11202 (KJC), 2007 Banker. LEXIS 2764, *253 (Bankr. D. Del. Aug. 15, 2007) ("The paramount goal in any proposed sale of property of the estate is to maximize the proceeds received by the estate.") (internal citations omitted).

15.    The Bid Procedures allow the Debtors to conduct the Auction in a controlled, fair, and open fashion that will encourage participation by financially capable bidders, thereby increasing the likelihood that the Debtors will receive the best possible consideration for the Transferred Assets. Bid Procedures should be approved when they provide a benefit to the estate by maximizing the value of the assets and enhance competitive bidding. <u>Id.</u> (citing <u>Calpine Corp. v. O'Brien Envl'l Energy, Inc.</u>, 181 F.3d 527, 535-537 (3d Cir. 1999)) (detailing situations where bidding incentives are appropriate in bankruptcy because they provide a benefit to the estate). The Debtors believe that the Bid Procedures are consistent with other procedures previously approved in this district and other bankruptcy courts.

#11435231 v1

16.     Although the Debtors believe that the value to be provided pursuant to the terms set forth in the APA is fair and reasonable, the Debtors submit that the Bid Procedures and the Auction will ensure that the Debtors' estates receive the highest or best value available by allowing the market to test the Purchase Price of the Transferred Assets.  The Debtors hereby request this Court's approval of the process and procedures set forth in the Bid Procedures for the submission and consideration of competing bids from other interested parties for the Transferred Assets.

**B.      Break-Up Fee And Expense Reimbursement Are Necessary To Preserve The Value Of The Debtors' Estates For The Benefit Of All Creditors.**

17.     The Purchaser has expended significant amount of time, effort and resources in pursuit of the purchase of the Transferred Assets under the APA, and will continue to expend a significant amount of time, money and energy throughout the remainder of the sale process. The Debtors believe the Break-up Fee and Expense Reimbursement are reasonable in light of the intense analysis, due diligence investigation and the lengthy, complex, good-faith negotiations with the Debtors and other interested parties in relation to the proposed asset sale and the APA.

18.     The Break-Up Fee and Expense Reimbursement are a material inducement for, and condition of the Purchaser's entry into the transaction.. If triggered, the Purchaser would have generated the opportunity for the Debtors to receive a higher and better offer all to the benefit of the Debtors' creditors.

19.     In recognition of the benefit to the estates of having the Purchaser enter into the APA and serve as a floor against which other interested parties may submit higher and better bids , the Debtors have agreed to pay, the Break-Up Fee and Expense Reimbursement to the Purchaser as described below and as governed by the APA.  The Debtors believe it is appropriate and reasonable to compensate the Purchaser for undertaking the efforts and expenditures to

negotiate the APA, establish a "floor" bid for the Transferred Assets, and establish the terms for the sale and assignment of the Debtors' assets in the event a sale is made to another purchaser, and believe that extending the bid protections the Purchaser as set for the in the APA is an exercise of sound business judgment and provide a substantial benefit to the estates and creditors.

**C.     The Sale Hearing**

20.     The Debtors request that the Court schedule a hearing on **[DATE]** at __:____ a.m. (prevailing Eastern Time), or as soon thereafter as counsel may be heard, to consider entry of the Sale Order authorizing the sale or sales of the Transferred Assets and approving the APA, or the Modified APA(s), as the case may be, with the Successful Bidder in accordance with the Bid Procedures.

21.     The Debtors further request that any responses or objections to the relief to be considered at the Sale Hearing, including, but not limited to, the Debtors' request to approve the sale of the Transferred Assets, (a) be in writing; (b) comply with the Bankruptcy Rules and the Local Rules; (c) be filed with the clerk of the Bankruptcy Court for the District of Delaware, Third Floor, 824 North Market Street, Wilmington Delaware 19801 by 4:00 p.m. (prevailing Eastern Time) on **[DATE]** (the "Objection Deadline"); and (d) be served upon (i) co-counsel to the Debtors, Nixon Peabody LLP, 437 Madison Avenue, New York, NY 10022, Attn: Dennis J. Drebsky, Esq.; (ii) co-counsel to the Debtors, Pepper Hamilton LLP, 1313 North Market Street, Wilmington, DE 19801, Attn: David B. Stratton, Esq.; (iii) counsel to any Creditors Committee; (iv) counsel for each of (A) Comerica, Bodman LLP, 6th Floor at Ford Field, 1901 St. Antoine Street, Detroit, MI 48336, Attn:  Robert J. Diehl, Jr., Esq., (B) Wells, Paul, Hastings, Janofsky & Walker LLP, 515 South Flower Street, 25th Floor, Los Angeles, CA 90071, Attn: Peter S. Burke, Esq., (C) the Dymas Group), Milbank, Tweed, Hadley & McCloy LLP, 1 Chase Manhattan Plaza,

New York, NY 10005, Attn: Gregory A. Bray, Esq., and (D) Garrison, Proskauer Rose LLP, 1585 Broadway, New York, NY 10036, Attn: Peter J. Antoszyk, Esq.; (v) counsel to Harris, Torys LLP, 237 Park Avenue, New York, NY 10017, Attn: Alison D. Bauer, Esq.; (vi) counsel to the Purchaser, Akerman Senterfitt LLP, 335 Madison Ave., Suite 2600, New York, NY 10017, Attn: Susan F. Balaschak, Esq.; and (vii) Office of the United States Trustee for the District of Delaware (the "U.S. Trustee"), 844 King Street, Room 2313, Wilmington, DE 19801 (Attn: Thomas P. Tinker), so as to be received no later than the Objection Deadline.

**D.    The Sale Notice.**

22.    Bankruptcy Rule 6004 provides that notice of a proposed sale of property outside the ordinary course pursuant to section 363(b) of the Bankruptcy Code must satisfy the requirements of Bankruptcy Rule 2002. Pursuant to Bankruptcy Rule 2002, the Debtors are required to notify their creditors of the sale of the Transferred Assets, including a disclosure of the time and place of an auction, the terms and conditions of a sale, and the deadline for filing any objections. In accordance with such rules, the Debtors propose to serve copies of the Bid Procedures Order and the Sale Notice no later than one (1) day after entry of the Bid Procedures Order, by first class mail, postage prepaid, or other method reasonably calculated to provide notice of the Sale and the Auction, upon: (a) the U.S. Trustee, (b) counsel to any Creditors Committee; (c) counsel to the Secured Lenders; (d) counsel to the postpetition lenders; (e) counsel to Harris; (f) parties entitled to receive notice in these Cases pursuant to Bankruptcy Rule 2002; (g) all entities known by the Debtors to have asserted any lien, claim, interest, or encumbrance in or on the Transferred Assets, (h) all counterparties to the Assumed Contracts, (i) the Internal Revenue Service and all state/local taxing authorities in jurisdictions where the Seller has or may have any tax liability; and (j) all persons who have expressed an interest in

acquiring one or more of the Transferred Assets within the last six months. All parties identified by the Debtors as potential bidders will be contacted directly by the Debtors via telephone, facsimile, or courier.

23. The Sale Notice will include (a) the date, time, and location of the Auction, (b) the Bid Deadline, (c) the date, time, and location of the Sale Hearing, and (d) the Objection Deadline.

24. The Debtors submit that such notice shall constitute good and sufficient notice of the Auction and the Sale of the Transferred Assets, and that no other or further notice need be given. Accordingly, the Debtors request that the Court approve the form and manner of the Sale Notice.

**E.     The Notice of Assumption and Assignment.**

25. To facilitate the sale of the Transferred Assets and the assumption and assignment any executory contracts and unexpired leases of the Debtors, the Debtors propose to serve a Cure Notice on the non-debtor counterparties (each, a "Counter-Party") to each Assumed Contract no later than twenty (20) days prior to the Sale Hearing by first class mail or hand delivery.

26. In each Cure Notice, the Debtors propose to set forth the following information: (a) the name and last known address of the Counter-Party, (b) notice of the proposed effective date of the assignment, (c) identification of the applicable Assumed Contract, (d) the amount, if any, determined by the Debtors to be necessary to be paid to cure any existing default pursuant to Bankruptcy Code section 365 (the "Cure Amount"), and (e) a description of the Purchaser and a statement as to the Purchaser's ability to perform the Debtors' obligations under the Assumed Contract. All Cure Notices will be accompanied by a copy of the Bid Procedures Order.

#11435231 v1

27.     The Debtors request that each Counter-Party be required to file an objection (the "Cure Objection") to its scheduled Cure Amount and/or to the proposed assumption and assignment of the applicable Assumed Contract by 4:00 p.m. (prevailing Eastern Time) on **[DATE]** (the "Cure Objection Deadline").  Any such Cure Objection must:

(a)     be in writing;

(b)     comply with the Bankruptcy Rules and the Local Rules;

(c)     to the extent it challenges a scheduled Cure Amount, set forth the cure amount being claimed by the objecting party (the "Claimed Cure Amount") with appropriate documentation in support thereof;

(d)     be filed with the clerk of the Bankruptcy Court for the District of Delaware, Third Floor, 824 North Market Street, Wilmington Delaware 19801 by the Cure Objection Deadline; and

(e)     be served upon (i) co-counsel to the Debtors, Nixon Peabody LLP, 437 Madison Avenue, New York, NY 10022, Attn: Dennis J. Drebsky, Esq.; (ii) co-counsel to the Debtors, Pepper Hamilton LLP, 1313 North Market Street, Wilmington, DE 19801, Attn: David B. Stratton, Esq.; (iii) counsel to any Creditors Committee; (iv) counsel for each of (A) Comerica, Bodman LLP, 6th Floor at Ford Field, 1901 St. Antoine Street, Detroit, MI 48336, Attn:  Robert J. Diehl, Jr., Esq., (B) Wells, Paul, Hastings, Janofsky & Walker LLP, 515 South Flower Street, 25th Floor, Los Angeles, CA 90071, Attn: Peter S. Burke, Esq., (C) the Dymas Group), Milbank, Tweed, Hadley & McCloy LLP, 1 Chase Manhattan Plaza, New York, NY  10005, Attn:  Gregory A. Bray, Esq., and (D) Garrison, Proskauer Rose LLP, 1585 Broadway, New York, NY  10036, Attn:  Peter J. Antoszyk, Esq.; (v) counsel to Harris, Torys LLP, 237 Park Avenue, New York, NY 10017, Attn: Alison D. Bauer, Esq.; (vi) counsel to the Purchaser, Akerman Senterfitt LLP, 335 Madison Ave., Suite 2600, New York, NY 10017, Attn: Susan F. Balaschak, Esq.; and (vii) Office of the United States Trustee for the District of Delaware (the "U.S. Trustee"), 844 King Street, Room 2313, Wilmington, DE  19801 (Attn: Thomas P. Tinker), so as to be received no later than the Cure Objection Deadline.

28.     The Debtors request that to the extent any Counter-Party does not timely file a Cure Objection, such Counter-Party should (a) be forever barred from objecting to the Cure Amount and from asserting any additional cure or other amounts with respect to such Assumed Contract and the Debtors shall be entitled to rely solely upon the Cure Amount, and (b) if the

-20-

Purchaser is the Successful Bidder, be deemed to have consented to the assumption and assignment of such Assumed Contract and shall be forever barred and estopped from asserting or claiming against the Debtors, the Purchaser or such other Successful Bidder or any other assignee of the relevant Assumed Contract that any additional amounts are due or defaults exist, or conditions to assumption and assignment must be satisfied, under such Assumed Contract.

29.     Except as may otherwise be agreed to by the parties to an Assumed Contract (with the consent of the Successful Bidder), on the Closing Date, the Successful Bidder shall cure those defaults under the Assumed Contracts that are required to be cured in accordance with Bankruptcy Code section 365(b) by (a) payment of any undisputed Cure Amounts and (b) reserving amounts with respect to any disputed Cure Amounts.  In the event of a dispute regarding any Cure Amount, any payments required, following entry of any order resolving such dispute, shall be made as soon as practicable thereafter.

30.     Notwithstanding anything to the contrary herein, through the date of Closing, the Debtors or the Successful Bidder, as the case may be, reserves the right to exclude from the Transferred Assets any one or more Permits or Contracts, in such case any such excluded Contract or Permit shall constitute an Excluded Asset and shall not constitute, for any purpose whatsoever, a Transferred Asset.  Neither the Debtors nor the Successful Bidder shall incur any liability, obligation, or debt in connection with or related to such Excluded Assets.  In the event the Debtors or the Successful Bidder exercises its right to excluded from the Transferred Assets one or more Permits or Contracts that had been designated as an Assumed Contract (the "Additional Excluded Contracts"), on or before the Closing, the Debtors will serve a notice on the non-debtor counterparties to such Additional Excluded Contracts.

31.     In the event that the Purchaser is not the Successful Bidder for the Transferred

Assets, within two (2) business days after the conclusion of the Auction, the Debtors propose to

serve a notice identifying the Successful Bidder upon each Counter-Party to an executory

contract or unexpired lease to be assumed and assigned to the Successful Bidder.  The Debtors

propose that, in that event, each Counter-Party have until __:____ _.m. on the date this is

two (2) business days prior to the Sale Hearing (the "Adequate Assurance Objection Deadline")

to object to the assumption and assignment of such executory contract or unexpired lease solely

on the issue of whether the Successful Bidder can provide adequate assurance of future

performance as required by section 365 of the Bankruptcy Code.

## AUTHORITY FOR RELIEF REQUESTED

**A.      The Sale of the Transferred Assets is Within the Sound
         Business Judgment of the Debtors and Should Be Approved**

32.     Section 363(b)(1) of the Bankruptcy Code provides, in relevant part, that a debtor

in possession "after notice and a hearing, may use, sell, or lease, other than in the ordinary course

of business, property of the estate." 11 U.S.C. § 363(b)(1).  Although section 363 of the

Bankruptcy Code does not specify a standard for determining when it is appropriate for a court to

authorize the use, sale or lease of property of the estate, bankruptcy courts routinely authorize

sales of a debtor's assets if such sale is based upon the sound business judgment of the debtor.  In

re Dura Automotive, 2007 Bankr. LEXIS 2764 at * 258, (citing Myers v. Martin (In re Martin),

91 F.3d 389, 395 (3d Cir. 1996)); Comm. of Equity Sec. Holders v. Lionel Corp. (In re Lionel

Corp.), 722 F.2d 1063, 1070 (2d Cir. 1983); In re Abbotts Dairies of Penn., Inc., 788 F.2d 143

(3d Cir. 1986) (implicitly adopting the "sound business judgment" test of Lionel Corp, and

requiring good faith); In re Delaware and Hudson Ry. Co., 124 B.R. 169 (D. Del. 1991)

(concluding that the Third Circuit adopted the "sound business judgment" test in the Abbotts

Dairies decision); In re Montgomery Ward Holding Corp., 242 B.R. 147, 153 (D. Del. 1999) (same).

33.     In the circumstances of valid business justifications, applicable principles of law attach to a debtor's decision a strong presumption "that in making a business decision[,] the directors of a corporation acted on an informed basis, in good faith and in the honest belief that the action taken was in the best interests of the company." Official Comm. of Sub, Bondholders v. Integrated Res., Inc. (In re Integrated Res., Inc.), 147 B.R. 650, 656 (S.D.N.Y. 1990) (holding that the Delaware business judgment rule has "vitality by analogy" in chapter 11, especially where the debtor is a Delaware corporation) (quotations omitted).  In this District, once a court is satisfied that there is a sound business justification for the proposed sale, the court must then determine whether (i) the debtor in possession has provided the interested parties with adequate and reasonable notice, (ii) the sale price is fair and reasonable, and (iii) the purchaser is proceeding in good faith.  In re Delaware and Hudson Ry. Co., 124 B.R. at 166; accord.  In re Decora Indus., Inc., Case No. 00-4459, 2002 WL 32332749, at *3 (Bankr. D. Del. May 20, 2002).

34.     The Debtors submit that the decision to sell the Transferred Assets is based upon their sound business judgment and should be approved.  The Debtors have worked diligently with their advisors to explore alternatives to a sale of some or all of their assets.  However, the current economic climate resulted in the Debtors' determination that the sale of the Transferred Assets is a crucial step towards a successful restructuring.  The Debtors believe that the sale of the Transferred Assets will provide them with the ability to successfully reorganize.

35.     In addition, the Debtors believe their prepetition marketing efforts, arms'-length negotiations with the Purchaser, and the proposed Bid Procedures will achieve the best results

for their estates and maximize value for all constituents.  Furthermore, the Bid Procedures contemplate an open auction process and are designed to ensure that the ultimate purchase price of the Transferred Assets is fair and reasonable.  Thus, the Debtors submit that the sale of the Transferred Assets is within their business judgment.

**B.      The Proposed Sale Satisfies the Requirements
of Section 363(f) of the Bankruptcy Code**

36.      In the interest of attracting the best offers, the Sale of the Transferred Assets should be free and clear of any and all liens, claims, and encumbrances in accordance with section 363(f) of the Bankruptcy Code (except for the Permitted Encumbrances and Assumed Liabilities), with holders of any such liens, claims, and encumbrances being paid from the proceeds of the Sale of the Transferred Assets and/or being given replacement liens, claims, and encumbrances attaching to the proceeds of the Sale of the Transferred Assets.  Pursuant to section 363(f) of the Bankruptcy Code, a debtor in possession may sell property of the estate "free and clear of any interest in such property of an entity other than the estate" if any one of the following conditions is satisfied:

(a)      applicable nonbankruptcy law permits sale of such property free and clear of such interest;

(b)      such entity consents;

(c)      such interest is a lien and the price at which such property is to be sold is greater than the aggregate value of all liens on such property;

(d)      such interest is in bona fide dispute; or

(e)      such entity could be compelled, in a legal or equitable proceeding, to accept a money satisfaction of such interest.

37.      The Debtors request that the Court authorize the Sale of the Transferred Assets free and clear of all liens, claims, encumbrances, and other interests (collectively, the "Liens"), other than any liabilities expressly assumed by the Successful Bidder.  The Sale of the

Transferred Assets pursuant to the Bid Procedures will satisfy section 363(f) of the Bankruptcy Code because any entities holding Liens on the Transferred Assets will have received notice of this Motion and the Sale Notice. All parties in interest will be given sufficient opportunity to object to the relief requested herein and any such entity that does not object to the Sale of the Transferred Assets should be deemed to have consented. See Futuresource LLC v. Reuters Ltd., 312 F.3d 281, 285-86 (7th Cir. 2002) ("It is true that the Bankruptcy Code limits the conditions under which an interest can be extinguished by a bankruptcy sale, but one of those conditions is the consent of the interest holder, and lack of objection (provided of course there is notice) counts as consent. It could not be otherwise; transaction costs would be prohibitive if everyone who might have an interest in the bankrupt's assets had to execute a formal consent before they could be sold.") (internal citations omitted); Hargrave v. Township of Pemberton (In re Tabone, Inc.), 175 B.R. 855, 858 (Bankr. D.N.J. 1994) (failure to object to sale free and clear of liens, claims and encumbrances satisfies section 363(f)(2)); Citicorp Homeowners Serv., Inc. v. Elliot (In re Elliot), 94 B.R. 343, 345 (ED. Pa. 1988) (same); see also In re Enron Corp., 2003 WL 21755006, at *2 (Bankr. S.D.N.Y. 2003) (order deeming all parties who did not object to proposed sale to have consented under section 363(f)(2)). As such, to the extent that no party holding a Lien objects to the relief requested in the Sale Order, the Sale of the Transferred Assets free and clear of all Liens except any liabilities expressly assumed by the Successful Bidder satisfies section 363(f)(2) of the Bankruptcy Code.

38.     Accordingly, the Debtors request that the Transferred Assets be transferred to the Successful Bidder free and clear of all liens, claims, encumbrances, and interests except for any liabilities expressly assumed by the Successful Bidder, with such liens, claims, encumbrances, and interests to attach to the net sale proceeds of the Transferred Assets and/or paid to the

secured creditors, and that all cash sale proceeds received by the Debtors in connection therewith be paid to Harris and Comerica (in its capacity as Working Capital DIP Agent (as defined in the DIP Motion[4]) and in its capacity as Prepetition Senior Agent (as defined in the DIP Motion)) in accordance with their respective lien priorities.

**C.     The Successful Bidder Should Be Afforded All
        Protections Under Section 363(m) as a Good Faith Purchaser**

39.     The Debtors request that the Court find that the Purchaser (or other Successful Bidder) is entitled to the benefits and protections provided by section 363(m) of the Bankruptcy Code in connection with the sale of the Transferred Assets.

40.     Section 363(m) of the Bankruptcy Code protects the sale of a debtor's property to a good faith purchaser.  Section 363(m) provides,

> The reversal or modification on appeal of an authorization under subsection (b) or (c) of this section of a sale or lease of property does not affect the validity of a sale or lease under such authorization to an entity that purchased or leased such property in good faith, whether or not such entity knew of the pendency of the appeal, unless such authorization and such sale or lease were stayed pending appeal.

11 U.S.C. § 363(m).

41.     Section 363(m) of the Bankruptcy Code thus protects the good faith purchaser of assets sold pursuant to section 363 of the Bankruptcy Code from the risk that it will lose its interest in the purchased assets if the order allowing the sale is reversed on appeal.  By its terms, section 363(m) of the Bankruptcy Code applies to sales of interests in tangible assets. Additionally, the United States Court of Appeals for the Third Circuit (the "<u>Third Circuit</u>") has

---

[4]     "DIP Motion" means that certain Motion For Interim Order (I) Authorizing Use of Cash Collateral, (II) Authorizing Postpetition Financing, (III) Granting Senior Priming Liens and Superpriority Claims, (IV) Granting Adequate Protection to the Prepetition Secured Parties and (V) Scheduling a Final Hearing to Incur Such Financing On A Permanent Basis filed on September 1, 2009, by the Debtors.

#11435231 v1

indicated that section 363(m) of the Bankruptcy Code also protects the assignee of a debtor's interest in executory contracts under Bankruptcy Code section 365. See Krebs Chrysler-Plymouth, Inc. v. Valley Motors, Inc., 141 F.3d 490, 497-98 (3d Cir. 1998). In Krebs, the court considered "whether assignments of [certain automobile dealership] franchises under section 365 are also sales of estate property subject to section 363(m)." Id. at 497. Despite the absence of an explicit reference to assignments of executory contracts under section 365 of the Bankruptcy Code, the Court in Krebs concluded that section 363(m) of the Bankruptcy Code protected an assignment of a debtor's interest in certain automobile franchise agreements pursuant to an auction sale. Like the franchise agreements protected in Krebs, the Executory Contracts are contracts that may be assumed and assigned pursuant to section 365 of the Bankruptcy Code. In light of Krebs, the Debtors respectfully submit that section 363(m) applies to protect the Purchaser (or other Successful Bidder) with respect to both the Executory Contracts and the Transferred Assets.

42. Although the Bankruptcy Code does not define "good faith," the Third Circuit has noted that the phrase "encompasses one who purchases in 'good faith' and 'for value.'" In re Abbotts Dairies of Pa., Inc., 788 F.2d 143, 147 (3d Cir. 1986). Further, the Third Circuit has recognized that the type of misconduct that would destroy a purchaser's good faith status involves 'fraud, collusion between the purchaser and other bidders or the trustee, or an attempt to take grossly unfair advantage of other bidders.' Id. (remanding case involving insider transaction back to the bankruptcy court for further consideration of good faith where there was evidence that the sale had been orchestrated between insiders and some of the sale conditions were not disclosed to the debtor's creditors) (quoting In re Rock Indus. Mach. Corp., 572 F.2d 1195, 1198 (7th Cir. 1978)). Due to the absence of a bright-line test for good faith, the

determination is based on the facts of each case, concentrating on the "integrity of [an actor's] conduct during the sale proceedings." In re Pisces Leasing Corp., 66 B.R. 671, 673 (E.D.N.Y. 1986) (quoting In re Rock Indus. Mach. Corp., 572 F.2d at 1198).

43. As will be further demonstrated at the Sale Hearing, the sale of the Transferred Assets and the assignment of the Executory Contracts to the Purchaser was proposed in good faith as a result of arms'-length negotiations between the Debtors and Purchaser. In addition, the sale of the Transferred Assets to the Purchaser is subject to higher or better offers pursuant to the Bid Procedures, which are designed not only to solicit potential competing bidders, but to ensure that no party is able to exert undue influence over the process. Under such circumstances, the Debtors submit that the Purchaser (or other Successful Bidder, if not the Purchaser) should be afforded the protections that section 363(m) of the Bankruptcy Code provides to a good faith purchaser.

**D.     The Break-Up Fee and Expense Reimbursement
         Are Reasonable and Appropriate**

44. Bidding incentives, such as the Break-Up Fee and Expense Reimbursement, encourage a potential purchaser to invest the requisite time, money, and effort to negotiate with a debtor and perform the necessary due diligence attendant to the acquisition of a debtor's assets, despite the inherent risks and uncertainties of the chapter 11 process. "Agreements to provide breakup fees or reimbursement of fees and expenses are meant to compensate the potential acquirer who serves as a catalyst or 'stalking horse' which attracts more favorable offers." In re S.N.A. Nut Co., 186 B.R. 98, 101 (Bankr. N.D. Ill. 1995); see also In re 995 Fifth Ave. Assoc. L.P., 96 B.R. 24, 28 (Bankr. S.D.N.Y. 1992) (bidding incentives may "be legitimately necessary to convince a white knight to enter the bidding by providing some form of compensation for the risks it is undertaking") (citation omitted).

45.     A proposed bidding incentive to be paid to a "stalking horse", such as the Break-Up Fee or Expense Reimbursement, should be approved when it is in the best interests of the estate.  S.N.A. Nut Co., 186 B.R. at 104; see also In re America West Airlines, Inc., 166 B.R. 908 (Bankr. D. Ariz. 1994); In re Hupp Indus., Inc., 140 B.R. 191 (Bankr. N.D. Ohio 1992). Typically, this requires that the bidding incentive provide some benefit to the debtor's estate. Calpine Corp. v. O'Brien Envtl. Energy, Inc. (In re O'Brien Envtl. Energy, Inc.), 181 F.3d 527, 533 (3d Cir. 1999) (holding even though bidding incentives are measured against a business judgment standard in non-bankruptcy transactions the administrative expense provisions of Bankruptcy Code section 503(b) govern in the bankruptcy context) (hereinafter, "O'Brien").

46.     The Third Circuit Court of Appeals in O'Brien has identified at least two instances in which bidding incentives may benefit the estate. First, a break-up fee or expense reimbursement may be necessary to preserve the value of the estate if assurance of the fee "promote[s] more competitive bidding, such as by inducing a bid that otherwise would not have been made and without which bidding would have been limited." Id.  Second, if the availability of break-up fees and expense reimbursement were to induce a bidder to research the value of the debtor and convert that value to a dollar figure on which other bidders can rely, the bidder may have provided a benefit to the estate by increasing the likelihood that the price at which the debtor is sold will reflect its true worth. Id.

47.     In O'Brien, the Third Circuit reviewed the nine factors set forth by the lower court as relevant in deciding whether to award a break-up fee. Such factors are as follows:

    (a)     the presence of self-dealing or manipulation in negotiating the break-up fee;

    (b)     whether the fee harms, rather than encourages, bidding;

    (c)     the reasonableness of the break-up fee relative to the purchase price;

(d) whether the unsuccessful bidder placed the estate property in a "sales configuration mode" to attract other bidders to the auction;

(e) the ability of the request for a break-up fee to attract or retain a potentially successful bid, establish a bid standard or minimum for other bidders, or attract additional bidders;

(f) the correlation of the fee to a maximization of value of the debtor's estate;

(g) the support of the principal secured creditors and creditors

(h) committees of the break-up fee;

(i) the benefits of the safeguards to the debtor's estate; and

(j) the substantial adverse impact of the break-up fee on

(k) unsecured creditors, where such creditors are in opposition to the break-up fee.

O'Brien, 181 F.3d at 536.

48.     The Break-Up Fee and Expense Reimbursement allow the Debtors to set a floor for the Transferred Assets and, thus, insist that competing bids be materially higher or otherwise better than the APA, a clear benefit to the Debtors' estates. Moreover, the Debtors do not believe the Purchaser would agree to act as a stalking horse bidder without the Break-Up Fee and Expense Reimbursement. Without the benefit of the Purchaser, the bids received at Auction for the Transferred Assets could be substantially lower than that offered by the Potential Purchaser.

49.     Further, in the present case, for example, potential purchasers of the Transferred Assets will be provided with the APA reflecting the terms already negotiated by the Purchaser, will have the opportunity to propose changes to the APA, and thereafter will have the opportunity to outbid the Purchaser for the Transferred Assets.  In this way, the potential purchasers will have the benefit of the negotiations and due diligence already undertaken by the Purchaser and will thus be more likely to bring their own competing bid and increase competition, and potentially, value to the estates, at the Auction..

#11435231 v1

50. In the present case, for example, potential purchasers of the Transferred Assets will be provided with the APA reflecting the terms already negotiated by the Purchaser, will have the opportunity to propose changes to the APA, and thereafter will have the opportunity to outbid the Purchaser for the Transferred Assets. In this way, the potential purchasers will have the benefit of the negotiations and due diligence already undertaken by the Purchaser and will thus be more likely to bring their own competing bid and increase competition, and potentially, value to the estate, at the Auction. Further, it is appropriate and reasonable to compensate the Purchaser for undertaking the efforts and expenditures to establish a "floor" bid for the Transferred Assets, as well as establishing the terms for the sale and assignment of such assets in the event a sale is made to another purchaser. For these reasons, extending the bid protections to the Purchaser as proposed in the APA is an exercise of sound business judgment.

51. "The usual rule is that if break-up fees encourage bidding, they are enforceable; if they stifle bidding, they are not enforceable." In re Integrated Res., Inc., 147 B.R. 650, 660 (S.D.N.Y. 1992). As is customary, the Break-Up Fee and Expense Reimbursement were required by the Purchaser as a condition to spending the significant time and expense to negotiate and ultimately agree to the APA. The Debtors believe that the Break-Up Fee and Expense Reimbursement will not stifle bidding. To the contrary, the Debtors believe that in the event of an auction, the Break-Up Fee and Expense Reimbursement will encourage bidding by serving "any of three possible useful functions: (1) to attract or retain a potentially successful bid; (2) to establish a bid standard or minimum for other bidders to follow; or (3) to attract additional bidders." Id. at 662. In other words, if the assets are sold to a competing bidder, it will – in all likelihood – be because of Purchaser's crucial role as an initial bidder generating interest in the assets.

#11435231 v1

52.    In addition, "[a] break-up fee should constitute a fair and reasonable percentage of the proposed purchase price, and should be reasonably related to the risk, effort, and expenses of the prospective purchaser.  When reasonable in relation to the bidder's efforts and to the magnitude of the transaction, break-up fees are generally permissible." Id.  The Break-Up Fee of 2%, is within the range of fees typically paid in other significant sales transactions that have been consummated in the past.  See, e.g., In re Maxide Acquisition, Inc., Case No. 05-10429 (MFW) (Bankr. D. Del. Mar. 15, 2005) (approving break-up fee of 3%, or $2.5 million, in connection with a $75 million sale); In re Ameriserve Food Distrib., Inc., Case No. 00-00358 (PJW) (Bankr. D. Del. June 15, 2000) (approving break-up fee of 3.6%, or $4 million, in connection with $110 million sale).  The Debtors, in their business judgment, believe that $1,620,000 as a Break-Up Fee as contemplated by the APA is fair and reasonable because of risk, effort and expenses undertaken and incurred by the Purchaser in entering into the APA.

53.    For these reasons, and given the benefits to the Debtors' estates conferred by the Purchaser and the APA, the Debtors respectfully request that the Court approve the Break-Up Fee and Expense Reimbursement.

**E.    Assumption and Assignment of Executory Contracts
       and Unexpired Leases Should Be Approved**

54.    To facilitate and effectuate the sale of the Transferred Assets, the Debtors also seek authority to assume and assign certain Executory Contracts to the purchaser of the Transferred Assets.  Section 365 allows the debtor in possession to "maximize the value of the debtor's estate" by assuming executory contracts or unexpired leases that "benefit the estate" and by rejecting those that do not.  Cinicola v. Scharffenberger, 248 F.3d 110, 119 (3d Cir. 2001) (quotations omitted); COR Route 5 Co., LLC v. The Penn Traffic Co. (In re The Penn Traffic Co.), 524 F.3d 373, 382 (2d Cir. 2008).  Section 365 of the Bankruptcy Code authorizes the

proposed assumptions and assignments, provided that the defaults under such contracts and leases are cured and adequate assurance of future performance is provided.  <u>See</u> 11 U.S.C. § 365(0(2).

55.     The words "adequate assurance of future performance" must be given a "practical, pragmatic construction" in "light of the proposed assumption." <u>In re Fleming Cos.</u>, 499 F.3d 300 (3d Cir. 2007) (quoting <u>Cinicola</u>, 248 F.3d at 120, n.10).  <u>See</u> <u>also</u> <u>Carlisle Homes, Inc. v. Arrari</u> (<u>In re Carlisle Homes, Inc.</u>), 103 B.R. 524, 538 (Bankr. D.N.J. 1989) (same); <u>In re Nalco Indus., Inc.</u>, 54 B.R. 436, 440 (Bankr. S.D.N.Y. 1985) (adequate assurance of future performance does not mean absolute assurance that debtor will thrive and pay rent); <u>In re Bon Ton Rest. & Pastry Shop, Inc.</u>, 53 B.R. 789, 803 (Bankr. N.D. Ill. 1985) ("Although no single solution will satisfy every case, the required assurance will fall considerably short of an absolute guarantee of performance.").

56.     Among other things, adequate assurance may be given by demonstrating the assignee's financial health and experience in managing the type of enterprise or property assigned.  <u>See</u> <u>In re Bygaph, Inc.</u>, 56 B.R. 596, 605-06 (Bankr. S.D.N.Y.  1986) (adequate assurance of future performance is present when prospective assignee of a lease from debtor has financial resources and has expressed a willingness to devote sufficient funding to business in order to give it strong likelihood of succeeding; chief determinant of adequate assurance is whether rent will be paid); <u>see</u> <u>also</u> <u>In re Vitanza</u>, Case No. No. 98-19611DWS, 1998 WL 808629, at *26 (Bankr. E.D. Pa. 1998) ("The test is not one of guaranty but simply whether it appears that the rent will be paid and other lease obligations met.").

57.     As set forth above, to submit a Qualified Bid, a bidder must provide the Debtors with sufficient and adequate information to demonstrate that such bidder has the financial

wherewithal and ability to consummate the transactions contemplated in the applicable Modified APA, which includes future performance of any assumed executory contracts or unexpired leases. Furthermore, the Debtors believe that Purchaser has sufficient capital and financing commitments to provide adequate assurance of future performance of any Assumed Contracts.

58.     Specifically, with respect to the BIN Agreement, the Purchaser has, as part of the negotiation of the APA, represented that it has the financial means to satisfy its financial obligations thereunder.  Furthermore, the assignment of the BIN Agreement to the Purchaser will also allow the Debtors to avoid a potentially sizable rejection claim and/or administrative expense from Harris.  Accordingly, the Debtor's assuming and assigning the BIN Agreement to the Purchaser is a fair and reasonable exercise of the Debtors' business judgment and in the best interest of the Debtors, their estates and creditors.  Furthermore, it is alleged that defaults under the BIN Agreement must be cured for the assignment of the Merchants Agreements.

59.     At the Sale Hearing, the Debtors will provide evidence that all requirements for the assumption and assignment of any executory contracts or unexpired leases to be assigned to the Successful Bidder will be satisfied, and the Court and other interested parties will have the opportunity to evaluate the ability of any Successful Bidder to provide adequate assurance of future performance as required by section 365(b)(1)(C) of the Bankruptcy Code.

60.     In addition, to the extent that any defaults exist under any executory contracts or unexpired leases to be assumed and assigned to the Successful Bidder, such defaults will be cured on the Closing pursuant to the APA or Modified APA, as applicable.  This procedure is appropriate and consistent with section 365 of the Bankruptcy Code.

#11435231 v1

**F.     Relief from the Ten-Day Waiting Periods Under
           Bankruptcy Rules 6004(h) and 6006(d) Is Appropriate**

61.     Bankruptcy Rule 6004(h) provides that an "order authorizing the use, sale, or lease of property . . . is stayed until the expiration of 10 days after entry of the order, unless the court orders otherwise."  Similarly, Bankruptcy Rule 6006(d) provides that an "order authorizing the trustee to assign an executory contract or unexpired lease . . . is stayed until the expiration of 10 days after the entry of the order, unless the court orders otherwise."

62.     To successfully implement the sale of the Transferred Assets as described above, the Debtors request a waiver of the ten-day stay under Bankruptcy Rules 6004(h) and 6006(d).

### NOTICE

63.     The Debtors have served notice of this Motion on: (a) the U.S. Trustee; (b) counsel to any Creditors Committee; (c) counsel for the Secured Lenders; (d) counsel to Harris; (e) parties entitled to receive notice in these Cases pursuant to Bankruptcy Rule 2002; (f) all entities known by the Debtors to have asserted any lien, claim, interest, or encumbrance in or on the Transferred Assets; and (g) all persons who have expressed an interest in acquiring one or more of the Transferred Assets within the last six months.  In addition, the Bid Procedures Order, the Sale Notice and the Cure Notice will be served as set forth in paragraphs 19 and 22 above. The Debtors submit that no other or further notice need be provided.

## CONCLUSION

WHEREFORE the Debtors respectfully request: that this Court enter the Bid Procedures Order substantially in the form attached hereto as Exhibit B (i) approving the Bid Procedures attached to the Bid Procedures Order as Schedule 1, (ii) approving the Break-up Fee and Expense Reimbursement, (iii) scheduling the Auction and Sale Hearing and approving the Sale Notice annexed to the Bid Procedures Order as Exhibit A (iv) establishing the Cure Procedures and approving the Cure Notice annexed to the Bid Procedures Order as Exhibit B, and (v) granting such other and further relief, and after a sale hearing enter the Sale Order substantially in the form annexed to the Bid Procedures Order as Exhibit C (i) approving the sale of the Purchase Assets to the Purchaser or, if not the Purchaser, the Successful Bidder, (ii) authorizing the assumption and assignment of the Purchased Contracts, and (iii) granting certain related relief as the Court deems just and proper.

Dated:  September 1, 2009
       Wilmington, Delaware

Respectfully submitted,

PEPPER HAMILTON LLP


/s/  Evelyn J. Meltzer
David B. Stratton (DE No. 960)
Evelyn J. Meltzer (DE No. 4581)
John H. Schanne, II (DE No. 5260)
Hercules Plaza, Suite 5100
1313 Market Street
P.O. Box 1709
Wilmington, DE 19899-1709
Telephone: (302) 777-6500
Facsimile: (302) 421-8390

-and-

#11435231 v1

NIXON PEABODY LLP
Mark N. Berman
Dennis J. Drebsky
Lee Harrington (DE No. 4046)
437 Madison Avenue
New York, New York  10022
Telephone:  (212) 940-3000
Facsimile:  (212) 940-3111

*Proposed Counsel for the Debtors*
*and Debtors in Possession*

#11435231 v1