**EXHIBIT 3: LETTER AGREEMENTS**

 

July 6, 2009

PERSONAL AND CONFIDENTIAL

Mr. Marcelo Paladini
Chief Executive Officer
Cynergy Data, LLC
30-30 47th Avenue, 9th Floor
Long Island City, NY 11101

Dear Mr. Paladini:

Stifel, Nicolaus & Company, Incorporated ("Stifel Nicolaus") and Peter J. Solomon Securities Company, LLC ("PJS" and together with Stifel Nicolaus, the "Financial Advisors") and Cynergy Data, LLC (together with any present and future subsidiaries and affiliates of Cynergy Data, LLC, the "Company") previously entered into a letter agreement dated December 19, 2008 (the "Previous Agreement"). This letter agreement (the "Agreement") is intended to supplement the Previous Agreement specifically as it relates to a Sale (as defined below) of the Company, and the Previous Agreement as so supplemented shall remain in full force and effect. The services provided hereunder by the Financial Advisors shall be several and not joint, and neither Financial Advisor will be considered a partner, agent or joint venturer of the other Financial Advisor, nor will be responsible or liable for the acts or omissions of the other Financial Advisor in connection with the performance of services hereunder or otherwise.

1.   The Company hereby engages the Financial Advisors as the Company's sole and exclusive agents for the purpose of (a) identifying opportunities for the "Sale" (as defined below) of the Company; (b) advising the Company concerning opportunities for such Sale, whether or not identified by the Financial Advisors; and (c) as requested by the Company, participating on the Company's behalf in negotiations concerning such Sale. The Company shall have absolute discretion in determining whether to consummate a Sale and the Company shall have no liability for failing to consummate a Sale.

2.   In connection with our engagement, the Financial Advisors and the Company will develop a list of entities that might be potential purchasers

of the Company and/or any of its businesses, securities or assets. As required, the Financial Advisors will initiate and coordinate discussions with potential purchasers, participate in the negotiation of possible transactions and advise the Company as to negotiating strategy and other matters in connection therewith. The Financial Advisors shall not initiate discussions with potential purchasers without prior written consent from the Company (which may be via e-mail). The Company will furnish the Financial Advisors with all information and material regarding the Company and any proposed Sale of the Company as the Financial Advisors may request in connection with the performance of their obligations hereunder. The Financial Advisors will assist the Company in preparing a document or documents (collectively, "Documents") to describe the Company and its management and financial status for use in discussions with prospective purchasers. The Company represents and warrants that all information made available to the Financial Advisors by the Company or contained in the Documents will, at all times during the period of the engagement of the Financial Advisors hereunder, be complete and correct in all material respects and will not contain any untrue statement of a material fact or omit to state a material fact necessary in order to make the statements therein not misleading in light of the circumstances under which such statements are made. The Company further represents and warrants that any projections provided to the Financial Advisors or contained in the Documents will have been prepared in good faith and will be based upon assumptions which, in light of the circumstances under which they are made, are reasonable. The Company acknowledges and agrees that in rendering its services hereunder, the Financial Advisors will be using and relying upon, without any independent investigation or verification thereof, all information that is or will be furnished to the Financial Advisors by or on behalf of the Company and on publicly available information, and the Financial Advisors will not in any respect be responsible for the accuracy or completeness of any of the foregoing kinds of information (included in the Documents or otherwise), and that the Financial Advisors will not undertake to make an independent appraisal of any of the assets of the Company. The Company understands that in rendering services hereunder the Financial Advisors do not provide accounting, legal or tax advice and will rely upon the advice of counsel to the Company and other advisors to the Company as to accounting, legal, tax and other matters relating to any transaction or proposed transaction contemplated by this Agreement.

Stifel Nicolaus agrees with the Company that no members of the "Stifel Nicolaus Deal Team" (as defined below), and PJS agrees with the Company that no members of the "PJS Deal Team" (as defined below), shall provide investment banking services during the term of this

Agreement to any direct competitors of the Company in the credit card processing or electronic payment business. For purposes of this Agreement, the "Stifel Nicolaus Deal Team" shall mean Michael J. Kollender and Brett Pogany and the "PJS Deal Team" shall mean Marc S. Cooper. The foregoing restriction shall not prohibit or restrict either of the Financial Advisors or any employee or representative of either of the Financial Advisors (other than members of the Stifel Nicolaus Deal Team or the PJS Deal Team) from providing brokerage, investment advisory, securities trading, research or other financial services to any such direct competitor of the Company, or from trading in the securities (on its own behalf or on behalf of its clients) of any such direct competitor of the Company.

3.   For the purposes of this Agreement:

(a)   A "Sale" of the Company shall mean any transaction or series or combination of transactions, other than in the ordinary course of trade or business, involving an acquisition of all or a material portion of the equity or equity-linked securities, senior debt, subordinated debt, assets or business of the Company, measured on a consolidated basis, is acquired by or combined with any person or entity, whether or not such transaction is effectuated in-court, out-of-court, through a credit bid in a bankruptcy proceeding, or through the confirmation of a plan of reorganization or liquidation of the Company (excluding a Chapter 7 liquidation prior to or after the occurrence of a transaction that qualifies as a Sale hereunder (in which case the Financial Advisors shall only be entitled to a success fee with respect to such Sale)) or otherwise under Title 11 of the United States Code ("Bankruptcy Code"), and whether through a sale or exchange of capital stock, debt or assets, a lease of assets with or without a purchase option, a merger or consolidation, a tender or exchange offer, a leveraged buy-out, the formation of a joint venture or partnership, a proceeding under Chapter 11 (a "Chapter 11 Proceeding") of the Bankruptcy Code (including a Section 363 sale), or any other business combination or similar transaction.

(b)   Except as provided in subsection 3(c) below, "Consideration" shall mean the full transaction value of any Sale of the Company including, without limitation, the total value of all cash (including escrowed funds), securities, other property and any contingent, earned or other consideration paid or payable, directly or indirectly, by an acquiring party to a selling party or to a participant in the transaction in connection with a Sale of the Company. The value

of any such securities (whether debt or equity) or other property or items of value shall be determined as follows: (i) the value of securities that are freely tradeable in an established public market shall be the last closing market price of such securities prior to the public announcement of the Sale; (ii) the value of securities which are not freely tradeable or which have no established public market, or if the Consideration utilized consists of property other than securities, the value of such securities or other property shall be the fair market value thereof (without any discount for minority interest or non-marketability); and (iii) the sum of all assumed lease payments. Consideration shall also include the face value of any indebtedness (including trade and other assumed ordinary course liabilities) to which the Sale of the Company is subject or to which the Company (or portion thereof to be sold) remains obligated, or indebtedness that is assumed in connection therewith, the value of any consulting, severance or employment agreements received by the principals of the Company in excess of their historical salary levels, and the value of any payments to be received by the principals of the Company for entering into non-compete, no-shop, standstill or similar agreements. In the case of a recapitalization, Consideration shall include the aggregate amount of indebtedness incurred or equity raised by the Company or a successor thereof in connection with such recapitalization. If a Sale of the Company is structured such that it involves a direct or indirect transfer of more than half of the outstanding equity interests in the Company, the Consideration involved in that transaction shall be deemed increased to include the value of any equity interests in the Company that are not transferred in the transaction by the owners thereof, with such value calculated at the price or implied price per share paid for or with respect to interests of the same class in the transaction (without any discount for minority interest or for non-marketability). If any Consideration to be paid is computed in a foreign currency, the value of such foreign currency shall, for purposes hereof, be converted into U.S. Dollars at the prevailing exchange rate on the date or dates on which such Consideration is paid.

(c)     If the Sale of the Company is structured in such a way as to provide for the transfer of only part of the assets of the Company or one or more of the Businesses of the Company and the retention of other assets or Business(es), including, but not limited to, cash, cash equivalents, investments, inventories and receivables, such retained assets or Businesses shall be deemed to be part of the Consideration received in connection with the Sale of the

Company, as follows: (A) with respect to investments, in an amount equal to the market value of such investments, (B) with respect to inventories and receivables, in an amount equal to the book value thereof, and (C) with respect to any other assets or Businesses, in an amount to be reasonably determined by the parties.

4. The Company may refuse to discuss or negotiate the Sale of the Company with any party for any reason whatsoever and may terminate negotiations with any party at any time.

5. As compensation for the services rendered by the Financial Advisors hereunder, the Company shall pay or cause the Financial Advisors to be paid as follows:

(a) A monthly retainer fee of $50,000, payable upon the execution of this Agreement and on each monthly anniversary of such date. The monthly retainer fee shall be earned when paid and shall be non-refundable, provided that such fee(s) shall be credited against any fees that may be payable pursuant to subsection 5(b) below.

(b) If a Sale of the Company occurs, or the parties to a Sale reach a preliminary understanding or definitive agreement in respect of such Sale, either during the term of the engagement hereunder, or at any time during a period of 12 months following the effective date of termination of the engagement hereunder, and regardless of whether the party or parties to the Sale were identified by the Financial Advisors or whether the Financial Advisors rendered advice concerning the Sale, then, upon consummation of the Sale, the Company shall pay to Stifel Nicolaus the greater of (X) $1,000,000 and (Y) 3.0% of the Consideration involved in the Sale.

(c) Compensation which is payable to the Financial Advisors pursuant to subsection 5(b) (including compensation payable with respect to escrowed funds) shall be paid by the Company to the Financial Advisors upon the earlier of (i) the closing of a Sale of the Company or (ii) the confirmation of a Chapter 11 plan of reorganization, provided that compensation attributable to that part of Consideration which is contingent upon future earnings performance or the occurrence of some other event or circumstance ("Contingent Consideration") shall be paid by the Company to the Financial Advisors at the earlier of (i) the receipt of such

Contingent Consideration or (ii) the time that the amount of such Contingent Consideration can be determined.

(d)     In the event that Contingent Consideration described in subsection 5(c) above is payable by an individual, group or legal entity other than the Company, or by a successor to the Company, after the closing of a Sale of the Company, the Company shall cause such individual, group, entity or successor to pay compensation payable to the Financial Advisors hereunder, or, at the closing, to enter into an agreement to pay such compensation to the Financial Advisors according to the terms hereof.

(e)     In the event that a Sale of the Company involves a combination or series of related transactions, the compensation due to the Financial Advisors under subsection (b) above shall be determined as of the closing of each such transaction, based on the aggregate amount of Consideration involved in such transaction.     Accordingly, the Financial Advisors shall be entitled to additional compensation at the time of closing of each such subsequent transaction covered by this Agreement.  The amount set forth in clause (X) contained in subsection (b) above apply one time only and not on each closing of a transaction covered by this Agreement.

(f)     If any compensation or expenses payable to the Financial Advisors pursuant to this Agreement are not fully paid when due, the Company agrees to pay all costs of collection or other enforcement of the Financial Advisors' rights hereunder, including but not limited to attorneys' fees and expenses, whether collected or enforced by suit or otherwise.  The fees and other compensation set forth in this Section 5 are not negotiable and are not subject to any reduction, set-off, counterclaim or refund for any reason or matter whatsoever including, without limitation, against any fees or expenses paid or payable pursuant to the Previous Agreement.

6.     In addition to the fees described in Section 5 above and the obligation of the Company to pay certain expenses set forth in Section 7 below, and whether or not any Sale of the Company is consummated, the Company will pay all of the Financial Advisors' reasonable out-of-pocket expenses (including, without limitation, expenses related to document and presentation materials, travel, external database and communications services, an online data room, courier and delivery services, and the fees and expenses of its outside legal counsel) incurred in connection with this engagement.  Such out-of-pocket expenses shall be payable as they are

incurred upon request by the Financial Advisors and shall not exceed $50,000 without the Company's prior approval.

7.    In connection with engagements of the nature covered by this Agreement, it is the Financial Advisors' practice to provide for indemnification, contribution, and limitation of liability. By signing this Agreement, the Company agrees to the provisions attached to this Agreement (Attachments A and B), which provisions are expressly incorporated by reference herein.

8.    No fee paid or payable to the Financial Advisors or any of their affiliates shall be credited against any other fee paid or payable to the Financial Advisors or any of their affiliates, except as is expressly provided for herein.

9.    The Company represents and warrants to the Financial Advisors that this Agreement has been duly authorized and represents the legal, valid, binding and enforceable obligation of the Company and that neither this Agreement nor the consummation of the transactions contemplated hereby requires the approval or consent of any governmental or regulatory agency or violates any law, regulation, contract or order binding on the Company.

10.   Each of the Financial Advisors is being retained to serve as financial advisor solely to the Company, and it is agreed that the engagement of the Financial Advisors is not, and shall not be deemed to be, on behalf of, and is not intended to confer rights or benefits upon, any shareholder or creditor of the Company or upon any other person or entity. No one other than the Company is authorized to rely upon this engagement of the Financial Advisors or any statements, conduct or advice of the Financial Advisors, and no one other than the Company is intended to be a beneficiary of this engagement. All opinions, advice or other assistance (whether written or oral) given by the Financial Advisors in connection with this engagement are intended solely for the benefit and use of the Company and will be treated by the Company as confidential, and no opinion, advice or other assistance of the Financial Advisors shall be used for any other purpose or reproduced, disseminated, quoted or referred to at any time, in any manner or for any purpose, nor shall any public or other references to the Financial Advisors (or to such opinions, advice or other assistance) be made without the express prior written consent of the Financial Advisors.

11.   The Company agrees that, following the closing or consummation of a Sale of the Company, each of the Financial Advisors has the right to place advertisements in financial and other newspapers and journals at its own

expense, describing its respective services to the Company and a general description of the transaction involving the Company, provided that said Financial Advisor will submit a copy of any such advertisements to the Company for its prior written consent (which may be via e-mail), which approval shall not be unreasonably withheld or delayed. In addition, the Company agrees to include in any press release or public announcement announcing a Sale of the Company a reference to the Financial Advisors' role as financial advisors to the Company with respect to such Sale, provided that the Company will submit a copy of any such press release or public announcement to each of the Financial Advisors for its prior approval, which approval shall not be unreasonably withheld or delayed.

12.     The term of this engagement will continue until terminated by either party at any time by giving the other party at least 30 days' prior written notice. The provisions of Sections 2, 5, 6, 7, 8, 9, 10, 11, 13, 14, 15 and 16 hereof shall survive any expiration or termination of this Agreement.

13.     In the event that the Company is or becomes a debtor under Chapter 11 of the Bankruptcy Code, whether voluntarily or involuntarily, the Company shall seek an order authorizing the employment of the Financial Advisors pursuant to the terms of this Agreement and the Previous Agreement, as a professional person pursuant to, and subject to the standard of review of, Section 328(a) of the Bankruptcy Code, the Federal Rules of Bankruptcy Procedure (the "Bankruptcy Rules") and applicable local rules and orders and not subject to any other standard of review under Section 330 of the Bankruptcy Code. In so agreeing to seek the Financial Advisors' retention under Section 328(a) of the Bankruptcy Code, the Company acknowledges that it believes that the Financial Advisors' general restructuring experience and expertise, their knowledge of the capital markets and their merger and acquisition capabilities will inure to the benefit of the Company in pursuing any Sale or Financing, as defined in the Previous Agreement, that the value to the Company of the Financial Advisors' services derives in substantial part from that expertise and experience and that, accordingly, the structure and amount of the contingent success fee(s), pursuant to Section 5 hereof with respect to a Sale and Section III of the Previous Agreement with respect to a Financing, is reasonable regardless of the number of hours to be expended by the Financial Advisors' professionals in the performance of the services to be provided hereunder.     The Company shall submit the Financial Advisors' employment application as soon as practicable following the Company's filing of a voluntary Chapter 11 case, or the entry of an order for relief in any involuntary case filed against the Company, and use its commercially reasonable efforts to cause such application to be considered on an expedited basis.     The employment application and the proposed order

authorizing employment of the Financial Advisors shall be provided to the Financial Advisors as much in advance of any Chapter 11 filing as is practicable, and must be reasonably acceptable to the Financial Advisors. Following entry of the order authorizing the employment of the Financial Advisors, the Company shall pay all fees and expenses due pursuant to this Agreement and the Previous Agreement, as approved by the court having jurisdiction of the bankruptcy case involving the Company (the "Bankruptcy Court"), as promptly as possible in accordance with the terms of this Agreement and the Previous Agreement and the order of such Bankruptcy Court, the Bankruptcy Code, the Bankruptcy Rules and applicable local rules and orders, and will work with the Financial Advisors to promptly file any and all necessary applications regarding such fees and expenses with the Bankruptcy Court. The Financial Advisors shall have no obligation to provide services under this Agreement or the Previous Agreement in the event that the Company becomes a debtor under the Bankruptcy Code unless the Financial Advisors' retention under this Agreement and/or the Previous Agreement is approved under Section 328(a) of the Bankruptcy Code by final order of the Bankruptcy Court no longer subject to appeal, rehearing, reconsideration or petition for certiorari, and which is acceptable to the Financial Advisors in all respects. If the order authorizing the employment of the Financial Advisors is not obtained, or is later reversed or set aside for any reason, the Financial Advisors may terminate this Agreement as well as the Previous Agreement, and the Company shall reimburse the Financial Advisors for all fees and expenses reasonably incurred prior to the date of expiration or termination, subject to the requirements of the Bankruptcy Code, Bankruptcy Rules and applicable local rules and orders. Prior to commencing a Chapter 11 case, the Company shall pay all amounts due and payable to the Financial Advisors under this Agreement and the Previous Agreement prior to the commencement date in cash. The terms of this paragraph are solely for the benefit of the Financial Advisors, and may be waived, in whole or in part, only by the Financial Advisors.

14.    The Company represents and warrants that there are no brokers, representatives or other persons that have an interest in any compensation due to the Financial Advisors from any transaction contemplated herein. The Company acknowledges and agrees that Stifel Nicolaus is a full-service securities firm and as such from time-to-time may effect transactions for its own account or the accounts of its customers and hold long or short positions in debt or equity securities of the companies which may be the subject of a Sale.

15.     The terms and provisions of this Agreement are solely for the benefit of the Company and the Financial Advisors and the other Stifel Nicolaus Indemnified Persons (as defined in Attachment A) and PJS Indemnified Persons (as defined in Attachment B) and their respective successors, assigns, heirs and personal representatives, and no other person or entity shall acquire or have any right by virtue of this Agreement. The Company and the Financial Advisors acknowledge and agree that each of the Financial Advisors is acting as an independent contractor, and is not a fiduciary of, nor will its engagement hereunder give rise to fiduciary duties to, the Company. This Agreement represents the entire understanding between the Company and the Financial Advisors with respect to the Financial Advisors' engagement hereunder, and all prior discussions are merged herein provided, however, that the Previous Agreement as supplemented hereby remains in full force and effect. This Agreement may be executed in two or more counterparts (including fax or electronic counterparts), all of which together will be considered a single instrument. THIS AGREEMENT SHALL BE GOVERNED BY, AND CONSTRUED IN ACCORDANCE WITH, THE LAWS OF THE STATE OF NEW YORK WITHOUT REGARD TO SUCH STATE'S PRINCIPLES OF CONFLICTS OF LAWS, AND MAY BE AMENDED, MODIFIED OR SUPPLEMENTED ONLY BY WRITTEN INSTRUMENT EXECUTED BY EACH OF THE PARTIES HERETO.

16.     The parties hereby submit to the jurisdiction of and venue in the federal courts located in the City of New York, New York in connection with any dispute related to this Agreement, any transaction contemplated hereby, or any other matter contemplated hereby. If for any reason jurisdiction and/or venue is unavailable in such federal courts, then the parties hereby submit to the jurisdiction of and venue in the state courts located in such city in connection with any such dispute or matter. In addition, the parties hereby waive any right to a trial by jury with respect to any such dispute or matter.

If the foregoing correctly sets forth the entire understanding and agreement between the Financial Advisors and the Company, please so indicate in the space provided for that purpose below and return an executed copy to us, whereupon this letter shall constitute a binding agreement as of the date first above written.

Very truly yours,

STIFEL, NICOLAUS & COMPANY, INCORPORATED

By:_____
　　Michael J. Kollender
　　Managing Director

PETER J. SOLOMON SECURITIES COMPANY, LLC

By:_____
　　Marc S. Cooper
　　Managing Director

AGREED:

CYNERGY DATA, LLC

By:_____
　　Marcelo Paladini
　　Chief Executive Officer

## ATTACHMENT A

### STIFEL, NICOLAUS & COMPANY, INCORPORATED
### INDEMNIFICATION, CONTRIBUTION AND
### LIMITATION OF LIABILITY PROVISIONS

(a)     The Company agrees to indemnify and hold harmless Stifel Nicolaus and its affiliates and their respective officers, directors, employees and agents, and any persons controlling Stifel Nicolaus or any of its affiliates within the meaning of Section 15 of the Securities Act of 1933 or Section 20 of the Securities Exchange Act of 1934 (Stifel Nicolaus and each such other person or entity being referred to herein as a "Stifel Nicolaus Indemnified Person"), from and against all claims, liabilities, losses or damages (or actions in respect thereof) or other expenses which (A) are related to or arise out of (i) actions taken or omitted to be taken (including any untrue statements made or any statements omitted to be made in any Document) by the Company or its affiliates or (ii) actions taken or omitted to be taken by a Stifel Nicolaus Indemnified Person with the consent or in conformity with the actions or omissions of the Company or its affiliates or (B) are otherwise related to or arise out of Stifel Nicolaus' activities on behalf of the Company or its affiliates. The Company will not be responsible, however, for any losses, claims, damages, liabilities or expenses pursuant to clause (B) of the preceding sentence which are finally judicially determined to have resulted primarily from such Stifel Nicolaus Indemnified Person's bad faith, gross negligence or willful misconduct. In addition, the Company agrees to reimburse each Stifel Nicolaus Indemnified Person for all reasonable out-of-pocket expenses (including the reasonable fees and expenses of counsel) as they are incurred by such Stifel Nicolaus Indemnified Person in connection with investigating, preparing, conducting or defending any such action or claim, or in connection with enforcing the rights of such Stifel Nicolaus Indemnified Person under this Agreement. In no event shall the Company be responsible for any indirect, special or consequential damages.

(b)     If for any reason the foregoing indemnity is unavailable to a Stifel Nicolaus Indemnified Person or insufficient to hold a Stifel Nicolaus Indemnified Person harmless, then the Company shall contribute to the amount paid or payable by such Stifel Nicolaus Indemnified Person as a result of such claim, liability, loss, damage or expense in such proportion as is appropriate to reflect not only the relative benefits received by the Company on the one hand and Stifel Nicolaus on the other, but also the relative fault of the Company on the one hand and Stifel Nicolaus on the other, as well as any relevant equitable considerations, subject to the limitation that in any event the aggregate contribution of all Stifel Nicolaus Indemnified Persons to all losses, claims, liabilities, damages and expenses shall not exceed the amount of fees actually received by Stifel Nicolaus pursuant to this

Agreement. It is hereby further agreed that the relative benefits to the Company on the one hand and Stifel Nicolaus on the other with respect to any transaction or proposed transaction contemplated by this Agreement shall be deemed to be in the same proportion as (i) the total value the transaction or proposed transaction bears to (ii) the fees paid to Stifel Nicolaus with respect to such transaction.

(c)     No Stifel Nicolaus Indemnified Person shall have any liability to the Company or any other person in connection with the services rendered pursuant to this Agreement, except for any liability for losses, claims, damages or liabilities finally judicially determined to have resulted primarily from such Indemnified Person's bad faith, gross negligence or willful misconduct.

(d)     If indemnification is to be sought hereunder by any Stifel Nicolaus Indemnified Person, then such Stifel Nicolaus Indemnified Person shall notify the Company of the commencement of any action or proceeding in respect thereof; provided, however, that the failure so to notify the Company shall not relieve the Company from any liability that it may otherwise have to such Stifel Nicolaus Indemnified Person. Following such notification, the Company may elect in writing to assume the defense of such action or proceeding, and, upon such election, it shall not be liable for any legal costs subsequently incurred by such Stifel Nicolaus Indemnified Person (other than reasonable costs of investigation) in connection therewith, unless (i) the Company has failed to provide adequate counsel in a timely manner or (ii) representation of such Stifel Nicolaus Indemnified Person by counsel provided by the Company could present such counsel with a conflict of interest.

(e)     The Company agrees that it will not settle or compromise or consent to the entry of any judgment in any pending or threatened claim, action, suit or proceeding in respect of which indemnification may be sought from the Company by any Stifel Nicolaus Indemnified Person (whether any Stifel Nicolaus Indemnified Person is an actual or potential party to such claim, action, suit or proceeding) unless such settlement, compromise or consent includes an unconditional release of Stifel Nicolaus Indemnified Persons hereunder from all liability arising out of such claim, action, suit or proceeding.

(f)     To the extent any Stifel Nicolaus Indemnified Person appears as a witness, is deposed, or otherwise is involved in any action relating to or arising from a Sale of the Company or Stifel Nicolaus' engagement hereunder or in a situation where such appearance, involvement or assistance results from Stifel Nicolaus' engagement hereunder, the Company will reimburse such Stifel Nicolaus Indemnified Person for reasonable travel expenses and any reasonable fees and expenses of counsel (only if Company has failed to provide counsel) incurred by it by reason of it or any of its personnel being involved in any such action.

(g)     The Company waives any right to a trial by jury with respect to any claim or action arising out of this Agreement or the actions of Stifel Nicolaus, and consents to personal jurisdiction, service of process and venue in any court in which any claim covered by the provisions of this Attachment A may be brought against a Stifel Nicolaus Indemnified Person.

(h)     The provisions of this Attachment A shall survive the expiration or termination of this Agreement and the closing of any Sale of the Company or any other transaction contemplated by this Agreement.

## ATTACHMENT B

## PETER J. SOLOMON SECURITIES COMPANY, LLC
## INDEMNIFICATION, CONTRIBUTION AND
## LIMITATION OF LIABILITY PROVISIONS

(a) The Company agrees to indemnify and hold harmless PJS and its affiliates and their respective officers, directors, employees and agents, and any persons controlling PJS or any of its affiliates within the meaning of Section 15 of the Securities Act of 1933 or Section 20 of the Securities Exchange Act of 1934 (PJS and each such other person or entity being referred to herein as a "PJS Indemnified Person"), from and against all claims, liabilities, losses or damages (or actions in respect thereof) or other expenses which (A) are related to or arise out of (i) actions taken or omitted to be taken (including any untrue statements made or any statements omitted to be made in any Document) by the Company or its affiliates or (ii) actions taken or omitted to be taken by a PJS Indemnified Person with the consent or in conformity with the actions or omissions of the Company or its affiliates or (B) are otherwise related to or arise out of PJS' activities on behalf of the Company or its affiliates. The Company will not be responsible, however, for any losses, claims, damages, liabilities or expenses pursuant to clause (B) of the preceding sentence which are finally judicially determined to have resulted primarily from such PJS Indemnified Person's bad faith, gross negligence or willful misconduct. In addition, the Company agrees to reimburse each PJS Indemnified Person for all reasonable out-of-pocket expenses (including the reasonable fees and expenses of counsel) as they are incurred by such PJS Indemnified Person in connection with investigating, preparing, conducting or defending any such action or claim, or in connection with enforcing the rights of such PJS Indemnified Person under this Agreement. In no event shall the Company be responsible for any indirect, special or consequential damages.

(b) If for any reason the foregoing indemnity is unavailable to a PJS Indemnified Person or insufficient to hold a PJS Indemnified Person harmless, then the Company shall contribute to the amount paid or payable by such PJS Indemnified Person as a result of such claim, liability, loss, damage or expense in such proportion as is appropriate to reflect not only the relative benefits received by the Company on the one hand and PJS on the other, but also the relative fault of the Company on the one hand and PJS on the other, as well as any relevant equitable considerations, subject to the limitation that in any event the aggregate contribution of all PJS Indemnified Persons to all losses, claims, liabilities, damages and expenses shall not exceed the amount of fees actually received by PJS pursuant to this Agreement. It is hereby further agreed that the relative benefits to the Company on the one hand and PJS on the other with respect to any transaction or proposed transaction contemplated by this Agreement shall be

deemed to be in the same proportion as (i) the total value the transaction or proposed transaction bears to (ii) the fees paid to PJS with respect to such transaction.

(c)     No PJS Indemnified Person shall have any liability to the Company or any other person in connection with the services rendered pursuant to this Agreement, except for any liability for losses, claims, damages or liabilities finally judicially determined to have resulted primarily from such Indemnified Person's bad faith, gross negligence or willful misconduct.

(d)     If indemnification is to be sought hereunder by any PJS Indemnified Person, then such PJS Indemnified Person shall notify the Company of the commencement of any action or proceeding in respect thereof; provided, however, that the failure so to notify the Company shall not relieve the Company from any liability that it may otherwise have to such PJS Indemnified Person. Following such notification, the Company may elect in writing to assume the defense of such action or proceeding, and, upon such election, it shall not be liable for any legal costs subsequently incurred by such PJS Indemnified Person (other than reasonable costs of investigation) in connection therewith, unless (i) the Company has failed to provide adequate counsel in a timely manner or (ii) representation of such PJS Indemnified Person by counsel provided by the Company could present such counsel with a conflict of interest.

(e)     The Company agrees that it will not settle or compromise or consent to the entry of any judgment in any pending or threatened claim, action, suit or proceeding in respect of which indemnification may be sought from the Company by any PJS Indemnified Person (whether any PJS Indemnified Person is an actual or potential party to such claim, action, suit or proceeding) unless such settlement, compromise or consent includes an unconditional release of PJS Indemnified Persons hereunder from all liability arising out of such claim, action, suit or proceeding.

(f)     To the extent any PJS Indemnified Person appears as a witness, is deposed, or otherwise is involved in any action relating to or arising from a Sale of the Company or PJS' engagement hereunder or in a situation where such appearance, involvement or assistance results from PJS' engagement hereunder, the Company will reimburse such PJS Indemnified Person for reasonable travel expenses and any reasonable fees and expenses of counsel (only if Company has failed to provide counsel) incurred by it by reason of it or any of its personnel being involved in any such action.

(g)     The Company waives any right to a trial by jury with respect to any claim or action arising out of this Agreement or the actions of PJS, and consents to personal jurisdiction, service of process and venue in any court in which any claim

covered by the provisions of this Attachment B may be brought against a PJS Indemnified Person.

(h)     The provisions of this Attachment B shall survive the expiration or termination of this Agreement and the closing of any Sale of the Company or any other transaction contemplated by this Agreement.

Cynergy Data, LLC
July 6, 2009
Page 11

    If the foregoing correctly sets forth the entire understanding and agreement between the Financial Advisors and the Company, please so indicate in the space provided for that purpose below and return an executed copy to us, whereupon this letter shall constitute a binding agreement as of the date first above written.

Very truly yours,

STIFEL NICOLAUS & COMPANY, INCORPORATED

By:
Michael J. Kollender
Managing Director

PETER J. SOLOMON SECURITIES COMPANY, LLC

By:
Marc N. Cooper
Managing Director

AGREED:

CYNERGY DATA, LLC

By:
Marcelo Paladini
Chief Executive Officer

 

August 28, 2009

Mr. Marcelo Paladini
Chief Executive Officer
Cynergy Data, LLC
30-30 47th Avenue, 9th Floor
Long Island City, NY 11101

      Re:    Engagement of Financial Advisors

Dear Mr. Paladini:

Reference is made to those certain December 19, 2008 and July 6, 2009 engagement letter agreements (inclusive, without limitation, of Attachments A and B to the July 6, 2009 engagement letter agreement and collectively, the "Engagement Agreement") by and among Stifel, Nicolaus & Company, Incorporated ("Stifel Nicolaus") and Peter J. Solomon Securities Company, LLC ("PJSC") (collectively, the "Financial Advisors") and Cynergy Data, LLC, Cynergy Data Holdings, Inc., and Cynergy Prosperity Plus, LLC and any present and future affiliates and subsidiaries (collectively, the "Company"). This letter amendment thereto (the "First Amendment") supplements the agreement contained therein and the Engagement Agreement otherwise remains in full force and effect and is entered into by Financial Advisors and the Company for due consideration as of the date written above, each such party intending to be legally bound thereby.

Subsections 5(a) and (b) of the Engagement Agreement are hereby deleted and replaced with the following:

> "(a)    A monthly retainer fee of $50,000 ($30,000 to Stifel Nicolaus and $20,000 to PJSC), payable upon the execution of this Agreement and on each monthly anniversary of such date. The monthly retainer fee shall be earned when paid and shall be nonrefundable, provided that such fee(s) received by a Financial Advisor shall be credited against any fees that may be payable to such Financial Advisor pursuant to subsection 5(b) below.

Mr. Marcelo Paladini
First Amendment to Engagement Agreement (Stifel Nicolaus/PJSC)
Chief Executive Officer
Cynergy Data, LLC
August 28, 1009
Page 2

(b)     If a Sale of the Company occurs, or the parties to a Sale reach a preliminary understanding or definitive agreement in respect of such Sale, either during the term of the engagement hereunder, or at any time during a period of 12 months following the effective date of termination of the engagement hereunder, and regardless of whether the party or parties to the Sale were identified by any Financial Advisor or whether such Financial Advisor rendered advice concerning the Sale then, upon consummation of the Sale, the Company shall pay:

to Stifel Nicolaus the greater of (X) $600,000 and (Y) 1.8% of the Consideration involved in the Sale and

to PJSC the greater of (W) $400,000 and (Z) 1.2% of the Consideration involved in the Sale."

This First Amendment may be executed and delivered by and among the parties hereto by telefax or electronically in pdf format and in counterpart (each counterpart signature taken together forming a fully executed and effective document).

Very truly yours,

STIFEL, NICOLAUS & COMPANY, INCORPORATED

By: _____
Michael J. Kollender
Managing Director

PETER J. SOLOMON SECURITIES COMPANY, LLC

By: _____
BRADLEY I. DIETZ
Managing Director

Mr. Marcelo Paladini
First Amendment to Engagement Agreement (Stifel Nicolaus/PJSC)
Chief Executive Officer
Cynergy Data, LLC
August 28, 1009
Page 3

AGREED:

CYNERGY DATA, LLC,
CYNERGY DATA HOLDINGS, INC.
CYNERGY PROSPERITY PLUS, LLC

By: _____
       Marcelo Paladini
       Chief Executive Officer