# IN THE UNITED STATES BANKRUPTCY COURT
# FOR THE DISTRICT OF DELAWARE

| | |
|---|---|
| In re: | Chapter 11 |
| CYNERGY DATA, LLC, *et al.*,[1] | Case No. 09-13038 (KG) |
| Debtors. | Jointly Administered<br>**Related Docket No. 11** |

## FINAL ORDER (I) AUTHORIZING USE OF CASH COLLATERAL, (II) AUTHORIZING POSTPETITION FINANCING, (III) GRANTING SENIOR PRIMING LIENS AND SUPERPRIORITY CLAIMS, AND (IV) GRANTING ADEQUATE PROTECTION TO THE PREPETITION SECURED PARTIES

This matter having come before the Court upon the **Motion for Interim Order (I) Authorizing Use Of Cash Collateral, (II) Authorizing Postpetition Financing, (III) Granting Senior Priming Liens And Superpriority Claims, (IV) Granting Adequate Protection to the Prepetition Secured Parties and (V) Scheduling A Final Hearing to Incur Such Financing On A Permanent Basis** (the "Motion") filed on September 1, 2009 by Cynergy Data, LLC ("Cynergy"), Cynergy Data Holdings, Inc. ("Holdings"), and Cynergy Prosperity Plus, LLC ("Prosperity," and together with Cynergy and Holdings, the "Debtors"), the debtors and debtors-in-possession in the above-captioned Chapter 11 bankruptcy cases (the "Cases"), requesting entry of an interim and this final order (the "Final Order"):

(1)     authorizing and approving, pursuant to sections 105, 361, 362, and 364 of Title 11 of the United States Code (the "Bankruptcy Code") and Rules 2002, 4001, and 9014 of the Federal Rules of Bankruptcy Procedure (the "Bankruptcy Rules"), (x) Debtors to obtain postpetition financing up to the Working Capital DIP Facility Cap (as defined below) (the "Working Capital DIP Facility") from Comerica Bank ("Comerica"), as agent to the Working

---

[1]     The Debtors are the following entities (with the last four digits of their federal tax identification numbers in parentheses): Cynergy Data, LLC (8677); Cynergy Data Holdings, Inc. (8208); Cynergy Prosperity Plus, LLC (4265). The mailing address for the Debtors is 30-30 47th Avenue, 9th Floor, Long Island City, New York 11101.

Capital DIP Lenders (as defined below) (in such capacity, the "Working Capital DIP Agent"), and Comerica and Wells Fargo Foothill, LLC ("Wells Fargo"), in their respective capacities as lenders under the Working Capital DIP Facility (in such capacities, collectively, the "Working Capital DIP Lenders"), pursuant to the Working Capital DIP Facility Notes (as defined below) and the other Working Capital DIP Facility Documents (as defined below) and (y) Debtors to obtain postpetition financing in an aggregate principal outstanding amount of up to $7,500,000 (the "Interchange DIP Facility," and together with the Working Capital DIP Facility, the "DIP Facilities") from Harris, N.A. and Moneris Solutions, Inc. (collectively, "Harris" or the "Interchange DIP Lenders"), pursuant to the Prepetition Harris Documents as supplemented or modified by this Final Order (the "Interchange DIP Facility Documents"), and together with the Working Capital DIP Facility Documents, the "DIP Facility Documents"), to (A) fund, among other things, Interchange and Network Reimbursement Fees (as defined below) and ongoing working capital, general corporate, and other financing needs of Debtors, (B) provide the Prepetition Senior Agent, Prepetition Senior Lenders and Harris (collectively, the "Prepetition Secured Parties") Adequate Protection (as defined below), and (C) pay fees and expenses owed under the DIP Facility Documents to the Working Capital DIP Agent, the Working Capital DIP Lenders and the Interchange DIP Lenders (other than attorney fees owed under the DIP Facility Documents, which, notwithstanding anything to the contrary in this Final Order, shall be accrued and included in the respective claims of those parties in accordance with their respective priority, but not paid (by transfer, setoff, recoupment or in any other manner) until the earlier of a Termination Event or the Termination Date;

-2-

(2)     authorizing and empowering Debtors to execute and enter into the DIP Facility Documents and to perform such other and further acts as may be required in connection with the DIP Facility Documents;

(3)     providing, pursuant to section 364(c) and (d) of the Bankruptcy Code, that the financing under the Working Capital DIP Facility:

a.     has priority over any and all administrative expenses, including, without limitation, the kind specified in sections 105, 326, 328, 330, 331, 503(b), 506(c), 507(a), 507(b), 546(c), 726, 1113, or 1114 of the Bankruptcy Code, whether or not such expenses or claims may become secured by a judgment lien or other consensual or non-consensual lien, levy or attachment, whether incurred in the Cases or any successor case (the "Working Capital DIP Facility Superpriority Claims"); provided, however, that the Working Capital DIP Facility Superpriority Claims shall be *pari passu* with the Interchange DIP Facility Superpriority Claims (as defined below) and shall be payable from, and have recourse to, all prepetition and postpetition property of Debtors, and

1.     be and be deemed immediately secured by valid, binding, continuing, enforceable, fully perfected and unavoidable first priority senior priming security interests and liens (the "Working Capital DIP Facility Liens") in and on all prepetition and postpetition property and assets of Debtors, wherever located, whether real or personal, whether tangible or intangible, and whether now existing or hereafter acquired, including, without limitation, proceeds, products, offspring, rents and profits thereof, and including, without limitation, (i) the Prepetition Lender Collateral (as defined below); (ii) all accounts, accounts receivable, instruments, documents, drafts, notes, acceptances, chattel paper, general intangibles (including, without limitation, all goodwill, copyrights, patents, trademarks, trade names and franchises),

-3-

software, contract rights, rights to payment evidenced by chattel paper, documents or instruments, deposit accounts, rights to payment for money or funds advanced or sold, causes of action, choses in action, commercial tort claims, letters of credit, letter of credit rights, supporting obligations, investment property or other property in possession or control of Working Capital DIP Lenders, all personal property received as returns and repossessions, all other forms of receivables, tax refunds of any form, all inventory, including all goods held for sale and documents evidencing inventory, all equipment (together with spare and repair parts, special tools and equipment and replacements), the proceeds of credit and other forms of insurance coverage of any of the foregoing and all books and records pertaining to all of the foregoing; and (iii) all interests in real property and fixtures (collectively, the "Working Capital Collateral"), subject only to the Permitted Prior Liens (as defined below) and the Interchange DIP Facility Liens (as defined below) in the Interchange Collateral (as defined below); provided, however, that the Working Capital Collateral shall not include (i) as determined under a final order sustaining a timely filed Prepetition Senior Lenders Challenge, as provided for under paragraph 7 below, claims, causes of action, or defenses of the Debtors or their estates against the Prepetition Secured Parties that as of the Petition Date were not subject to a valid, perfected, enforceable prepetition security interest held by the Prepetition Senior Agent or the Prepetition Senior Lenders ("Sustained Unpledged Prepetition Senior Lenders Challenged Claims"), (ii) nunc pro tunc to September 2, 2009, any causes of action, choses in action or commercial tort claims arising solely prepetition in which the Prepetition Senior Agent or the Prepetition Senior Lenders do not have a perfected security interest as of the Petition Date, or (iii) claims and causes of action arising solely under 502(d), 544, 545, 547, 548, 549, 550 or 553 of the Bankruptcy Code, or the liens preserved by or the proceeds of any of the foregoing (the claims

-4-

#11605854 v1

and causes of action described in subsections (ii) and (iii), "Excluded Claims") (terms used but not defined herein that are defined in the Michigan Uniform Commercial have the meaning set forth therein in the Michigan Uniform Commercial Code);

    (4)    providing, pursuant to section 364(c) and (d) of the Bankruptcy Code, that the financing under the Interchange DIP Facility:

    a.    has priority over any and all administrative expenses, including, without limitation, the kind specified in sections 105, 326, 328, 330, 331, 503(b), 506(c), 507(a), 507(b), 546(c), 726, 1113, or 1114 of the Bankruptcy Code, whether or not such expenses or claims may become secured by a judgment lien or other consensual or non-consensual lien, levy or attachment, whether incurred in the Cases or any successor case (the "Interchange DIP Facility Superpriority Claims," and together with the Working Capital DIP Facility Superpriority Claims, the "DIP Facility Superpriority Claims"); provided, however, that the Interchange DIP Facility Superpriority Claims shall be *pari passu* with the Working Capital DIP Facility Superpriority Claims and shall be payable from and have recourse to all prepetition and postpetition property of Debtors, and

    b.    be and be deemed immediately secured by valid, binding, continuing, enforceable, fully perfected and unavoidable first priority senior priming security interests and liens (the "Interchange DIP Facility Liens," and together with the Working Capital DIP Facility Liens, the "DIP Facility Liens") in and on all of Debtors' ISO Revenue (as such term is defined in the Forbearance Agreement (as defined below)), the Reserve Account, the ISO Operating Account, the Merchant Suspense Account, the ISO Clearing Account, and all other of Debtors' deposit accounts maintained with the Interchange DIP Lenders, wherever located, whether now existing or hereafter acquired (collectively, the "Interchange Collateral"), subject

only to the Permitted Prior Liens (as defined below) to the extent any such Permitted Prior Liens on such Interchange Collateral were senior in priority to the Prepetition Harris Liens (as defined below) on such Interchange Collateral, none of which includes the Excluded Claims. Terms used but not defined herein that are defined in the Interchange DIP Facility Documents shall have the meaning set forth in the Interchange DIP Facility Documents as the same are approved by this Final Order.

(5) authorizing Debtors, pursuant to sections 361, 363(c) and (e), and 364(d)(1) of the Bankruptcy Code, to use "cash collateral" as defined under section 363 of the Bankruptcy Code (the "Cash Collateral") to pay, first, the Prepetition Senior Lender Forbearance Indebtedness (as defined below); second, the Prepetition Senior Lender Non-Forbearance Indebtedness (as defined below); and, third, the Working Capital DIP Facility Indebtedness (as defined below), and to provide Adequate Protection to the Prepetition Secured Parties on account of their claims under the Prepetition Loan Documents (as defined below) for any diminution to the Prepetition Collateral (as defined below) caused by the use of Cash Collateral and the terms of the financing being granted herein; provided, however, that with respect to Cash Collateral arising from ISO Revenue (the "Interchange Cash Collateral"), the application of Cash Collateral provided in this subparagraph shall be net of such Interchange Cash Collateral that is used to pay the indebtedness under the Prepetition Harris Documents to the extent permitted under the Forbearance Agreement (defined below) and the Interchange DIP Facility Indebtedness (defined below);

(6) authorizing Debtors, pursuant to sections 363 and 364(d)(1) of the Bankruptcy Code, to borrow under the Working Capital DIP Facility in an aggregate outstanding principal amount at any one time of up to an amount equal to the lesser of (i) the amount of (A)

-6-

$9,000,000 less (B) the amount of the outstanding Prepetition Senior Lender Forbearance Indebtedness as of the Petition Date plus (C) the aggregate amount of payments or proceeds of Collateral that are applied after the Petition Date to reduce the amount of Prepetition Senior Lender Indebtedness and (ii) $25,000,000 (the "Working Capital DIP Facility Cap") (together with interest, fees, charges and expenses payable under the Working Capital DIP Facility Notes (as defined below)), in each case, pursuant to the terms and conditions of the Working Capital DIP Facility Documents, and to use the amounts borrowed to fund Debtors' working capital and other general corporate needs, in accordance with the terms of the Working Capital DIP Facility Documents and this Final Order; and

(7)     authorizing Debtors, pursuant to sections 363 and 364(d)(1) of the Bankruptcy Code, to borrow under the Interchange DIP Facility in an aggregate outstanding principal amount at any one time of up to $7,500,000 (together with interest, fees, charges and expenses payable under the Interchange DIP Facility Documents) pursuant to the terms and conditions of the Interchange DIP Facility Documents and this Final Order;

(8)     authorizing Debtors and the Interchange DIP Lenders, pursuant to sections 105, 363 and 365 of the Bankruptcy Code, to perform under the Interchange DIP Facility Documents in their entirety, including authorizing Interchange DIP Lenders to withhold amounts to the extent permitted under the Forbearance Agreement in accordance with the Interchange DIP Facility Documents regardless of whether such amounts pertain to prepetition or postpetition transactions;

(9)     authorizing the waiver by Debtors of any right to surcharge against the Working Capital Collateral and Interchange Collateral;

(10)     scheduling, pursuant to Bankruptcy Rule 4001, a final hearing (the "Final Hearing") before this Court to consider entry of an order (a) approving the DIP Facilities and authorizing Debtors to borrow all amounts available under the DIP Facilities and use such borrowed amounts (i) from the Working Capital DIP Facility, to fund Debtors' working capital and other general corporate needs and pay such other amounts required or allowed to be paid pursuant to the Working Capital DIP Facility Documents, this Final Order and any other order of this Court, and (ii) from the Interchange DIP Facility, to pay such other amounts required or allowed to be paid pursuant to the Interchange DIP Facility Documents, this Final Order and any other order of this Court, (b) authorizing the use of Cash Collateral first to pay the Prepetition Senior Lender Indebtedness until paid in full and thereafter to pay the Working Capital DIP Facility Indebtedness; provided, however, that with respect to Interchange Cash Collateral, the application of Cash Collateral provided in this Final Order shall be net of such Interchange Cash Collateral that is used to pay the indebtedness under the Prepetition Harris Documents to the extent permitted under the Forbearance Agreement and the Interchange DIP Facility Indebtedness, and (c) authorizing the grant of Adequate Protection to the Prepetition Secured Parties, all on a final basis, as set forth in the Motion; and

(11)     modifying the automatic stay imposed under section 362 of the Bankruptcy Code to the extent necessary to permit Debtors, the Working Capital DIP Agent, the Working Capital DIP Lenders, and the Interchange DIP Lenders to implement the terms of this Final Order.

Pursuant to Bankruptcy Rules 4001(b) and 4001(c)(1), due and sufficient notice under the circumstances of the Motion and the Final Hearing having been provided by Debtors as set forth in paragraph L below, and an interim hearing and a further interim hearing having been held on

-8-

September 2, 2009 and on September 15, 2009 respectively, and the Final Hearing having been held on October 1, 2009, and upon consideration of all the pleadings filed with this Court; and any objections to the relief requested in the Motion that have not been resolved are hereby overruled; and upon the record made by Debtors at the interim hearings and the Final Hearing and the Declaration of Charles M. Moore in Support of Chapter 11 Petitions and First Day Pleadings, and after due deliberation and consideration and good and sufficient cause appearing therefor;

THE COURT FINDS THAT:

A.      Debtors filed voluntary petitions for relief under Chapter 11 of the Bankruptcy Code on September 1, 2009 (the "Petition Date"). Debtors are continuing to operate their business and manage their properties as debtors-in-possession pursuant to sections 1107 and 1108 of the Bankruptcy Code.

B.      By order dated September 2, 2009, the Court allowed the Debtors' motion requesting that the Cases be jointly administered. No request has been made for the appointment of a trustee or examiner. On September 10, 2009, the Office of the United States Trustee appointed the Official Committee of Unsecured Creditors (the "Committee") in these Cases.

C.      This Court has subject matter jurisdiction to consider this matter pursuant to 28 U.S.C. § 1334. This is a core proceeding pursuant to 28 U.S.C. § 157(b). Venue is proper before this Court pursuant to 28 U.S.C. §§ 1408 and 1409.

D.      Subject to the rights of any party in interest (other than the Credit Parties (as defined below)) as provided in paragraph 7 herein, each of the Credit Parties acknowledges and stipulates that:

-9-

(1)     Debtors are indebted to Comerica, as agent to the Prepetition Senior Lenders (as defined below) (in such capacity, the "Prepetition Senior Agent"), and to Comerica, Wells Fargo (Comerica and Wells Fargo, in their capacity as Prepetition Senior Lenders, are referred to collectively as the "First Out Banks"), A3 Funding LP ("A3"), Ableco Finance LLC ("Ableco"), Garrison Credit Investments I, LLC ("GCI") and Garrison Credit Opportunities Holdings L.P. ("GCH", together with A3, Ableco and GCI, the "Term Loan B Banks" and together with First Out Banks, the "Prepetition Senior Lenders"), as follows:

a.     under a certain Master Revolving Note executed by Cynergy to the order of Comerica on July 24, 2009 in the original principal amount of $4,316,807.50 ("Comerica Revolving Note #1"). The indebtedness under the Comerica Revolving Note #1 as of the Petition Date includes principal of $4,316,807.50, and interest of $28,509.70;

b.     under a certain Master Revolving Note executed by Cynergy to the order of Wells Fargo on July 24, 2009 in the original principal amount of $4,683,192.50 ("Wells Fargo Revolving Note #1"). The indebtedness under the Wells Fargo Revolving Note #1 as of the Petition Date includes principal of $4,683,192.50, and interest of $30,929.44;

c.     under a certain Revolving Credit Note executed by Cynergy to the order of Comerica on December 15, 2008 in the original principal amount of $10,704,245.28 ("Comerica Revolving Note #2"). The indebtedness under the Comerica Revolving Note #2 as of the Petition Date includes principal of $10,099,752.90, and interest of $125,826.09;

d.     under a certain Revolving Credit Note executed by Cynergy to the order of Wells Fargo on December 15, 2008 in the original principal amount of

#11605854 v1

$8,195,754.72 ("Wells Fargo Revolving Note #2"). The indebtedness under the Wells Fargo Revolving Note #2 as of the Petition Date includes principal of $7,732,922.35, and interest of $96,339.32. The Comerica Revolving Note #1, Comerica Revolving Note #2, the Wells Fargo Revolving Note #1 and the Wells Fargo Revolving Note #2 are identified collectively as the "Prepetition Revolving Notes";

e.    under a certain Term Loan A Note executed by Cynergy to the order of Comerica on August 1, 2008 in the original principal amount of $11,695,754.71 ("Comerica Term Loan A Note"). The indebtedness under the Comerica Term Loan A Note as of the Petition Date includes principal of $9,155,772.78, and interest of $114,065.66;

f.    under a certain Term Loan A Note executed by Cynergy to the order of Wells Fargo on August 1, 2008 in the original principal amount of $16,804,245.29 ("Wells Fargo Term Loan A Note"). The indebtedness under the Wells Fargo Term Loan A Note as of the Petition Date includes principal of $13,154,845.97, and interest of $163,887.45. The Comerica Term Loan A Note and the Wells Fargo Term Loan A Note are identified collectively as the "Prepetition Term Loan A Notes";

g.    under a certain Term Loan B Facility in the original principal amount of $26,500,000 ("Term Loan B Facility"). The indebtedness under the Term Loan B Facility as of the Petition Date includes principal of $26,901,732.65, and interest of $429,867.28;

h.    under a Revolving Credit Note dated December 15, 2008 in the principal amount of $10,100,000 (the "Prosperity Note") executed by Prosperity to the order of Comerica, and guaranteed under a guaranty (the "Prosperity Guaranty") dated as

#11605854 v1

of September 20, 2007 by Cynergy in favor of Comerica. The indebtedness under the Prosperity Note and Prosperity Guaranty as of the Petition Date includes principal of $9,050,000, and interest of $237,059.72; and

      i.     reimbursement obligations with regard to letters of credit issued by First Out Banks, or either of them, upon the application of Debtors, or any of them, including those letters of credit issued in the amount of $150,000; and

      j.     in respect of each of the foregoing, accruing interest, costs, fees and expenses.

As used herein, the Prepetition Revolving Notes, the Prepetition Term Loan A Notes, the Term Loan B Facility and the Prosperity Notes are identified collectively as the "Prepetition Notes." All of Debtors' obligations to the Prepetition Senior Agent and the Prepetition Senior Lenders under the Prepetition Notes, the Prosperity Guaranty, and the other documents, instruments and agreements related to or executed in connection with the Prepetition Notes and the Prosperity Guaranty (collectively, the "Prepetition Senior Loan Documents," which includes, without limitation, that certain Amended and Restated Credit Agreement dated as of August 1, 2008 by and among Cynergy, the Prepetition Senior Agent and the Prepetition Senior Lenders (the "Cynergy Prepetition Credit Agreement"), that certain Credit Agreement dated as of September 20, 2007 between Comerica (as Agent and lender) and Prosperity (the "Prosperity Prepetition Credit Agreement"), and that certain Forbearance Agreement dated as of July 24, 2009 (the "Forbearance Agreement") among the Credit Parties, the Prepetition Senior Agent, the Prepetition Senior Lenders, and Harris) including, without limitation, all principal, accrued interest, unpaid fees and expenses (including attorneys' fees) are identified as the "Prepetition Senior Lender Indebtedness." All of Debtors' obligations to the Prepetition Senior Lenders

-12-

under Comerica Revolving Credit Note #1 and Wells Fargo Revolving Credit Note #1, including, without limitation, all principal, accrued interest, and unpaid fees and expenses (including attorneys' fees), are identified as the "Prepetition Senior Lender Forbearance Indebtedness." All of Debtors' obligations to the Prepetition Senior Lenders under Comerica Revolving Note #2, Wells Fargo Revolving Note #2, Comerica Term Loan A Note, Wells Fargo Term Loan A Note and Prosperity Note including, without limitation, all principal, accrued interest, and unpaid fees and expenses (including attorneys' fees), are identified as the "Prepetition Senior Lender Non-Forbearance Indebtedness."

(2) The Prepetition Senior Lender Indebtedness is guaranteed by Prosperity and Holdings. The Prepetition Senior Lender Indebtedness, except for the amounts advanced under Comerica Revolving Note #1 and Wells Fargo Revolving Note #1, is guaranteed by Marcelo Paladini. Debtors and Marcelo Paladini are identified collectively as the "Credit Parties."

(3) The Prepetition Senior Lender Indebtedness is secured by all assets of Debtors, including without limitation, all of their respective now owned or after acquired:

        a.       accounts;

        b.       chattel paper (whether tangible chattel paper or electronic chattel paper);

        c.       general intangibles (including, without limitation, payment intangibles);

        d.       equipment;

        e.       inventory and goods;

        f.       documents;

-13-

g.  instruments (including, without limitation, promissory notes);

h.  deposit accounts and any other cash collateral, deposit or investment accounts, including all cash collateral, deposit or investment accounts established or maintained pursuant to the terms of the Security Agreement (as defined below) or the other Prepetition Senior Loan Documents, together with all cash and other assets and property from time to time deposited therein and the monies, assets and properties in the possession or control of Prepetition Senior Agent or any Prepetition Senior Lender or any affiliate, representative, agent or correspondent of Prepetition Senior Agent or any Prepetition Senior Lender;

i.  computer records and software, whether relating to the foregoing collateral or otherwise, but in the case of such software, subject to the rights of any non-affiliated licensee of software;

j.  investment property;

k.  commercial tort claims listed in the Prepetition Senior Loan Documents, if any; and

l.  the proceeds, in cash or otherwise, of any of the property described in the foregoing clauses (a) through (k) and all liens, security, rights, remedies and claims of such debtor with respect thereto;

all as more particularly described in the Security Agreement executed by Debtors in favor of Prepetition Senior Agent dated April 16, 2007 (as amended "Security Agreement"). The Prepetition Senior Lender Indebtedness is also secured by (a) all of Andres Ordonez's shares of stock of Holdings, (b) all of Marcelo Paladini's shares of stock of Holdings, and (c) all of Gustavo Ceballos's shares of stock in Holdings. The collateral securing the Prepetition Senior

-14-

#11605854 v1

Lender Indebtedness that is owned by Debtors is identified collectively as the "Prepetition Lender Collateral."

(4)     As of the Petition Date and immediately prior to giving effect to each of the interim orders granting the Motion (the "Interim Orders") and to this Final Order, (a) the Prepetition Senior Loan Documents are valid and binding agreements and obligations of Debtors and are enforceable against Debtors in accordance with their terms, (b) the first priority and continuing pledges, liens and security interests granted by Debtors to and/or for the benefit of the Prepetition Senior Agent and Prepetition Senior Lenders (the "Prepetition Senior Lenders' Liens") (i) constitute valid, binding, enforceable and perfected first priority security interests and liens, subject only to the liens permitted under the Prepetition Senior Loan Documents, but only to the extent such permitted liens (including the Prepetition Harris Liens, solely to the extent (including as to scope of collateral and obligations secured) that the Prepetition Harris Liens are senior in priority to the Prepetition Lenders' Liens with respect to any Prepetition Harris Collateral that also constitutes Prepetition Lender Collateral (the "Prepetition Common Collateral") pursuant to the terms of the Harris Intercreditor Agreement (defined below)) are (x) valid, enforceable, non-avoidable liens and security interests that are perfected prior to the Petition Date (or perfected after the Petition Date to the extent permitted by section 546(b) of the Bankruptcy Code), (y) not subject to avoidance, reduction, disallowance, impairment or subordination pursuant to the Bankruptcy Code or applicable non-bankruptcy law, and (z) senior in priority to the Prepetition Senior Lenders' Liens under applicable law and after giving effect to any applicable subordination or intercreditor agreements, including the Harris Intercreditor Agreement and the Subordination Agreement (each as defined below) (such permitted liens that meet the requirements of clauses (x), (y) and (z) above, the "Permitted Prior Liens" (for the

-15-

avoidance of doubt, the Prepetition Senior Lenders' Liens shall not constitute Permitted Prior Liens)), and (ii) are not subject to avoidance, reduction, disallowance, impairment or subordination pursuant to the Bankruptcy Code or applicable non-bankruptcy law except as provided by the Harris Intercreditor Agreement and the Subordination Agreement, (c) the Prepetition Senior Lender Indebtedness constitutes legal, valid and binding obligations of Debtors, and the Prepetition Senior Lender Indebtedness, and any amounts paid at any time to the Prepetition Senior Agent or any Prepetition Senior Lender on account thereof or with respect thereto, are not subject to (i) any objection, offset, defense or counterclaim of any kind or nature, or (ii) avoidance, reduction, disallowance, impairment, recharacterization or subordination pursuant to the Bankruptcy Code or applicable non-bankruptcy law except as provided by Harris Intercreditor Agreement and the Subordination Agreement, and (d) no claims exist against the Prepetition Senior Agent or any of or any Prepetition Senior Lender under any contract or tort (including, without limitation, lender liability) theories of recovery or pursuant to section 105 of the Bankruptcy Code.

(5)     The Credit Parties have waived, discharged and released any and all rights to challenge any of the Prepetition Senior Lender Indebtedness and the security for those obligations, and to assert any offsets, defenses, claims, objections, challenges, causes of action and/or choses of action against the Prepetition Senior Agent or any Prepetition Senior Lender and/or any of their respective affiliates, parents, subsidiaries, agents, attorneys, advisors, professionals, officers, directors and employees.

E.     Subject to the rights of any party in interest (other than the Credit Parties) as provided in paragraph 7 herein, each of the Credit Parties acknowledges and stipulates that:

-16-

(1)     Debtors are also obligated to Harris under a certain BIN Sponsor Agreement dated as of November 1, 2008, as amended, restated, supplemented or otherwise modified prior to the Petition Date, various merchant agreements entered into among Harris, Debtors (or agents of Debtors) and merchants for the processing of credit card purchases (each a "Merchant Agreement" and, collectively, the "Merchant Agreements"), the Harris Intercreditor Agreement, the Forbearance Agreement and various other documents and instruments executed by Debtors and Harris, to the extent provided for directly or indirectly, by merger, integration or otherwise, in each such document (collectively, "Prepetition Harris Documents"), including, without limitation, obligations with respect to amounts advanced to Debtors by Harris to fund Interchange and Network Reimbursement Fees for Debtors and Debtors' merchants (as such term is defined in the Forbearance Agreement). The indebtedness under the Prepetition Harris Documents with respect to the funding of Interchange and Network Reimbursement Fees includes principal of $7,158,504.16 and interest of $32,744.32, both as of the Petition Date, plus advances with respect to the funding of Interchange and Network Reimbursement Fees made after that date until the Petition Date. All of Debtors' obligations to Harris under the Prepetition Harris Documents, including, without limitation, all principal, accrued interest, unpaid fees and expenses (including attorneys' fees) are identified as the "Prepetition Harris Indebtedness". The Prepetition Senior Lender Indebtedness, and the Prepetition Harris Indebtedness and the indebtedness asserted by various holders of subordinated debt under the Financing Agreement with Debtors dated November 15, 2007, as amended, restated, supplemented or otherwise modified prepetition, and the documents, instruments and agreements executed in connection therewith are referred to, collectively, as the "Prepetition Indebtedness".

-17-

(2)     Debtors derive a substantial portion of their revenue from merchants whose customers pay with VISA U.S.A. Inc. or MasterCard International Incorporated and possibly other credit cards' associations (the "Associations"). Debtors' ability to provide merchants with access to any process merchant payment transactions with the Associations is vital to their ongoing business as an independent sales organization. In order to be in a position to accept and receive credit for purchases made with a VISA or MasterCard credit card, merchants must be a party to a merchant services agreement or similar agreement with a party that has access to the VISA/MasterCard payment and collection systems. Harris currently is such a party that has access to the VISA/MasterCard payment and collection systems.

(3)     Pursuant to the Interchange DIP Facility Documents, among other things (a) Harris accepts sales slips submitted by Debtors' merchants whose customers use their VISA or MasterCard credit cards; (b) Harris sponsors Debtors into the Associations as an independent sales organization and establishes and maintains a dedicated, segregated Association Bank Identification Number (BIN) and Interbank Card Association (ICA) for Debtors; (c) Harris makes payment to VISA or MasterCard for fees; and (d) Harris then makes certain settlement payments to Debtors, subject to, among other things, Harris's rights of recoupment, retention, offset, and other rights set forth in the Interchange DIP Facility Documents.

(4)     Due to the nature of the above-described transaction, Harris contends that it is at risk for Debtors' future performance because it is liable to the customers who make purchases with the VISA or MasterCard credit cards and have a right to receive a credit if Debtors and/or their merchants fail to perform and that Debtors are then ultimately liable to Harris.

-18-

(5)     Pursuant to the Prepetition Harris Documents, Debtors granted to and for the benefit of Harris, to secure the Prepetition Harris Indebtedness (subject, however, to the terms of the Harris Intercreditor Agreement), rights of offset and recoupment and liens and security interests (the "Prepetition Harris Liens," and together with the Prepetition Senior Lenders' Liens, the "Prepetition Liens") on and in all of Debtors' right, title and interest, whether now owned or existing or hereafter acquired or arising, in, to or under the ISO Revenue, the Reserve Account, the ISO Operating Account, the Merchant Suspense Account, the ISO Clearing Account, and the funds and proceeds thereof, the "Prepetition Harris Collateral," and together with the Prepetition Lender Collateral, the "Prepetition Collateral"). The Prepetition Harris Liens shall only be senior to the Prepetition Senior Lenders' Liens for and to the extent (including as to scope of collateral and obligations secured) that such liens would be senior to the Prepetition Senior Lenders' Liens under the Harris Intercreditor Agreement with respect to the Prepetition Common Collateral as of the Petition Date and otherwise in the absence of the commencement of these Cases.

(6)     The Credit Parties have acknowledged and agreed to duly perform all of their obligations under, and stay in full compliance with, the Interchange DIP Facility Documents (provided, however, that Debtors have not yet determined whether they will assume or reject the BIN Sponsor Agreement or each and every Merchant Agreement and the documents related thereto), and have agreed to maintain and preserve the Prepetition Harris Collateral securing the Prepetition Harris Liens in accordance with the terms of the applicable documents.

(7)     Pursuant to that certain letter agreement dated as of April 28, 2009 by and among the Prepetition Senior Agent, Harris and others (as amended, supplemented, restated or otherwise modified prior to the Petition Date, the "Harris Intercreditor Agreement"; the

-19-

Prepetition Senior Loan Documents, the Subordination Agreement, the Prepetition Harris Documents and the Harris Intercreditor Agreement are referred to, collectively, as the "Prepetition Loan Documents"), the Prepetition Harris Liens on the Prepetition Harris Collateral are senior to the Prepetition Senior Lenders' Liens and other liens, to the extent (including as to scope of collateral and obligations secured) set forth in the Harris Intercreditor Agreement.

(8)     As of the Petition Date and immediately prior to giving effect to each of the Interim Orders and this Final Order, (a) the Prepetition Harris Documents are valid and binding agreements and obligations of Debtors and are enforceable against Debtors in accordance with their terms, (b) the Prepetition Harris Liens (i) constitute valid, binding, enforceable and perfected security interests and liens and (ii) are not subject to avoidance, reduction, disallowance, impairment or subordination pursuant to the Bankruptcy Code or applicable non-bankruptcy law except as provided by the Harris Intercreditor Agreement, (c) the Prepetition Harris Indebtedness constitutes legal, valid and binding obligations of Debtors, and the Prepetition Harris Indebtedness, and any amounts paid at any time to Harris on account thereof or with respect thereto, are not subject to (i) any objection, offset, defense or counterclaim of any kind or nature, or (ii) avoidance, reduction, disallowance, impairment, recharacterization or subordination pursuant to the Bankruptcy Code or applicable non-bankruptcy law except as provided by the Harris Intercreditor Agreement and the Subordination Agreement, and (d) no claims exist against Harris under any contract or tort (including, without limitation, lender liability) theories of recovery or pursuant to section 105 of the Bankruptcy Code.

(9)     The Credit Parties have waived, discharged and released any and all rights to challenge any of the Prepetition Harris Indebtedness and the security for those obligations, and

-20-

to assert any offsets, defenses, claims, objections, challenges, causes of action and/or choses of action against Harris and/or any of its respective affiliates, parents, subsidiaries, agents, attorneys, advisors, professionals, officers, directors and employees.

F.  In order for Debtors to continue to operate their businesses, and preserve their goodwill and going concern value, it is necessary for Debtors to obtain immediate postpetition financing and use of Cash Collateral to enable it to pay normal operating expenses (including, without limitation, wages, salaries, insurance premiums, utilities, rent and taxes). Without such postpetition financing and use of Cash Collateral, Debtors will be unable to operate their business. The ability of Debtors to finance their operations and the availability to Debtors of sufficient working capital and other financial and general corporate liquidity through postpetition financing and use of Cash Collateral is in the best interests of Debtors and their estates. Among other things, Debtors must be able to process VISA and/or MasterCard credit cards and obtain funds to continue the operation of their businesses. The continued performance under the Prepetition Harris Documents is vital to Debtors' continued and ongoing business operations and it is in the best interests of Debtors to continue to perform thereunder.

G.  Debtors are unable to obtain sufficient financing from sources other than Working Capital DIP Lenders and the Interchange DIP Lenders on terms more favorable than the DIP Facilities described in this Final Order and pursuant to the DIP Facility Documents. Debtors have been unable to obtain unsecured credit solely under section 503(b)(1) of the Bankruptcy Code as an administrative expense. New credit is unavailable to Debtors without (a) providing the Working Capital DIP Agent and the Working Capital DIP Lenders (i) the Working Capital DIP Facility Superpriority Claims as provided herein and (ii) the Working Capital DIP Facility Liens as provided herein and in the Working Capital DIP Facility Documents, (b) providing the

-21-

Interchange DIP Lenders (i) the Interchange DIP Facility Superpriority Claims as provided herein and (ii) the Interchange DIP Facility Liens as provided herein and in the Interchange DIP Facility Documents, (c) providing for the Adequate Protection of the Prepetition Secured Parties' interests in the Prepetition Collateral to the extent and on the terms and conditions as set forth herein, (d) permitting the Interchange DIP Lenders to setoff or recoup amounts advanced under the Interchange DIP Facility with respect to Interchange and Network Reimbursement Fees, and (e) authorizing Debtors and the Interchange DIP Lenders to continue to perform postpetition under the Interchange DIP Facility Documents in their entirety, including authorizing the Interchange DIP Lenders to withhold amounts in accordance with the Interchange DIP Facility Documents to the extent permitted under the Forbearance Agreement regardless of whether such amounts pertain to prepetition or postpetition transactions.

H.     Based upon the record presented by Debtors to this Court: (i) the terms of the DIP Facilities and use of Cash Collateral described in this Final Order are the best available under the circumstances, reflect Debtors' exercise of prudent business judgment consistent with their fiduciary duty, and are supported by reasonably equivalent value and fair consideration; and (ii) the DIP Facilities and use of Cash Collateral described in this Final Order have been negotiated in good faith and at arm's length among Debtors, Working Capital DIP Agent, Working Capital DIP Lenders, Interchange DIP Lenders, Prepetition Senior Agent, and Prepetition Senior Lenders, and any loans, use of Cash Collateral or other financial accommodations set forth in this Final Order shall be deemed to have been extended, issued, made, or consented to, as the case may be, in "good faith" within the meaning of section 364(e) of the Bankruptcy Code.

#11605854 v1

I. The Working Capital DIP Agent, Working Capital DIP Lenders, Interchange DIP Lenders, and Prepetition Secured Parties have indicated a willingness to provide financing to Debtors and/or permit the use of Cash Collateral by Debtors (or to otherwise refrain from objecting to such financing or use of Cash Collateral) subject to (i) the entry of this Final Order, (ii) the terms and conditions of the DIP Facility Documents, and (iii) findings by the Court that such postpetition financing and use of Cash Collateral is essential to Debtors' estates, that the terms of such financing and use of Cash Collateral were negotiated in good faith and at arm's length, and that the DIP Facility Liens, the DIP Facility Superpriority Claims, and the other protections granted pursuant to this Final Order and the DIP Facility Documents will not be affected by any subsequent reversal, modification, vacatur, or amendment of this Final Order or any other order, as provided in section 364(e) of the Bankruptcy Code. The Working Capital DIP Agent, Working Capital DIP Lenders, Interchange DIP Lenders and Prepetition Secured Parties have each acted in good faith in, as applicable, negotiating, consenting to and agreeing to provide the postpetition financing arrangements and/or use of Cash Collateral (or otherwise not opposing such financing or use of Cash Collateral) contemplated by this Final Order and the other DIP Facility Documents, and the reliance of Working Capital DIP Agent, Working Capital DIP Lenders, Interchange DIP Lenders and Prepetition Secured Parties on the assurances referred to above is in good faith.

J. The Budget (as defined below), is achievable and will allow Debtors to operate in the Case, sell certain assets and pay administrative expenses as they become due. The Working Capital DIP Agent, Working Capital DIP Lenders, Interchange DIP Lenders, First Out Banks and Prepetition Secured Parties are relying upon Debtors' compliance with the Budget in

-23-

accordance with this Final Order in determining to enter into the DIP Facility Documents and consent to the use of Cash Collateral.

K. The Credit Parties consent to the terms and conditions of this Final Order.

L. Telephonic, facsimile or overnight mail notice of the Interim Hearing and the proposed entry of this Final Order has been provided to (i) the thirty (30) largest creditors of Debtors on a consolidated basis, (ii) the Office of the United States Trustee for the District of Delaware (the "U.S. Trustee"), (iii) counsel to the Committee, (iv) counsel to the Working Capital DIP Agent, (v) counsel to the Interchange DIP Lenders and Harris, (vi) counsel to the Prepetition Senior Agent, (vii) each of Debtors' cash management banks, (viii) all known parties asserting a lien against the Collateral, and (ix) any other party that has filed a request for notice pursuant to Bankruptcy Rule 2002 or is required to receive notice under the Bankruptcy Rules (collectively, the "Notice Parties"). Under the exigent circumstances of this case, the requisite notice of the Motion and the relief requested thereby and this Final Order has been provided in accordance with Bankruptcy Rule 4001 and Local Bankruptcy Rule 9013-1(m), which notice is sufficient for all purposes under the Bankruptcy Code, including, without limitation, sections 102(1) and 364 of the Bankruptcy Code, and no other notice need be provided for entry of this Final Order.

M. Debtors have requested immediate entry of this Final Order under Rules 4001(b)(2) and 4001(c)(2) of the Federal Rules of Bankruptcy Procedure. Immediate entry of this Final Order is in the best interests of the Debtors and their estates.

N. None of the Prepetition Secured Parties have opposed the terms and conditions of this Final Order, including the priming under section 364(d) of the Bankruptcy Code as provided for herein. The consent of the Prepetition Secured Parties is expressly limited

-24-

to (i) Debtors' use of Cash Collateral solely on the terms and conditions set forth in this Final Order (ii) the postpetition financing being provided by the Working Capital DIP Agent and Working Capital DIP Lenders as contemplated by this Final Order and the Working Capital DIP Facility Documents and (iii) the postpetition financing being provided by the Interchange DIP Lenders as contemplated by this Final Order and the Interchange DIP Facility Documents. The Adequate Protection granted in this Final Order constitutes "adequate protection necessary" of the Prepetition Secured Parties' interests in the Prepetition Collateral, including Cash Collateral, with respect to Debtors' use of Cash Collateral, the Postpetition Indebtedness (as defined below) and the priming of the Prepetition Liens as authorized herein. This Final Order is in lieu of all further hearings on the issue of Adequate Protection with respect to the Prepetition Secured Parties unless there is a material adverse change postpetition, in which case nothing in this Final Order shall preclude any Prepetition Secured Party from asserting that it is entitled to more or different adequate protection. Nothing in this Final Order, including, without limitation, any of the provisions herein with respect to Adequate Protection, shall constitute, or be deemed to constitute, a finding that the interests of any Prepetition Secured Party are or will be adequately protected with respect to any non-consensual use of Cash Collateral or priming of the Prepetition Liens.

Under consideration of the above findings, which are incorporated into this Final Order, IT IS THEREFORE ORDERED:

1.      Disposition. The Motion is granted as set forth in this Final Order. Any objections that have not previously been withdrawn are hereby overruled. The Final Order shall immediately become effective upon its entry pursuant to Rules 4001(b)(2) and 4001(c)(2) of the Bankruptcy Rules.

#11605854 v1

2. <u>Authorization to Borrow and Use Cash Collateral</u>. Subject to the terms and conditions of this Final Order and the DIP Facility Documents, Debtors may use Cash Collateral and obtain postpetition financing from the Working Capital DIP Lenders and the Interchange DIP Lenders as follows:

(a) Working Capital DIP Facility.

(i) The Working Capital DIP Facility will be governed by the Prepetition Senior Loan Documents and the Interim Orders, as supplemented or modified by this Final Order, and the other Working Capital DIP Facility Documents.

(ii) Under no circumstances will there be any further advances or other extensions of credit under the Prepetition Notes.

(iii) The postpetition revolving credit in the total amount of the Working Capital DIP Facility Cap shall be evidenced by a $11,991,132 revolving credit note in favor of Comerica in the form attached as Exhibit A for 47.96% of the Working Capital DIP Facility Cap and a $13,008,868 revolving credit note in favor of Wells Fargo in the form attached as Exhibit B for 52.04% of the Working Capital DIP Facility Cap (collectively, the "Working Capital DIP Facility Notes"). All of Debtors' obligations arising under the Working Capital DIP Facility, including, without limitation, all principal, interest, attorneys' fees and other expenses are identified as the "Working Capital DIP Facility Indebtedness." The Working Capital DIP Facility Notes and all other documents related to or executed in connection with the Working Capital DIP Facility, as they may be amended, restated, supplemented or otherwise modified from time to time, including, without limitation, the Prepetition Senior Loan Documents, shall be identified collectively as the "Working Capital DIP Facility Documents."

-26-

(iv)     Subject to the terms and conditions of the Working Capital DIP Facility Documents and this Final Order, Debtors are authorized to receive advances under the Working Capital DIP Facility, and the DIP Lenders are authorized to fund advances under the Working Capital DIP Facility, notwithstanding (A) that the provisions of Section 5.16 of the Prepetition Credit Agreement may not be satisfied at the time of any such advances due to defaults existing as of the date of entry of this Final Order under the Prepetition Senior Loan Documents of which Working Capital DIP Lenders have been notified in writing, and (B) any notice that the Term Loan B Banks have provided to Prepetition Senior Agent under Section 2.17 of the Prepetition Credit Agreement.

(v)     Debtors may immediately request advances under the Working Capital DIP Facility; provided, that the principal amount of each such requested advance and all other postpetition advances outstanding as of the date of such request, are consistent with the budget attached as Exhibit C, as modified from time to time with the prior consent of the Working Capital DIP Agent and the Working Capital DIP Lenders and contemporaneous notice to the Committee (the "Budget"), do not exceed the budgeted DIP Balance referenced in the Budget for such period, and the total amount advanced does not exceed the Working Capital DIP Facility Cap.

(vi)     Commencing on September 1, 2009, and continuing each Tuesday thereafter, Debtors shall deliver to the Working Capital DIP Agent, Harris and the Committee a report regarding actual collections and disbursements for the previous week, including a comparison to the projections for such week provided in the Budget. From the Petition Date through October 1, 2009, 100% of Debtors' cash inflows (net of certain fees and processing charges due to First Data and amounts due to Harris as provided in the Prepetition Harris

-27-

Documents, subject to and as modified by the Forbearance Agreement dated July 24, 2009, and this Final Order, including, without limitation, repayment of the Interchange DIP Facility Indebtedness) shall be applied as provided under the Interim Orders. After October 1, 2009, 100% of Debtors' cash inflows including proceeds of the Sale but subject to the provisions of the order of this Court approving the Sale (net of (i) certain fees and processing charges due to First Data and amounts due to Harris as provided in the Prepetition Harris Documents, subject to and as modified by the Forbearance Agreement dated July 24, 2009, and this Final Order, including, without limitation, repayment of the Interchange DIP Facility Indebtedness, and (ii) unless and until the earliest of a Termination Event, the Termination Date or notification by Working Capital DIP Agent to Debtors to the contrary, up to a maximum of $1,500,000 cash (the "Permitted Working Capital Amount")) will be applied as follows: first, to the Working Capital DIP Agent for application to the Working Capital DIP Facility Indebtedness, in accordance with the Working Capital DIP Facility Documents until paid in full; second, to the Prepetition Senior Agent for application to the Prepetition Senior Lender Forbearance Indebtedness in accordance with the Prepetition Senior Loan Documents until paid in full; third, to the Prepetition Senior Agent for application to the Prepetition Senior Non-Forbearance Indebtedness in accordance with the applicable Prepetition Senior Loan Documents until paid in full; and thereafter, to any other Prepetition Senior Lender Indebtedness in accordance with the respective lien priorities of the holders of such indebtedness in such Collateral as set forth in this Final Order or any Prepetition Senior Loan Document. Any Advances under the Working Capital DIP Facility Notes that are made from time to time by the Working Capital DIP Lenders, may be used by Debtors solely and exclusively as provided for in the Budget as and when budgeted, measured weekly for total budgeted disbursements only (with an adverse variance on budgeted

-28-

disbursements measured on a cumulative basis of up to 10% but in no event shall the cumulative variance on all budgeted disbursements exceed $1 million; provided, however, Debtors cannot use a positive variance in one line item to increase the budgeted amount for professional fees in aggregate or individually). The "working capital" line item which covers reserves, chargebacks, rejects and merchant finance and the debit network line which covers inflows and outflows related to the debit network are not subject to the budget variance test, unless there is a permanent, material adverse change in the working capital line item. Debtors warrant and represent that the Budget includes all reasonable, necessary, and foreseeable expenses to be incurred in the ordinary course of business in connection with the operation of their businesses for the period set forth in the Budget. Without limitation, the failure to comply with any covenant set forth in this paragraph, including the use of Advances for any other purposes or in amounts in excess of the Budget shall constitute an immediate default under this Final Order.

(vii)    The Budget shall provide for payment of (A) fees due and payable to the Clerk of the Court and the U.S. Trustee under 28 U.S.C. § 1930, (B) costs and expenses of winding down the Debtors' business and operations following a Sale (as defined herein) in an amount not to exceed $250,000, and (C) fees and expenses incurred by professionals retained under an order of the Court capped at the amounts set forth in the Budget (the "Professional Fees"), which Professional Fees are budgeted on a rolling basis (e.g., any Professional Fees budgeted for any professional for any given week that are not fully earned or expended during that week shall be available in the Budget for that professional to earn or to expend for prior or subsequent weeks), and which may only be paid by Debtors to the extent accrued on or before the earlier of the date of (x) the occurrence of a default by any Debtors under this Final Order which is not waived by the Working Capital DIP Lenders; provided, that accrued and unpaid fees

-29-

and expenses incurred after a default that is waived or cured, shall also be payable under the Budget (so long as no unwaived or uncured default has occurred and is continuing) or (y) the conversion of any of the Cases to a case under chapter 7 of the Bankruptcy Code; provided, that the payment of such fees and expenses must be in accordance with any other order of this Court. In no event shall any amount budgeted for Professional Fees be used to pay any fees or expenses of any person retained in a chapter 7 case under sections 326, 327 or 328 of the Bankruptcy Code. Any amounts budgeted for Professional Fees or otherwise provided for in the Budget are subject to the restrictions set forth in paragraph 7(c) of this Final Order. Nothing contained in this paragraph shall (i) be construed to exempt those attorneys, accountants, and other professionals retained in this case under sections 327 and 1103 of the Bankruptcy Code by Debtors and by the Committee from receiving interim compensation payments or reimbursement of expenses subject to compliance with any Court approved procedure for compensation or otherwise from applicable provisions of bankruptcy law, including but not limited to requirements that such compensation or reimbursement be allowed on a final basis after the filing of appropriate fee applications, and when applicable, any subsequent order of this Court requiring that such payments be disgorged, (ii) be construed as consent to the allowance of any fees and expenses referred to above, or (iii) be construed to affect any right of any person to object to the reasonableness of such amounts. The Committee has not agreed to the adequacy of the post-Sale wind down amount in subparagraph (B) above and may argue that a greater amount should be required in its objections, if any, to the Sale, on which issues the Court has reserved decision.

        (b)     Interchange DIP Facility.

#11605854 v1

(i) The Interchange DIP Facility will be governed by the Interchange DIP Facility Documents.

(ii) Subject to the terms and conditions of the Interchange DIP Facility Documents and this Final Order, Debtors are authorized to receive postpetition advances of Interchange and Network Reimbursement Fees up to $7,500,000 under the Interchange DIP Facility, and the Interchange DIP Lenders are authorized and agree to fund the advances and settle by setoff, recoupment or otherwise from ISO Revenue or any of Debtors' accounts maintained with any Interchange DIP Lender on a monthly basis, in accordance with past practice and the Interchange DIP Facility Documents, provided, however, that the setoff and recoupment rights of the Interchange DIP Lenders with respect to postpetition advances of Interchange and Network Reimbursement Fees are not greater than the prepetition rights of Harris under paragraph 2 of the Forbearance Agreement for setoff or recoupment for the Interchange and Network Reimbursement Fees advanced prepetition.

(iii) All of Debtors' postpetition obligations to the Interchange DIP Lenders under the Interchange DIP Facility Documents and this Final Order, including, without limitation, all principal, accrued interest, unpaid fees and expenses (including attorneys' fees) are identified, collectively, as the "Interchange DIP Facility Indebtedness" (the Interchange DIP Facility Indebtedness and the Working Capital DIP Facility Indebtedness are, collectively, the "Postpetition Indebtedness").

(iv) Interchange DIP Lenders are allowed to set off, recoup or otherwise collect against the ISO Revenue or amounts maintained in Debtors' accounts at any Interchange DIP Lender, in the ordinary course of business, all Interchange DIP Facility Indebtedness as and when such amounts are due; provided, however, that the setoff and

-31-

recoupment rights of the Interchange DIP Lenders with respect to postpetition advances of Interchange and Network Reimbursement Fees are not greater than the prepetition rights of Harris under paragraph 2 of the Forbearance Agreement for setoff or recoupment for the Interchange and Network Reimbursement Fees advanced prepetition. To the extent necessary, Interchange DIP Lenders are granted relief from the automatic stay to set off or recoup such amounts.

      (c)      General.

      (i)      Debtors' ability to request advances under the Working Capital DIP Facility and the Interchange DIP Facility shall terminate upon a Termination Event (as defined below) or on the "Termination Date," which is the earlier of (A) the date of consummation of a sale of substantially all of Debtors' assets ("Sale"), or (B) October 26, 2009, unless otherwise extended in writing by Prepetition Senior Agent, Working Capital DIP Lenders, and Interchange DIP Lenders. "Termination Event" is defined as (i) a default by any Debtor under this Final Order that is not waived by the Working Capital DIP Lenders or Interchange DIP Lenders, as applicable; (ii) default by any Debtor under the Working Capital DIP Facility Documents or the Interchange DIP Facility Documents, as amended (excluding any defaults existing as of the date of entry of this Final Order under the Prepetition Loan Documents of which the Working Capital DIP Agent has been notified in writing) that is not waived by the Working Capital DIP Lenders or Interchange DIP Lenders, as applicable; (iii) default by any Debtor under the Forbearance Agreement that is not waived by the Working Capital DIP Lenders or Interchange DIP Lenders, as applicable; (iv) failure by Debtors to employ at any time a chief restructuring officer acceptable to the Working Capital DIP Agent and Working Capital DIP Lenders; (v) appointment of a trustee, examiner with expanded powers, custodian or receiver,

-32-

(vi) conversion of any of the Cases to a case under Chapter 7 of the Bankruptcy Code, (vii) dismissal of any of the Cases, or (viii) with respect to the Interchange DIP Facility and use of Harris' Cash Collateral (a) the unfunded merchant reserve under the Prepetition Harris Documents and Interchange DIP Facility Documents exceeds $21,341,801, (b) a motion to reject the Prepetition Harris Documents is filed, or (c) Debtors accept a winning bidder for a Sale that does not contemplate the assumption of the Prepetition Harris Documents, provided however, notwithstanding anything in this Final Order to the contrary, the Debtor may continue to holdback and use cash collateral to the extent necessary to allow it to pay all expenses incurred prior to the Termination Event or Termination Date to the extent such expenses have been provided for in the Budget through such date.

(ii)     Debtors shall provide Working Capital DIP Lenders and Interchange DIP Lenders, on or before the following dates, all of the following with respect to the Sale:

(A) Reserved;

(B) Debtors shall close the Sale on or before October 26, 2009.

Under paragraph 17(d) of the Forbearance Agreement, the Sale Milestone date for consummation of the Sale is hereby extended to October 26, 2009, and under paragraph 1(c) of the Forbearance Agreement (defining the Forbearance Termination Date) the date appearing therein is also hereby extended to October 26, 2009. Without limitation, Debtors will be in default under this Final Order if it fails to meet any of the deadlines referenced in this paragraph 2(c)(ii), unless it receives the prior written extension or waiver of the Prepetition Senior Agent, Working Capital DIP Lenders, Term Loan B Banks and Interchange DIP Lenders.

-33-

(iii)     On the date of entry of this Final Order, Debtors shall pay to Working Capital DIP Agent the Revolving Credit Commitment Fee (as defined in the Cynergy Prepetition Credit Agreement) for the pro rata benefit of Working Capital DIP Lenders.

(iv)     Debtors shall supply financial information and information relating to the Collateral as required by any of the DIP Facility Documents or at the request of Working Capital DIP Agent, Working Capital DIP Lenders, Term Loan B Agent or Interchange DIP Lenders. Without limitation, Debtors shall deliver to Working Capital DIP Agent, Working Capital DIP Lenders, Term Loan B Agent, Interchange DIP Lenders and the Committee: (A) as and when filed, all reports and other documents and pleadings filed by Debtors with the Court or the U.S. Trustee; (B) a weekly cash flow statement, comparing actual receipts and disbursements to the projected receipts and disbursements set forth in the Budget; (C) daily reconciliations regarding the unfunded rolling merchant reserve; and (D) daily merchant activity reports.

(v)     Upon the occurrence of the Termination Date pursuant to clause (A) of the definition thereof all cash and cash equivalents (including any Cash Collateral, net of certain fees and processing charges due to First Data and amounts due to Harris as provided in the Prepetition Harris Documents, subject to and as modified by the Forbearance Agreement dated July 24, 2009, and this Final Order, including, without limitation, repayment of the Interchange DIP Facility Indebtedness) shall be applied as follows: first, to fund a reserve equal to the amount provided for in the Budget with respect to all unpaid expenses incurred through that date in accordance with the Budget plus wind down expenses from and after the occurrence of such Termination Date; and thereafter, to, in the following order of priority, the Working Capital DIP Facility Indebtedness and the   Prepetition Senior Lender Indebtedness, in

-34-

accordance with the respective lien or payment priorities of the holders of such indebtedness in such Collateral or proceeds thereof.

(vi)     Except as modified by the DIP Facility Documents or this Final Order, all of the provisions of the Prepetition Senior Loan Documents and Prepetition Harris Documents are ratified and confirmed by Debtors and the other Credit Parties.

(vii)     Debtors are authorized to perform all of their obligations under the Prepetition Harris Documents, and Harris shall perform all of its obligations thereunder and, except as otherwise set forth in this Final Order or the Forbearance Agreement, retain all of its rights, privileges, priorities and benefits under the Prepetition Harris Documents (provided, that Debtors and their merchants are in compliance with their respective obligations thereunder as modified by the Forbearance Agreement and this Final Order) for a limited time pending assumption of the Prepetition Harris Documents, pursuant to a final order acceptable to Harris. Harris is authorized in accordance with the Prepetition Harris Documents to settle, withhold, setoff and recoup amounts in accordance with the Prepetition Harris Documents regardless of whether such amounts pertain to prepetition or postpetition transactions; provided, however, that the setoff and recoupment rights of Harris are as provided under paragraph 2 of the Forbearance Agreement. Except as set forth in this Final Order, nothing herein shall be construed to alter the liens, rights and priorities granted to, and obligations of, Harris under the Prepetition Harris Documents, which liens, rights and priorities and obligations shall continue postpetition.

(viii)     Marcelo Paladini, by his consent to this Final Order, affirms and ratifies his guaranty to Prepetition Senior Agent. Holdings and Prosperity acknowledge and agree that the Prepetition Senior Lender Indebtedness and the Working Capital DIP Facility Indebtedness are guaranteed under their respective guaranties previously executed in favor of

-35-

Prepetition Senior Agent and Prepetition Senior Lenders. Marcelo Paladini acknowledges and agrees that the Prepetition Senior Lender Indebtedness (except, however, for amounts advanced under Comerica Revolving Note #1 and Wells Fargo Revolving Note #1) and the Working Capital DIP Facility Indebtedness are guaranteed under his guaranty previously executed in favor of Prepetition Senior Agent and Prepetition Senior Lenders.

3.    Working Capital DIP Facility Superpriority Claims.    For all of the Working Capital DIP Facility Indebtedness, the Working Capital DIP Agent and Working Capital DIP Lenders are each granted, pursuant to section 364(c)(1) of the Bankruptcy Code, the allowed Working Capital DIP Facility Superpriority Claims, which claims shall be payable from and have recourse to, in addition to the Collateral, any unencumbered prepetition or postpetition property of Debtors whether now existing or hereafter acquired. The Working Capital DIP Facility Superpriority Claims shall be deemed legal, valid, binding, enforceable, and perfected claims, not subject to subordination, impairment or avoidance other than as specifically provided for herein, for all purposes in the Cases and any successor case.

4.    Working Capital DIP Facility Liens. Under section 364(c)(2), (c)(3), and (d) of the Bankruptcy Code, the Working Capital DIP Facility Indebtedness shall be secured by, and Working Capital DIP Agent, for the benefit of itself and the Working Capital DIP Lenders, and Working Capital DIP Lenders are hereby granted (without the necessity of the execution by Debtors, or the filing or recordation, of mortgages, security agreements, account control agreements, financing statements, or otherwise), the Working Capital DIP Facility Liens. The Working Capital DIP Facility Liens are valid, binding, enforceable and fully perfected as of the date hereof, not subject to subordination, impairment or avoidance other than as specifically provided for herein, for all purposes in these Cases and any successor case. The Working

-36-

Capital DIP Facility Liens granted herein shall prime and be senior in all respects to the Prepetition Liens (other than the Permitted Prior Liens) and the Replacement Liens (as defined below) pursuant to section 364(d) of the Bankruptcy Code; provided, however, that the priority of Working Capital DIP Facility Liens and the Interchange DIP Facility Liens with respect to the Working Capital Collateral that is also Interchange Collateral (the "DIP Common Collateral") shall be subject to the same order of priority that the Prepetition Harris Liens and the Prepetition Lenders' Liens are subject to in accordance with the terms of the Harris Intercreditor Agreement. Upon entry of this Final Order, all possessory collateral held by the Prepetition Senior Agent shall be deemed to have been transferred to the Working Capital DIP Agent, and all lockbox, blocked account or similar control agreements shall be deemed assigned to the Working Capital DIP Agent, on behalf of the Working Capital DIP Lenders.

5. Interchange DIP Facility Superpriority Claims. For all of the Interchange DIP Facility Indebtedness, the Interchange DIP Lenders are each granted, pursuant to section 364(c)(1) of the Bankruptcy Code, the allowed Interchange DIP Facility Superpriority Claims, which claims shall be payable from and have recourse to, in addition to the Collateral, any unencumbered prepetition or postpetition property of Debtors whether now existing or hereafter acquired. The Interchange DIP Facility Superpriority Claims shall be deemed legal, valid, binding, enforceable, and perfected claims, not subject to subordination, impairment or avoidance other than as specifically provided for herein, for all purposes in these Cases and any successor case.

6. Interchange DIP Facility Liens. Under section 364(c)(2), (c)(3), and (d) of the Bankruptcy Code, the Interchange DIP Facility Indebtedness shall be secured by, and the Interchange DIP Lender are hereby granted (without the necessity of the execution by Debtors,

-37-

or the filing or recordation, of mortgages, security agreements, account control agreements, financing statements, or otherwise), the Interchange DIP Facility Liens. The Interchange DIP Facility Liens are valid, binding, enforceable and fully perfected as of the date hereof, not subject to subordination, impairment or avoidance other than as specifically provided for herein, for all purposes in these Cases and any successor case. The Interchange DIP Facility Liens granted herein shall prime and be senior (subject, however, to the Prepetition Lenders' Liens and the Working Capital DIP Facility Liens on the same basis as, and to the same extent that, the Prepetition Harris Liens are subject to the Prepetition Lenders' Liens pursuant to the terms of the Harris Intercreditor Agreement) in all respects to the Prepetition Liens (other than the Permitted Prior Liens) and the Replacement Liens (as defined below) pursuant to section 364(d) of the Bankruptcy Code; provided, however, that the priority of Working Capital DIP Facility Liens and the Interchange DIP Facility Liens with respect to the DIP Common Collateral shall be subject to the same order of priority that the Prepetition Harris Liens and the Prepetition Lenders' Liens are subject to in accordance with the terms of the Harris Intercreditor Agreement.

7.    Investigation Rights.

(a)    Investigation Rights With Respect to Prepetition Senior Agent and Prepetition Senior Lenders. Notwithstanding anything herein to the contrary, including the Credit Parties' stipulations and releases herein solely as they relate to the Prepetition Secured Parties the Committee and any other party in interest (including, without limitation, any receiver, administrator or trustee appointed or elected in any of the Cases or any successor case or in any jurisdiction) other than any of the Credit Parties shall have until November 16, 2009 (the applicable date in each case, or such other later date as extended by the written consent of the Prepetition Senior Agent without the need for further order of the Court, the "Prepetition Senior

-38-

Investigation Termination Date") to investigate the validity, extent, perfection, and enforceability of the Prepetition Senior Lenders' Liens and the amount and allowability of the Prepetition Senior Lender Indebtedness, and/or any other claims, causes of action, or defenses against the Prepetition Senior Agent or any of the Prepetition Senior Lenders (a "Prepetition Senior Lenders Challenge"). If the Committee or any other party in interest (other than the Credit Parties), timely determines that there may be a Prepetition Senior Lenders Challenge by the applicable Prepetition Senior Investigation Termination Date, upon five (5) days' written notice to Debtors and the Prepetition Senior Agent setting forth the basis of any such Prepetition Senior Lenders Challenge, but no later than the Prepetition Senior Investigation Termination Date, such Committee or other party in interest (other than the Credit Parties) shall file a motion with the Court seeking authority to commence an adversary proceeding, contested matter, or civil action, as required by the applicable Bankruptcy Rules, asserting such Prepetition Senior Lenders Challenge on behalf of the Debtors' estates. In no event shall the filing of any such Prepetition Senior Lenders Challenge affect any of the rights, privileges, powers or remedies of the Prepetition Secured Parties under this Final Order or the Prepetition Loan Documents pending a judgment, order, or other ruling on such Prepetition Senior Lenders Challenge. If no Prepetition Senior Lenders Challenge is timely filed on or before the applicable Prepetition Senior Investigation Termination Date, then the agreements, acknowledgements, releases and stipulations contained in this Final Order shall be irrevocably binding on the estate, the Committee and all other parties in interest (including, without limitation, any receiver, administrator, or trustee appointed in any of these Cases or any successor case or in any jurisdiction) without further action by any party or this Court, and the Committee and any other party in interest (including without limitation a receiver, administrator, or trustee appointed in

-39-

any of the Cases or any successor case or in any jurisdiction) shall thereafter be forever barred from bringing any Prepetition Senior Lenders Challenge with respect to the Prepetition Senior Agent, or any Prepetition Senior Lender. If a Prepetition Senior Lenders Challenge is timely filed on or before the applicable Prepetition Senior Investigation Termination Date, all claims and actions against the Prepetition Senior Agent or any Prepetition Senior Lender not expressly asserted in such Prepetition Senior Lenders Challenge shall be deemed, immediately and without further notice, motion or application to, order of, or hearing before, this Court, to have been forever relinquished, discharged, released and waived. Nothing in this Final Order (I) confers standing on any party to file or prosecute such Prepetition Senior Lenders Challenge, or (II) precludes the Prepetition Senior Agent or any Prepetition Senior Lenders from seeking allowance of all or any portion of the Prepetition Senior Lender Indebtedness prior to the occurrence of the Prepetition Senior Investigation Termination Date. If a Challenge is successful, the rights of parties to request a remedy from the Court is reserved.

        (b)    Investigation Rights With Respect to Harris. Notwithstanding anything herein to the contrary, including the Credit Parties' stipulations and releases herein solely as they relate to the Prepetition Secured Parties, the Committee and any other party in interest (including, without limitation, any receiver, administrator or trustee appointed or elected in any of the Cases or any successor case or in any jurisdiction) other than any of the Credit Parties shall have until November 16, 2009 (the applicable date in each case, or such other later date as extended by the written consent of Harris without the need for further order of the Court, the "Harris Investigation Termination Date") to investigate the validity, extent, perfection, and enforceability of the Prepetition Harris Liens and the amount and allowability of the Prepetition Harris Indebtedness, and/or any other claims, causes of action, or defenses against Harris (a

#11605854 v1

"Harris Challenge"). If the Committee or any other party in interest (other than the Credit Parties), timely determines that there may be a Harris Challenge by the applicable Harris Investigation Termination Date, upon five (5) days' written notice to Debtors and Harris setting forth the basis of any such Harris Challenge, but not later than the applicable Harris Investigation Termination Date, such Committee or other party in interest (other than the Credit Parties) shall file a motion with the Court seeking authority to commence an adversary proceeding, contested matter, or civil action, as required by the applicable Bankruptcy Rules, asserting such Harris Challenge on behalf of the Debtors' estates. In no event shall the filing of any such Harris Challenge affect any of the rights, privileges, powers or remedies of the Prepetition Secured Parties under this Final Order or the Prepetition Loan Documents pending a judgment, order, or other ruling on such Harris Challenge. If no Harris Challenge is timely filed on or before the applicable Harris Investigation Termination Date, then the agreements, acknowledgements, releases and stipulations contained in this Final Order shall be irrevocably binding on the estates, the Committee and all other parties in interest (including, without limitation, any receiver, administrator, or trustee appointed in any of the Cases or any successor case or in any jurisdiction) without further action by any party or this Court, and the Committee and any other party in interest (including without limitation a receiver, administrator, or trustee appointed in any of the Cases or any successor case or in any jurisdiction) shall thereafter be forever barred from bringing any Harris Challenge with respect to Harris. If a Harris Challenge is timely filed on or before the applicable Harris Investigation Termination Date, all claims and actions against Harris not expressly asserted in such Harris Challenge shall be deemed, immediately and without further notice, motion or application to, order of, or hearing before, this Court, to have been forever relinquished, discharged, released and waived. Nothing in this Final Order (iii) confers

-41-

standing on any party to file or prosecute such Harris Challenge or (iv) precludes Harris from seeking allowance of all or any portion of the Prepetition Harris Indebtedness prior to the occurrence of the Harris Investigation Termination Date.

(c)     Notwithstanding anything herein to the contrary, no Prepetition Collateral, Working Capital Collateral, Interchange Collateral, or Cash Collateral (collectively, the "Collateral,") no amounts borrowed under the DIP Facilities, no amounts provided for in the Budget, including, without limitation, amounts budgeted for Professional Fees, and no proceeds of any of the foregoing shall include, apply to, or be used or available for, the payment or reimbursement of any fees or expenses incurred by any party, including, without limitation, the Credit Parties or the Committee, in connection with (i) the assertion, initiation or prosecution of, or joinder in, (as opposed to investigation of) any claims, causes of action, adversary proceedings, contested matters or other litigation against the Working Capital DIP Facility Agent, any of the Working Capital DIP Lenders, any of the Interchange DIP Lenders, Prepetition Senior Agent or any of the Prepetition Secured Parties, including, without limitation, challenging the amount, validity, extent, perfection, priority, characterization, or enforceability of, or asserting any defense, counterclaim, or offset to, the Prepetition Indebtedness, the Prepetition Liens, the Adequate Protection, the Postpetition Indebtedness, the DIP Facility Superpriority Claims, or the DIP Facility Liens, (ii) any claims or causes of action, seeking to hinder or delay the assertion or enforcement of the DIP Facility Liens, the Prepetition Senior Lenders' Liens or the Replacement Liens, or realization on the Collateral, by the Working Capital DIP Facility Agent, any Working Capital DIP Facility Lender, any Interchange DIP Facility Lender, Prepetition Senior Agent or any Prepetition Secured Party, in accordance with the DIP Facility Documents or this Final Order, or (iii) any Excluded Claims against any of the Prepetition

-42-

Secured Parties, provided, however, that the foregoing prohibition shall not apply to the investigation of any claims, causes of action, adversary proceedings, contested matters, or other investigation against any of the Prepetition Secured Parties, which costs shall be limited to the $300,000 provided for Committee professionals under the Budget and such funds cannot come from the Working Capital Collateral, Prepetition Lender Collateral, Harris Collateral or Interchange Collateral.

8.    Section 506(c) and 552(b) Waivers.   Upon entry of a Final Order, no cost or expenses of administration shall be imposed against the Working Capital DIP Agent, the Working Capital DIP Lenders, the Interchange DIP Lenders in their capacities as such, any of their claims, or the Collateral under sections 105, 506(c) or 552 of the Bankruptcy Code, or otherwise, by Debtors or any other party in interest without the prior written consent of the Working Capital DIP Agent and the Interchange DIP Lenders, and no such consent shall be implied from any action, inaction, or acquiescence by any party, including, but not limited to, funding of Debtors' ongoing operations by the Working Capital DIP Agent, Working Capital DIP Lenders and Interchange DIP Lenders. The "equities of the case" exception contained in section 552(b) of the Bankruptcy Code shall be deemed waived. Neither the Working Capital DIP Agent, nor any of the Working Capital DIP Lenders, Interchange DIP Lenders or Prepetition Secured Parties, shall be subject to the equitable doctrine of "marshaling" or any similar doctrine with respect to the Collateral.

9.    Prepetition Senior Agent and Prepetition Senior Lenders' Adequate Protection.   In consideration for the use of Cash Collateral and the priming of the Prepetition Senior Lenders' Liens (solely upon the terms and conditions of this Order), the Prepetition

-43-

Senior Agent and Prepetition Senior Lenders shall receive the following (collectively, the "Prepetition Senior Lender Adequate Protection"):

(a)     To the extent there is any diminution in Prepetition Lenders' interest in the Prepetition Lender Collateral in which Prepetition Lenders have a perfected and nonavoidable security interest (whether the reason for such diminution is as a result of, arises from, or is attributable to, the imposition of the automatic stay, the priming of the Prepetition Senior Lenders' Liens, the use of Cash Collateral, or the physical deterioration, consumption, use, sale, lease, disposition, shrinkage, or decline in market value of the Prepetition Lender Collateral), the Prepetition Senior Agent, for the benefit of itself and the Prepetition Senior Lenders, and the Prepetition Senior Lenders are each granted continuing replacement liens and security interests on and in all of the Collateral, subject to the Harris Intercreditor Agreement (the "Prepetition Senior Lender Replacement Liens"), which liens are valid, binding, enforceable and fully perfected as of the date hereof and shall be subordinate only to the DIP Facility Liens, Permitted Prior Liens, Prepetition Harris Liens (solely to the extent (including as to scope of collateral and obligations secured) that Prepetition Lenders' Liens are subordinate to the Prepetition Harris Liens in the Prepetition Common Collateral pursuant to the terms of the Harris Intercreditor Agreement), Harris Replacement Liens (solely to the extent (including as to scope of collateral and obligations secured) that the Prepetition Lenders' Liens are subordinate to the Prepetition Harris Liens in the Prepetition Common Collateral pursuant to the terms of the Harris Intercreditor Agreement), and Prepetition Senior Lenders' Liens; and

(b)     To the extent that the Prepetition Senior Lender Replacement Liens do not adequately protect the diminution in the value of the Prepetition Lender Collateral, an allowed administrative claim in favor of the Prepetition Senior Lenders, or any of them, (the

-44-

"Prepetition Senior Lender Administrative Claim") against Debtors' estates under section 507(b) of the Bankruptcy Code, which Prepetition Senior Lender Administrative Claim, if any, shall be junior and subordinate only to the DIP Facility Superpriority Claims and shall be *pari passu* with the Harris Administrative Claim (as defined below).

10.   Harris Adequate Protection.   In consideration for the use of Cash Collateral and the priming of the Prepetition Harris Liens (solely upon the terms and conditions of this Order), Harris shall receive the following (collectively the "Harris Adequate Protection", and together with the Prepetition Senior Adequate Protection, the "Adequate Protection"):

(a)   To the extent there is a diminution in Harris' interests in the Prepetition Harris Collateral in which Harris has a perfected and nonavoidable security interest (whether the reason for such diminution is as a result of, arises from, or is attributable to, the imposition of the automatic stay, the priming of the Prepetition Harris Liens, the use of Cash Collateral or the physical deterioration, consumption, use, sale, lease, disposition, shrinkage, or decline in market value of the Prepetition Harris Collateral), Harris is granted continuing replacement liens and security interests on and in all of the Interchange Collateral, subject to the Harris Intercreditor Agreement (the "Harris Replacement Liens", and together with the Prepetition Senior Replacement Liens, the "Replacement Liens"), which liens are valid, binding, enforceable and fully perfected as of the date hereof and shall be subordinate, subject to the Harris Intercreditor Agreement, only to the DIP Facility Liens (to the extent that Prepetition Senior Lenders' Liens are senior to the Prepetition Harris Liens in the Prepetition Common Collateral pursuant to the terms of the Harris Intercreditor Agreement (including as to scope of collateral and obligations secured)), Permitted Prior Liens, Prepetition Senior Lenders' Liens (to the extent that Prepetition Senior Lenders' Liens are senior to the Prepetition Harris Liens in the

-45-

Prepetition Common Collateral pursuant to the terms of the Harris Intercreditor Agreement (including as to scope of collateral and obligations secured)) and Prepetition Senior Lender Replacement Liens (to the extent that Prepetition Senior Lenders' Liens are senior to the Prepetition Harris Liens in the Prepetition Common Collateral pursuant to the terms of the Harris Intercreditor Agreement (including as to scope of collateral and obligations secured));

(b)     The right to continue to withdraw, setoff or recoup from ISO Revenue or any of Debtors' accounts maintained at Harris amounts advanced by Harris in accordance with the Prepetition Harris Documents, including, without limitation, with respect to Interchange and Network Reimbursement Fees whether such amounts were advanced prepetition or postpetition or whether such amounts pertain to prepetition or postpetition transactions; provided, however, that the setoff and recoupment rights of Harris are as provided under paragraph 2 of the Forbearance Agreement;

(c)     To the extent the Harris Replacement Liens do not adequately protect Harris for any diminution in the value of the Prepetition Harris Collateral, an allowed administrative claim in favor of Harris (the "Harris Administrative Claim") against Debtors' estates under section 507(b) of the Bankruptcy Code, which Harris Administrative Claim, if any, shall be junior and subordinate only to the DIP Facility Superpriority Claims and shall be *pari passu* with the Prepetition Senior Lender Administrative Claim.

11.     Restrictions on Debtors.  Other than the Permitted Prior Liens, no claim or lien having a priority superior or *pari passu* with those granted by this Final Order to the Working Capital DIP Agent, the Working Capital DIP Lenders, the Interchange DIP Lenders or any of the Prepetition Senior Secured Parties shall be granted by any Debtor, while any portion of the Postpetition Indebtedness (or refinancing thereof) or the Prepetition Indebtedness, or any

-46-

commitment under the DIP Facilities, remains outstanding, without the written consent of the Working Capital DIP Agent, the Working Capital DIP Lenders, the Interchange DIP Lenders and the Prepetition Senior Agent. Except as expressly permitted by the DIP Facility Documents and this Order, Debtors will not, at any time during the Case, grant mortgages, security interests, or liens in the Collateral or any portion thereof pursuant to section 364(d) of the Bankruptcy Code or otherwise.

12.     Additional Perfection Measures. Neither the Working Capital DIP Agent, nor any of the Working DIP Lenders, Interchange DIP Lenders or Prepetition Secured Parties, shall be required to file financing statements, mortgages, deeds of trust, security deeds, notices of lien, or similar instruments in any jurisdiction, or take any other action, to attach or perfect the security interests and liens granted under the DIP Facility Documents and this Order (including, without limitation, the taking possession of any of the Collateral, or the taking of any action to have security interests or liens noted on certificates of title or similar documents). Notwithstanding the foregoing, the Working Capital DIP Agent, any Working Capital DIP Lender, any Interchange DIP Lender, and/or any Prepetition Secured Party may, in their sole discretion, file this Order or such financing statements, mortgages, deeds of trust, notices of lien, or similar instruments, or otherwise confirm perfection of such liens, security interests, and mortgages, without seeking modification of the automatic stay under section 362 of the Bankruptcy Code, and all such documents shall be deemed to have been filed or recorded on the Petition Date, with the priorities set forth herein.

13.     Access to Collateral – No Landlord's Liens. Upon approval at the Final Hearing, notwithstanding anything contained herein to the contrary and without limiting any other rights or remedies of the Working Capital DIP Agent, for the ratable benefit of the

-47-

Working Capital DIP Lenders, contained in this Order or the Working Capital DIP Facility Documents, or otherwise available at law or in equity, and subject to the terms of the Working Capital DIP Facility Documents, upon written notice to the landlord of any leased premises that an Event of Default has occurred and is continuing under the Working Capital DIP Facility Documents, the Working Capital DIP Agent may, subject to any separate agreement by and between such landlord and the Working Capital DIP Agent (the "Separate Agreement"), enter upon any leased premises of Debtors for the purpose of exercising any remedy with respect to Collateral located thereon and, subject to the Separate Agreement, shall be entitled to all of Debtors' rights and privileges as lessee under such lease without interference from such landlord; provided, that, subject to the Separate Agreement, the Working Capital DIP Agent shall only pay rent of Debtors that first accrues after the written notice referenced above and that is payable during the period of such occupancy by the Working Capital DIP Agent, calculated on a per diem basis. Nothing herein shall require the Working Capital DIP Agent to assume any lease as a condition to the rights afforded to the Working Capital DIP Agent in this paragraph.

14. <u>Automatic Stay</u>. Without further order from this Court, the automatic stay provisions of section 362 of the Bankruptcy Code are hereby vacated and modified to the extent necessary to (a) permit Harris to perform under the Prepetition Harris Documents and, upon the occurrence of a Termination Event, to exercise all rights and remedies provided for in the Prepetition Harris Documents and (b) permit the Working Capital DIP Agent, Working Capital DIP Lenders and Interchange DIP Lenders, upon the occurrence of a Termination Event, to exercise all rights and remedies provided for in the DIP Facility Documents; provided, however, that prior to the exercise of any enforcement or liquidation remedies against the Collateral, the party exercising such rights or remedies shall be required to give three (3) business days' prior

-48-

written notice to Debtors, counsel to Debtors, counsel to the Committee, counsel to the Prepetition Senior Agent, counsel to Harris, and the U.S. Trustee; provided, however, that such notice shall not be required prior to the exercise of any right or remedy to (i) freeze monies or balances in Debtors' accounts, (ii) set off monies or balances of Debtors in accounts maintained by Harris, the Working Capital DIP Agent, any Working Capital DIP Lender or any Interchange DIP Lender, (iii) charge default rates of interest, (iv) terminate commitments and cease funding under the DIP Facility Documents, or (v) revoke consent to the use of Cash Collateral; provided, further, however, that except as set forth in the Harris Intercreditor Agreement or the Forbearance Agreement no notice is required for Harris or any Interchange DIP Lender to exercise any and all contractual rights under the Prepetition Harris Documents or the Interchange DIP Facility Documents, including, without limitation, the withholding and retention of all amounts under such documents, to the extent permitted therein, whether before or after the Petition Date, the assessment of fees, adjustments, chargebacks, charges and/or credits permitted by such documents, and the exercise of the rights of recoupment, setoff and the like that may be exercised in the ordinary course of performance under said documents. Notwithstanding the occurrence of a Termination Event, all of the rights, remedies, benefits, and protections provided to Harris, the Working Capital DIP Agent, the Working Capital DIP Lenders, and the Interchange DIP Lenders under the DIP Facility Documents and this Order shall survive the Termination Date. Debtors and/or the Committee shall have the initial burden of proof at any hearing on any request by Debtors and/or the Committee to re-impose or continue the automatic stay with respect to Harris, the Working Capital DIP Agent, the Working Capital DIP Lenders or the Interchange DIP Lenders; provided, however, that the only issue to be determined at such hearing shall be whether a Termination Event has occurred, and if a Termination Event is

-49-

determined to have occurred, the automatic stay will not be re-imposed or continue with respect to Harris, the Working Capital DIP Agent, the Working Capital DIP Lenders, and the Interchange DIP Lenders. This Court shall retain exclusive jurisdiction to hear and resolve any disputes and enter any orders required by the provisions of this paragraph and relating to the application, re-imposition or continuance of the automatic stay with respect to Harris, the Working Capital DIP Agent, Working Capital DIP Lenders, or Interchange DIP Lenders.

15.     Binding Effect. The provisions of this Order shall be binding upon and inure to the benefit of the Working Capital DIP Agent, the Working Capital DIP Lenders, the Interchange DIP Lenders, the Prepetition Senior Lenders, Debtors, the Committee, and their respective successors and assigns, including any trustee hereafter appointed for the estates of Debtors, whether in these Cases or any successor case, including the conversion of any of the Cases to a case under Chapter 7 of the Bankruptcy Code. Such binding effect is an integral part of this Order.

16.     Survival. Except as otherwise provided in this Final Order, the provisions of this Final Order and any actions taken pursuant hereto shall survive the Termination Date and the entry of any order (a) confirming any plan under Chapter 11 of the Bankruptcy Code in the Cases (and, to the extent not satisfied in full in cash, the Postpetition Indebtedness shall not be discharged by the entry of any such order, or pursuant to section 1141(d)(4) of the Bankruptcy Code, each Debtor having hereby waived such discharge); (b) approving any sale under section 363 of the Bankruptcy Code, (c) converting any of the Cases to a Chapter 7 case unless permitted under the Working Capital DIP Facility Documents, or (d) dismissing any of the Cases unless permitted under the Working Capital DIP Facility Documents; and, notwithstanding the entry of any such order, the terms and provisions of this Final Order shall continue in full force

-50-