and effect, and the DIP Facility Superpriority Claims, DIP Facility Liens, and Adequate Protection granted pursuant to or provided for by this Final Order and/or the DIP Facility Documents as modified or approved by this Final Order shall continue in full force and effect and shall maintain their priority as provided by this Final Order and the DIP Facility Documents as modified or approved by this Final Order to the maximum extent permitted by law until all of the Postpetition Indebtedness is indefeasibly paid in full in cash.

17. <u>After-Acquired Property</u>. Except as otherwise provided in this Final Order, pursuant to section 552(a) of the Bankruptcy Code, all property acquired by Debtors after the Petition Date, including, without limitation, all Collateral pledged or otherwise granted to (x) the Working Capital DIP Agent, on behalf of the Working Capital DIP Lenders, pursuant to the Working Capital DIP Facility Documents and this Order, and (y) the Interchange DIP Lenders pursuant to the Interchange DIP Facility Documents and the Order, is not and shall not be subject to any lien of any person or entity resulting from any security agreement entered into by any Debtor prior to the Petition Date, except to the extent that such property constitutes proceeds, products, offspring or profits of property of Debtors that is subject to a valid, enforceable, perfected, and unavoidable lien as of the Petition Date which is not subject to subordination under section 510(c) of the Bankruptcy Code or other provision or principles of applicable law.

18. <u>Access to Debtors</u>. Debtors shall provide the Working Capital DIP Agent, the Working Capital DIP Lenders, the Interchange DIP Lenders, the Committee, and each of their respective attorneys, accountants, representatives, agents, and/or employees reasonable access to Debtors' premises and books and records during normal business hours (without unreasonable interference with the proper operation of Debtors' businesses) for the purpose of audit, examination, and inspection thereof, and observation of Debtors' operations, and shall

-51-

provide all reasonable information and documents requested by the Working Capital DIP Agent, the Working Capital DIP Lenders, the Interchange DIP Lenders, the Committee, or their designated agents. Without limiting the generality of the foregoing, Working Capital DIP Agent, the Working Capital DIP Lenders, the Interchange DIP Lenders, the Committee, and their attorneys, accountants, representatives, agents, and/or employees shall have the right to enter Debtors' business premises during reasonable business hours for the purpose of examining and appraising the Collateral. Debtors shall pay the cost of any audit requested or performed by Working Capital DIP Agent, the Working Capital DIP Lenders, or the Interchange DIP Lenders.

19. <u>Authorization to Act</u>. Debtors are authorized to do and perform all acts, to make, execute and deliver all instruments and documents (including, without limitation, the execution of security agreements, mortgages and financing statements), and to pay interest, fees and all other amounts as provided under this Final Order and the DIP Facility Documents, which may be reasonably required or necessary for Debtors' full and timely performance under the DIP Facility Documents and this Order, including, without limitation:

(a) the execution of the Working Capital DIP Facility Documents and the Interchange DIP Facility Documents;

(b) the modification or amendment of the DIP Facility Documents without further order of this Court, in such form as Debtors, the Working Capital DIP Agent, and the Working Capital DIP Lenders may agree in the case of the Working Capital DIP Facility Documents, or Debtors and Interchange DIP Lenders may agree in the case of the Interchange DIP Facility Documents, in each case in accordance with the terms of the applicable DIP Facility Documents; <u>provided</u>, <u>however</u>, that written notice of any material modification or amendment shall be provided to counsel for the Committee, counsel for the Prepetition Senior Agent,

-52-

counsel for Harris, and the U.S. Trustee, each of which will have five (5) days from the date of delivery of such notice within which to object in writing; provided, further, that if such objection is timely provided, then such modification or amendment shall be permitted only pursuant to an order of the Court; and

(c)     the non-refundable payments to the Working Capital DIP Agent, the Working Capital DIP Lenders or the Interchange DIP Lenders, as the case may be, of the fees referred to in this Final Order and the DIP Facility Documents, and of the reasonable costs and expenses as may be due from time to time, including, without limitation, reasonable attorneys' and other professional fees and disbursements as provided in the DIP Facility Documents.

20.     Insurance Policies.  Upon entry of this Final Order, the Working Capital DIP Agent and Working Capital DIP Lenders shall be, and shall be deemed to be, without any further action or notice, named as additional insureds and loss payees on each insurance policy maintained by Debtors which in any way relates to the Collateral.  Any insurance proceeds or other receipts from any source that relate to the Collateral and are paid to any Prepetition Secured Party shall be immediately delivered to Debtors and subject to the DIP Facility Liens and the terms of this Order and the DIP Facility Documents.

21.     Waiver.  Working Capital DIP Agent, Working Capital DIP Lenders and Interchange DIP Lenders, in their sole discretion, may in writing waive any covenant or term of this Final Order imposed upon Debtors for the benefit of Working Capital DIP Agent, Working Capital DIP Lenders or Interchange DIP Lenders.

22.     Harris Disgorgement.  To the extent that Harris or the Interchange DIP Lenders are required to disgorge amounts received or recouped with respect to the Interchange and Network Reimbursement Fees, Prepetition Senior Agent, Prepetition Senior Lenders,

-53-

Working Capital DIP Agent and Working Capital DIP Lenders, each acknowledge and agree that it will transfer to Harris or the Interchange DIP Lenders, as applicable, any amounts received by it with respect to such disgorged amounts.

23.     Subsequent Reversal.  If any or all of the provisions of this Final Order or the DIP Facility Documents are hereafter modified, vacated, amended or stayed by subsequent order of this Court or any other court, other than by agreement with or with the assent of the Working Capital DIP Agent, Working Capital DIP Lenders, Interchange DIP Lenders, Prepetition Senior Agent or any Prepetition Secured Party:  (a) such modification, vacatur, amendment or stay shall not affect: (i) the validity of any obligation of Debtors to the Working Capital DIP Agent, Working Capital DIP Lenders, Interchange DIP Lenders, Prepetition Senior Agent or any Prepetition Secured Party that is or was incurred prior to such party receiving written notice of the effective date of such modification, vacatur, amendment, or stay (the "Effective Date"), or (ii) the validity, enforceability or priority of the DIP Facility Superpriority Claims, DIP Facility Liens, Adequate Protection or other grant authorized or created by this Final Order and the DIP Facility Documents as modified and approved by this Final Order; (b) the Postpetition Indebtedness and Adequate Protection pursuant to this Final Order and the DIP Facility Documents arising prior to the Effective Date; and (c) the use of Cash Collateral and the validity of any financing provided or security interest granted pursuant to this Final Order and the DIP Facility Documents, each of which are and shall be protected by section 364(e) of the Bankruptcy Code; or (d) the conduct of Prepetition Senior Agent, Working Capital DIP Agent, Working Capital DIP Lenders and Interchange DIP Lenders with respect to the rights granted to Prepetition Senior Agent, Working Capital DIP Agent, Working Capital DIP Lenders and Interchange DIP Lenders in this Final Order prior to the Effective Date, all amounts owed to

-54-

Prepetition Senior Agent, Working Capital DIP Agent, Working Capital DIP Lenders and Interchange DIP Lenders by Debtors under this Final Order prior to the Effective Date, shall be governed in all respects by the original provisions of this Final Order in effect immediately prior to the Effective Date and Prepetition Senior Agent, Working Capital DIP Agent, Working Capital DIP Lenders and Interchange DIP Lenders shall be entitled to all the rights, privileges and benefits, including the security interests and priorities granted herein, with respect to all such advances and the course of conduct established in connection therewith.

24.     Effect of Dismissal of Cases. If the Cases, or any of them, is dismissed, converted or substantively consolidated, then neither the entry of this Final Order nor such dismissal, conversion or substantive consolidation of shall affect the rights of the Working Capital DIP Agent, Working Capital DIP Lenders, Interchange DIP Lenders, and Prepetition Secured Parties (to the extent of Adequate Protection provided hereunder) under their respective documents or this Final Order, and all of the respective rights and remedies thereunder of the Working Capital DIP Agent, Working Capital DIP Lenders, Interchange DIP Lenders, and Prepetition Secured Parties (to the extent of Adequate Protection provided hereunder) shall remain in full force and effect as if none of the Cases had been dismissed, converted, or substantively consolidated. If an order dismissing any of the Cases is at any time entered, such order shall provide (in accordance with sections 105 and 349 of the Bankruptcy Code) that (a) the DIP Facility Liens and DIP Facility Superpriority Claims granted to and conferred upon the Working Capital DIP Agent, Working Capital DIP Lenders and/or Interchange DIP Lenders DIP Agent and the protections afforded to the Working Capital DIP Agent, Working Capital DIP Lenders and/or Interchange DIP Lenders pursuant to this Final Order and the DIP Facility Documents shall continue in full force and effect and shall maintain their priorities as provided

-55-

in this Final Order until all Postpetition Indebtedness shall have been paid and satisfied in full in cash and that such DIP Facility Liens, DIP Facility Superpriority Claims, and other protections shall, notwithstanding such dismissal, remain binding on all interested parties, (b) the Adequate Protection granted to and conferred upon the Prepetition Secured Parties shall continue in full force and effect and shall maintain their priorities as provided in this Final Order until such Adequate Protection has been satisfied, (c) this Court shall retain jurisdiction, notwithstanding such dismissal, for the purpose of enforcing the DIP Facility Liens, Prepetition Liens, DIP Facility Superpriority Claims, and Adequate Protection, and (d) any hearing on any motion to dismiss any of the Cases shall require at least twenty (20) days' prior notice to the Working Capital DIP Agent, Interchange DIP Lenders and the Prepetition Senior Agent and all other creditors and parties in interest as required by Fed. R. Bankr. P. 2002.

25.     Certain Rights under the Bankruptcy Code.  Notwithstanding anything to the contrary herein or in any DIP Facility Document nothing shall waive, prejudice or modify any interested party's rights under (a) section 363 or 365 of the Bankruptcy Code with respect to any sale of the Debtors' assets; or (b) sections 510 or 551 of the Bankruptcy Code.

26.     Findings of Fact and Conclusions of Law.  This Final Order constitutes findings of fact and conclusions of law and shall take effect and be fully enforceable *nunc pro tunc* to the Petition Date immediately upon the entry thereof.

27.     Controlling Effect of Order.  To the extent any provision of this Final Order conflicts with any provision of the Motion, any documents executed or delivered prior to the Petition Date, or any DIP Facility Documents, the provisions of this Final Order shall control.

28.     Reserved.

-56-

29.  Adequate Notice.  The notice given by Debtors of the Final Hearing was given in accordance with Bankruptcy Rule 4001(c)(2).  Within three (3) business days after the Court's entry of this Final Order, Debtors shall mail copies of this Final Order to the Notice Parties.  Any and all written notices contemplated or required to be given by this Final Order shall be delivered to the following:

(a)  **Nixon Peabody LLP**, 437 Madison Avenue, New York, New York 10022 (Attn:  Mark N. Berman, Dennis J. Drebsky, and Lee Harrington), and **Pepper Hamilton LLP**, Hercules Plaza, Suite 5100, 1313 Market Street, P.O. Box 1709, Wilmington, Delaware 19899-1709 (Attn:  David B. Stratton, Evelyn J. Meltzer, and John H. Schanne), counsel to Debtors;

(b)  **Bodman LLP**, 6th Floor at Ford Field, 1901 St. Antoine Street, Detroit, Michigan 48226 (Attn: Robert J. Diehl, Jr.), and **Buchanan Ingersoll & Rooney PC**, The Brandywine Building, 1000 West Street, Suite 1410, Wilmington, Delaware 19801-1054 (Attn:  Mary F. Caloway), counsel to the Working Capital DIP Agent and Prepetition Senior Agent;

(c)  **Torys LLP**, 237 Park Avenue, New York, New York 10017 (Attn:  Alison D. Bauer and William F. Gray, Jr.) and **Drinker, Biddle & Reath LLP**, 1100 N. Market Street, Wilmington, Delaware 19801-1254 (Attn: Howard A. Cohen and David P. Primack), counsel to Harris and the Interchange DIP Lenders;

(d)  **Jager Smith P.C.**, One Financial Center, Boston, Massachusetts 02111 (Attn: Bruce F. Smith, Esq. and Michael J. Fencer, Esq.) and **Ashby Geddes, P.A.**, 500 Delaware Avenue, P.O. Box 1150, Wilmington, Delaware 19899 (Attn: Gregory A. Taylor, Esq. and Karen B. Skomorucha, Esq.), proposed counsel to the Committee; and

(e)     **Office of the United States Trustee for the District of Delaware,**

844 King Street, Suite 2207, Lockbox 35, Wilmington, Delaware 19801 .

Dated: October 16 , 2009
      Wilmington, Delaware

_____
United States Bankruptcy Judge

# EXHIBIT A

**Master Revolving Note**
LIBOR-based Rate/Prime Referenced Rate
Demand-Optional Advances (Business and Commercial Loans Only)

| AMOUNT | NOTE DATE | | MATURITY DATE |
|--------|-----------|------|---------------|
| $11,991,132 | September | , 2009 | ON DEMAND |

ON DEMAND (or as otherwise provided in this Note), FOR VALUE RECEIVED, the undersigned promise(s) to pay to the order of COMERICA BANK (herein called "Bank"), care of Comerica Bank, as Agent, at 500 Woodward Avenue, Detroit, Michigan 48226, the principal sum of ELEVEN MILLION NINE HUNDRED NINETY ONE THOUSAND ONE HUNDRED THIRTY TWO DOLLARS ($11,991,132), or so much of said sum as has been advanced and is then outstanding under this Note, together with interest thereon as hereinafter set forth.

This Note is a note under which Advances, repayments and re-Advances may be made from time to time, subject to the terms and conditions of this Note. **AT NO TIME SHALL THE BANK BE UNDER ANY OBLIGATION TO MAKE ANY ADVANCES TO THE UNDERSIGNED PURSUANT TO THIS NOTE (NOTWITHSTANDING ANYTHING EXPRESSED OR IMPLIED IN THIS NOTE OR ELSEWHERE TO THE CONTRARY, INCLUDING, WITHOUT LIMIT, IF THE BANK SUPPLIES THE UNDERSIGNED WITH A BORROWING FORMULA) AND THE BANK, AT ANY TIME AND FROM TIME TO TIME, WITHOUT NOTICE, AND IN ITS SOLE DISCRETION, MAY REFUSE TO MAKE ADVANCES TO THE UNDERSIGNED WITHOUT INCURRING ANY LIABILITY DUE TO THIS REFUSAL AND WITHOUT AFFECTING THE UNDERSIGNED'S LIABILITY UNDER THIS NOTE FOR ANY AND ALL AMOUNTS ADVANCED.**

Subject to the terms and conditions of this Note, each of the Advances made hereunder shall bear interest at the LIBOR-based Rate plus the Applicable Margin or the Prime Referenced Rate plus the Applicable Margin, as elected by the undersigned or as otherwise determined under this Note; provided, however, the Prime Reference Rate plus the Applicable Margin may only be selected if the LIBOR-based Rate is not available under the terms of this Note

Unless sooner demanded, accrued and unpaid interest on the unpaid balance of each outstanding Advance hereunder shall be payable monthly, in arrears, on the first Business Day of each month. Interest accruing on the basis of the Prime Referenced Rate shall be computed on the basis of a year of 360 days, and shall be assessed for the actual number of days elapsed, and in such computation, effect shall be given to any change in the Applicable Interest Rate as a result of any change in the Prime Referenced Rate on the date of each such change. Interest accruing on the basis of the LIBOR-based Rate shall be computed on the basis of a 360 day year and shall be assessed for the actual number of days elapsed from the first day of the Interest Period applicable thereto but not including the last day thereof.

Upon demand and from and after the occurrence of any Default hereunder, and so long as any such Default remains unremedied or uncured thereafter, the indebtedness outstanding under this Note shall bear interest at a per annum rate of three percent (3%) above the otherwise Applicable Interest Rate(s), which interest shall be payable upon demand. In addition to the foregoing, a late payment charge equal to five percent (5%) of each late payment hereunder may be charged on any payment not received by Bank within ten (10) calendar days after the payment due date therefor, but acceptance of payment of any such charge shall not constitute a waiver of any Default hereunder.

In no event shall the interest payable under this Note at any time exceed the maximum rate permitted by law.

The amount and date of each Advance, its Applicable Interest Rate, its Interest Period, if applicable, and the amount and date of any repayment shall be noted on Bank's records, which records shall be conclusive evidence thereof, absent manifest error; provided, however, any failure by Bank to make any such notation, or any error in any such notation, shall not relieve the undersigned of its/their obligations to repay Bank all amounts payable by the undersigned to Bank under or pursuant to this Note, when due in accordance with the terms hereof.

The undersigned may request an Advance hereunder, including the refunding of an outstanding Advance as the same type of Advance or the conversion of an outstanding Advance to another type of Advance, upon the delivery to Bank of a Request for Advance executed by the undersigned, subject to the following: (a) Bank shall not have made demand hereunder and no Default, or any condition or event which, with the giving of notice or the running of time, or both, would constitute a Default, shall have occurred and be continuing or exist under this Note; (b) each such Request for Advance shall set forth the information required on the Request for Advance form annexed hereto as Exhibit "A"; (c) each such Request for Advance shall be delivered to Bank by 11:00 a.m. (Detroit, Michigan time) on the proposed date of the

requested Advance; (d) the principal amount of each LIBOR-based Advance shall be at least Two Hundred Fifty Thousand Dollars ($250,000.00) (or such lesser amount as is acceptable to Bank in its sole discretion); (e) the proposed date of any refunding of any outstanding LIBOR-based Advance as another LIBOR-based Advance or the conversion of any outstanding LIBOR-based Advance to another type of Advance shall only be on the last day of the Interest Period applicable to such outstanding LIBOR-based Advance; (f) after giving effect to such Advance, the aggregate unpaid principal amount of Advances outstanding under this Note shall not exceed the face amount of this Note; and (g) a Request for Advance, once delivered to Bank, shall not be revocable by the undersigned; provided, however, as aforesaid, Bank shall not be obligated to make any Advance under this Note.

Advances hereunder may be requested in the undersigned's discretion by telephonic notice to Bank. Any Advance requested by telephonic notice shall be confirmed by the undersigned that same day by submission to Bank, either by first class mail, facsimile or other means of delivery acceptable to Bank, of the written Request for Advance aforementioned. The undersigned acknowledge(s) that if Bank makes an Advance based on a telephonic request, it shall be for the undersigned's convenience and all risks involved in the use of such procedure shall be borne by the undersigned, and the undersigned expressly agree(s) to indemnify and hold Bank harmless therefor. Bank shall have no duty to confirm the authority of anyone requesting an Advance by telephone.

If, as to any outstanding LIBOR-based Advance, Bank shall not receive a timely Request for Advance, or telephonic notice, in accordance with the foregoing requesting the refunding or continuation of such Advance as another LIBOR-based Advance for a specified Interest Period or the conversion of such Advance to a Prime-based Advance, effective as of the last day of the Interest Period applicable to such outstanding LIBOR-based Advance, and as of the last day of each succeeding Interest Period, the principal amount of such Advance which is not then repaid shall be automatically refunded or continued as a LIBOR-based Advance having an Interest Period equal to the same period of time as the Interest Period then ending for such outstanding LIBOR-based Advance, unless the undersigned is/are not entitled to request LIBOR-based Advances hereunder or otherwise elect the LIBOR-based Rate as the basis for the Applicable Interest Rate for the principal Indebtedness outstanding hereunder in accordance with the terms of this Note, or the LIBOR-based Rate is not otherwise available to the undersigned as the basis for the Applicable Interest Rate hereunder for the principal Indebtedness outstanding hereunder in accordance with the terms of this Note, in which case, the Prime Referenced Rate plus the Applicable Margin shall be the Applicable Interest Rate hereunder in respect of such Indebtedness for such period, subject in all respects to the terms and conditions of this Note. The foregoing shall not in any way whatsoever limit or otherwise affect Bank's right to make demand for payment of all or any part of the Indebtedness hereunder at any time in Bank's sole and absolute discretion or any of Bank's rights or remedies under this Note upon the occurrence of any Default hereunder, or any condition or event which, with the giving of notice or the running of time, or both, would constitute a Default.

Subject to the definition of an "Interest Period" hereunder, in the event that any payment under this Note becomes due and payable on any day which is not a Business Day, the due date thereof shall be extended to the next succeeding Business Day, and, to the extent applicable, interest shall continue to accrue and be payable thereon during such extension at the rates set forth in this Note.

All payments to be made by the undersigned to Bank under or pursuant to this Note shall be in immediately available United States funds, without setoff or counterclaim, and in the event that any payments submitted hereunder are in funds not available until collected, said payments shall continue to bear interest until collected.

If the undersigned make(s) any payment of principal with respect to any LIBOR-based Advance on any day other than the last day of the Interest Period applicable thereto (whether voluntarily, upon demand (whether or not any Default shall have occurred and be continuing or exist under this Note), required payment or otherwise), or if the undersigned fail(s) to borrow any LIBOR-based Advance after notice has been given by the undersigned (or any of them) to Bank in accordance with the terms of this Note requesting such Advance, or if the undersigned fail(s) to make any payment of principal or interest in respect of a LIBOR-based Advance when due, the undersigned shall reimburse Bank, on demand, for any resulting loss, cost or expense incurred by Bank as a result thereof, including, without limitation, any such loss, cost or expense incurred in obtaining, liquidating, employing or redeploying deposits from third parties, whether or not Bank shall have funded or committed to fund such Advance. Such amount payable by the undersigned to Bank may include, without limitation, an amount equal to the excess, if any, of (a) the amount of interest which would have accrued on the amount so prepaid, or not so borrowed, refunded or converted, for the period from the date of such prepayment or of such failure to borrow, refund or convert, through the last day of the relevant Interest Period, at the applicable rate of interest for said Advance(s) provided under this Note, over (b) the amount of interest (as reasonably determined by Bank) which would have accrued to Bank on such amount by placing such amount on deposit for a comparable period with leading banks in the interbank eurodollar market. Calculation of any amounts payable to Bank under this paragraph shall

2

be made as though Bank shall have actually funded or committed to fund the relevant LIBOR-based Advance through the purchase of an underlying deposit in an amount equal to the amount of such Advance and having a maturity comparable to the relevant Interest Period; provided, however, that Bank may fund any LIBOR-based Advance in any manner it deems fit and the foregoing assumptions shall be utilized only for the purpose of the calculation of amounts payable under this paragraph. Upon the written request of the undersigned, Bank shall deliver to the undersigned a certificate setting forth the basis for determining such losses, costs and expenses, which certificate shall be conclusively presumed correct, absent manifest error. The undersigned may prepay all or part of the outstanding balance of any Prime-based Advance under this Note or any Indebtedness hereunder which is bearing interest based upon the Prime Referenced Rate at any such time without premium or penalty. Any prepayment hereunder shall also be accompanied by the payment of all accrued and unpaid interest on the amount so prepaid. The undersigned hereby acknowledge(s) and agree(s) that the foregoing shall not, in any way whatsoever, limit, restrict or otherwise affect Bank's right to make demand for payment of all or any part of the Indebtedness under this Note at any time in Bank's sole and absolute discretion, whether such Indebtedness is bearing interest based upon the LIBOR-based Rate or the Prime Referenced Rate at such time.

For any LIBOR-based Advance, if Bank shall designate a LIBOR Lending Office which maintains books separate from those of the rest of Bank, Bank shall have the option of maintaining and carrying such Advance on the books of such LIBOR Lending Office.

If, at any time, Bank determines that, (a) Bank is unable to determine or ascertain the LIBOR-based Rate, or (b) by reason of circumstances affecting the foreign exchange and interbank markets generally, deposits in eurodollars in the applicable amounts or for the relative maturities are not being offered to Bank for any applicable Advance or Interest Period, or (c) the LIBOR-based Rate plus the Applicable Margin will not accurately or fairly cover or reflect the cost to Bank of maintaining any of the Indebtedness under this Note based upon the LIBOR-based Rate, then Bank shall forthwith give notice thereof to the undersigned. Thereafter, until Bank notifies the undersigned that such conditions or circumstances no longer exist, the right of the undersigned to request a LIBOR-based Advance and to convert an Advance to or refund an Advance as a LIBOR-based Advance shall be suspended, and the Prime Referenced Rate plus the Applicable Margin shall be the Applicable Interest Rate for all Indebtedness hereunder during such period of time.

If, after the date hereof, the introduction of, or any change in, any applicable law, rule or regulation or in the interpretation or administration thereof by any governmental authority charged with the interpretation or administration thereof, or compliance by Bank (or its LIBOR Lending Office) with any request or directive (whether or not having the force of law) of any such authority, shall make it unlawful or impossible for the Bank (or its LIBOR Lending Office) to make or maintain any Advance with interest based upon the LIBOR-based Rate, Bank shall forthwith give notice thereof to the undersigned. Thereafter, (a) until Bank notifies the undersigned that such conditions or circumstances no longer exist, the right of the undersigned to request a LIBOR-based Advance and to convert an Advance to or refund an Advance as a LIBOR-based Advance shall be suspended, and thereafter, the undersigned may select only the Prime Referenced Rate plus the Applicable Margin as the Applicable Interest Rate for the Indebtedness hereunder, and (b) if Bank may not lawfully continue to maintain an outstanding LIBOR-based Advance to the end of the then current Interest Period applicable thereto, the Prime Referenced Rate plus the Applicable Margin shall be the Applicable Interest Rate for the remainder of such Interest Period with respect to such outstanding Advance.

If the adoption after the date hereof, or any change after the date hereof in, any applicable law, rule or regulation (whether domestic or foreign) of any governmental authority, central bank or comparable agency charged with the interpretation or administration thereof, or compliance by Bank (or its LIBOR Lending Office) with any request or directive (whether or not having the force of law) made by any such authority, central bank or comparable agency after the date hereof: (a) shall subject Bank (or its LIBOR Lending Office) to any tax, duty or other charge with respect to this Note or any Indebtedness hereunder, or shall change the basis of taxation of payments to Bank (or its LIBOR Lending Office) of the principal of or interest under this Note or any other amounts due under this Note in respect thereof (except for changes in the rate of tax on the overall net income of Bank or its LIBOR Lending Office imposed by the jurisdiction in which Bank's principal executive office or LIBOR Lending Office is located); or (b) shall impose, modify or deem applicable any reserve (including, without limitation, any imposed by the Board of Governors of the Federal Reserve System), special deposit or similar requirement against assets of, deposits with or for the account of, or credit extended by Bank (or its LIBOR Lending Office), or shall impose on Bank (or its LIBOR Lending Office) or the foreign exchange and interbank markets any other condition affecting this Note or the Indebtedness hereunder; and the result of any of the foregoing is to increase the cost to Bank of maintaining any part of the Indebtedness hereunder or to reduce the amount of any sum received or receivable by Bank under this Note by an amount deemed by the Bank to be material, then the undersigned shall pay to Bank, within fifteen (15) days of the undersigned's receipt of written notice from Bank demanding such compensation, such additional amount or amounts as will compensate Bank for such increased cost or reduction. A certificate of Bank, prepared in good faith and in reasonable detail by Bank and submitted by Bank to the undersigned, setting forth the basis

3

for determining such additional amount or amounts necessary to compensate Bank shall be conclusive and binding for all purposes, absent manifest error.

In the event that any applicable law, treaty, rule or regulation (whether domestic or foreign) now or hereafter in effect and whether or not presently applicable to Bank, or any interpretation or administration thereof by any governmental authority charged with the interpretation or administration thereof, or compliance by Bank with any guideline, request or directive of any such authority (whether or not having the force of law), including any risk-based capital guidelines, affects or would affect the amount of capital required or expected to be maintained by Bank (or any corporation controlling Bank), and Bank determines that the amount of such capital is increased by or based upon the existence of any obligations of Bank hereunder or the maintaining of any Indebtedness hereunder, and such increase has the effect of reducing the rate of return on Bank's (or such controlling corporation's) capital as a consequence of such obligations or the maintaining of such Indebtedness hereunder to a level below that which Bank (or such controlling corporation) could have achieved but for such circumstances (taking into consideration its policies with respect to capital adequacy), then the undersigned shall pay to Bank, within fifteen (15) days of the undersigned's receipt of written notice from Bank demanding such compensation, additional amounts as are sufficient to compensate Bank (or such controlling corporation) for any increase in the amount of capital and reduced rate of return which Bank reasonably determines to be allocable to the existence of any obligations of the Bank hereunder or to maintaining any Indebtedness hereunder. A certificate of Bank as to the amount of such compensation, prepared in good faith and in reasonable detail by the Bank and submitted by Bank to the undersigned, shall be conclusive and binding for all purposes absent manifest error.

This Note and any other Indebtedness and liabilities of any kind of the undersigned (or any of them) to the Bank, and any and all modifications, renewals or extensions of it, whether joint or several, contingent or absolute, now existing or later arising, and however evidenced and whether incurred voluntarily or involuntarily, known or unknown, or originally payable to the Bank or to a third party and subsequently acquired by Bank including, without limitation, any late charges; loan fees or charges; overdraft indebtedness; costs incurred by Bank in establishing, determining, continuing or defending the validity or priority of any security interest, pledge or other lien or in pursuing any of its rights or remedies under any loan document (or otherwise) or in connection with any proceeding involving the Bank as a result of any financial accommodation to the undersigned (or any of them); and reasonable costs and expenses of attorneys and paralegals, whether inside or outside counsel is used, and whether any suit or other action is instituted, and to court costs if suit or action is instituted, and whether any such fees, costs or expenses are incurred at the trial court level or on appeal, in bankruptcy, in administrative proceedings, in probate proceedings or otherwise (collectively "Indebtedness") are secured by and the Bank is granted a security interest in and lien upon all items deposited in any account of any of the undersigned with the Bank and by all proceeds of these items (cash or otherwise), all account balances of any of the undersigned from time to time with the Bank, by all property of any of the undersigned from time to time in the possession of the Bank and by any other collateral, rights and properties described in each and every deed of trust, mortgage, security agreement, pledge, assignment and other security or collateral agreement which has been, or will at any time(s) later be, executed by any (or all) of the undersigned to or for the benefit of the Bank (collectively "Collateral"). Notwithstanding the above, (i) to the extent that any portion of the Indebtedness is a consumer loan, that portion shall not be secured by any deed of trust or mortgage on or other security interest in any of the undersigned's principal dwelling or in any of the undersigned's real property which is not a purchase money security interest as to that portion, unless expressly provided to the contrary in another place, or (ii) if the undersigned (or any of them) has (have) given or give(s) Bank a deed of trust or mortgage covering California real property, that deed of trust or mortgage shall not secure this Note or any other Indebtedness of the undersigned (or any of them), unless expressly provided to the contrary in another place, or (iii) if the undersigned (or any of them) has (have) given or give(s) the Bank a deed of trust or mortgage covering real property which, under Texas law, constitutes the homestead of such person, that deed of trust or mortgage shall not secure this Note or any other Indebtedness of the undersigned (or any of them) unless expressly provided to the contrary in another place.

If (a) the undersigned (or any of them) or any guarantor under a guaranty of all or part of the Indebtedness ("guarantor") (i) fail(s) to pay this Note or any of the Indebtedness when due, by maturity, acceleration or otherwise, or fail(s) to pay any Indebtedness owing on a demand basis upon demand; or (ii) fail(s) to comply with any of the terms or provisions of any agreement between the undersigned (or any of them) or any guarantor and the Bank, and any such failure continues beyond any applicable grace or cure period, if any, expressly provided with respect thereto; or (iii) become(s) insolvent or the subject of a voluntary or involuntary proceeding in bankruptcy, or a reorganization, arrangement or creditor composition proceeding, (if a business entity) cease(s) doing business as a going concern, (if a natural person) die(s) or become(s) incompetent, (if a partnership) dissolve(s) or any general partner of it dies, becomes incompetent or becomes the subject of a bankruptcy proceeding, or (if a corporation or a limited liability company) is the subject of a dissolution, merger or consolidation; or (b) any warranty or representation made by any of the undersigned or any guarantor in connection with this Note or any of the Indebtedness shall be discovered to be untrue or incomplete; or (c) there is any

4

termination, notice of termination, or breach of any guaranty, pledge, collateral assignment or subordination agreement relating to all or any part of the Indebtedness; or (d) there is any failure by any of the undersigned or any guarantor to pay when due any of its indebtedness (other than to the Bank) or in the observance or performance of any term, covenant or condition in any document evidencing, securing or relating to such indebtedness; or (e) the Bank deems itself insecure, believing that the prospect of payment or performance of this Note or any of the Indebtedness is impaired or shall fear deterioration, removal or waste of any of the Collateral; or (f) there is filed or issued a levy or writ of attachment or garnishment or other like judicial process upon the undersigned (or any of them) or any guarantor or any of the Collateral, including, without limit, any accounts of the undersigned (or any of them) or any guarantor with the Bank; then the Bank, upon the occurrence and at any time during the continuance or existence of any of these events (each a "Default"), may, at its option and without prior notice to the undersigned (or any of them), declare any or all of the Indebtedness to be immediately due and payable (notwithstanding any provisions contained in the evidence of it to the contrary), sell or liquidate all or any portion of the Collateral, set off against the Indebtedness any amounts owing by the Bank to the undersigned (or any of them), charge interest at the default rate provided in the document evidencing the relevant Indebtedness and exercise any one or more of the rights and remedies granted to the Bank by any agreement with the undersigned (or any of them) or given to it under applicable law.

**The undersigned hereby expressly acknowledge(s) and agree(s) that this Note is a demand note and matures upon issuance, and that the Indebtedness hereunder shall be payable upon demand (unless earlier payment is required in accordance with the terms and conditions of this Note), and that Bank may, at any time in its sole and absolute discretion, without notice and without reason and whether or not any Default shall have occurred and/or exist under this Note, without notice, demand that this Note and the Indebtedness hereunder be immediately paid in full. The Bank may from time to time make demand for partial payments under this Note and these demands shall not preclude the Bank from demanding at any time that this Note be immediately paid in full. The demand nature of this Note shall not be deemed to be modified, limited or otherwise affected by the fact that all or any part of the Indebtedness outstanding hereunder may be bearing interest at an Applicable Interest Rate based upon the LIBOR-based Rate or by the fact that LIBOR-based Rates shall have Interest Periods applicable thereto, and Bank may make demand for payment of all or any part of such Indebtedness at any time prior to the last day of any such Interest Period, in each case, in Bank's sole and absolute discretion. Further, the demand nature of this Note shall not be deemed to be modified, limited or otherwise affected by any reference to any Default in this Note, and to the extent that there are any references to any Default(s) hereunder, such references are for the purpose of permitting Bank to accelerate any Indebtedness not on a demand basis and to receive interest at the applicable default rate provided in the document evidencing the relevant Indebtedness.**

The undersigned authorize(s) the Bank to charge any account(s) of the undersigned (or any of them) with the Bank for any and all sums due hereunder when due; provided, however, that such authorization shall not affect any of the undersigned's obligation to pay to the Bank all amounts when due, whether or not any such account balances that are maintained by the undersigned with the Bank are insufficient to pay to the Bank any amounts when due, and to the extent that are insufficient to pay to the Bank all such amounts, the undersigned shall remain liable for any deficiencies until paid in full.

If this Note is signed by two or more parties (whether by all as makers or by one or more as an accommodation party or otherwise), the obligations and undertakings under this Note shall be that of all and any two or more jointly and also of each severally. This Note shall bind the undersigned, and the undersigned's respective heirs, personal representatives, successors and assigns.

The undersigned waive(s) presentment, demand, protest, notice of dishonor, notice of demand or intent to demand, notice of acceleration or intent to accelerate, and all other notices, and agree(s) that no extension or indulgence to the undersigned (or any of them) or release, substitution or nonenforcement of any security, or release or substitution of any of the undersigned, any guarantor or any other party, whether with or without notice, shall affect the obligations of any of the undersigned. The undersigned waive(s) all defenses or right to discharge available under Section 3-605 of the Michigan Uniform Commercial Code and waive(s) all other suretyship defenses or right to discharge. The undersigned agree(s) that the Bank has the right to sell, assign, or grant participations or any interest in, any or all of the Indebtedness, and that, in connection with this right, but without limiting its ability to make other disclosures to the full extent allowable, the Bank may disclose all documents and information which the Bank now or later has relating to the undersigned or the Indebtedness. The undersigned agree(s) that the Bank may provide information relating to this Note or relating to the undersigned to the Bank's parent, affiliates, subsidiaries and service providers.

The undersigned agree(s) to reimburse Bank, or any other holder or owner of this Note, for any and all costs and expenses (including, without limit, court costs, legal expenses and reasonable attorneys' fees, whether inside or outside

5

counsel is used, whether or not suit is instituted, and, if suit is instituted, whether at the trial court level, appellate level, in a bankruptcy, probate or administrative proceeding or otherwise) incurred in collecting or attempting to collect this Note or the Indebtedness or incurred in any other matter or proceeding relating to this Note or the Indebtedness.

The undersigned acknowledge(s) and agree(s) that there are no contrary agreements, oral or written, establishing a term of this Note and agree(s) that the terms and conditions of this Note may not be amended, waived or modified except in a writing signed by an officer of the Bank expressly stating that the writing constitutes an amendment, waiver or modification of the terms of this Note. As used in this Note, the word "undersigned" means, individually and collectively, each maker, accommodation party, endorser and other party signing this Note in a similar capacity. If any provision of this Note is unenforceable in whole or part for any reason, the remaining provisions shall continue to be effective. **THIS NOTE SHALL BE GOVERNED BY AND CONSTRUED IN ACCORDANCE WITH THE INTERNAL LAWS OF THE STATE OF MICHIGAN, WITHOUT REGARD TO CONFLICT OF LAWS PRINCIPLES.**

For the purposes of this Note, the following terms have the following meanings:

"Advance" means a borrowing requested by the undersigned and made by Bank under this Note, including any refunding of an outstanding Advance as the same type of Advance or the conversion of any such outstanding Advance to another type of Advance, and shall include a LIBOR-based Advance and a Prime-based Advance.

"Applicable Interest Rate" means the LIBOR-based Rate plus the Applicable Margin or the Prime Referenced Rate plus the Applicable Margin, as selected by the undersigned from time to time or as otherwise determined in accordance with the terms and conditions of this Note.

"Applicable Margin" means:

(a)     in respect of the LIBOR–based Rate, ten percent (10%) per annum; and

(b)     in respect of the Prime Referenced Rate, ten percent (10%) per annum.

"Business Day" means any day, other than a Saturday, Sunday or any other day designated as a holiday under Federal or applicable State statute or regulation, on which Bank is open for all or substantially all of its domestic and international business (including dealings in foreign exchange) in Detroit, Michigan, and, in respect of notices and determinations relating to LIBOR-based Advances, the LIBOR-based Rate and the Daily Adjusting LIBOR Rate, also a day on which dealings in dollar deposits are also carried on in the London interbank market and on which banks are open for business in London, England.

"Daily Adjusting LIBOR Rate" means, for any day, a per annum interest rate which is equal to the quotient of the following:

(a)     for any day, the per annum rate of interest determined on the basis of the rate for deposits in United States Dollars for a period equal to one (1) month appearing on Page BBAM of the Bloomberg Financial Markets Information Service as of 11:00 a.m. (Detroit, Michigan time) (or as soon thereafter as practical) on such day, or if such day is not a Business Day, on the immediately preceding Business Day. In the event that such rate does not appear on Page BBAM of the Bloomberg Financial Markets Information Service (or otherwise on such Service) on any day, the "Daily Adjusting LIBOR Rate" for such day shall be determined by reference to such other publicly available service for displaying eurodollar rates as may be reasonably selected by Bank, or, in the absence of such other service, the "Daily Adjusting LIBOR Rate" for such day shall, instead, be determined based upon the average of the rates at which Bank is offered dollar deposits at or about 11:00 a.m. (Detroit, Michigan time) (or as soon thereafter as practical), on such day, or if such day is not a Business Day, on the immediately preceding Business Day, in the interbank eurodollar market in an amount comparable to the applicable principal amount of Indebtedness hereunder and for a period equal to one (1) month;

divided by

(b)     1.00 minus the maximum rate (expressed as a decimal) on such day at which Bank is required to maintain reserves on "Euro-currency Liabilities" as defined in and pursuant to Regulation D of the Board of Governors of the Federal Reserve System or, if such regulation or definition is modified, and as long as Bank is required to maintain reserves against a category of liabilities which includes eurodollar deposits or includes a category of assets which includes eurodollar loans, the rate at which such reserves are required to be maintained on such category.

6

"Interest Period" means, with respect to a LIBOR-based Advance, a period of one (1) month, or as otherwise determined pursuant to and in accordance with the terms of this Note, commencing on the day a LIBOR-based Advance is made or the day an Advance is converted to a LIBOR-based Advance or the day an outstanding LIBOR-based Advance is refunded or continued as another LIBOR-based Advance for an applicable Interest Period, provided that any Interest Period which would otherwise end on a day which is not a Business Day shall be extended to the next succeeding Business Day, except that if the next succeeding Business Day falls in another calendar month, the Interest Period shall end on the next preceding Business Day, and when an Interest Period begins on a day which has no numerically corresponding day in the calendar month during which such Interest Period is to end, it shall end on the last Business Day of such calendar month. In the event that any LIBOR-based Advance is at any time refunded or continued as another LIBOR-based Advance for an additional Interest Period, such Interest Period shall commence on the last day of the preceding Interest Period then ending.

"LIBOR-based Advance" means an Advance which bears interest at the LIBOR-based Rate plus the Applicable Margin.

"LIBOR-based Rate" means a per annum interest rate which is equal to the quotient of the following:

(a)    the LIBOR Rate;

       divided by

(b)    1.00 minus the maximum rate (expressed as a decimal) during such Interest Period at which Bank is required to maintain reserves on "Euro-currency Liabilities" as defined in and pursuant to Regulation D of the Board of Governors of the Federal Reserve System or, if such regulation or definition is modified, and as long as Bank is required to maintain reserves against a category of liabilities which includes eurodollar deposits or includes a category of assets which includes eurodollar loans, the rate at which such reserves are required to be maintained on such category;

provided, however, in no event and at no time shall the LIBOR-based Rate be less than two and one-half percent (2.50%) per annum.

"LIBOR Lending Office" means Bank's office located in the Cayman Islands, British West Indies, or such other branch of Bank, domestic or foreign, as it may hereafter designate as its LIBOR Lending Office by notice to the undersigned.

"LIBOR Rate" means, with respect to any Indebtedness outstanding under this Note bearing interest on the basis of the LIBOR-based Rate, the per annum rate of interest determined on the basis of the rate for deposits in United States Dollars for a period equal to the relevant Interest Period for such Indebtedness, commencing on the first day of such Interest Period, appearing on Page BBAM of the Bloomberg Financial Markets Information Service as of 11:00 a.m. (Detroit, Michigan time) (or as soon thereafter as practical), two (2) Business Days prior to the first day of such Interest Period. In the event that such rate does not appear on Page BBAM of the Bloomberg Financial Markets Information Service (or otherwise on such Service), the "LIBOR Rate" shall be determined by reference to such other publicly available service for displaying eurodollar rates as may be reasonably selected by Bank, or, in the absence of such other service, the "LIBOR Rate" shall, instead, be determined based upon the average of the rates at which Bank is offered dollar deposits at or about 11:00 a.m. (Detroit, Michigan time) (or as soon thereafter as practical), two (2) Business Days prior to the first day of such Interest Period in the interbank eurodollar market in an amount comparable to the principal amount of the respective LIBOR-based Advance which is to bear interest on the basis of such LIBOR-based Rate and for a period equal to the relevant Interest Period.

"Prime Rate" means the per annum interest rate established by Bank as its prime rate for its borrowers, as such rate may vary from time to time, which rate is not necessarily the lowest rate on loans made by Bank at any such time.

"Prime-based Advance" means an Advance which bears interest at the Prime Referenced Rate plus the Applicable Margin.

"Prime Referenced Rate" means, for any day, a per annum interest rate which is equal to the Prime Rate in effect on such day, but in no event and at no time shall the Prime Referenced Rate be less than the sum of the Daily Adjusting LIBOR Rate for such day plus two and one-half percent (2.50%) per annum. If, at any time, Bank determines that it is unable to determine or ascertain the Daily Adjusting LIBOR Rate for any day, the Prime Referenced Rate for each such day shall be the Prime Rate in effect at such time, but not less than two and one-half percent (2.50%) per annum.

7

"Request for Advance" means a Request for Advance issued by the undersigned under this Note in the form annexed to this Note as Exhibit "A".

No delay or failure of Bank in exercising any right, power or privilege hereunder shall affect such right, power or privilege, nor shall any single or partial exercise thereof preclude any further exercise thereof, or the exercise of any other power, right or privilege. The rights of Bank under this Note are cumulative and not exclusive of any right or remedies which Bank would otherwise have, whether by other instruments or by law.

**THE MAXIMUM INTEREST RATE SHALL NOT EXCEED 25% PER ANNUM OR THE HIGHEST APPLICABLE USURY CEILING, WHICHEVER IS LESS.**

THE UNDERSIGNED AND BANK, BY ACCEPTANCE OF THIS NOTE, ACKNOWLEDGE THAT THE RIGHT TO TRIAL BY JURY IS A CONSTITUTIONAL ONE, BUT THAT IT MAY BE WAIVED UNDER CERTAIN CIRCUMSTANCES. TO THE EXTENT PERMITTED BY LAW, EACH PARTY, AFTER CONSULTING (OR HAVING HAD THE OPPORTUNITY TO CONSULT) WITH COUNSEL OF THEIR CHOICE, KNOWINGLY AND VOLUNTARILY, AND FOR THEIR MUTUAL BENEFIT, WAIVES ANY RIGHT TO TRIAL BY JURY IN THE EVENT OF LITIGATION REGARDING THE PERFORMANCE OR ENFORCEMENT OF, OR IN ANY WAY RELATED TO, THIS NOTE OR THE INDEBTEDNESS.

**THIS NOTE IS A "WORKING CAPITAL DIP FACILITY NOTE" AS DEFINED UNDER THAT CERTAIN INTERIM ORDER (I) AUTHORIZING USE OF CASH COLLATERAL, (II) AUTHORIZING POSTPETITION FINANCING, (III) GRANTING SENIOR PRIMING LIENS AND SUPERPRIORITY CLAIMS, (IV) GRANTING ADEQUATE PROTECTION TO THE PREPETITION SECURED PARTIES, AND (V) SCHEDULING A FINAL HEARING TO INCUR SUCH FINANCING ON A PERMANENT BASIS DATED SEPTEMBER  15 , 2009, (THE "FINANCING ORDER") ENTERED BY THE U.S. BANKRUPTCY COURT FOR THE DISTRICT OF DELAWARE, IN THE MATTER OF <u>CYNERGY DATA, LLC, CYNERGY DATA HOLDINGS, INC., AND CYNERGY PROSPERITY PLUS, LLC</u>, DEBTORS, JOINTLY ADMINISTERED, CASE NO. 09-13038 .  THIS NOTE IS SUBJECT TO THE FINANCING ORDER AND, TO THE EXTENT THE FINANCING ORDER CONFLICTS WITH THIS NOTE, THE FINANCING ORDER SHALL GOVERN.**

[SIGNATURE TO FOLLOW ON SUCCEEDING PAGE]

8

**CYNERGY DATA, LLC**

By: _[signature]_
  SIGNATURE OF

Its: _[signature]_
  TITLE

| 45 W. 36TH Street, 6th Floor, | New York | NY | 10018 |
|---|---|---|---|
| STREET ADDRESS | CITY | STATE | ZIP |

| For Bank Use Only | | | | |
|---|---|---|---|---|
| LOAN OFFICER INITIALS | LOAN GROUP NAME | OBLIGOR NAME<br>Cynergy Data, LLC | | |
| LOAN OFFICER ID. NO. | LOAN GROUP NO. | OBLIGOR NO. | NOTE NO. | AMOUNT<br>$11,991,132 |

## EXHIBIT "A"

## REQUEST FOR ADVANCE

The undersigned hereby request(s) COMERICA BANK ("Bank") to make a _____ * Advance to the undersigned on _____, _____, in the amount of _____ _____ Dollars ($_____) under the Master Revolving Note dated as of September ____, 2009, issued by the undersigned to said Bank in the face amount of ELEVEN MILLION NINE HUNDRED NINETY ONE THOUSAND ONE HUNDRED THIRTY TWO DOLLARS ($11,991,132) (the "Note"). The Interest Period for the requested Advance, if applicable, shall be one (1) month. In the event that any part of the Advance requested hereby constitutes the refunding or conversion of an outstanding Advance, the amount to be refunded or converted is _____ Dollars ($_____ _____), and the last day of the Interest Period for the amounts being converted or refunded hereunder, if applicable, is _____, _____.

The undersigned represent(s), warrant(s) and certify(ies) that no Default, or any condition or event which, with the giving of notice or the running of time, or both, would constitute a Default, has occurred and is continuing under the Note, and none will exist upon the making of the Advance requested hereunder. The undersigned further certify(ies) that upon advancing the sum requested hereunder, the aggregate principal amount outstanding under the Note will not exceed the face amount thereof. If the amount advanced to the undersigned under the Note shall at any time exceed the face amount thereof, the undersigned will immediately pay such excess amount, without any necessity of notice or demand.

The undersigned hereby authorize(s) Bank to disburse the proceeds of the Advance being requested by this Request for Advance by crediting the account of the undersigned with Bank separately designated by the undersigned or as the undersigned may otherwise direct, unless this Request for Advance is being submitted for a conversion or refunding of all or any part of any outstanding Advance(s), in which case, such proceeds shall be deemed to be utilized, to the extent necessary, to refund or convert that portion stated above of the existing outstandings under such Advance(s).

Capitalized terms used but not otherwise defined herein shall have the respective meanings given to them in the Note.

Dated this _____ day of _____, _____.

### CYNERGY DATA, LLC

By:_____

Its:_____

---

* Insert, as applicable, "LIBOR-based" or "Prime Referenced Rate".

# EXHIBIT B

**Master Revolving Note**
LIBOR-based Rate/Prime Referenced Rate
Demand-Optional Advances (Business and Commercial Loans Only)

| AMOUNT | NOTE DATE | | MATURITY DATE |
|---|---|---|---|
| $13,008,868 | September | , 2009 | ON DEMAND |

ON DEMAND (or as otherwise provided in this Note), FOR VALUE RECEIVED, the undersigned promise(s) to pay to the order of WELLS FARGO FOOTHILL, LLC (herein called "Bank"), care of Comerica Bank, as Agent, at 500 Woodward Avenue, Detroit, Michigan 48226, the principal sum of THIRTEEN MILLION EIGHT THOUSAND EIGHT HUNDRED SIXTY EIGHT DOLLARS ($13,008,868) or so much of said sum as has been advanced and is then outstanding under this Note, together with interest thereon as hereinafter set forth.

This Note is a note under which Advances, repayments and re-Advances may be made from time to time, subject to the terms and conditions of this Note. **AT NO TIME SHALL THE BANK BE UNDER ANY OBLIGATION TO MAKE ANY ADVANCES TO THE UNDERSIGNED PURSUANT TO THIS NOTE (NOTWITHSTANDING ANYTHING EXPRESSED OR IMPLIED IN THIS NOTE OR ELSEWHERE TO THE CONTRARY, INCLUDING, WITHOUT LIMIT, IF THE BANK SUPPLIES THE UNDERSIGNED WITH A BORROWING FORMULA) AND THE BANK, AT ANY TIME AND FROM TIME TO TIME, WITHOUT NOTICE, AND IN ITS SOLE DISCRETION, MAY REFUSE TO MAKE ADVANCES TO THE UNDERSIGNED WITHOUT INCURRING ANY LIABILITY DUE TO THIS REFUSAL AND WITHOUT AFFECTING THE UNDERSIGNED'S LIABILITY UNDER THIS NOTE FOR ANY AND ALL AMOUNTS ADVANCED.**

Subject to the terms and conditions of this Note, each of the Advances made hereunder shall bear interest at the LIBOR-based Rate plus the Applicable Margin or the Prime Referenced Rate plus the Applicable Margin, as elected by the undersigned or as otherwise determined under this Note; provided, however, the Prime Reference Rate plus the Applicable Margin may only be selected if the LIBOR-based Rate is not available under the terms of this Note

Unless sooner demanded, accrued and unpaid interest on the unpaid balance of each outstanding Advance hereunder shall be payable monthly, in arrears, on the first Business Day of each month. Interest accruing on the basis of the Prime Referenced Rate shall be computed on the basis of a year of 360 days, and shall be assessed for the actual number of days elapsed, and in such computation, effect shall be given to any change in the Applicable Interest Rate as a result of any change in the Prime Referenced Rate on the date of each such change. Interest accruing on the basis of the LIBOR-based Rate shall be computed on the basis of a 360 day year and shall be assessed for the actual number of days elapsed from the first day of the Interest Period applicable thereto but not including the last day thereof.

Upon demand and from and after the occurrence of any Default hereunder, and so long as any such Default remains unremedied or uncured thereafter, the Indebtedness outstanding under this Note shall bear interest at a per annum rate of three percent (3%) above the otherwise Applicable Interest Rate(s), which interest shall be payable upon demand. In addition to the foregoing, a late payment charge equal to five percent (5%) of each late payment hereunder may be charged on any payment not received by Bank within ten (10) calendar days after the payment due date therefor, but acceptance of payment of any such charge shall not constitute a waiver of any Default hereunder.

In no event shall the interest payable under this Note at any time exceed the maximum rate permitted by law.

The amount and date of each Advance, its Applicable Interest Rate, its Interest Period, if applicable, and the amount and date of any repayment shall be noted on Bank's records, which records shall be conclusive evidence thereof, absent manifest error; provided, however, any failure by Bank to make any such notation, or any error in any such notation, shall not relieve the undersigned of its/their obligations to repay Bank all amounts payable by the undersigned to Bank under or pursuant to this Note, when due in accordance with the terms hereof.

The undersigned may request an Advance hereunder, including the refunding of an outstanding Advance as the same type of Advance or the conversion of an outstanding Advance to another type of Advance, upon the delivery to Bank of a Request for Advance executed by the undersigned, subject to the following: (a) Bank shall not have made demand hereunder and no Default, or any condition or event which, with the giving of notice or the running of time, or both, would constitute a Default, shall have occurred and be continuing or exist under this Note; (b) each such Request for Advance shall set forth the information required on the Request for Advance form annexed hereto as Exhibit "A"; (c) each such Request for Advance shall be delivered to Bank by 11:00 a.m. (Detroit, Michigan time) on the proposed date of the

requested Advance; (d) the principal amount of each LIBOR-based Advance shall be at least Two Hundred Fifty Thousand Dollars ($250,000.00) (or such lesser amount as is acceptable to Bank in its sole discretion); (e) the proposed date of any refunding of any outstanding LIBOR-based Advance as another LIBOR-based Advance or the conversion of any outstanding LIBOR-based Advance to another type of Advance shall only be on the last day of the Interest Period applicable to such outstanding LIBOR-based Advance; (f) after giving effect to such Advance, the aggregate unpaid principal amount of Advances outstanding under this Note shall not exceed the face amount of this Note; and (g) a Request for Advance, once delivered to Bank, shall not be revocable by the undersigned; provided, however, as aforesaid, Bank shall not be obligated to make any Advance under this Note.

Advances hereunder may be requested in the undersigned's discretion by telephonic notice to Bank. Any Advance requested by telephonic notice shall be confirmed by the undersigned that same day by submission to Bank, either by first class mail, facsimile or other means of delivery acceptable to Bank, of the written Request for Advance aforementioned. The undersigned acknowledge(s) that if Bank makes an Advance based on a telephonic request, it shall be for the undersigned's convenience and all risks involved in the use of such procedure shall be borne by the undersigned, and the undersigned expressly agree(s) to indemnify and hold Bank harmless therefor. Bank shall have no duty to confirm the authority of anyone requesting an Advance by telephone.

If, as to any outstanding LIBOR-based Advance, Bank shall not receive a timely Request for Advance, or telephonic notice, in accordance with the foregoing requesting the refunding or continuation of such Advance as another LIBOR-based Advance for a specified Interest Period or the conversion of such Advance to a Prime-based Advance, effective as of the last day of the Interest Period applicable to such outstanding LIBOR-based Advance, and as of the last day of each succeeding Interest Period, the principal amount of such Advance which is not then repaid shall be automatically refunded or continued as a LIBOR-based Advance having an Interest Period equal to the same period of time as the Interest Period then ending for such outstanding LIBOR-based Advance, unless the undersigned is/are not entitled to request LIBOR-based Advances hereunder or otherwise elect the LIBOR-based Rate as the basis for the Applicable Interest Rate for the principal Indebtedness outstanding hereunder in accordance with the terms of this Note, or the LIBOR-based Rate is not otherwise available to the undersigned as the basis for the Applicable Interest Rate hereunder for the principal Indebtedness outstanding hereunder in accordance with the terms of this Note, in which case, the Prime Referenced Rate plus the Applicable Margin shall be the Applicable Interest Rate hereunder in respect of such Indebtedness for such period, subject in all respects to the terms and conditions of this Note. The foregoing shall not in any way whatsoever limit or otherwise affect Bank's right to make demand for payment of all or any part of the Indebtedness hereunder at any time in Bank's sole and absolute discretion or any of Bank's rights or remedies under this Note upon the occurrence of any Default hereunder, or any condition or event which, with the giving of notice or the running of time, or both, would constitute a Default.

Subject to the definition of an "Interest Period" hereunder, in the event that any payment under this Note becomes due and payable on any day which is not a Business Day, the due date thereof shall be extended to the next succeeding Business Day, and, to the extent applicable, interest shall continue to accrue and be payable thereon during such extension at the rates set forth in this Note.

All payments to be made by the undersigned to Bank under or pursuant to this Note shall be in immediately available United States funds, without setoff or counterclaim, and in the event that any payments submitted hereunder are in funds not available until collected, said payments shall continue to bear interest until collected.

If the undersigned make(s) any payment of principal with respect to any LIBOR-based Advance on any day other than the last day of the Interest Period applicable thereto (whether voluntarily, upon demand (whether or not any Default shall have occurred and be continuing or exist under this Note), required payment or otherwise), or if the undersigned fail(s) to borrow any LIBOR-based Advance after notice has been given by the undersigned (or any of them) to Bank in accordance with the terms of this Note requesting such Advance, or if the undersigned fail(s) to make any payment of principal or interest in respect of a LIBOR-based Advance when due, the undersigned shall reimburse Bank, on demand, for any resulting loss, cost or expense incurred by Bank as a result thereof, including, without limitation, any such loss, cost or expense incurred in obtaining, liquidating, employing or redeploying deposits from third parties, whether or not Bank shall have funded or committed to fund such Advance. Such amount payable by the undersigned to Bank may include, without limitation, an amount equal to the excess, if any, of (a) the amount of interest which would have accrued on the amount so prepaid, or not so borrowed, refunded or converted, for the period from the date of such prepayment or of such failure to borrow, refund or convert, through the last day of the relevant Interest Period, at the applicable rate of interest for said Advance(s) provided under this Note, over (b) the amount of interest (as reasonably determined by Bank) which would have accrued to Bank on such amount by placing such amount on deposit for a comparable period with leading banks in the interbank eurodollar market. Calculation of any amounts payable to Bank under this paragraph shall

2

be made as though Bank shall have actually funded or committed to fund the relevant LIBOR-based Advance through the purchase of an underlying deposit in an amount equal to the amount of such Advance and having a maturity comparable to the relevant Interest Period; provided, however, that Bank may fund any LIBOR-based Advance in any manner it deems fit and the foregoing assumptions shall be utilized only for the purpose of the calculation of amounts payable under this paragraph. Upon the written request of the undersigned, Bank shall deliver to the undersigned a certificate setting forth the basis for determining such losses, costs and expenses, which certificate shall be conclusively presumed correct, absent manifest error. The undersigned may prepay all or part of the outstanding balance of any Prime-based Advance under this Note or any Indebtedness hereunder which is bearing interest based upon the Prime Referenced Rate at any such time without premium or penalty. Any prepayment hereunder shall also be accompanied by the payment of all accrued and unpaid interest on the amount so prepaid. The undersigned hereby acknowledge(s) and agree(s) that the foregoing shall not, in any way whatsoever, limit, restrict or otherwise affect Bank's right to make demand for payment of all or any part of the Indebtedness under this Note at any time in Bank's sole and absolute discretion, whether such Indebtedness is bearing interest based upon the LIBOR-based Rate or the Prime Referenced Rate at such time.

For any LIBOR-based Advance, if Bank shall designate a LIBOR Lending Office which maintains books separate from those of the rest of Bank, Bank shall have the option of maintaining and carrying such Advance on the books of such LIBOR Lending Office.

If, at any time, Bank determines that, (a) Bank is unable to determine or ascertain the LIBOR-based Rate, or (b) by reason of circumstances affecting the foreign exchange and interbank markets generally, deposits in eurodollars in the applicable amounts or for the relative maturities are not being offered to Bank for any applicable Advance or Interest Period, or (c) the LIBOR-based Rate plus the Applicable Margin will not accurately or fairly cover or reflect the cost to Bank of maintaining any of the Indebtedness under this Note based upon the LIBOR-based Rate, then Bank shall forthwith give notice thereof to the undersigned. Thereafter, until Bank notifies the undersigned that such conditions or circumstances no longer exist, the right of the undersigned to request a LIBOR-based Advance and to convert an Advance to or refund an Advance as a LIBOR-based Advance shall be suspended, and the Prime Referenced Rate plus the Applicable Margin shall be the Applicable Interest Rate for all Indebtedness hereunder during such period of time.

If, after the date hereof, the introduction of, or any change in, any applicable law, rule or regulation or in the interpretation or administration thereof by any governmental authority charged with the interpretation or administration thereof, or compliance by Bank (or its LIBOR Lending Office) with any request or directive (whether or not having the force of law) of any such authority, shall make it unlawful or impossible for the Bank (or its LIBOR Lending Office) to make or maintain any Advance with interest based upon the LIBOR-based Rate, Bank shall forthwith give notice thereof to the undersigned. Thereafter, (a) until Bank notifies the undersigned that such conditions or circumstances no longer exist, the right of the undersigned to request a LIBOR-based Advance and to convert an Advance to or refund an Advance as a LIBOR-based Advance shall be suspended, and thereafter, the undersigned may select only the Prime Referenced Rate plus the Applicable Margin as the Applicable Interest Rate for the Indebtedness hereunder, and (b) if Bank may not lawfully continue to maintain an outstanding LIBOR-based Advance to the end of the then current Interest Period applicable thereto, the Prime Referenced Rate plus the Applicable Margin shall be the Applicable Interest Rate for the remainder of such Interest Period with respect to such outstanding Advance.

If the adoption after the date hereof, or any change after the date hereof in, any applicable law, rule or regulation (whether domestic or foreign) of any governmental authority, central bank or comparable agency charged with the interpretation or administration thereof, or compliance by Bank (or its LIBOR Lending Office) with any request or directive (whether or not having the force of law) made by any such authority, central bank or comparable agency after the date hereof: (a) shall subject Bank (or its LIBOR Lending Office) to any tax, duty or other charge with respect to this Note or any Indebtedness hereunder, or shall change the basis of taxation of payments to Bank (or its LIBOR Lending Office) of the principal of or interest under this Note or any other amounts due under this Note in respect thereof (except for changes in the rate of tax on the overall net income of Bank or its LIBOR Lending Office imposed by the jurisdiction in which Bank's principal executive office or LIBOR Lending Office is located); or (b) shall impose, modify or deem applicable any reserve (including, without limitation, any imposed by the Board of Governors of the Federal Reserve System), special deposit or similar requirement against assets of, deposits with or for the account of, or credit extended by Bank (or its LIBOR Lending Office), or shall impose on Bank (or its LIBOR Lending Office) or the foreign exchange and interbank markets any other condition affecting this Note or the Indebtedness hereunder; and the result of any of the foregoing is to increase the cost to Bank of maintaining any part of the Indebtedness hereunder or to reduce the amount of any sum received or receivable by Bank under this Note by an amount deemed by the Bank to be material, then the undersigned shall pay to Bank, within fifteen (15) days of the undersigned's receipt of written notice from Bank demanding such compensation, such additional amount or amounts as will compensate Bank for such increased cost or reduction. A certificate of Bank, prepared in good faith and in reasonable detail by Bank and submitted by Bank to the undersigned, setting forth the basis

3

for determining such additional amount or amounts necessary to compensate Bank shall be conclusive and binding for all purposes, absent manifest error.

In the event that any applicable law, treaty, rule or regulation (whether domestic or foreign) now or hereafter in effect and whether or not presently applicable to Bank, or any interpretation or administration thereof by any governmental authority charged with the interpretation or administration thereof, or compliance by Bank with any guideline, request or directive of any such authority (whether or not having the force of law), including any risk-based capital guidelines, affects or would affect the amount of capital required or expected to be maintained by Bank (or any corporation controlling Bank), and Bank determines that the amount of such capital is increased by or based upon the existence of any obligations of Bank hereunder or the maintaining of any Indebtedness hereunder, and such increase has the effect of reducing the rate of return on Bank's (or such controlling corporation's) capital as a consequence of such obligations or the maintaining of such Indebtedness hereunder to a level below that which Bank (or such controlling corporation) could have achieved but for such circumstances (taking into consideration its policies with respect to capital adequacy), then the undersigned shall pay to Bank, within fifteen (15) days of the undersigned's receipt of written notice from Bank demanding such compensation, additional amounts as are sufficient to compensate Bank (or such controlling corporation) for any increase in the amount of capital and reduced rate of return which Bank reasonably determines to be allocable to the existence of any obligations of the Bank hereunder or to maintaining any Indebtedness hereunder. A certificate of Bank as to the amount of such compensation, prepared in good faith and in reasonable detail by the Bank and submitted by Bank to the undersigned, shall be conclusive and binding for all purposes absent manifest error.

This Note and any other indebtedness and liabilities of any kind of the undersigned (or any of them) to the Bank, and any and all modifications, renewals or extensions of it, whether joint or several, contingent or absolute, now existing or later arising, and however evidenced and whether incurred voluntarily or involuntarily, known or unknown, or originally payable to the Bank or to a third party and subsequently acquired by Bank including, without limitation, any late charges; loan fees or charges; overdraft indebtedness; costs incurred by Bank in establishing, determining, continuing or defending the validity or priority of any security interest, pledge or other lien or in pursuing any of its rights or remedies under any loan document (or otherwise) or in connection with any proceeding involving the Bank as a result of any financial accommodation to the undersigned (or any of them); and reasonable costs and expenses of attorneys and paralegals, whether inside or outside counsel is used, and whether any suit or other action is instituted, and to court costs if suit or action is instituted, and whether any such fees, costs or expenses are incurred at the trial court level or on appeal, in bankruptcy, in administrative proceedings, in probate proceedings or otherwise (collectively "Indebtedness") are secured by and the Bank is granted a security interest in and lien upon all items deposited in any account of any of the undersigned with the Bank and by all proceeds of these items (cash or otherwise), all account balances of any of the undersigned from time to time with the Bank, by all property of any of the undersigned from time to time in the possession of the Bank and by any other collateral, rights and properties described in each and every deed of trust, mortgage, security agreement, pledge, assignment and other security or collateral agreement which has been, or will at any time(s) later be, executed by any (or all) of the undersigned to or for the benefit of the Bank (collectively "Collateral"). Notwithstanding the above, (i) to the extent that any portion of the Indebtedness is a consumer loan, that portion shall not be secured by any deed of trust or mortgage on or other security interest in any of the undersigned's principal dwelling or in any of the undersigned's real property which is not a purchase money security interest as to that portion, unless expressly provided to the contrary in another place, or (ii) if the undersigned (or any of them) has (have) given or give(s) Bank a deed of trust or mortgage covering California real property, that deed of trust or mortgage shall not secure this Note or any other indebtedness of the undersigned (or any of them), unless expressly provided to the contrary in another place, or (iii) if the undersigned (or any of them) has (have) given or give(s) the Bank a deed of trust or mortgage covering real property which, under Texas law, constitutes the homestead of such person, that deed of trust or mortgage shall not secure this Note or any other indebtedness of the undersigned (or any of them) unless expressly provided to the contrary in another place.

If (a) the undersigned (or any of them) or any guarantor under a guaranty of all or part of the Indebtedness ("guarantor") (i) fail(s) to pay this Note or any of the Indebtedness when due, by maturity, acceleration or otherwise, or fail(s) to pay any Indebtedness owing on a demand basis upon demand; or (ii) fail(s) to comply with any of the terms or provisions of any agreement between the undersigned (or any of them) or any guarantor and the Bank, and any such failure continues beyond any applicable grace or cure period, if any, expressly provided with respect thereto; or (iii) become(s) insolvent or the subject of a voluntary or involuntary proceeding in bankruptcy, or a reorganization, arrangement or creditor composition proceeding, (if a business entity) cease(s) doing business as a going concern, (if a natural person) die(s) or become(s) incompetent, (if a partnership) dissolve(s) or any general partner of it dies, becomes incompetent or becomes the subject of a bankruptcy proceeding, or (if a corporation or a limited liability company) is the subject of a dissolution, merger or consolidation; or (b) any warranty or representation made by any of the undersigned or any guarantor in connection with this Note or any of the Indebtedness shall be discovered to be untrue or incomplete; or (c) there is any

4

termination, notice of termination, or breach of any guaranty, pledge, collateral assignment or subordination agreement relating to all or any part of the Indebtedness; or (d) there is any failure by any of the undersigned or any guarantor to pay when due any of its Indebtedness (other than to the Bank) or in the observance or performance of any term, covenant or condition in any document evidencing, securing or relating to such indebtedness; or (e) the Bank deems itself insecure, believing that the prospect of payment or performance of this Note or any of the Indebtedness is impaired or shall fear deterioration, removal or waste of any of the Collateral; or (f) there is filed or issued a levy or writ of attachment or garnishment or other like judicial process upon the undersigned (or any of them) or any guarantor or any of the Collateral, including, without limit, any accounts of the undersigned (or any of them) or any guarantor with the Bank; then the Bank, upon the occurrence and at any time during the continuance or existence of any of these events (each a "Default"), may, at its option and without prior notice to the undersigned (or any of them), declare any or all of the Indebtedness to be immediately due and payable (notwithstanding any provisions contained in the evidence of it to the contrary), sell or liquidate all or any portion of the Collateral, set off against the Indebtedness any amounts owing by the Bank to the undersigned (or any of them), charge interest at the default rate provided in the document evidencing the relevant Indebtedness and exercise any one or more of the rights and remedies granted to the Bank by any agreement with the undersigned (or any of them) or given to it under applicable law.

**The undersigned hereby expressly acknowledge(s) and agree(s) that this Note is a demand note and matures upon issuance, and that the Indebtedness hereunder shall be payable upon demand (unless earlier payment is required in accordance with the terms and conditions of this Note), and that Bank may, at any time in its sole and absolute discretion, without notice and without reason and whether or not any Default shall have occurred and/or exist under this Note, without notice, demand that this Note and the Indebtedness hereunder be immediately paid in full. The Bank may from time to time make demand for partial payments under this Note and these demands shall not preclude the Bank from demanding at any time that this Note be immediately paid in full. The demand nature of this Note shall not be deemed to be modified, limited or otherwise affected by the fact that all or any part of the Indebtedness outstanding hereunder may be bearing interest at an Applicable Interest Rate based upon the LIBOR-based Rate or by the fact that LIBOR-based Rates shall have Interest Periods applicable thereto, and Bank may make demand for payment of all or any part of such Indebtedness at any time prior to the last day of any such Interest Period, in each case, in Bank's sole and absolute discretion. Further, the demand nature of this Note shall not be deemed to be modified, limited or otherwise affected by any reference to any Default in this Note, and to the extent that there are any references to any Default(s) hereunder, such references are for the purpose of permitting Bank to accelerate any Indebtedness not on a demand basis and to receive interest at the applicable default rate provided in the document evidencing the relevant Indebtedness.**

The undersigned authorize(s) the Bank to charge any account(s) of the undersigned (or any of them) with the Bank for any and all sums due hereunder when due; provided, however, that such authorization shall not affect any of the undersigned's obligation to pay to the Bank all amounts when due, whether or not any such account balances that are maintained by the undersigned with the Bank are insufficient to pay to the Bank any amounts when due, and to the extent that are insufficient to pay to the Bank all such amounts, the undersigned shall remain liable for any deficiencies until paid in full.

If this Note is signed by two or more parties (whether by all as makers or by one or more as an accommodation party or otherwise), the obligations and undertakings under this Note shall be that of all and any two or more jointly and also of each severally. This Note shall bind the undersigned, and the undersigned's respective heirs, personal representatives, successors and assigns.

The undersigned waive(s) presentment, demand, protest, notice of dishonor, notice of demand or intent to demand, notice of acceleration or intent to accelerate, and all other notices, and agree(s) that no extension or indulgence to the undersigned (or any of them) or release, substitution or nonenforcement of any security, or release or substitution of any of the undersigned, any guarantor or any other party, whether with or without notice, shall affect the obligations of any of the undersigned. The undersigned waive(s) all defenses or right to discharge available under Section 3-605 of the Michigan Uniform Commercial Code and waive(s) all other suretyship defenses or right to discharge. The undersigned agree(s) that the Bank has the right to sell, assign, or grant participations or any interest in, any or all of the Indebtedness, and that, in connection with this right, but without limiting its ability to make other disclosures to the full extent allowable, the Bank may disclose all documents and information which the Bank now or later has relating to the undersigned or the Indebtedness. The undersigned agree(s) that the Bank may provide information relating to this Note or relating to the undersigned to the Bank's parent, affiliates, subsidiaries and service providers.

The undersigned agree(s) to reimburse Bank, or any other holder or owner of this Note, for any and all costs and expenses (including, without limit, court costs, legal expenses and reasonable attorneys' fees, whether inside or outside

5

counsel is used, whether or not suit is instituted, and, if suit is instituted, whether at the trial court level, appellate level, in a bankruptcy, probate or administrative proceeding or otherwise) incurred in collecting or attempting to collect this Note or the Indebtedness or incurred in any other matter or proceeding relating to this Note or the Indebtedness.

The undersigned acknowledge(s) and agree(s) that there are no contrary agreements, oral or written, establishing a term of this Note and agree(s) that the terms and conditions of this Note may not be amended, waived or modified except in a writing signed by an officer of the Bank expressly stating that the writing constitutes an amendment, waiver or modification of the terms of this Note. As used in this Note, the word "undersigned" means, individually and collectively, each maker, accommodation party, endorser and other party signing this Note in a similar capacity. If any provision of this Note is unenforceable in whole or part for any reason, the remaining provisions shall continue to be effective. **THIS NOTE SHALL BE GOVERNED BY AND CONSTRUED IN ACCORDANCE WITH THE INTERNAL LAWS OF THE STATE OF MICHIGAN, WITHOUT REGARD TO CONFLICT OF LAWS PRINCIPLES.**

For the purposes of this Note, the following terms have the following meanings:

"Advance" means a borrowing requested by the undersigned and made by Bank under this Note, including any refunding of an outstanding Advance as the same type of Advance or the conversion of any such outstanding Advance to another type of Advance, and shall include a LIBOR-based Advance and a Prime-based Advance.

"Applicable Interest Rate" means the LIBOR-based Rate plus the Applicable Margin or the Prime Referenced Rate plus the Applicable Margin, as selected by the undersigned from time to time or as otherwise determined in accordance with the terms and conditions of this Note.

"Applicable Margin" means:

(a)     in respect of the LIBOR–based Rate, ten percent (10%) per annum; and

(b)     in respect of the Prime Referenced Rate, ten percent (10%) per annum.

"Business Day" means any day, other than a Saturday, Sunday or any other day designated as a holiday under Federal or applicable State statute or regulation, on which Bank is open for all or substantially all of its domestic and international business (including dealings in foreign exchange) in Detroit, Michigan, and, in respect of notices and determinations relating to LIBOR-based Advances, the LIBOR-based Rate and the Daily Adjusting LIBOR Rate, also a day on which dealings in dollar deposits are also carried on in the London interbank market and on which banks are open for business in London, England.

"Daily Adjusting LIBOR Rate" means, for any day, a per annum interest rate which is equal to the quotient of the following:

(a)     for any day, the per annum rate of interest determined on the basis of the rate for deposits in United States Dollars for a period equal to one (1) month appearing on Page BBAM of the Bloomberg Financial Markets Information Service as of 11:00 a.m. (Detroit, Michigan time) (or as soon thereafter as practical) on such day, or if such day is not a Business Day, on the immediately preceding Business Day. In the event that such rate does not appear on Page BBAM of the Bloomberg Financial Markets Information Service (or otherwise on such Service) on any day, the "Daily Adjusting LIBOR Rate" for such day shall be determined by reference to such other publicly available service for displaying eurodollar rates as may be reasonably selected by Bank, or, in the absence of such other service, the "Daily Adjusting LIBOR Rate" for such day shall, instead, be determined based upon the average of the rates at which Bank is offered dollar deposits at or about 11:00 a.m. (Detroit, Michigan time) (or as soon thereafter as practical), on such day, or if such day is not a Business Day, on the immediately preceding Business Day, in the interbank eurodollar market in an amount comparable to the applicable principal amount of Indebtedness hereunder and for a period equal to one (1) month;

divided by

(b)     1.00 minus the maximum rate (expressed as a decimal) on such day at which Bank is required to maintain reserves on "Euro-currency Liabilities" as defined in and pursuant to Regulation D of the Board of Governors of the Federal Reserve System or, if such regulation or definition is modified, and as long as Bank is required to maintain reserves against a category of liabilities which includes eurodollar deposits or includes a category of assets which includes eurodollar loans, the rate at which such reserves are required to be maintained on such category.

6

"Interest Period" means, with respect to a LIBOR-based Advance, a period of one (1) month, or as otherwise determined pursuant to and In accordance with the terms of this Note, commencing on the day a LIBOR-based Advance is made or the day an Advance is converted to a LIBOR-based Advance or the day an outstanding LIBOR-based Advance is refunded or continued as another LIBOR-based Advance for an applicable Interest Period, provided that any Interest Period which would otherwise end on a day which Is not a Business Day shall be extended to the next succeeding Business Day, except that if the next succeeding Business Day falls in another calendar month, the Interest Period shall end on the next preceding Business Day, and when an Interest Period begins on a day which has no numerically corresponding day in the calendar month during which such Interest Period is to end, it shall end on the last Business Day of such calendar month. In the event that any LIBOR-based Advance is at any time refunded or continued as another LIBOR-based Advance for an additional Interest Period, such Interest Period shall commence on the last day of the preceding Interest Period then ending.

"LIBOR-based Advance" means an Advance which bears interest at the LIBOR-based Rate plus the Applicable Margin.

"LIBOR-based Rate" means a per annum interest rate which is equal to the quotient of the following:

(a)     the LIBOR Rate;

        divided by

(b)     1.00 minus the maximum rate (expressed as a decimal) during such Interest Period at which Bank is required to maintain reserves on "Euro-currency Liabilities" as defined in and pursuant to Regulation D of the Board of Governors of the Federal Reserve System or, if such regulation or definition is modified, and as long as Bank Is required to maintain reserves against a category of liabilities which includes eurodollar deposits or includes a category of assets which includes eurodollar loans, the rate at which such reserves are required to be maintained on such category;

provided, however, in no event and at no time shall the LIBOR-based Rate be less than two and one-half percent (2.50%) per annum.

"LIBOR Lending Office" means Bank's office located in the Cayman Islands, British West Indies, or such other branch of Bank, domestic or foreign, as it may hereafter designate as Its LIBOR Lending Office by notice to the undersigned.

"LIBOR Rate" means, with respect to any Indebtedness outstanding under this Note bearing Interest on the basis of the LIBOR-based Rate, the per annum rate of Interest determined on the basis of the rate for deposits in United States Dollars for a period equal to the relevant Interest Period for such Indebtedness, commencing on the first day of such Interest Period, appearing on Page BBAM of the Bloomberg Financial Markets Information Service as of 11:00 a.m. (Detroit, Michigan time) (or as soon thereafter as practical), two (2) Business Days prior to the first day of such Interest Period. In the event that such rate does not appear on Page BBAM of the Bloomberg Financial Markets Information Service (or otherwise on such Service), the "LIBOR Rate" shall be determined by reference to such other publicly available service for displaying eurodollar rates as may be reasonably selected by Bank, or, in the absence of such other service, the "LIBOR Rate" shall, instead, be determined based upon the average of the rates at which Bank is offered dollar deposits at or about 11:00 a.m. (Detroit, Michigan time) (or as soon thereafter as practical), two (2) Business Days prior to the first day of such Interest Period in the interbank eurodollar market in an amount comparable to the principal amount of the respective LIBOR-based Advance which Is to bear interest on the basis of such LIBOR-based Rate and for a period equal to the relevant Interest Period.

"Prime Rate" means the per annum interest rate established by Bank as its prime rate for its borrowers, as such rate may vary from time to time, which rate is not necessarily the lowest rate on loans made by Bank at any such time.

"Prime-based Advance" means an Advance which bears interest at the Prime Referenced Rate plus the Applicable Margin.

"Prime Referenced Rate" means, for any day, a per annum interest rate which is equal to the Prime Rate in effect on such day, but in no event and at no time shall the Prime Referenced Rate be less than the sum of the Daily Adjusting LIBOR Rate for such day plus two and one-half percent (2.50%) per annum. If, at any time, Bank determines that it is unable to determine or ascertain the Daily Adjusting LIBOR Rate for any day, the Prime Referenced Rate for each such day shall be the Prime Rate in effect at such time, but not less than two and one-half percent (2.50%) per annum.

7

"Request for Advance" means a Request for Advance issued by the undersigned under this Note in the form annexed to this Note as Exhibit "A".

No delay or failure of Bank in exercising any right, power or privilege hereunder shall affect such right, power or privilege, nor shall any single or partial exercise thereof preclude any further exercise thereof, or the exercise of any other power, right or privilege. The rights of Bank under this Note are cumulative and not exclusive of any right or remedies which Bank would otherwise have, whether by other instruments or by law.

**THE MAXIMUM INTEREST RATE SHALL NOT EXCEED 25% PER ANNUM OR THE HIGHEST APPLICABLE USURY CEILING, WHICHEVER IS LESS.**

THE UNDERSIGNED AND BANK, BY ACCEPTANCE OF THIS NOTE, ACKNOWLEDGE THAT THE RIGHT TO TRIAL BY JURY IS A CONSTITUTIONAL ONE, BUT THAT IT MAY BE WAIVED UNDER CERTAIN CIRCUMSTANCES. TO THE EXTENT PERMITTED BY LAW, EACH PARTY, AFTER CONSULTING (OR HAVING HAD THE OPPORTUNITY TO CONSULT) WITH COUNSEL OF THEIR CHOICE, KNOWINGLY AND VOLUNTARILY, AND FOR THEIR MUTUAL BENEFIT, WAIVES ANY RIGHT TO TRIAL BY JURY IN THE EVENT OF LITIGATION REGARDING THE PERFORMANCE OR ENFORCEMENT OF, OR IN ANY WAY RELATED TO, THIS NOTE OR THE INDEBTEDNESS.

**THIS NOTE IS A "WORKING CAPITAL DIP FACILITY NOTE" AS DEFINED UNDER THAT CERTAIN INTERIM ORDER (I) AUTHORIZING USE OF CASH COLLATERAL, (II) AUTHORIZING POSTPETITION FINANCING, (III) GRANTING SENIOR PRIMING LIENS AND SUPERPRIORITY CLAIMS, (IV) GRANTING ADEQUATE PROTECTION TO THE PREPETITION SECURED PARTIES, AND (V) SCHEDULING A FINAL HEARING TO INCUR SUCH FINANCING ON A PERMANENT BASIS  DATED SEPTEMBER  15 , 2009, (THE "FINANCING ORDER") ENTERED BY THE U.S. BANKRUPTCY COURT FOR THE DISTRICT OF DELAWARE, IN THE MATTER OF CYNERGY DATA, LLC, CYNERGY DATA HOLDINGS, INC., AND CYNERGY PROSPERITY PLUS, LLC, DEBTORS, JOINTLY ADMINISTERED, CASE NO. 09-13038.  THIS NOTE IS SUBJECT TO THE FINANCING ORDER AND, TO THE EXTENT THE FINANCING ORDER CONFLICTS WITH THIS NOTE, THE FINANCING ORDER SHALL GOVERN.**

[SIGNATURE TO FOLLOW ON SUCCEEDING PAGE]

Detroit_948235_3

**CYNERGY DATA, LLC**

By: _[signature]_
SIGNATURE OF

Its: _[handwritten]_
TITLE

| | | | |
|---|---|---|---|
| 45 W. 36TH Street, 6th Floor, | New York | NY | 10018 |
| STREET ADDRESS | CITY | STATE | ZIP |

| For Bank Use Only | | | | |
|---|---|---|---|---|
| LOAN OFFICER INITIALS | LOAN GROUP NAME | OBLIGOR NAME Cynergy Data, LLC | | |
| LOAN OFFICER ID. NO. | LOAN GROUP NO. | OBLIGOR NO. | NOTE NO. | AMOUNT $13,008,868 |

[SIGNATURE PAGE TO MASTER REVOLVING NOTE (WELLS FARGO FOOTHILL, LLC) (948235)]

**EXHIBIT "A"**

**REQUEST FOR ADVANCE**

The undersigned hereby request(s) WELLS FARGO FOOTHILL, LLC ("Bank") to make a _____* Advance to the undersigned on _____, _____, in the amount of _____ Dollars ($_____) under the Master Revolving Note dated as of September ___, 2009, issued by the undersigned to said Bank in the face amount of THIRTEEN MILLION EIGHT THOUSAND EIGHT HUNDRED SIXTY EIGHT DOLLARS ($13,008,868) (the "Note"). The Interest Period for the requested Advance, if applicable, shall be one (1) month. In the event that any part of the Advance requested hereby constitutes the refunding or conversion of an outstanding Advance, the amount to be refunded or converted is _____ Dollars ($_____), and the last day of the Interest Period for the amounts being converted or refunded hereunder, if applicable, is _____, _____.

The undersigned represent(s), warrant(s) and certify(ies) that no Default, or any condition or event which, with the giving of notice or the running of time, or both, would constitute a Default, has occurred and is continuing under the Note, and none will exist upon the making of the Advance requested hereunder. The undersigned further certify(ies) that upon advancing the sum requested hereunder, the aggregate principal amount outstanding under the Note will not exceed the face amount thereof. If the amount advanced to the undersigned under the Note shall at any time exceed the face amount thereof, the undersigned will immediately pay such excess amount, without any necessity of notice or demand.

The undersigned hereby authorize(s) Bank to disburse the proceeds of the Advance being requested by this Request for Advance by crediting the account of the undersigned with Bank separately designated by the undersigned or as the undersigned may otherwise direct, unless this Request for Advance is being submitted for a conversion or refunding of all or any part of any outstanding Advance(s), in which case, such proceeds shall be deemed to be utilized, to the extent necessary, to refund or convert that portion stated above of the existing outstandings under such Advance(s).

Capitalized terms used but not otherwise defined herein shall have the respective meanings given to them in the Note.

Dated this _____ day of _____, _____.

**CYNERGY DATA, LLC**

By:_____

Its:_____

---

* Insert, as applicable, "LIBOR-based" or "Prime Referenced Rate".

# EXHIBIT C

**Cynergy Data**
**Budget**

| In $000's | 7 10/16/09 | 8 10/23/09 | CF - 10/23 Total |
|---|---|---|---|
| **Beginning Cash** | 1,253 | - | 1,253 |
| **Receipts** | | | |
| Discount Revenue Net of Interchange Fees | 495 | - | 495 |
| Assessments & Processing Fees | - | - | - |
| **Total Receipts for DIP Paydown** | 495 | - | 495 |
| **Operating Expenses** | | | |
| Processing Fees | - | (532) | (532) |
| Commissions | (990) | (6,973) | (7,963) |
| Payroll | (332) | - | (332) |
| Operating Expenses | (66) | (138) | (204) |
| Professional Fees | - | - | - |
| **Operating Expenses Total** | (1,388) | (7,643) | (9,031) |
| **Non Operating Cash Items** | | | |
| CAPEX | - | - | - |
| Debit Networks | (464) | 536 | 71 |
| Debt & Interest | - | - | - |
| Working Capital | - | - | - |
| **Total Non Operating Cash Items** | (464) | 536 | 71 |
| **Cash Gain/(Loss)** | (1,353) | (7,107) | (8,960) |
| **Cash Balance Before Revolver** | (600) | (7,107) | (7,707) |
| Revolver Draw | 600 | 7,107 | 7,707 |
| **Available Cash** | - | - | - |
| **Revolver Balance** | 5,105 | 12,212 | 12,212 |
| **Availability** | 7,452 | 344 | 344 |
| **Forbearance Revolver** | | | |
| Term Loan A | 18,754 | 18,754 | 18,754 |
| Senior Revolver | 17,833 | 17,833 | 17,833 |
| **Pre-Petition Debt** | 36,586 | 36,586 | 36,586 |

DRAFT
For Discussion Purposes Only
Privileged and Confidential

**Hourly Data**
**Professional Fees**

| | | 4-Sep | 11-Sep | 18-Sep | 25-Sep | 2-Oct | 9-Oct | 16-Oct | 23-Oct | 30-Oct | 6-Nov | 13-Nov | 20-Nov | 27-Nov | 4-Dec | 11-Dec | 18-Dec | 25-Dec | 31-Dec | Total |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| Retainer | Expense | | | | | | | | | | | | | | | | | | | |
| Financial Advisory | Expense | 170 | 100 | 240 | 100 | 100 | 100 | 200 | 100 | 100 | | | | | | | | | | 900 |
| Investment Banker | Expense | | 50 | | | | | | | | | | | | | | | | | 50 |
| Industry Expert | Expense | | | | | | | | | | | | | | | | | | | - |
| Debtor Legal | Expense | 150 | 125 | 135 | 125 | 125 | 125 | 125 | 125 | | | | | | | | | | | 1,175 |
| Debtor Legal [1] | Expense | 15 | 15 | 15 | 15 | 15 | 15 | 15 | 15 | | | | | | | | | | | 315 |
| Lender Legal | Expense | 150 | 150 | 150 | 150 | 150 | 150 | 150 | 150 | | | | | | | | | | | 1,350 |
| Shareholder Legal | Expense | | | | | | | | | | | | | | | | | | | 40 |
| Unsecured Creditor Committee Advisory | Expense | 50 | | 50 | 50 | 50 | 25 | 25 | | | | | | | | | | | | 200 |
| Unsecured Creditor Committee Legal | Expense | 30 | 25 | 25 | 25 | 25 | 20 | 20 | 25 | | | | | | | | | | | 225 |
| Claims Agent | Expense | 20 | 20 | 20 | 20 | 20 | 20 | 20 | 20 | | | | | | | | | | | 180 |
| US Trustee | Expense | 2 | 2 | 2 | 2 | 2 | 2 | 2 | 2 | 1 | | | | | | | | | | 31 |
| Wind-down | Expense | | | | | | | | | 250 | | | | | | | | | | 250 |
| **TOTAL** | **Expense** | **$ 597** | **$ 437** | **$ 487** | **$ 417** | **$ 482** | **$ 457** | **$ 482** | **$ 417** | **$ 295** | | | | | | | | | | **$ 5012** |

| | | 4-Sep | 11-Sep | 18-Sep | 25-Sep | 2-Oct | 9-Oct | 16-Oct | 23-Oct | 30-Oct | 6-Nov | 13-Nov | 20-Nov | 27-Nov | 4-Dec | 11-Dec | 18-Dec | 25-Dec | 31-Dec | Total |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| Retainer | Payment | | | | | | | | | | | | | | | | | | | |
| Financial Advisory | Payment | | | | | | | | | | 180 | | | | | 330 | | | | 900 |
| Investment Banker | Payment | | 50 | | | | | | | | | | | | | | | | | 50 |
| Industry Expert | Payment | | | | | | | | | | 200 | | | | | | | | | - |
| Debtor Legal | Payment | | | | | | | | | | 24 | | | | | 400 | | 405 | | 1,175 |
| Debtor Legal [2] | Payment | | | | | | | | | | | | | | | 49 | | 49 | | 315 |
| Lender Legal | Payment | 150 | | | | | | | | | | | | | | 900 | | 150 | | 1,350 |
| Shareholder Legal | Payment | | | | | | | | | | 40 | | | | | | | | | 40 |
| Unsecured Creditor Committee Advisory | Payment | | | | | | | | | | 60 | | | | | 40 | | 20 | | 200 |
| Unsecured Creditor Committee Legal | Payment | | | | | | | | | | 30 | | | | | 80 | | 85 | | 225 |
| Claims Agent | Payment | | | | | | | | | | | | | | | 64 | | 64 | | 180 |
| US Trustee | Payment | | | | | | | | | | | | | | | | | 16 | | 16 |
| Other | Payment | | | | | | | | | 250 | | | | | | | | | | 250 |
| **TOTAL** | **Payment** | **$ 150** | **$ 50** | **$ -** | **$ -** | **$ -** | **$ -** | **$ -** | **$ -** | **$ 250** | **$ 538** | **$ -** | **$ -** | **$ -** | **$ -** | **$ 1,862** | **$ -** | **$ 1,188** | | **$ 5012** |