# EXHIBIT 2

**ASCHETTINO STRUHS LLP**
Stephen A. Aschettino (SA4072)
Nicole J. Leibman (NL1713)
1500 Broadway, 21ˢᵗ Floor
New York, New York 10036
Tel: (212) 354-7600
Fax: (866) 260-5527
*Attorneys for Plaintiff Marcelo Paladini*

<u>UNITED STATES DISTRICT COURT</u>
<u>SOUTHERN DISTRICT OF NEW YORK</u>

| | |
|---|---|
| MARCELO PALADINI | |
| Plaintiff, | Civil Action: |
| v. | |
| BMO HARRIS BANK, N.A. and MONERIS SOLUTIONS, INC. | **AMENDED COMPLAINT** |
| Defendants. | |

      Plaintiff Marcelo Paladini ("Paladini"), by and through his counsel, Aschettino

Struhs LLP, as and for his Amended Complaint against the defendants, BMO Harris

Bank, N.A. ("Harris") and Moneris Solutions, Inc. ("Moneris"), hereby alleges as

follows:

<b>NATURE OF THE CASE</b>

      1.    Paladini brings this civil action against the Defendants for economic

duress, breach of fiduciary duty, breach of the covenants of good faith and fair dealing,

tortious interference with business relations, general malpractice and negligence.

      2.    Paladini was the majority shareholder and guarantor of non-party Cynergy

Data, LLC ("Cynergy Data"), for which Harris served as sponsor bank, and Moneris, its affiliate, provided certain services.

3.    Paladini was also a party to that certain Forbearance Agreement described more fully herein.

4.    As sponsor bank, Harris was the gatekeeper for all funds movements associated with credit card and other electronic transactions for which Cynergy provided processing services to thousands of merchants.

5.    Moneris provided various services for Harris and separately contracted with Cynergy to ensure that Cynergy's accounts were reconciled on a daily basis.

6.    The Defendants ignored their contractual and common law duties to Cynergy and Paladini. They failed to monitor the daily transactions in Cynergy's operating account and provided incorrect information to Cynergy. These transactions included authorized withholdings from merchants – merchant reserves – which were thus to be accounted for and maintained separately.

7.    More than eight (8) months after the inception of their contracts with Cynergy, through an improper and unauthorized communication with a third party, the Defendants claim to have first become aware that their failures had resulted in substantial shortfalls in Cynergy's merchant reserves and corresponding misinformation to Cynergy with regard to its operating account.

8.    Rather than acknowledge their errors and undertake corrective measures, the Defendants disingenuously feigned ignorance with respect to the shortfalls in Cynergy's operating accounts. They then made false allegations against Cynergy – including allegations that Cynergy had breached its contractual obligations to the

Defendants – in order to coerce Cynergy to replenish the alleged multi-million-dollar merchant reserve deficit the Defendants had created.

9.    Ultimately, the Defendants put a gun to Cynergy's head: Harris threatened to suspend Cynergy's funding and thus put Cynergy out of business unless it acceded to Harris's unjustified demands.

10.    It was in this context that Harris coerced Cynergy and Paladini to sign the Forbearance Agreement.

11.    The Defendants' egregious conduct resulted in a number of injuries to Paladini personally, including, but not limited to: the loss of Paladini's entire equity interest in Cynergy, a company he co-founded; several lawsuits filed against Paladini by lending institutions and Cynergy's liquidation trustee seeking to hold Paladini liable for transactions that occurred in reliance upon Defendants' misrepresenations; and permanent damage to Paladini's professional reputation.

12.    Beginning with its predecessor, CPS Group, Inc., Cynergy had been in operation since 1995. In 2008, the year preceding Cynergy's bankruptcy and sale, Cynergy had annual revenues of approximately $140,000,000 and was valued in excess of $300,000,000. Paladini's 91.6% ownership interest, net of the company's indebtedness, was thus conservatively believed to be worth in excess of $200,000,000.

13.    In 2009, Cynergy was sold in a bankruptcy sale to The ComVest Group for $81,000,000 – approximately $40,000,000 less than what Cynergy owed to its creditors. Paladini's shares were worthless. And Paladini was on the hook for the shortfall due to his personal guaranty of Cynergy's indebtedness.

## THE PARTIES AND OTHER ENTITIES

-3-

14.    Plaintiff Paladini is a citizen of the State of Florida and also has a residence in the State of New York, within the Southern District of New York.

15.    Defendant Harris is a corporation organized under the laws of Canada, with its principal place of business at 111 West Monroe Street, Chicago, Illinois 60603.

16.    Defendant Moneris is a corporation organized under the laws of Illinois, with its principal place of business at 150 North Martingale Road, Suite 900, Schaumburg, Illinois, 60173.  During the subject events, Moneris was an affiliate and agent of Harris.

17.    Non-party CPS Group, Inc. d/b/a/ Cynergy Data ("CPS") was a corporation organized under the laws of New York, with its principal place of business during the subject events at 45 West 36th Street, New York, New York.  CPS provided payment-processing services for merchants, including credit card, debit card, electronic benefit transfer and check processing services.

18.    Non-party Cynergy Data Holdings, Inc. ("Cynergy Holdings") was a corporation organized under the laws of Delaware, with its principal place of business initially at 45 West 36th Street, New York, New York, and thereafter at 30-30 47th Avenue, Long Island City, New York. Cynergy Holdings was the successor-in-interest to CPS, CPS having merged with Cynergy Holdings on October 4, 2007.

19.    Non-party Cynergy Data, LLC ("Cynergy Data" and together with Cynergy Holdings and CPS, "Cynergy") was a limited liability company organized under the laws of Delaware, with its principal place of business during the subject events at 45 West 36th Street, New York, New York, and thereafter at 30-30 47th Avenue, Long Island City, New York. Like CPS, Cynergy Data provided payment-processing services

-4-

for merchants, including credit card, debit card, electronic benefit transfer and check processing services. Cynergy Data was a wholly owned and controlled subsidiary of Cynergy Holdings.

20.    Cynergy Holdings and Cynergy Data together filed a petition for Chapter 11 bankruptcy protection on September 1, 2009.

21.    Plaintiff Paladini had held 47.75% of the shares of CPS and was the co-founder, Chief Executive Officer, Vice Chairman, and Vice President of Business Development of CPS. In 2007 Paladini purchased additional shares from the other majority shareholder, John Martillo. Paladini thus became the majority shareholder, owning 91.6% of Cynergy Holdings. Paladini also assumed the role of Chief Executive Officer of both Cynergy Holdings and Cynergy Data.

## JURISDICTION AND VENUE

22.    This Court has jurisdiction over this matter pursuant to 28 U.S.C. § 1332(a) because plaintiff Paladini and the Defendants hold diversity of citizenship, as Paladini is a citizen of Florida and Harris and Moneris are citizens of Illinois, and the claim of losses by plaintiff Paladini exceeds $75,000 in the aggregate.

23.    Venue is proper in the Southern District of New York pursuant to 28 U.S.C. § 1391(b)(2) because it is the "judicial district in which substantial parts of the events or omissions giving rise to the claim occurred." Plaintiff Paladini was located in the Southern District of New York at all times relevant to this action, and the facts and circumstances giving rise to this Amended Complaint, including, but not limited to, the payments between Cynergy and Harris, occurred in the Southern District of New York.

## GENERAL ALLEGATIONS

### I.    Cynergy's Business

24.     Cynergy was a provider of payment processing and related merchant services for credit card and other electronic transactions that served approximately 80,000 merchants.

25.     Cynergy was not a financial institution. Rather, Cynergy was an Independent Sales Organization ("ISO") and Member Service Provider ("MSP"), as those terms are described by Visa and MasterCard, respectively. This required Cynergy to register with the Visa and MasterCard networks in order to provide payment processing services to merchants.

26.     Further, Cynergy was not permitted to facilitate any credit card, debit card, or similar transactions without the involvement and assistance of a sponsoring bank. The sponsor bank itself was required to be a licensed financial institution, and a member of the Visa and MasterCard networks.

27.     Until November 2008, Bank of America ("BofA") served as Cynergy's sponsor bank.

## II.  Harris's Relationship with Cynergy as Sponsor Bank

### a.  Harris Replaces BofA as Cynergy's Sponsor Bank Pursuant to the BIN Sponsorship Agreement

28.     On November 1, 2008, Harris replaced BofA as Cynergy's sponsor bank pursuant to a BIN Sponsorship Agreement (the "BIN Agreement"). A true and correct copy of the BIN Agreement is annexed hereto as **Exhibit A**.

29.     Under the BIN Agreement, Cynergy purports to grant certain liens on Cynergy's assets in favor of Harris. However, Harris expressly agreed to subordinate these liens in an intercreditor agreement, dated April 28, 2009, among Harris and certain

other creditors (the "Harris ICA"). A true and correct copy of the Harris ICA is annexed hereto as **Exhibit B**.

30.     The Harris ICA provides, with limited exceptions, that Harris's liens would be subordinated to the existing liens of senior lenders. Specifically, in November of 2007, Ableco Finance LLC ("Ableco"), A3 Funding LP ("A3 Funding"), Dymas Funding Company, LLC ("Dymas") (collectively the "Lenders") and Cynergy entered into a Financing Agreement whereby the Lenders provided capital to Cynergy. Further, in August of 2008, Ableco, A3, Garrison Credit Investments I, LLC, and Garrison Credit Opportunities Holdings L.P., ("Garrison"), Comerica Bank ("Comerica"), as agent, and Dymas (collectively the "Term B Parties") entered into a Senior Credit Agreement with Cynergy for additional credit. (The Lenders and Term B Parties are collectively referred to herein as the "Cynergy Lenders.")

31.     These senior lien holders were parties that had previously provided credit and lending facilities to Cynergy, prior to Harris assuming the role of sponsor bank.

32.     Thus in assuming its role as sponsor bank, Harris expressly agreed to subordinate its liens subject to the Cynergy Lenders' liens.

### b. Harris's Role as Sponsor Bank

33.     In its role as sponsor bank, Harris had the exclusive ability to clear and settle credit card and debit card transactions. In addition, Harris had the final authority to approve any and all Cynergy merchants.

34.     Without Harris's sponsorship and assistance, Cynergy could not have continued in business.

35.     Harris alone was responsible for authorizing the transfer of funds to

merchants for goods or services.  Harris was thus the gatekeeper for all funds movements associated with credit card and other electronic transactions for which Cynergy provided processing services.

36.    Harris authorized and effectuated the transfer of funds to the credit card associations, merchants and Cynergy so that Cynergy could meet its obligations to merchants and third-party processors.  In some instances, Harris permitted third parties to effectuate transfers of funds to and from Cynergy's operating account.  *Funds could not move unless Harris moved or authorized them.*

37.    To facilitate this process, as part of its daily functions, Cynergy withheld from daily batches of transactions certain funds that could be used to offset potential future losses caused by a given merchant.  These withheld funds are what the parties refer to as "Rolling Reserves."

38.    Harris was also required to open and maintain a record for every questionable merchant ("QM") whose funds were to be withheld as a Rolling Reserves.

39.    Cynergy was then obligated to perform a calculation that determined what portion (if any) of the funds attributed to a merchant was to be allocated to that merchant's Rolling Reserves for each of Cynergy's QMs.

40.    Cynergy made this calculation based on information from each retail transaction conducted by a merchant, as well as any and all deductions and payments arising from that merchant activity.

41.    On a daily basis, Cynergy supplied the results of this calculation to Total System Services, Inc. (known within the trade as "TSYS"), a "back-end" information processor engaged by Cynergy and approved by Harris.

42.    This data was immediately and readily visible to Harris through the TSYS online interface provided to Harris.

43.    At all times, Harris had the ability to determine the amount of Rolling Reserves attributable to Cynergy's QMs, as well as any transfers made to/from Cynergy, simply by viewing the TSYS information screens.

### c.  The Merchant Processing Agreements

44.    As Cynergy's sponsor bank, Harris required that each merchant for whom Harris and Cynergy performed payment processing services execute a Merchant Processing Agreement ("MPA"). A true and correct copy of the MPA is annexed hereto as **Exhibit C.**

45.    The MPA is a Harris form agreement that governed the relationship between Cynergy and Harris, on the one hand, and each merchant utilizing Harris's and Cynergy's services on the other.

46.    This form agreement is virtually identical to the one used by BofA when it functioned as Cynergy's sponsor bank. Among other things, the Harris MPA recites that Cynergy functions as Harris's agent in all matters relating to the MPA and that "[Harris] is at all times entirely responsible for, and in control of [Cynergy's] performance." *See* Exhibit C, MPA, at § 9.D.

47.    The MPA entitles Harris to withhold some or all of the funds that would otherwise flow to a merchant in order to offset potential future losses caused by the merchant (i.e., the Rolling Reserves).

48.    Section 4.B. of the MPA recites:

> "You are fully liable for all transactions returned for whatever reasons, otherwise known as 'chargebacks.' ... Authorization is

-9-

granted to offset from incoming transactions and to debit the
Designated Account, the Reserve Account (defined in Section 7
below) or any other account held at [Harris] or at any other
financial institution the amount of all chargebacks."

49.    A chargeback, sometimes referred to as a "reject," may occur for several

reasons, including consumer dissatisfaction or merchant fraud.

50.    As a sponsor bank, Harris is required by the credit card association rules to

effect a refund to the bank that issues a consumer's credit card when a chargeback occurs.

51.    Harris could set these funds aside in order to establish a merchant reserve

account ("Reserve Account").

52.    The relevant text of Section 4.A.i. of the MPA recites:

"You understand and agree that [Harris] may withhold deposit and
payment to you without notice until the expiration of any
chargeback period if [Cynergy, acting as Harris's agent] or [Harris]
determine, in their sole and reasonable discretion, that a transaction
or batch of transactions poses a risk of loss. Neither [Cynergy] nor
[Harris] are responsible for any losses you may incur ... due to such
delayed deposit of funds." *See* Exhibit C, MPA, at § 4.A.i.

53.    The MPA further specifically provides that Harris has the option of

requiring a merchant to establish a Reserve Account with Harris to hold all Rolling

Reserve funds:

You [merchant] will establish and maintain a non-interest
bearing deposit account ("Reserve Account") *at [Harris]* initially
or at any time in the future *as requested* by [Cynergy, acting as
Harris's agent] and [Harris], with sums sufficient to satisfy your
current and future obligations as determined by [Cynergy, acting
as Harris's agent] and [Harris]. You authorize [Harris] to debit
the Designated Account or any other account you have at
[Harris] or any other financial institution to establish or maintain
funds in the Reserve Account. [Harris] may deposit into the
Reserve Account funds it would otherwise be obligated to pay to
you, for the purposes of establishing, maintaining or increasing
the Reserve Account in accordance with this Section, if it
determines such action reasonably necessary to protect its

-10-

interests.

Exhibit C, MPA, at § 7.B.i (emphasis added).

54.     Establishment of a Reserve Account is thus not automatic under the terms

of the MPA. But it may be requested by Cynergy or Harris at either's discretion. If such

a request is made, the obligation is then on *Harris,* not Cynergy, to establish a Reserve

Account at Harris.

55.     Had Harris elected to pursue this contractual option, Harris could have

maintained within its possession and control every penny of the Rolling Reserves.

### d. The Merchant Reserve Acknowledgment

56.     In addition to executing an MPA, merchants had to sign a form entitled

"Merchant Reserve Acknowledgement" ("MRA"). A true and correct copy of the MRA

is annexed hereto as **Exhibit D.**

57.     Pursuant to the MRA, the merchant acknowledged that: (a) "[Cynergy]

and its agents, including its processing bank [Harris], *have the authority to establish* a

reserve account in accordance with Section 7.B of the [MPA];" and (b) the merchant

could specify the manner in which such an account, if created, would be funded (either

by a lump sum payment made by check by the merchant or by withholding an agreed

percentage from the merchant's gross receipts). Exhibit D, MRA (emphasis added).

58.     The MRA also explained to the merchant the uses to which any funds

deposited in the account would be applied and that any funds remaining in the reserve

account, if established, "will be returned to the Merchant up to 270 days after termination

of the MPA or the Merchants' last transmission of sales drafts, whichever is later."

Exhibit D, MRA.

59.     The MRA concludes with the statement: "If there is any conflict between

-11-

the terms of this letter and the terms of the MPA, the terms of the MPA will govern." Exhibit D, MRA.

60.     Unlike the MPA, the MRA does not require or mandate the establishment of a reserve account. Rather, the election to establish such an account remains within the discretion of Harris or Cynergy, acting as Harris's agent.[1]

### III.   Harris's Agent Moneris's Provides Accounting Services to Cynergy

61.     In addition to Harris's role as Cynergy's sponsor bank, Harris's affiliate and agent, Moneris Solutions, Inc. ("Moneris"), performed all functions for and on behalf of Harris relating to the BIN Agreement and the MPA.

62.     Cynergy also separately engaged Moneris to provide certain accounting services. These additional services were separate and apart from services related to Harris's role as sponsor bank.

63.     Cynergy paid Harris directly for the additional services that Moneris provided.

64.     Specifically, Moneris was responsible for daily reconciliation of transfers in and out of Cynergy's operating accounts to ensure the account maintained a zero balance error. Moneris was also responsible for reconciling Cynergy's operating account balance with Harris's QM's.

---

[1] For the purpose of clarifying the relationship between the various agreements, the BIN Agreement requires that Cynergy maintain what is defined as a "Reserve Account" and further provides that Harris may ask a merchant to maintain what is defined as a "Merchant Reserve Account." Exhibit A, BIN Agreement, § 2.6. However, the "Reserve Account" as defined in the MPA and MRA, refers to the "Merchant Reserve Accounts" (herein referred to solely as the "Reserve Accounts") in the BIN Agreement, and not to the "Reserve Account" which the BIN Agreement requires Cynergy to maintain. At all times, Cynergy maintained its "Reserve Account" as it was required by the BIN Agreement. *See* Exhibit C, MPA, at § 4.A.i.

65.     Moneris billed Cynergy on a monthly basis – for no less than 50 hours of accounting services – for daily reconciliation of Cynergy's operating account.

66.     Moneris was thus responsible for any accounting or reconciliation errors in Cynergy's operating account related to Harris's QMs.

### IV. Harris Fails to Require Merchants to Maintain Reserve Accounts at Harris

67.     The MRA and MPA make clear that Harris could have elected to require that Rolling Reserve funds be maintained in Reserve Accounts under its control.

68.     Contrary to the MRA and MPA, however, Harris did not elect to maintain the Rolling Reserves. Nor did Harris require the creation of Reserve Accounts under its control to hold the Rolling Reserves.

69.     This was advantageous to Harris because it allowed Harris to avoid incurring administrative and bookkeeping costs, as well as potential liability, associated with establishing individual Reserve Accounts for each merchant that had an enhanced credit risk.

70.     Further, Harris made a determination that it had minimal economic risk in failing to establish and maintain the accounts because Harris had continuing control over the revenue flows to Cynergy.

71.     As set forth above, as sponsor bank, Harris had control of all cash from credit card, debits, ACH rejects, chargebacks and all other electronic transactions flowing to and from Cynergy, which it remitted to, or debited from, Cynergy on a daily basis.

72.     In the event Harris was called upon to pay an obligation to which Rolling Reserves should be applied, Harris could simply demand that Cynergy supply the required funds. Should Cynergy fail to provide those funds, Harris controlled the

movement of all funds and thus had the practical ability to force the payment from Cynergy by withholding the necessary funds.

73.    During the entire time it served as Cynergy's sponsor bank, Harris simply turned over substantially all daily Rolling Reserve funds to Cynergy's operating account, without limitation or restriction. By doing so, Harris knowingly transferred Rolling Reserves to Cynergy that were commingled with Cynergy's operating funds.

74.    This is how Harris operated during the *entire time* it served as Cynergy's sponsor bank.

75.    Harris never – from November 2008 until at least July 2009 – required merchants to establish Reserve Accounts and maintain funds with Harris, as was Harris's option under the MPA and MRA.

76.    Nor did Harris ever implement any procedures to otherwise require that Cynergy segregate and preserve the Rolling Reserves – despite the fact that Moneris had been expressly engaged to review and reconcile these accounts on a daily basis.

77.    Furthermore, Harris never audited Cynergy's records to ensure that the merchant reserve records were accurate and consistent with the funds available in the QM account prior to the inception of the BIN Agreement, nor did it ever perform or institute any controls going forward to balance such reserve levels with Cynergy's own proprietary system, "Vimas".

## V.  Cynergy's Forced Asset Sale

78.    In late 2008 and continuing in 2009, as a result of economic conditions in the market place, Cynergy experienced a decline in merchant activity and began facing financial difficulties.

79.    Accounting irregularities, first discovered in March 2009, further compounded the impact upon Cynergy. The Defendants exacerbated the impact of these irregularities by failing to reconcile Cynergy's operating account and to otherwise report correct information regarding the movement and withholding of funds.

80.    In 2009, after hiring FTI Consulting to perform a forensic accounting analysis, Cynergy had to restate its 2008 and 2007 earnings.

81.    These earnings restatements, among other things, resulted in technical defaults on the Cynergy Lenders' credit facilities.

82.    As a consequence of Cynergy's defaults, the Cynergy Lenders required Cynergy to market for sale its credit card and electronic transaction processing business, i.e., substantially all of Cynergy's assets.

83.    In the Spring of 2009, Cynergy retained the investment banking firms Stifel, Nicolaus and Company, Inc. and Peter J. Solomon Company to market the asset sale.

84.    Numerous parties expressed interest in Cynergy's assets.

85.    The list of suitors included Defendant Moneris.

86.    All potential bidders, including Moneris, were required to sign non-disclosure agreements ("NDA") that required, among other things, that the bidders: (a) keep confidential all non-public information received, and (b) not communicate with each other.

**a.  Moneris Disrupts the Sale Process**

87.    In or about June 2009, as Cynergy was reasonably anticipating Moneris would make a bid, Moneris and the other potential bidders were conducting their due

diligence.

88.     One of the other Cynergy bidders, EVO Merchant Services ("EVO"), had

a prior history with Cynergy. Like Cynergy, EVO was located in the New York

metropolitan area, and it was well versed in Cynergy's operations and proprietary

technology. EVO and Cynergy almost merged operations in 2006, but the transaction

was never consummated. EVO's CEO, Ray Sidhom ("Sidhom"), had a long-standing

relationship with Paladini and other members of Cynergy's management team. EVO was

thus viewed as a likely bidder.

89.     During the due diligence process, EVO reviewed certain information that

raised concerns about a potential shortfall of Cynergy's Rolling Reserves. Rather than

pose any questions to Cynergy's investment bankers or through counsel as EVO was

required to do pursuant to the NDA it had executed, Sidhom called and spoke with

Moneris's President, Gregg Cohen ("Cohen"). The two discussed their concerns and

exchanged information.

90.     By discussing confidential information with another potential bidder,

Moneris clearly violated the NDA it had entered into with Cynergy.

91.     Based on Cohen's improper disclosure of confidential information, EVO

immediately presented a lower offer to purchase Cynergy assets, and ultimately withdrew

from the bidding process.

92.     Moneris acted dishonestly and with malice in order to remove EVO from

the bidding process and lower the price of Cynergy.

93.     Moneris also subsequently failed to make a bid.

94.     The withdrawal of these two key bidders reduced the competitive bidding

process and ultimately had an adverse impact upon the entire sale process and the ultimate the sale price.

### b. Harris Suspends Cynergy's Funding

95.     On July 16, 2009, shortly after Moneris withdrew its bid, Moneris forwarded correspondence to Cynergy accusing Cynergy of being in default under the BIN Agreement (the "Default Letter"). A true and correct copy of the Default Letter is annexed hereto as **Exhibit E.**

96.     Moneris claimed that over $21,000,000 of Rolling Reserves should have been, but had not been, deposited and maintained in an account or accounts at Harris.

97.     Moneris further threatened to immediately exercise the setoff rights provided to Harris in the BIN Agreement, retaining all funds that would otherwise flow to Cynergy until it recovered the full amount of the purported Rolling Reserves shortfall.

98.     After knowingly transmitting the Rolling Reserve funds to Cynergy every day for over eight (8) months, Harris suddenly claimed that its own transmission of Rolling Reserves to Cynergy was somehow a violation *by Cynergy* of the BIN Agreement.

99.     Harris's claim of ignorance with respect to any shortfall was unfathomable given that Harris: a) controlled the flow of funds, b) had daily access to TSYS to view the Rolling Reserves, and c) was responsible for daily reconciliation of Cynergy's operating accounts.

100.    Further, Cohen had expressed concerns regarding Cynergy's operating accounts even prior to Harris entering the BIN Agreement with Cynergy. Armed with this knowledge, Harris undoubtedly should have paid even closer attention to Cynergy's

-17-

accounts rather than turn a blind eye.

101.    The Defendants knew or should have known about the alleged shortfall prior to Moneris's improper communications with EVO.

102.    In its Default Letter, Moneris contended that Cynergy breached obligations imposed by the association rules of Visa and MasterCard. Yet the Default Letter fails to cite any provision of the Rules that Cynergy allegedly violated.

103.    This contention was presumably based, misguidedly, on Section 5.2 of the BIN Agreement, in which Cynergy "agrees to comply with all applicable Rules," defined as including all rules "regulations or requirements that are issued or promulgated by Visa, MasterCard or other Card networks from time to time applicable to activities or transactions contemplated by this Agreement or under Merchant Agreements [MPA]." ("Rules"). Harris never provided a copy of the Rules to Cynergy.

104.    The Visa rules – over 900 pages in length – provide that "An Acquirer [here, Harris][2] must.... hold and control reserves that are accumulated and derived from the Merchant settlement funds or used to guarantee a Merchant's payment system obligations to the Member."

105.    The Visa rules Harris referenced in the Default Letter, by their own terms, govern the conduct of *Harris*, not Cynergy.

106.    The MasterCard rules – which exceed 200 pages – similarly impose a requirement upon Harris in section 7.3.11 to ensure that an MSP such as Cynergy does not have access to a "Settlement Account," as follows: "Settlement Account: An MSP [here, Cynergy] must not have access to any account for funds then or subsequently due

---

[2] Harris is defined as an "Acquirer" in the BIN Agreement, Section 3.1.B.

-18-

to a Merchant for Activity and/or funds withheld from a Merchant for chargebacks arising out of Activity. A Member [here, Harris] must not assign or otherwise transfer an obligation or reimburse a Merchant to an MSP if the obligation arises from Activity."

107.    Again, Cynergy did not and could not violate this provision. Nor did Harris ever even allege that Cynergy had access to a "Settlement Account."

108.    Lastly, the MasterCard rules state in section 7.3.1 that it is the obligation of Harris, not Cynergy, to ensure that conformance with the rules. Under the MasterCard Rules, Harris was at all times entirely responsible for and must itself manage, direct and enforce all aspects of Cynergy's merchant processing.

109.    Given Harris's unambiguous responsibility for compliance with the MasterCard rules, it is again unfathomable that Harris would contend that *its own conduct* -- in transferring Rolling Reserves to Cynergy -- was some sort of "default" by Cynergy.

110.    The Defendants' contentions in their Default Letter were false. Cynergy was not in default of the BIN Agreement. And there was no $21,000,000 shortfall or other amount due to Harris.

111.    Nevertheless, on or about July 16, 2009, the Defendants suspended all funding to Cynergy to initiate the recovery of those funds.

112.    The Defendants' actions were undertaken in bad faith and — in the context of an asset sale — jeopardized the entire sale process.

113.    Further, as a result of its loss of funding, Cynergy was unable to timely pay its extensive network of agents and ISOs their monthly commissions ("Residuals") on July 20, 2009.

114.    Ultimately, after being forced to enter into the onerous Forbearance

Agreement discussed *infra*, Cynergy paid the Residuals to its agents and ISO's approximately one week late.

115.    This was the first time in *fourteen years* that Cynergy had failed to timely pay its agents and ISOs their Residuals.

116.    By paying the Residuals late, Cynergy was faced with the risk of an imminent loss of all of Cynergy's merchants -- its most valuable asset -- and agents to other competitors.

117.    The ensuing bad rumors and press that invaded the market place with respect to Cynergy's alleged mishandling of merchant funds, the claimed breach of the BIN Agreement, and the potential liquidation of substantially all of Cynergy's assets destroyed both Cynergy's and Paladini's reputations.

### c.   Harris Forces Cynergy and Paladini to Enter the Forbearance Agreement.

118.    On July 24, 2009, one week after it had suspended Cynergy's funding, Harris forced Cynergy and Paladini to enter into a Forbearance Agreement.    A true and correct copy of the Forbearance Agreement is annexed hereto as **Exhibit F**.

119.    The Defendants threatened to continue suspending funding if Cynergy and Paladini did not sign the Forbearance Agreement.    As detailed above, without Harris's authorization, Cynergy could had no access to its operating revenues and thus could not operate its business.

120.    The Defendants acted in bath faith during the entire process of entering into the Forbearance Agreement.

121.    The Defendants refused Cynergy's collection and transfer of over $6 million as a good faith down payment on the alleged $21 million shortage of Rolling

Reserves to Harris.

122.    The Defendants further refused to provide Cynergy any opportunity to continue replenishing the Rolling Reserves at a reasonable rate and to pay merchants entitled to Rolling Reserves funds in due course in accordance with each individual reserve due date.

123.    Rolling Reserves were not due and payable.

124.    Cynergy had never failed to return any reserves due to its merchants in its fourteen-year history.

125.    If given the opportunity to replenish the Rolling Reserves at a reasonable pace, Cynergy could have cured the shortfall without ever defaulting on any of its obligations to return funds to merchants as such funds became due.

126.    The Defendants even disregarded the three-year business plan Cynergy had presented to the Cynergy Lenders that showed a clear path of growth and corrective actions to rebuild Cynergy's value so it could be sold for a substantially higher price in the future.

127.    The Defendants denied Cynergy the opportunity to negotiate with the Cynergy Lenders to try and recapitalize.

128.    The Defendants did so because Harris was aware that the Cynergy Lenders disagreed with Harris's untenable position regarding the claimed shortfall in Rolling Reserves, as well as Harris's contention that the reserves had to be funded by immediate payment to Harris.

129.    The Cynergy Lenders conveyed to Cynergy their strong disagreement with Harris's position.  Cynergy, in turn, encouraged them to collectively try to reach an

accommodation with Harris, to no avail.

130.    Harris even required that Paladini personally sign the Forbearance

Agreement based on a claim that Paladini was a guarantor of the Finance Agreement and

the Senior Credit Agreement with the Cynergy Lenders.

131.    Harris's motivation to force and accelerate the sale process was to

replenish the Rolling Reserves as quickly as possible in order to minimize their potential

liability to merchants and corresponding exposure to Visa and MasterCard stemming

from Harris's violation of the Rules.

## VI.  Harris's Claims That Cynergy Breached the BIN Agreement Were Knowingly False.

132.    Harris's position that Cynergy breached the BIN Agreement was

knowingly disingenuous.

133.    Other than the Defendants' vague, one-page Default Letter containing

baseless claims, Defendants never provided Cynergy or Paladini with any written support

for the claimed Rolling Reserves shortfall.

134.    Cynergy, Paladini and the Cynergy Lenders denied that any amount was

due to Harris.

135.    Harris essentially claimed that it first discovered in July of 2009 the

shortfall in the Reserve Accounts – accounts that by definition could only have been

established and maintained at Harris pursuant to Section 7.B of the MPA.

136.    Any surprise over the purported "shortfall" occurred because Harris and

Moneris were asleep at the wheel, failed to view the data available on TSYS, failed to

reconcile the merchant reserves balances inherited from its predecessor BofA and failed

to pay even minimal attention to the funds they were controlling and accounts they were

-22-

reconciling.

137.    Ironically, Harris and Moneris had been billing Cynergy for over fifty (50)

hours of monthly accounting services to reconcile Cynergy's operating account with

Harris's QM account on a daily basis.

138.    The fact that no Reserve Accounts had been maintained at Harris was not

a breach of the MPA by Cynergy but was instead a breach of the BIN Agreement by

*Harris*.

139.    Harris essentially put a gun to Cynergy's head: Harris threatened to put

Cynergy out of business unless Cynergy acceded to Harris's unjustified demands.

140.    It was in this context that Harris coerced Cynergy and Paladini to sign the

Forbearance Agreement.

141.    The Forbearance Agreement belatedly attempted to rewrite the BIN

Agreement and the MPA to impose upon Cynergy obligations that are not found in either

of those agreements.   However, as the Forbearance Agreement is not a contemporaneous

agreement entered among the parties, it can in no way vary or contradict the clear and

unambiguous terms of the BIN Agreement and MPA.

142.    In the Forbearance Agreement, Cynergy was forced to acknowledge that

the Rolling Reserves were "to be held in deposit at Harris pursuant to the BIN Agreement

and [were] not so held" and "are unconditional obligations of [Cynergy] to Harris." *See*

Exhibit F, Forbearance Agreement, at 2.

143.    Yet the BIN Agreement contains no such requirement.

144.    In fact, there is nothing in the BIN Agreement that creates an obligation by

-23-

Cynergy to replenish the Rolling Reserves held at Harris.[3]  Harris's practice of

transmitting the Rolling Reserve funds directly to Cynergy was entirely consistent with

the BIN Agreement and in no way constituted a "default" by Cynergy as Harris

erroneously asserted.

145.    Section 2.1 (F) of the BIN Agreement, specifically invoked by Moneris in

its July 16, 2009 letter, merely provides that "[Cynergy] acknowledges that it will not

have access to Merchant funds."

146.    Rolling Reserves are not considered "Merchant Funds" as that term is

defined in the BIN Agreement.

147.    Under the BIN Agreement, "Merchant Funds" are narrowly defined to

mean "the funds that are payable to a Merchant under the related [MPA]."  *See* Exhibit

A, BIN Agreement, Article I - Definitions, at p.3.

148.    Reading the BIN Agreement and MPA together, it is clear that Rolling

Reserves are not Merchant Funds.

149.    Cynergy never had access to or control of Merchant Funds.

150.    Under the terms of Section 7.B.iii. of the MPA, *Rolling Reserves are not*

*due and payable to a merchant* unless all the following conditions apply: (i) the merchant

has in fact established a Reserve Account with Harris, (ii) the merchant has terminated its

MPA, and (iii) after the later of 270 days following the MPA termination date or the date

of the merchant's last transaction conducted through Cynergy, the merchant has made a

written request for the return of any funds remaining in its Reserve Account. *See* MPA, §

---

[3] Cynergy's obligation to replenish is solely with respect to its "Reserve Account"; this
does not apply to the "Merchant Reserve Accounts." *See* BIN Agreement, p. 3; § 2.6.
*See also* footnote 2.

7.B.iii.

151.    Unless and until all of these conditions have been satisfied, there is no obligation on the part of Harris or Cynergy under the MPA to return the Rolling Reserves and, thus, no prohibition on Cynergy holding such funds.

152.    Harris thus falsely created and imposed upon Cynergy and Paladini the obligations of the Forbearance Agreement based on Harris's own erroneous and self-serving contentions that the Rolling Reserves were to be immediately released to Harris.

153.    The Forbearance Agreement was simply a means for the Defendants to hide their own breaches of the Visa and MasterCard Rules and to wrongfully impose obligations upon Cynergy and Paladini.

## VII.   Cynergy Files for Bankruptcy.

154.    Ultimately, both the existence and the terms of the Forbearance Agreement bankrupted Cynergy.

155.    Six weeks after its execution, on September 1, 2009, Cynergy filed for relief under Chapter 11 of the United States Bankruptcy Code.

156.    On or about October 28, 2010, ComVest purchased Cynergy Data and Cynergy Holdings for approximately $81,000,000.

157.    As a condition of the assumption of the BIN Agreement by ComVest – a necessary prerequisite for ComVest to continue servicing Cynergy's merchants, Harris required the full repayment of the Rolling Reserves deficit.   Yet as stated above, Harris was not entitled to these funds.

158.    Had Cynergy not been forced into bankruptcy as a result of the Forbearance Agreement, it would have been possible to sell substantially all of Cynergy's

assets at a much higher price.

## VIII.    Paladini Sustains Damages.

159.    As a result of the Defendants' improprieties, ComVest purchased substantially all of Cynergy's assets for $81MM. The sale price was roughly $40MM less than the amounts Cynergy owed to the Cynergy Lenders.

160.    Paladini's equity interest — valued at over $200MM just months before — was completely destroyed.

161.    Plaintiff has also been sued personally in four (4) separate lawsuits as a result of the above.

162.    The first two are state court lawsuits wherein the Cynergy Lenders' are seeking to hold Plaintiff liable loans made to Cynergy, (1) *Dymas Funding Company, LLC, A3 Funding LP; and Ableco Finance LLC v. Marcelo Paladini, John Martillo, and Gustavo Ceballos* Action" (Case Number 09-602852), and (2) *Garrison Credit Investments I LLC v. Marcelo Paladini, John Martillo, and Gustavo Ceballos* (Case Number 603 545/2009) (the "Garrison Action"), both filed in the Supreme Court for the State of New York.

163.    Cynergy's bankruptcy trustee also filed an adversary proceeding against Paladini, in his personal capacity, alleging claims for breach of fiduciary duty, and other claims arising out of the series of the above transactions, captioned as *CD Liquidation Co., LLC et al. v. Paladini (In re CD Liquidation Co., LLC et al.)*, (Adv. Case No. 10-53190), filed in the Bankruptcy Court for the District of Delaware (together with the Dymas and Garrison Actions, the "Lawsuits"). And one of Cynergy's lenders, Comerica Bank, filed an action in federal court in Florida Southern District Court:  *Comerica Bank,*

*Inc. v. Marcelo Paladini* (2011 CIV 62083).

164.    Paladini has incurred substantial legal fees in defense of the forgoing actions.

165.    Due to Cynergy's sale for approximately $40MM less than its indebtedness, Paladini was exposed to substantial liability by virtue of his personal guaranty.

166.    The Defendants' requirement that approximately $21MM of the sale proceeds be allocated to the Rolling Reserves exposed Paladini to further liability on his guaranty.

167.    Additionally, Paladini's fourteen-year reputation as an award-winning entrepreneur[4] and successful CEO of a leading payments processing company was damaged beyond repair.

168.    The combination of rumors initiated from conversations between the leaders of EVO and Moneris, coupled with the claimed and published shortfall of funds in an amount of $21MM dollars, caused irreversible damage to the perception of Paladini in the payments industry.

169.    Further, in the aftermath of the Forbearance Agreement, the former CFO of Cynergy, Gustavo Ceballos, left the United States, fueling rumors that Cynergy's leaders had somehow siphoned funds for their personal use.

170.    All of this served to support an assumption in the public that Paladini, as the former CEO of Cynergy, was responsible for mishandling $21MM of company funds.

171.    Having suffered such irreparable damage to his reputation, Paladini will

---

[4] Paladini's accolades include winning the Ernst & Young *Entrepreneur of the Year* award in 2008.

undoubtedly never obtain a position within the electronic payments industry again.

172.    Immediately following the sale, the only job offered to Paladini was by ComVest, the ultimate purchaser of Cynergy's assets.

173.    ComVest's engagement of Paladini was strategic. ComVest sought to obtain Paladini's knowledge and expertise in order to guarantee the continuance of Cynergy and thus to protect ComVest's newest asset.

174.    Subsequently, in February of 2012, having apparently obtained all of the knowledge ComVest felt it needed to run Cynergy, Paladini was unceremoniously discharged.

175.    Now unemployed, Paladini has no alternative but to abandon the industry in which he spent most of his career and pursue opportunities in other industries.

## FIRST CAUSE OF ACTION FOR
## ECONOMIC DURESS

176.    Paladini realleges and incorporates by reference herein the allegations set forth in paragraphs 1 through 175, inclusive hereof.

177.    In the Default Letter, Harris threatened Paladini that it would suspend any and all funds to Cynergy -- which would essentially put Cynergy out of business.

178.    That threat was unlawfully made based on a non-existent breach of the BIN Agreement.  Harris transmitted Rolling Reserves directly to Cynergy – entirely consistent with the BIN Agreement.

179.    The BIN Agreement did not prohibit Cynergy from receiving the Rolling Reserves.

180.    Based on this unlawful threat, Paladini agreed to execute the Forbearance Agreement in order to ensure Cynergy would continue to be funded on a daily basis.

181.    Paladini had no alternative but to execute the Forbearance Agreement.

182.    Cynergy's survival and any hope of a successful outcome for Paladini depended on receiving funds from Harris on a daily basis.

183.    By reason of the foregoing, Paladini is entitled to judgment against Harris and Moneris for economic duress, and Paladini is entitled to recover damages in an amount to be determined at trial.

## SECOND CAUSE OF ACTION FOR
## BREACH OF COVENANT OF GOOD FAITH AND FAIR DEALING

184.    Paladini realleges and incorporates by reference herein the allegations set forth in paragraphs 1 through 183, inclusive hereof.

185.    Under the BIN Agreement and other agreements between the parties, it is clear that Cynergy was relying upon the Defendants for cash flow to run and operate its business.

186.    The Defendants subsequent claimed breach of the BIN Agreement in July of 2009, and the ensuing forced execution of the Forbearance Agreement, destroyed and injured Cynergy's rights to receive the fruits of the parties of Agreement.

187.    The Defendants' actions disrupted the Cynergy asset sale and resulted in a sale for approximately $40MM less than the amount owed to the Cynergy Lenders.

188.    Paladini's injury is particularized to him because, among other things, a portion of the equity of Cynergy belonged to Paladini, personally, as majority shareholder. And Paladini was personally liable to the Cynergy Lenders for the shortfall in the asset sale price.

189.    In addition, such claims are personal to Paladini by virtue of the personal exposure and liabilities against Paladini under the Forbearance Agreement, and by virtue

-29-

of the multiple lawsuits filed against Paladini personally stemming from the Defendants' acts and omissions.

190.    By reason of the foregoing, Paladini is entitled to judgment against Harris and Moneris for breach of the covenants of good faith and fair dealing, and Paladini is entitled to recover damages in an amount to be determined at trial.

## THIRD CAUSE OF ACTION FOR
## BREACH OF FIDUCIARY DUTY

191.    Paladini realleges and incorporates by reference herein the allegations set forth in paragraphs 1 through 190, inclusive hereof.

192.    The Defendants owed Paladini a fiduciary duty, as the majority shareholder of Cynergy and a guarantor of its indebtedness, in the provision of their accounting and reconciliation services to exercise care and to act in Cynergy's and Paladini's best interest.

193.    Harris had a unique and special role with Cynergy and Paladini in its capacity as Cynergy's sponsor bank.   Harris and Moneris had complete control over the flow of funds to Cynergy.

194.    Further, as sponsor bank, Paladini placed confidence and trust in Harris in an advisory capacity for the successful operations of Cynergy.

195.    Additionally, Moneris was engaged separately and apart from its servicing role to perform accounting and reconciliation services for Cynergy.

196.    Harris and Moneris were aware that in his capacity as the majority shareholder and guarantor of Cynergy, Paladini was relying on their knowledge and expertise regarding the reconciliation of Cynergy's operating account.

197.    Paladini reasonably placed his trust and confidence in the Defendants'

-30-

representations and advice concerning these daily reconciliations and the overall financial state of Cynergy's accounts.

198.    By the conduct alleged herein, the Defendants breached their fiduciary duties to Paladini by failing to perform their material obligations with the requisite skill, expertise, and integrity.

199.    The services provided by the Defendants were deficient, inadequate, and not competent. Harris and Moneris fell far below the standard of care to be exercised by financial and accounting professionals engaged to provide similar services.

200.    The Defendants' failure proximately caused injury to Paladini by, among other things and as further detailed above, destroying the value of his equity in Cynergy.

201.    Paladini's injury is particularized to him because, among other things, a portion of the equity of Cynergy belonged to Paladini, personally, as majority shareholder.

202.    In addition, such claims are personal to Paladini by virtue of the personal exposure and liabilities against Paladini under the Forbearance Agreement, by virtue of the multiple lawsuits filed against Paladini personally stemming from Harris's and Moneris's acts and omissions and by virtue of his personal guaranty of Cynergy's indebtedness.

203.    By reason of the foregoing, Paladini is entitled to judgment against Harris and Moneris for breach of fiduciary duty, and Paladini is entitled to recover damages in an amount to be determined at trial.

## FOURTH CAUSE OF ACTION FOR
## TORTIOUS INTERFERENCE WITH BUSINESS RELATIONS

204.    Paladini realleges and incorporates by reference herein the allegations set

forth in paragraphs 1 through 203, inclusive hereof.

205.    During Cynergy's bid process, Cynergy and Paladini had a direct business relationship with EVO.

206.    Paladini and Cynergy also had a prior relationship and course of dealing with EVO.

207.    The Defendants knew that EVO was a potential bidder and intentionally interfered with that relationship.

208.    The Defendants acted dishonestly and with malice in order to remove EVO from the bidding process to lower the price of Cynergy.

209.    The Defendants' conduct caused damage and destroyed the relationship between Paladini and EVO:  EVO first presented a lower offer and later joined Moneris in withdrawing its bid.

210.    The Defendants' conduct damaged Paladini because the withdrawal of EVO's and Moneris's bids thwarted the sale process and lowered the sale price, triggering liability to Paladini by virtue of his guaranty, destroying Paladini's equity in Cynergy and irreparably damaging Paladini's professional reputation.

211.    By reason of the foregoing, Paladini is entitled to judgment against Harris EVO and Moneris for tortious interference with a business relationship, and Paladini is entitled to recover damages in an amount to be determined at trial.

## FIFTH CAUSE OF ACTION FOR
## GENERAL MALPRACTICE

212.    Paladini realleges and incorporates by reference herein the allegations set forth in paragraphs 1 through 211, inclusive hereof.

213.    Harris and its agent, Moneris, performed accounting services for Cynergy,

and as such owed Cynergy and its officers, directors and shareholders, including Paladini, a duty to exercise such reasonable skill, care and diligence, as members of the accounting profession commonly possess and exercise in similar situations.

214.    Throughout the provision of these accounting services, the Defendants represented that they had a high level of experience in providing accounting and reconciliation services and that they were competent to perform all the necessary services to Cynergy in compliance with the applicable professional standards and the reasonable skill, care, and diligence that members of the accounting and financial services professions commonly possess and exercise in similar situations.

215.    Harris and Moneris knew that Paladini would rely on their daily reconciliations of Cynergy's operation account and Harris's QMs, based on their knowledge that Paladini was the majority shareholder and corporate guarantor of Cynergy.

216.    At all times, Paladini reasonably relied upon the Defendants to perform their material obligations with the requisite skill, expertise and integrity.

217.    By the conduct alleged herein, the Defendants failed to perform their material obligations with the requisite skill, expertise, and integrity.

218.    The services provided by the Defendants were deficient, inadequate, and not competent. Harris and Moneris fell far below the standard of care to be exercised by accountants or other financial professionals engaged to provide similar services.

219.    The Defendants' malpractice proximately caused injury to Paladini by, among other things and as further detailed above, destroying the value of his equity in Cynergy.

220.    Paladini's injury is particularized to him because, among other things, a portion of the equity of Cynergy belonged to Paladini, personally, as majority shareholder. And Paladini was personally liable to the Cynergy Lenders for the shortfall in the asset sale price.

221.    In addition, such claims are personal to Paladini by virtue of the personal exposure and liabilities against Paladini under the Forbearance Agreement and by virtue of the multiple lawsuits filed against Paladini personally stemming from the Defendants' acts and omissions.

222.    By reason of the foregoing, Paladini is entitled to judgment against Harris and Moneris for general malpractice, and Paladini is entitled to recover damages in an amount to be determined at trial.

### SIXTH CAUSE OF ACTION FOR NEGLIGENCE

223.    Paladini realleges and incorporates by reference herein the allegations set forth in paragraphs 1 through 222, inclusive hereof.

224.    In their capacity of performing accounting and reconciliation services for Cynergy, and serving as sponsor bank, Harris and its agent Moneris owed a duty to Paladini, Cynergy's majority shareholder and guarantor of its financial obligations, to exercise reasonable care and diligence in performing those duties.

225.    The Defendants knew that Paladini would rely on their daily reconciliations of Cynergy's operating account and Harris's QMs, based on their knowledge that Paladini was the majority shareholder and guarantor of Cynergy.

226.    By the conduct alleged in the General Allegations, the Defendants breached their duties to Paladini.

-34-

227.   The Defendants' failure proximately caused injury to Paladini by, among other things and as further detailed above, destroying the value of his equity in Cynergy.

228.   Paladini's injury is particularized to him because, among other things, a portion of the equity of Cynergy belonged to Paladini, personally, as majority shareholder. And Paladini was personally liable to the Cynergy Lenders for the shortfall in the asset sale price.

229.   In addition, such claims are personal to Paladini by virtue of the personal exposure and liabilities against Paladini under the Forbearance Agreement, and by virtue of the multiple lawsuits filed against Paladini personally stemming from Harris's and Moneris's acts and omissions.

230.   By reason of the foregoing, Paladini is entitled to judgment against Harris and Moneris for negligence, and Paladini is entitled to recover damages in an amount to be determined at trial.

## PRAYER FOR RELIEF

**WHEREFORE**, Plaintiff respectfully demands judgment against Defendant as follows:

i.   Judgment on Count I for economic duress against Harris and Moneris in an amount to be determined at trial;

ii.   Judgment on Count II for breach of the covenant of good faith and fair dealing against Harris and Moneris in an amount to be determined at trial;

iii.   Judgment on Count III for breach of fiduciary duty against Harris and Moneris in an amount to be determined at trial;

iv.    Judgment on Count IV for tortious interference with business relations

against Harris and Moneris in an amount to be determined at trial;

v.    Judgment on Count V for general malpractice against Harris and Moneris

in an amount to be determined at trial;

vi.    Judgment on Count VI for negligence against Harris and Moneris in an

amount to be determined at trial;

vii.    Punitive damages in an amount to be determined at trial;

viii.    Costs and attorneys' fees; and

ix.    Such other and further relief as this court deems appropriate.

Dated:    New York, New York
         July 11, 2012

ASCHETTINO STRUHS LLP

_Nicole J. Leibman_

Stephen A. Aschettino (SA4072)
Nicole Joy Leibman (NL1713)
1500 Broadway, 21st Floor
New York, New York 10036
Tel: (212) 354-7600
Fax: (866) 260-5527
*Attorneys for Plaintiff Marcelo
Paladini*

-36-

# EXHIBIT A

Cynergy BIN Agmt (061908)

## BIN Sponsor Agreement

This BIN Sponsor Agreement ("Agreement") is made as of __*November 1*__, 2008 ("Effective Date") by and between Harris N.A., a national banking association with offices at 150 N. Martingale Rd., Suite 700, Schaumburg, IL 60173 ("Bank") and Cynergy Data, LLC, a limited liability corporation with offices at 45 W. 36th St., 6th Floor, New York, NY 10018 ("ISO"). ISO is engaged in the business of providing payment transaction processing to merchants. Bank is a member of Visa U.S.A. ("Visa") and MasterCard International ("MasterCard") and desires to sponsor ISO into such associations. Therefore, the parties agree as follows:

### I. Definitions

The following terms when used in this Agreement will have the meanings set forth in this Section:

"**Affiliate**" means: with regard to Bank, any company Controlled by or under common Control of the Bank; and with regard to ISO, any company of which the majority member of ISO is also a shareholder, member or owner.

"**Assessments**" means the amounts paid to the Associations attributable to the merchant processing activity, as the term is defined by the Rules.

"**Association(s)**" means Visa, MasterCard, and any successor organization.

"**Association Security Programs**" means those data security requirements imposed by the Rules on independent sales organizations/member service providers, merchant servicers or third party processors (if applicable), including but not limited to the Payment Card Industry (PCI) data security standards and PIN security requirements, Visa Cardholder Information Security Program (CISP), and MasterCard Site Data Protection (SDP).

"**Bank Fees**" means the fees set forth on the attached <u>Exhibit A</u>, Bank Fees.

"**BIN**" means the segregated Association Bank Identification Number and Interbank Card Association (ICA) assigned to ISO currently or additional BINs assigned in the future, which Bank will use exclusively for ISO's Merchants.

"**BofA**" shall mean Bank of America, Inc.

"**BofA Assignment and Assumption Agreement**" shall have the meaning given to it in Section 2.7E. of this Agreement.

"**Card**" means a valid payment or service account, whether or not evidenced by a plastic card, issued by a member of Visa, MasterCard or other card association, Third Party Provider or network approved by ISO.

"**Chargeback**" means a Sales Draft that has been presented to either the cardholder or the issuer of the Card and for which payment through the BIN has been refused or reversed in accordance with the Rules.

Cynergy BIN Agmt (061908)

**"Confidential Information"** means information owned or licensed by each party including, but not limited to, any information pertaining to the disclosing party's business operations, know how, manner and means of doing business, pricing, computer and software systems and programming, documentation, and requirements related thereto, customer and prospect lists, status reports, contracts, marketing strategies, business plans, notes, financial projections, financial statements, sales reports, technical partners, information regarding third parties doing business with either party, requirements and related information and any communications whether in oral, written, graphic, magnetic or electronic form, that is known or reasonably should be known by the other party to be confidential or proprietary.

**"Control"** means, as applied to a party at the time of determination, the possession at such time directly or indirectly of the power to direct or cause the direction of, the management and policies of such parties, whether through the ownership of more than 50% of the voting securities of such party, or by contract, or otherwise.

**"Conversion"** shall mean the conversion of Existing Merchants in the Existing Portfolio to Bank in accordance with the terms of this Agreement, along with the transfer of the BINs for such Existing Portfolio.

**"Credit Draft"** means the electronic format used in refunding Sales Drafts initially charged to a Card by a Merchant.

**"Credit Guidelines"** means the standards set forth on Exhibit C, as may be revised from time to time.

**"Designee Assignment and Assumption Agreement"** shall have the meaning given to it in Section 2.3.D. of this Agreement.

**"Effective Date"** means the date as outlined in the first paragraph of this Agreement.

**"Event of Default"** means the events listed in Section 7.3.

**"Existing Agent Banks"** means the agent banks set forth on Exhibit E to this Agreement.

**"Existing Merchants"** means those Merchants in the Existing Portfolio whose contract for transaction processing services with Bank of America, N.A. has been assigned to Bank.

**"Existing Portfolio"** means that collective of Merchants that were (i) receiving Transaction processing services from BofA., and (ii) whose contract has been assigned to Bank pursuant to the terms of the BofA Assignment and Assumption Agreement.

**"Existing Sales Groups"** means the sales groups set forth on Exhibit F to this Agreement.

**"Initial Term"** has the meaning set forth in Section 7.1.

**"Intellectual Property Rights"** means any and all (by whatever name or term known or designated) tangible and intangible and now known or hereafter existing (a) rights associated with

Cynergy BIN Agmt (061908)

works of authorship throughout the universe, including but not limited to copyrights, moral rights, and mask-works, (b) trademark and trade name rights and similar rights, (c) trade secret rights, (d) patents, designs, algorithms and other industrial property rights, (e) all other intellectual and industrial property rights (of every kind and nature throughout the world and however designated) (including logos, "rental" rights and rights to remuneration), whether arising by operation of law, contract, license, or otherwise, and (f) all registrations, initial applications, renewals, extensions, continuations, divisions or reissues hereof now or hereafter in force (including any rights in any of the foregoing).

"**Interchange Fees**" means the amounts paid as such, as defined by the Rules.

"**ISO Agents**" means independent sales organizations and agent banks which may be engaged by ISO to market the Merchant Program. ISO Agents shall include the Existing Agent Banks and the Existing Sales Groups.

"**ISO Clearing Account**" means the deposit account at the Bank designated by ISO and used to aggregate Merchant Funds, and for other purposes specified in this Agreement.

"**ISO Operating Account**" means the deposit account at Bank into which ISO Revenue will be deposited each day, and for other purposes specified in this Agreement. Any earnings on the funds deposited into this account will accrue to the benefit of ISO.

"**ISO Revenue**" means Merchant Fees less Interchange Fees and Assessments.

"**Loss**" means any loss incurred by Bank for any reason attributable to a Merchant or ISO, including but not limited to uncollected Chargebacks, Interchange Fees, and Association fines and charges.

"**MasterCard**" means MasterCard International Incorporated.

"**Merchant**" means a person, a business, or other entity that has entered into a Merchant Agreement and to which ISO provides services under this Agreement.

"**Merchant Agreement**" means the contract entered into among Bank, ISO (or an ISO Agent) and a Merchant pursuant to which ISO processes the Transactions of such Merchant, a form of which is attached as Exhibit D.

"**Merchant Fees**" means all revenues collected by Bank from Merchants and deposited to the ISO Clearing Account.

"**Merchant Funds**" means the funds that are payable to a Merchant under the related Merchant Agreement.

"**Merchant Loss**" (collectively, "**Merchant Losses**") means any loss incurred by Bank on a cash (i.e., pre-tax) basis for any reason attributable to a Merchant, including without limitation losses due to Association fines, Chargebacks, fraudulent practices of a Merchant, Merchant ACH rejects, returns, credits or fees and other uncollected amounts due from Merchants, and costs of collection and attorneys' fees.

Page 3 of 47

Cynergy BIN Agmt (061908)

**"Merchant Portfolio"** means the group of Merchants (including the Existing Merchants) participating in the Merchant Program pursuant to this Agreement.

**"Merchant Program"** means the package of services offered by ISO which enables a Merchant to make sales to persons by use of a Card and which permits the Merchant to present Card Transactions to ISO for payment and processing.

**"Merchant Reserve Account"** means one or more accounts maintained and controlled by Bank as security against a Merchant Loss that might be incurred by Bank or ISO.

**"Merchant Servicer"** means a third-party agent that: (a) is engaged by a Merchant, (b) is not a member of Visa, (c) is not directly connected to Visa's VisaNet system, (d) is party to an authorization and/or clearing message, and (e) has access to cardholder data, or processes, stores, or transmits transaction data.

**"Merchant Suspense Account"** means the deposit account designated by ISO at Bank to occasionally hold funds as a reserve against suspect Merchant activity. Any earnings on the funds deposited into this account will accrue to the benefit of ISO.

**"Minimum Annual Sales Volume"** means the minimum number of Transactions that must be generated by Merchants and processed by ISO under the Agreement during a calendar year.

**"Miscellaneous Adjustments"** means any transaction occurring through the BIN other than a Sales Draft, Credit Draft or a Chargeback.

**"Monthly Sales Volume"** means the gross dollar amount of Visa and MasterCard Card sales, before return, refund or exchange, that are generated by Merchants and processed by ISO during a calendar month.

**"Recovered Funds"** means all amounts received by the BIN directly or through Interchange Fees previously debited from the ISO Clearing Account, including but not limited to Chargeback reversals, code 26 reversals (credits issued in error), and funds attributable to Association pre-compliance and arbitration procedures.

**"Renewal Term"** has the meaning set forth in Section 7.1.

**"Reserve Account"** means the deposit account, in the name of and for the benefit of Bank, at Bank as further described in Section 2.6.

**"Retrieval"** means the production of an acceptable copy under the Rules of a Sales Draft, Credit Draft or other supporting documentation by a Merchant.

**"Rules"** means all rules, regulations or requirements that are issued or promulgated by Visa, MasterCard or other Card networks from time to time applicable to activities or transactions contemplated by this Agreement or under Merchant Agreements.

Cynergy BIN Agmt (061908)

**"Sales Draft"** means the paper form or electronic format used in consummating Transactions charged to the Card of a Merchant's customer.

**"Settled Transaction"** means Sales Drafts less Credit Drafts, voided Sales Drafts, host returns, rejected items, Chargebacks and Miscellaneous Adjustments.

**"Third Party Provider"** means third parties utilized by ISO, and approved by Bank, to process Transactions, including but not limited to: value added re-sellers, system integrators, software providers, loyalty providers and transaction processors.

**"Transaction"** means the purchase by a cardholder of goods or services from a Merchant, by use of a Card.

**"Visa"** means Visa U.S.A., Inc.

## II. ISO's Obligations and Rights

### 2.1  ISO Responsibilities.

A. <u>Solicitation.</u>  ISO will develop relationships with and solicit merchants that conform to the Credit Guidelines. ISO will solicit merchants for the Merchant Program on a non-exclusive basis and will process Merchant Transactions through the BIN. ISO may enter into other agreements with third parties for Card clearing and settlement services or refer prospective merchants to other parties for such clearing and settlement services. ISO will assist prospective Merchants in completing all documentation required for application to the Merchant Program. ISO will solicit merchants that conform to the Credit Guidelines and administer its program in conformity with its established risk practices. All solicitation materials, such as ads, sales brochures and Web Site promotional content, must be approved by Bank, such approval not to be unreasonably withheld or delayed.

B. <u>Administrative Responsibilities.</u>  ISO will direct, manage, conduct and administer the Merchant Program and the Merchant Agreements; provided, however, that nothing shall be construed to authorize ISO to modify the Merchant Agreements, or to waive any of Bank's rights under such agreements without Bank's prior written consent. ISO shall have the sole responsibility for ensuring that the Merchant Program, including without limitation the Merchant Agreement, Merchant application materials, promotional materials and services performed under this Agreement comply, and remain in compliance, with all applicable federal, state and local laws and the Rules. Bank's review and approval of such materials shall not alter ISO responsibilities therefor. ISO will at all times comply with the Rules, all rules and regulations of any Automated Clearing House and all municipal, state and federal laws, as applicable. ISO shall ensure that all Merchant Servicers engaged by Merchants are registered with the Associations, to the extent required under the Rules. ISO shall perform or contract for all front-line operational functions consistent with industry standards, including but not limited to Merchant underwriting, customer service, and risk/fraud monitoring. ISO will permit Bank to have remote access to ISO's risk/fraud monitoring systems.

Cynergy DIN Agmt (061908)

C. Merchant Agreement. ISO will use the form of the Merchant Agreement attached as Exhibit C. ISO has the right to change the form of Merchant Agreement from time to time upon the addition of additional independent sales organization(s) to this Agreement, and shall provide any new Merchant Agreement to Bank for approval prior to implementation. Approval of changes to the Merchant Agreement shall be effective upon the providing of written approval to ISO by Bank, with such approval not to be unreasonably withheld or delayed. ISO on behalf of Bank shall approve all prospective Merchant Agreements that conform to the Credit Guidelines. Bank authorizes ISO to execute Merchant Agreements on behalf of Bank. Any exceptions to the Credit Guidelines require the prior written approval of Bank and any such Merchant Agreement entered into shall be signed by that approving officer of Bank, and may require additional conditions of Bank. ISO will provide Bank with remote access to ISO's document storage system, through which Bank will have access to copies of all executed Merchant Agreements (including all related applications).

D. Merchant Relationship. Each Merchant will have a direct business relationship with ISO and as such, Bank will utilize ISO for all communications, written or oral, with Merchants. Subject to the Rules, ISO will administer and control the Merchant Agreement and the relationship created thereby including without limitation decisions regarding the continuance, amendment, assignment or termination of such Merchant Agreement. Bank maintains the right to terminate any Merchant Agreement due to (i) requirements relating to or violation of the Rules, applicable law or Association request, (ii) an uncured breach of the Merchant Agreement, (iii) if the operations of a Merchant materially differ from the basis upon which the Merchant was approved under the Credit Guidelines (such as significant volume differences, product differences, or type of business, each that results in a major increase in risk as to such Merchant), or (iv) if Bank in good faith deems it reasonably necessary to avoid loss, damage or adverse exposure to Bank. Subject to any requirements of the Rules, Bank will notify ISO of its desire to terminate a Merchant Agreement and will work with ISO to identify approaches to mitigate risk factors (such as initiating or increasing merchant reserves or transferring the merchant to another financial institution which is a member of the Associations) prior to terminating the Merchant.

E. Merchant Assistance. ISO will train Merchants on the procedures and Rules necessary to participate in the Merchant Program. ISO will input all data necessary to set up new Merchants, maintain Merchants' account data, process Merchant Transactions, and respond to Merchant inquiries, on a timely basis. ISO will provide to Merchants point of sale devices and other equipment necessary to participate in the Merchant Program, and will provide ongoing maintenance of such equipment. ISO also will distribute all Merchant supplies, and provide authorization and back office services to Merchants. ISO will process all Merchant Transactions into interchange according to the Rules. ISO will maintain adequate staffing to fulfill its obligations under this Agreement.

F. ACH. ISO will prepare the ACH file to credit each Merchant's settlement account for Sales Drafts and debit each Merchant's settlement account for the amount of Merchant Fees, any Chargebacks, Credit Drafts, or other amounts due under the terms of the Merchant Agreement to ISO by a Merchant. ISO acknowledges that it will not have access to Merchant funds, provided however; ISO is responsible for any fees of Bank

Cynergy BIN Agmt (061908)

related to the holding of Merchant funds prior to distribution to Merchants. Bank will reconcile the Merchant Suspense Account, and the ISO Clearing Account. All Merchant Reserve Accounts are held by Bank. The ACH file will be processed through Bank and the corresponding ACH offset will be made to the ISO Clearing Account. Any system connectivity fees will be paid by ISO.

G. Information. ISO will verify the input of data to processors to ensure accurate Merchant set up. ISO will provide on a monthly basis ISO's Merchant processing statistics to Bank. ISO will also provide to Bank within 5 days of receipt of Bank's written request information within ISO's possession: i) required to be filed with or reported to the Associations; or ii) reasonably requested by Bank to enable Bank to monitor Bank risk. ISO will provide ISO annual audited and quarterly unaudited financial statements to Bank. ISO will provide daily electronic merchant boarding activity reports to Bank.

H. ISO Training. All costs associated with training ISO conducted onsite at Bank will be paid by ISO.

I. ISO Agreement. ISO has entered into or will enter into an ISO Agreement with Bank to become a registered ISO/MSP of Bank, and will maintain such status in good standing.

J. Third Party Providers. ISO has entered or is entering into agreements directly with Third Party Providers to provide processing services (including, without limitation, authorization, data capture, data processing, customer service, statements, collections, new account processing, Retrieval, Chargeback, accounting, reporting and clearing and funding services) on the Third Party Providers' system. Bank will cooperate with a Third Party Provider to settle transactions through the Interchange process of the Associations. Bank shall have no responsibility or liability for any costs due to the arrangements between ISO and Third Party Providers or any claims of Merchants or others related to the processing services provided by Third Party Providers. ISO shall be responsible for and liable to Bank for any and all actions or omissions of Third Party Providers, and all costs related to any change to or from any Third Party Provider.

K. Additional Services. ISO may combine services it is authorized to provide under this Agreement with other services unrelated to the services offered by Bank to a Merchant without the express written consent of Bank, such as but not limited to Discover Card processing, marketing of American Express card acceptance, gift cards, check image capture and back office conversion processing services (the "Additional Services"). ISO shall provide Merchants with adequate disclosures that such Additional Services are being provided by ISO and not Bank, and shall defend and indemnify and hold harmless Bank against any and all claims which may be asserted against Bank with respect to such Additional Services. In the event Bank acts as the acquirer of Discover transactions for Merchants, the parties agree to amend this Agreement as necessary to comply with any requirements of the Discover Financial Services, Inc. IMAP and MAP programs.

**2.2   Audits.**

Cynergy BIN Agmt (061908)

A. <u>Audit</u>. Once each fiscal year, Bank may, upon 15 days prior written notice, conduct a financial and procedural audit of ISO to confirm compliance with this Agreement. Such audit will be conducted at ISO's expense, during ISO's normal business hours and with minimal disruption to ISO's business. ISO will within 15 days of receipt of Bank's written request supply such auditors with requested information related to Transactions. Visa, MasterCard and bank regulatory agencies may also conduct financial and procedural audits of ISO to confirm compliance with this Agreement and the Rules and legal requirements. Bank may, no more than once each 12 month period, at any time and at its own expense, perform a background check on ISO, its principals, and any of ISO's agents or employees, which may include a personal credit report or criminal background verification.

B. <u>Regulatory Audit</u>. ISO understands and agrees that Bank is subject to examination by government agencies and ISO agrees it will cooperate with any such examination. Federal and state agencies may require access to ISO's facilities to audit the performance of ISO and ISO Affiliates and Bank under this Agreement. ISO will cooperate with all such governmental audits, at ISO's expense.

**2.3    Ownership; Portability.**

A. Bank and ISO agree that the relationship with, and the names, addresses and all information (other than cardholder account information) relating to Merchants, any ISO Agents, and any Agent Banks of the Merchant Program, the Merchant Agreements and any revenues, fees and benefits thereunder, and the BINs and ICAs are owned by and proprietary to ISO and all right, title and interest therein and liabilities therefrom are vested in ISO. ISO's data will not be used by Bank except as necessary to carry out its obligations under this Agreement, or with ISO's prior written consent.

B. ISO may sell or assign all or any portion of the Merchant Portfolio at any time. Prior to the time that ISO has processed through Bank the Aggregate Minimum Sales Volume specified in Exhibit A, prior to accepting an offer to sell or assign any interest in the Merchant Portfolio to an unaffiliated third party (a "Transfer"), ISO shall provide Bank the right of first refusal described in Section 2.3.C. Once ISO has processed through Bank the Aggregate Minimum Sales Volume specified in Exhibit A, ISO may sell or assign an interest in the Merchant Portfolio to a third party without offering Bank the right of first refusal. For purposes of clarification, a sale or assignment of all or any portion of the Merchant Portfolio between ISO and an affiliate would not be deemed a Transfer, as well as ISO's acquisition of all or any portion of any ISO Agent's interests in the Merchant Portfolio, but the sale by any affiliated party of all or any portion of the Merchant Portfolio would be deemed a Transfer.

C. Subject to Section 2.3.B., in the event ISO desires to effect a Transfer pursuant to a bona fide offer from a third party, ISO shall first offer to Transfer its interest in the Merchant Portfolio to Bank, upon the same terms and conditions as contained in such third party offer, by giving written notice thereof to the Bank. Within fifteen (15) days of receipt of such notice, the Bank shall notify ISO of the Bank's election to implement the Transfer on terms and conditions equal to that contained in the bona fide third party offer. In the event that the Bank fails to provide ISO with notice of its intention within such fifteen

Cynergy BIN Agmt (061908)

(15) day time period, or in the event that the Bank consents to the Transfer, ISO shall have the right to consummate the Transfer at the price, terms and conditions specified in such notice of offer.

D. In connection with any sale or assignment of an interest in the Merchant Portfolio, ISO shall first pay all amounts owed to Bank under this Agreement. Additionally, Bank, ISO and the "Designee" (as defined below) shall enter into an Assignment and Assumption Agreement acceptable to Bank (the "Designee Assignment and Assumption Agreement"). Further, Bank may require ISO to maintain a balance in the Reserve Account as provided below.

Upon completion of the above, Bank agrees to execute and assign the related Merchant Agreements, Merchant Accounts, funds held in the Merchant Reserve Accounts, and agreements with any ISO Agents (and any other agreements in Bank's name related to the Merchant Program) to the entity designated by ISO to accept assignment from Bank of such agreements. Bank also agrees to assign all dedicated BINs relating to the assigned portion of the Merchant Portfolio to the financial institution and Association member designated by ISO to accept assignment thereof on behalf of ISO ("Designee"). Upon the termination of this Agreement, and the execution of the Designee Assignment and Assumption Agreement, all rights and liabilities under the Merchant Program, including the all Merchant Agreements, Merchant Accounts, funds held in the Merchant Reserve Accounts, agreements with the ISO Agents, and the BINs, shall continue to be fully vested in ISO. Bank shall execute and deliver any assignments, bills of sale and other documents necessary to assign all of Bank's right, title, interest, and liabilities in the Merchant Program, including the Merchant Agreements, Merchant Accounts, funds held in the Merchant Reserve Accounts, and agreements with the ISO Agents (and related agreements) and the BINs to the Designee. Notwithstanding the foregoing, Bank and ISO agree that Bank may require ISO to maintain a Reserve Account as provided below.

2.4  **[Intentionally Left Blank.]**.

2.5  **Insurance and Continuity Plan**. ISO will maintain standard worker's compensation and general liability insurance consistent with industry standards and will provide proof of such insurance upon written request. ISO will maintain a disaster recovery and contingency plan that meets or exceeds applicable bank regulatory and Association requirements. ISO will deliver a copy of such plan to Bank upon request. If the plan does not meet such requirements or if a bank regulatory agency requires changes to such plan, ISO agrees to promptly make such changes.

2.6  **Reserve Account.**

A. Funding of Reserve Account. At the time provided in the BofA Assignment and Assumption Agreement (as defined below), ISO will establish a Reserve Account to fund the payment of Losses by transferring $650,000 from ISO's existing reserve account currently held at Bank of America, N.A. ("BofA").

B. The Reserve Amount will be reviewed annually and shall be maintained in an amount

Page 9 of 47

Cynergy BIN Agmt (061908)

equal to the greater of (i) $650,000, or (ii) the preceding calendar month's Monthly Sales Volume, multiplied by seven (7) basis points (the "Reserve Amount Minimum"), but in no event shall the reserve amount exceed $1,000,000. If the Reserve Amount falls below the Reserve Ammount Minimum, then ISO shall within five (5) business days fund the Reserve Account up to the Reserve Amount Minimum. If the review indicates that the current Reserve Amount is greater than the Reserve Account Minimum, then Bank shall permit ISO to withdraw funds from the Reserve Account in excess of the Reserve Amount Minimum. ISO agrees that, in the event that ISO fails to make a deposit into the Reserve Account as required by this subparagraph, Bank may debit the required amount from then-current or future ISO Revenue, or then-current or future funds in the ISO Operating Account, or the ISO Clearing Account and deposit it into the Reserve Account.

C.  Upon the expiration or termination of this Agreement, Bank may retain in the Reserve Account a sum equal to two (2) times the aggregate Merchant Losses suffered during the six (6) month period occurring prior to the expiration or termination of this Agreement. Such amount will be funded by ISO via then-current or future ISO Revenue, or then-current or future funds in the Reserve Account, the ISO Operating Account, the ISO Clearing Account, and additional deposit of funds, or a combination of any of the foregoing.

D.  The Reserve Account shall remain domiciled at Bank throughout the term of this Agreement, including any extensions and renewals hereof, and for a period of six (6) full calendar months following the expiration or earlier termination of this Agreement. If, at the end of such six-month period, any Chargebacks or other Losses remain pending, Bank may retain an amount equal to two (2) times such pending amounts. Any amounts remaining after the resolution of such items shall be returned to ISO.

Cynergy BIN Agmt (061908)

### 2.7   Existing Portfolio.

A. Transfer of BINs. Immediately following execution of this Agreement, for purposes of facilitating the assignment of the Existing Portfolio to Bank, ISO shall initiate and be responsible for the transfer of the BINs from Bank of America, N.A. to Bank with respect to the Existing Portfolio. To that end, ISO shall be responsible for providing any and all information, documents or materials as may be necessary to transfer the BINs for the Existing Portfolio and for addressing any information requests from Visa or MasterCard. Upon completion of such transfer to Bank, including without limitation, approval by Visa and MasterCard, such BINs shall be dedicated for ISO's use.

B. ISO represents and warrants that a true and correct list of Merchants for whom ISO is providing Transaction processing and settlement services for Card transactions , has been provided to Bank on a CD-ROM. Such CD-ROM will be updated and delivered by Bank to ISO upon Bank's request.

C. ISO represents and warrants that, except as disclosed by ISO and approved by Bank, none of the Merchants in the Existing Portfolio operate in the unacceptable industries outlined in the Credit Guidelines.

D. ISO represents and warrants that, subject to the execution and delivery of the BofA Assignment and Assumption Agreement by Bank and BofA., it has the ownership, authority and right to assign and transfer the Merchant Agreements, merchant accounts and merchant reserves for the Existing Merchants in the Existing Portfolio to Bank.

E. Immediately following the Effective Date of this Agreement, ISO shall arrange for and effectuate the assignment and transfer of the Card processing agreements (merchant agreements), merchant accounts, merchant reserve funds, letter of credit, bond, insurance policy, guaranty and all other collateral with respect to the Existing Portfolio, and the agreements with the Existing Agent Banks and the Existing Sales Groups. Such transfer shall be accomplished through the execution of an assignment and assumption agreement between Bank and BofA (the "BofA Assignment and Assumption Agreement"). The BofA Assignment and Assumption Agreement shall contain terms typical of such a transaction and satisfactory to the parties.

F. Bank acknowledges that it has received forms of merchant agreements which are in use with the Merchants in the Existing Portfolio from ISO, which forms are acceptable to Bank. ISO has a signed Merchant Agreement from each of its Existing Merchants and shall provide Bank with remote access to the executed copies of such Merchant Agreements.

G. ISO represents and warrants that its merchant processing business with respect to the Existing Portfolio has in all material respects been operated in compliance with all applicable laws, orders, regulations, policies and guidelines of all governmental entities and all Association Rules, including all underwriting and monitoring procedures.

H. Bank will not be responsible in any manner with respect to any Card transaction of an Existing Merchant with a processing date before the Conversion Date. The parties

Cynergy BIN Agmt (061908)

acknowledge that certain of the Existing Merchants have agreements that have been terminated or have expired prior to Conversion, and as such, are no longer processing and settling Transactions ("Inactive Merchants"). The Merchant Reserve Accounts for such Inactive Merchants shall be transferred to Bank upon Conversion and ISO shall be responsible for any and all Losses for such Inactive Merchants after the Conversion Date.

2.8 **Credit Guidelines.** ISO has the right to change the Credit Guidelines from time to time, and shall provide any new Credit Guidelines to Bank for approval prior to implementation. Approval of changes to the Credit Guidelines shall be effective upon the providing of written approval to ISO by Bank, with such approval not to be unreasonably withheld or delayed.

## III. Bank Responsibilities

### 3.1 Bank Responsibilities.

A. [Intentionally Left Blank]

B. Membership. Bank will remain a member of the Associations and serve as the Acquiring Bank or Acquiring Member (as that term is defined in the Rules) for those Merchants who enter into Merchant Agreements including, without limitation, by maintaining necessary capital requirements, and obtaining and providing for the use and benefit of ISO the BINs and ICAs necessary for clearing and settlement of Merchant credit and debit card and related Transactions for the Merchant Program.

C. Sponsorship. Bank will sponsor ISO and any qualified ISO Affiliates into the Associations, as independent sales organizations, member service providers and into any other Association program for which sponsorship is required. Bank shall also sponsor ISO Agents designated by ISO and approved by Bank as independent sales organizations into Visa and member service providers into MasterCard, and shall, upon ISO's request, provide such ISO Agents with separate, dedicated BINs. Any ISO Agents must be approved in writing by Bank, which approval will not be unreasonably withheld. If approved by Bank, ISO Agents must be registered with the Associations in accordance with the Rules and enter into contractual agreements with Bank as required by Bank. ISO shall be responsible for monitoring the activities of all ISO Agents to ensure compliance with the Rules. ISO will direct, manage, conduct, administer and enforce the agreements entered into by with Bank as to ISO Agents and, as to Bank, shall be responsible and liable for the acts and omissions of all ISO Agents and merchants of the ISO Agents.

D. Merchant Agreements. Bank will approve the form of the Merchant Agreement to be used by ISO. Bank may terminate any Merchant Agreement pursuant to the terms of the Merchant Agreement or the Rules by notifying ISO, which will notify the relevant Merchant.

E. BIN and Settlement. Bank will establish and maintain a dedicated BIN and ICA for ISO. Bank will, at ISO's request, provide additional BINs at ISO's expense upon ISO's

Cynergy BIN Agmt (061908)

> request Bank will cooperate with ISO and Third Party Providers regarding Chargeback proceedings. Bank will provide ISO with all rebates provided by Associations in connection to the BIN. All matters regarding the BIN will be directly referred to ISO. Bank will also reasonably support ISO in Association issues regarding the BIN.

F. **Reports.** Bank will provide to ISO, within 2 business days after receipt by Bank, all BIN processing reports received from Associations and any additional data related to this Agreement requested by ISO. ISO will provide to Bank any data required to be submitted back to the Associations within 5 business days of receipt of Bank's written or oral notice therefor.

G. **Acquisitions.** Bank acknowledges that ISO may, from time to time, acquire the stock or assets of other entities that provide processing services for merchants. In addition, it is acknowledged by Bank and ISO that, if requested by ISO, Bank will provide the services contemplated under this Agreement to such acquired merchants so long as such acquisition does not materially change the business or risk profile of ISO as defined by the Merchants serviced under this Agreement. Bank's approval for such acquisitions will be completed through the signing of documentation acceptable to Bank regarding the provision of processing services for the acquired business, including, without limitation, the right of Bank to reimbursement from ISO for any trailing chargeback liability.

3.2 **Third Party Audits.** Each party will notify the other party as soon as practicable of any formal request by a governmental agency or Association to talk with such entity related to this Agreement, examine the records pertaining to duties, responsibilities and obligations under this Agreement or conduct a site visit, at ISO's expense.

3.3 **Losses.** All Losses incurred by Bank for any reason will be borne by ISO, including but not limited to 100% of any amount incurred by Bank arising out of ISO's or any ISO sales representatives' negligence or fraud. ISO will notify Bank immediately of any information concerning any Merchant or any transaction that would indicate that Bank may incur a Loss. Each month Bank shall deduct the amount of any Loss incurred the previous month from ISO Revenue. If the amount of the Loss exceeds the amount of the ISO Revenue, Bank shall have the right to deduct the amount of the Loss from the ISO Operating Account, the Reserve Account, the ISO Clearing Account. In addition, Bank shall have the right to set off any unpaid Loss from any future ISO Revenue, or future amounts in the ISO Operating Account, the Reserve Account, and the ISO Clearing Account. Reimbursement of all Losses is, in addition to any others, a precondition of any transfer of any part of the Merchant Portfolio or any related processing.

Cynergy BIN Agmt (061908)

## IV. Fees, Charges and Security Interest

4.1   **Bank Fees.** ISO will pay to Bank the fees set forth on Exhibit A. Bank is authorized to debit the ISO Operating Account for these amounts. Amounts debited shall equal at least the fees associated with the Minimum Annual Sales Volume set forth on Exhibit A (i.e., If the Minimum Annual Sales Volume specified in Exhibit A is not met, within ninety (90) days after the end of each year Bank will invoice ISO for the amount, if any, by which the transaction fees associated with the Minimum Annual Sales Volume exceed the actual transaction fees which were paid by ISO to Bank for such year. The other fees listed on Exhibit A are in addition to the transaction fees associated with the Minimum Annual Sales Volume

4.2   **Association Fees and Assessments.** ISO is responsible for all Association fees related to its or its sales agents registration, and the establishment and maintenance of the BINs and ICAs and Assessments.

4.3   **Conversion Costs.** ISO will pay to Bank any conversion costs incurred by Bank to convert existing merchants of ISO into the Merchant Program. Notwithstanding the foregoing, Bank shall be responsible for such conversion costs in the event (1) Bank's membership in either Association is terminated, or (2) this Agreement is terminated by ISO by virtue of an uncured breach by Bank.

4.4   **BIN Funds.** All income and expenses attributable through the BIN, including but not limited to Recovered Funds, Chargeback income, Retrieval income, interchange income, debits and credits will derive to the benefit of ISO.

4.5   **Security Interest; Set Off.**

A. Grant. As security for the obligations of ISO to Bank, or amounts owing from ISO to Bank, ISO grants Bank a first priority security interest in all of its right, title and interest, whether now owned or existing or hereafter created, acquired or arising, in, to and under the ISO Revenue, the Reserve Account, the ISO Operating Account, the Merchant Suspense Account, and the ISO Clearing Account, including, without limitation, present and future funds comprising the foregoing.

B. Perfection and Release. ISO authorizes for filings to perfect, maintain and enforce Bank's security interest. If any account is established at another depositary institution, then ISO will require such depository institution to enter into a control agreement in favor of Bank regarding the account. Upon termination of this Agreement, if ISO is not in default under this Agreement and (i) all sums then owing to Bank have been paid in full and (ii) the Reserve Account contains the amount specified in Section 2.6(c); or if in Bank's reasonable opinion, all such liability has been transferred to a subsequent acquiring bank, then Bank will promptly release its security interest in the above-named accounts.

C. Set Off. The ISO Operating Account (including, without limitation, the ISO Revenue), the ISO Clearing Account, and the Reserve Account shall be subject to Bank's right to set off any claims Bank has against ISO, whether absolute or contingent under this Agreement.

Cynergy BIN Agmt (061908)

## V. Association Requirements

5.1    **Potential Fines.** Bank will, within 5 business days after receipt of notice, notify ISO in writing of any notices, warnings or impending fines by any Association attributable to ISO or a Merchant. Bank will immediately notify ISO if any fines are imposed on ISO or its Merchants. ISO will reimburse Bank within 10business days of a final determination for any actual fines (other than those arising out of Bank's breach of its obligations under this Agreement or Bank's negligence or willful misconduct) imposed upon Bank.

5.2    **Rules.** ISO received understands, and agrees to comply with all applicable Rules. In the event of any inconsistency between this Agreement and any Rules, the Rules will apply. ISO will comply with all applicable Rules and Association Security Programs. ISO acknowledges that MasterCard and Visa have the right to enforce any provision of the Rules and to prohibit ISO conduct that creates a risk of injury to the Associations or that may adversely affect the integrity or reputation of the Associations' or Bank's systems, information, or both. ISO agrees to monitor its portfolio via means such as a "web crawler" service (e.g., G2, or such other mutually agreeable service), with such service being obtained through a third party or through Bank, in either case at ISO's expense.

5.3    **Operations.** On an ongoing basis, ISO will promptly provide Bank with the current address of each of its offices. ISO acknowledges that all Merchant Fees must be clearly and conspicuously disclosed to the Merchant in writing prior to any payment or application and agrees to so disclose such fees.

5.4    **Information.** ISO will provide requested Merchant information to the Associations within 5 days of the request.

5.5    **Rule Enforcement.** ISO acknowledges that the Associations have the right to enforce any provision of the Rules and to prohibit any ISO conduct that may injure or create a risk of injury to the Associations, including injury to reputation, or that may adversely affect the integrity of the Associations' and Bank's core payment systems, information, or both. ISO will not take any action that might interfere with or prevent exercise of this right.

## VI. Representations, Warranties, Confidentiality, Non-Solicitation and Indemnification

6.1.    **Representations and Warranties.** Each party represents and warrants to the other that:

A. Good Standing. ISO is a business entity authorized, validly existing and in good standing under the laws of the State indicated in the opening paragraph. Bank is duly chartered and validly existing as a national banking association with full power and authority to carry on its banking business as now conducted. This Agreement represents a valid obligation of that party and is fully enforceable against it according to its terms.

B. Full Authority. It has full authority and power to enter into this Agreement and to perform its obligations under this Agreement.

Page 15 of 47

Cynergy BIN Agmi (061908)

C. No Violation. Its performance of this Agreement will not violate, to the best of its knowledge, any applicable law or regulation or any agreement to which it may now or hereafter be bound. It will comply with the terms of this Agreement, with the Rules, and with all applicable state and federal laws and regulations.

**6.2   Confidentiality.**

A. Use. ISO and Bank each agree that it will retain in confidence the Confidential Information and all information and data belonging to or relating to the business of the other party including without limitation aggregate information regarding Merchants or specific information related to Merchants (which the parties acknowledge belongs to ISO), and that each party will safeguard such information and data by using the same degree of care and discretion that it uses to protect its own Confidential Information. No party will use the other party's Confidential Information for its own benefit other than for the purposes contemplated by this Agreement, nor will it allow any third party to use such information other than third parties with a need to know pursuant to this Agreement. ISO will limit access to the MasterCard and Visa systems to those ISO employees it deems necessary to perform its responsibilities under this Agreement. ISO will use MasterCard and Visa information identified or reasonably understood to be confidential or proprietary solely to perform its duties on behalf of this Agreement. ISO and Bank will implement reasonable and appropriate safeguards to prevent unauthorized access to such systems and to the other party's Confidential Information.

B. Disclosure. Prior to the disclosure of any Confidential Information to third parties, recipient of Confidential Information ("Recipient") will obtain a written agreement from any such third party (i) to hold all Confidential Information in confidence and not use it for any purpose not expressly consented to by the disclosing party; and (ii) to return all Confidential Information immediately after the third party has completed the work for which the Confidential Information was disclosed.

C. Return of Confidential Information. Upon termination of this Agreement, the Recipient shall promptly deliver to the disclosing party of Confidential Information ("Disclosing Party") all Confidential Information in its possession or under its control or, alternatively, shall destroy the Disclosing Party's Confidential Information and certify to such destruction; provided, however, that that Confidential Information required by auditors, the Rules, or regulators to be retained may be retained by the Recipient.

D. Non-Protected Information. The parties will have no obligations of confidentiality for: (i) information which at the time of disclosure is in the public domain; (ii) information which after the time of disclosure becomes part of the public domain through no fault of the disclosee, but only after and to the extent that such information is published; (iii) information which is disclosed by a third party having legitimate possession and the unrestricted right to make such disclosure; (iv) information that such party can demonstrate to have been in its legitimate possession prior to the disclosure of the Confidential Information; (v) information required to be disclosed by law, subpoena or court order, provided, however, that the receiving party shall promptly inform the disclosing party of the operation of this Section to enable the disclosing party to defend nondisclosure of its Confidential Information.

Page 16 of 47

–

Cynergy BIN Agmt (061908)

E. No License. Nothing in this Section shall be construed to convey to the Recipient any right, title or interest or copyright in any Confidential Information, or any license to use, sell, exploit, copy or further develop any such Confidential Information, except use of Confidential Information is permitted if necessary by Recipient to comply with this Agreement.

6.3  **Non-Solicitation.** During the term of this Agreement and for a period of 6 months thereafter, neither Bank nor ISO or any of their Affiliates shall solicit, refer or enter into a contract with employees of the other without the express prior written consent of the other. During the term of this Agreement and for a period of 18 months thereafter, Bank shall not knowingly solicit or refer Merchants or registered independent sales organizations of ISO or enter into contracts with them, without the prior written consent of ISO, and ISO shall not directly solicit or refer merchants or sales agents of Bank or enter into contracts with them, without the prior written consent of Bank.  This prohibition shall not preclude general solicitations or inquiries by a party or such party's  agent banks or other independent sales organizations, or referrals to such party by third parties.  In the event of default by ISO or the need for Bank to sell, transfer or assign some or all of the Merchant Agreements to satisfy ISO's obligations to Bank, ISO and any Affiliate of ISO or any entity owned or operated by the principals, officers, directors or shareholders of ISO or its Affiliates agree during the period Bank is recovering amounts due Bank, not to solicit or refer Merchants or sales agents or enter into contracts or arrangements therewith, or resulting in compensation therefrom, with respect to the Merchant Agreements sold, transferred or assigned (including to Bank) to satisfy ISO's obligations or pursuant to the security interest granted to Bank under this Agreement. The economic benefits of any agreements entered into in violation of this section shall accrue to the benefit of the non-breaching party.

6.4  **Indemnification.**

   A.  ISO Indemnification. ISO will indemnify and hold Bank harmless from and against all Losses that result from or arise out of (other than those resulting out of Bank's breach of its obligations under this Agreement or Bank's negligence or willful misconduct): (i) the performance, or failure to perform, by any Merchant, Third Party Provider or ISO, any obligation under the Merchant Agreement or this Agreement; and (ii) the violation by ISO of any law or Rule in connection with its performance of, or failure to perform, its obligations under this Agreement. ISO's obligation to indemnify Bank will survive for a period of 3 years following the expiration or termination of this Agreement by either party for any reason.

   B.  Bank Indemnification. Bank will indemnify and hold ISO harmless from and against all Losses that result from or arise out of (other than those resulting out of ISO's breach of its obligations under this Agreement or ISO's negligence or willful misconduct): (i) Bank's performance, or failure to perform, any obligation under this Agreement; or (ii) the violation by Bank of any law or Rule in connection with its performance of, or failure to perform, its obligations under this Agreement. Bank's obligation to indemnify ISO will survive for a period of 3 years following the expiration or termination of this Agreement by either party for any reason.

Page 17 of 47

Cynergy BIN Agmt (061908)

C. Procedure. Each party will promptly notify the other of any claim, demand, suit or threat of suit of which that party becomes aware which may give rise to a right of indemnification under this Agreement. Both parties will cooperate in the prosecution of such suit. The indemnifying party will be entitled to participate in the settlement or defense of any such suit.

## VII. Term, Termination, Default

7.1     Term. This Agreement will become effective on the Effective Date, and will remain in effect for a period of 3 years from the Effective Date ("Initial Term"). This Agreement will automatically renew for 2 year period ("First Renewal Term"), and then for 1 year periods ("Additional Renewal Term") unless terminated earlier in accordance with the provisions of this Agreement.

7.2     Termination. Notwithstanding the above, the parties will have the following rights.

   A. Automatic Termination. This Agreement will automatically terminate if: (i) Visa or MasterCard prohibits ISO from providing, or prohibits Bank from allowing ISO to provide, the services set forth in this Agreement; or (ii) Visa or MasterCard cancels Bank's Association membership.

   B. Termination Without Cause. After the end of the Initial Term or any Renewal Term, Bank may terminate this Agreement with or without cause upon at least 180 days prior written notice to ISO. ISO may terminate this Agreement with or without cause at the end of the Initial Term or any Renewal Term (i) upon 90 days prior written notice to Bank; or (ii) if ISO sells all Merchant Agreements to a third party in accordance with this Agreement, upon Bank's assignment of such Merchant Agreements to ISO's designee.

   C. Termination For Cause. A party may terminate this Agreement upon the occurrence of an Event of Default by the other party. In the event that Bank terminates this Agreement for cause, ISO agrees to pay Bank a termination fee equal to the greater of (i) the average monthly sponsorship and underwriting fees paid to Bank at the time of termination, or (ii) the minimum annual fees at the time of termination set forth on Exhibit A. The foregoing fee is an expression of liquidated damages, and not a penalty, but shall not be construed to modify any of Bank's other rights in the event of Bank's termination of the Agreement for cause.

7.3     Default. Each of the following occurrences will constitute an Event of Default under this Agreement:

   A. Nonpayment. Either party fails to pay the other when due any undisputed amount due under this Agreement and such failure continues for a period of 30 days after written and oral notice has been sent to the non-paying party.

   B. Financial Instability. Either party: (i) files for bankruptcy, receivership, insolvency, reorganization, dissolution, liquidation or any similar proceeding, (ii) has such a proceeding instituted against it and such proceeding is not dismissed within 60 days, (iii)

Page 18 of 47

Cynergy BIN Agmt (061908)

> makes an assignment for the benefit of its creditors or an offer of settlement, extension or composition to its creditors generally; or (iv) a trustee, conservator, receiver or similar fiduciary is appointed for that party or substantially all of that party's assets.
>
> C. <u>Breach</u>. Either party fails to observe any material obligation specified in this Agreement or the Rules, and such failure is not cured within 60 days of receipt of written notice from the non-breaching party.

## VIII. Names and Trademarks; Intellectual Property

8.1    **Names.** Neither party will use the other's name in any promotional or written or electronic marketing materials, nor will it promote the other's programs in any way, without the other's written consent. Bank agrees to allow ISO to use the name, logo and specified trademarks of Bank solely in connection with the Merchant Program as required under the Rules, such as on Merchant Agreements, provided that any such other use shall require the prior written approval of Bank, such approval not to be unreasonably withheld or delayed and consistent with any Bank usage guidelines. If such approval is granted, ISO may utilize such names, logos or marks with Bank's approval of such materials. This use terminates upon termination of this Agreement.

8.2    **MasterCard and Visa Trademarks.** ISO acknowledges that MasterCard and Visa are the sole owners of their trademarks. ISO will not contest the ownership of such marks, and MasterCard or Visa may at any time and immediately without advance notice prohibit ISO from using its marks for any reason.

8.3    **Intellectual Property Rights.** ISO shall be the sole and exclusive owner of all right, title and interest (including, without limitation, all Intellectual Property Rights) in and to the Vimas System. Nothing in this Agreement shall be deemed to grant to one party, by implication, estoppel or otherwise, license rights, ownership rights or any other Intellectual Property Rights in any materials owned by the other party or any Affiliate of the other Party.

## IX. General

9.1    **Assignment.** ISO may not assign its rights under this Agreement to any third party without Bank's prior written consent, which consent may not be unreasonably withheld, and any attempted assignment without such consent shall be void. Notwithstanding any such assignment, delegation or subcontract, ISO shall remain jointly and severally liable with the assignee for all of its obligations under this Agreement which are so assigned, delegated or subcontracted.

9.2    **Notice.** All communications under this Agreement will be in writing, sent via overnight delivery, and will be deemed received as evidenced by a signature from ISO or Bank. Such communication will be sent to the following:

If to ISO:    CYNERGY DATA
45 W 36th Street, 6th floor
New York, NY 10018
Attn: Marcelo Paladini

Cynergy BIN Agmt (061908)

Fax: 212-594-7245
E-Mail: marcelop@cynergydata.net
If to Bank:    Harris, NA.
150 N. Martingale Rd., Suite 900
Schaumburg, IL 60173
Fax: 847.240.6583

The parties may, from time to time, designate different persons or addresses to which subsequent communications will be sent by sending a notice of such designations in accordance with this Section.

**9.3**    **Entire Understanding and Amendment.** This Agreement, including the attached Exhibits which are incorporated by reference, sets forth the entire understanding of the parties relating to its subject matter, and all other understandings, written or oral, are superseded. Except as otherwise provided in this Agreement, this Agreement may not be amended except in writing executed by both parties.

**9.4**    **Severability.** If any provision of this Agreement is illegal, the invalidity of such provision will not affect any of the remaining provisions, and this Agreement will be construed as if the illegal provision is not contained in the Agreement. This Agreement will be deemed modified to the extent necessary to render enforceable its provisions, and to comply with the Rules.

**9.5**    **No Waiver of Rights.** No failure or delay on the part of any party in exercising any right under this Agreement will operate as a waiver of that right, nor will any single or partial exercise of any right preclude any further exercise of that right.

**9.6**    **Successors and Assigns.** This Agreement will inure to the benefit of and will be binding upon the parties and their respective permitted successors and assigns.

**9.7**    **Applicable Law.** The Agreement will be deemed to be a contract made under the laws of the State of Illinois, and will be construed in accordance with the laws of Illinois without regard to principles of conflicts of law.

**9.8**    **Independent Contractors.** Bank and ISO will be deemed to be independent contractors and will not be considered to be agent, servant, joint venturer or partner of the other.

**9.9**    **Construction.** The headings used in this Agreement are inserted for convenience only and will not affect the interpretation of any provision. All sections mentioned in the Agreement reference section numbers of this Agreement. The language used will be deemed to be the language chosen by the parties to express their mutual intent, and no rule of strict construction will be applied against any party.

**9.10**    **Force Majeure.** Neither party will be liable to the other for any failure or delay in its performance of this Agreement in accordance with its terms if such failure or delay arises out of causes beyond the control and without the fault or negligence of such party.

Cynergy BIN Agmt (061908)

**9.11**   **Attorney's Fees.** If any court finds that a party has breached this Agreement, then the non-defaulting party will be entitled to recover from the breaching party expenses incurred in enforcing the provisions of this Agreement, including but not limited to reasonable attorneys' fees and costs.

**9.12**   **Limitation of Liability.** In no event shall either party, their respective Affiliates or any of their respective directors, officers, employees, agents or subcontractors, be liable under any theory of tort, contract, strict liability or other legal theory for lost profits, lost revenues, lost business opportunities, exemplary, punitive, special, incidental, indirect or consequential damages, each of which is excluded by agreement of the parties, regardless of whether the damages were foreseeable or whether any party or any entity has been advised of the possibility of the damages. This limitation of liability shall not apply to, and is no way intended to or limit or relieve ISO's obligations with respect to any liability of ISO related to misconduct, fraud, failure to pay Bank's fees or other costs described on Exhibit A, any losses under the Merchant Agreements and/or Merchant activities or as otherwise set forth in this Agreement.

**9.13**   **Waiver of Jury Trial.** BANK AND ISO HEREBY WAIVE ANY RIGHT TO A TRIAL BY JURY IN ANY ACTION CONCERNING ANY RIGHTS OR DISPUTES UNDER THIS AGREEMENT. BANK AND ISO AGREE THAT, FOR PURPOSES OF ACTIONS BROUGHT BY BANK OR MONERIS SOLUTIONS, INC., JURISDICTION AND VENUE SHALL BE IN ANY STATE OR FEDERAL COURT LOCATED IN THE STATE AND COUNTY OF NEW YORK, AND, FOR PURPOSES OF ACTIONS BROUGHT BY ISO, JURISDICTION AND VENUE SHALL BE IN ANY COURT LOCATED IN COOK COUNTY, ILLINOIS.

**9.14**   **Survival.** All agreements that by their context are intended to survive the termination of this Agreement, including without limitation, 2.2, 2.3, 2.6, 3.3, 4.1, 4.2, 4.5, 4.6, 4.6, 5.1, and Articles VI and IX).

**CYNERGY DATA, LLC**                    **HARRIS N.A.**, a national banking association

By: _____          By: _____

Name: *MARCELO PALADINI*                Name: *GREGORY C. COHEN*

Its: *CEO*                              Its: _____

Date: *6/20th, 2008*                    Date: *October 23, 2008*

Page 21 of 47

# EXHIBIT B

April 28, 2009

Harris N.A.
150 N. Martingale Road
Suite 900
Schaumburg, Illinois 60173

      Re:        Cynergy Data, LLC

Ladies and Gentlemen:

      Reference is made to (a) that certain Amended and Restated Credit Agreement ("Cynergy Credit Agreement") dated August 1, 2008, as amended, among Cynergy Data, LLC ("ISO"), the lenders party to the Cynergy Credit Agreement from time to time ("Cynergy Banks") and Comerica Bank, as Agent for the Cynergy Banks (in such capacity, the "Cynergy Agent"), that certain Security Agreement dated April 16, 2007, as amended, by ISO and its subsidiaries in favor of the Cynergy Agent for the benefit of the Cynergy Banks ("Cynergy Security Agreement"), that certain Guaranty ("Guaranty") by ISO of all liabilities and obligations of Cynergy Prosperity Plus, LLC arising under and in connection with that certain Credit Agreement ("Prosperity Credit Agreement") dated September 20, 2007, as amended, among Cynergy Prosperity Plus, LLC, the lenders party to the Prosperity Credit Agreement from time to time ("Prosperity Banks") and Comerica Bank, as Agent for the Prosperity Banks (in such capacity, the "Prosperity Agent"), that certain Security Agreement dated September 20, 2007, as amended, by ISO in favor of the Prosperity Agent for the benefit of the Prosperity Banks ("Prosperity Security Agreement"), that certain Financing Agreement dated November 15, 2007 ("Dymas Financing Agreement"), as amended, among ISO, the lenders party to the Dymas Financing Agreement from time to time ("Dymas Banks" and together with the Cynergy Banks and the Prosperity Banks, collectively the "Banks" and individually each, a "Bank") and Dymas Funding Company, LLC, as Agent for the Dymas Banks (in such capacity, the "Dymas Agent" and together with the Cynergy Agent and the Prosperity Agent, collectively the "Agents" and individually each, an "Agent"), that certain Security Agreement dated November 15, 2007, as amended, by ISO and its subsidiaries in favor of the Dymas Agent for the benefit of the Dymas Banks ("Dymas Security Agreement" and together with the Cynergy Credit Agreement, the Prosperity Credit Agreement, the Cynergy Security Agreement, the Guaranty, the Prosperity Security Agreement and the Dymas Financing Agreement, the "Bank Group Agreements") and (b) that certain BIN Sponsor Agreement dated as of November 1, 2008, (as amended or modified from time to time, the "MSA") by and between Harris N.A. ("Processor") and ISO. All capitalized terms not otherwise defined in this letter will have the meanings ascribed in the MSA.

      Security Interests. Pursuant to the Bank Group Agreements, ISO has granted a security interest in all of its assets in favor of Agents for the benefit of the Banks (the "Lender Collateral") to secure its obligations under the Cynergy Credit Agreement, the Guaranty, the Dymas Financing Agreement and all other present and future obligations of ISO to Agents and the Banks. The Lender Collateral includes, without limitation, all of ISO's rights, title and interest in and to (a) all Merchant Agreements, (b) funds held in the Reserve Account, the

Merchant Suspense Account, the ISO Operating Account and the ISO Clearing Account and all ISO Revenue and (c) all ISO Revenue (ISO's rights, title and interest in and to the Merchant Agreements, the Reserve Account, the Merchant Suspense Account, the ISO Operating Account, the ISO Clearing Account and the ISO Revenue are collectively referred to as the "Merchant Services Collateral"), Processor understands that the Agents shall have a first priority security interest in favor of the Agents in the Lender Collateral ("Lender First Priority Lien"), subject to Processor's interest in the Merchant Services Collateral as set forth in this Agreement.

Agents understand that, pursuant to the MSA, ISO intends to grant a perfected first priority security interest in favor of Processor (the "Processor Lien") in the Merchant Services Collateral.

Processor acknowledges and consents to the existence of the Lender First Priority Lien. Each Agent acknowledges and consents to the existence of the Processor Lien. Each Agent acknowledges that any lien such Agent may have in the Merchant Services Collateral (other than the Lender First Priority Lien on the ISO's rights in the Merchant Agreements) shall be subordinate and junior to the Processor Lien in the Merchant Services Collateral as provided in this Agreement to the extent of the First Priority Obligations. "First Priority Obligations" shall mean all obligations of ISO owing to Processor under the provisions of paragraphs 3.3, 4.1 and 4.2 of the MSA; provided however in no event shall the First Priority Obligations include any Losses which are not Merchant Losses.

Proceeds. Any proceeds received by the Agents, or either of them, from the enforcement of their respective security interests in the Merchant Services Collateral shall be applied first to the First Priority Obligations until paid in full , then to the obligations of ISO owing to the Agents and the Banks until paid in full and then to any remaining obligations owing by ISO to Processor. Any proceeds received by Processor from the enforcement of its security interest in the Merchant Services Collateral or the exercise of any rights of setoff shall be applied first to the First Priority Obligations until paid in full, then to the obligations of ISO owing to the Agents and the Banks until paid in full and then to any remaining obligations owing by ISO to Processor.

Agents and Processor agree that this subordination shall be applicable irrespective of the time or order of attachment, perfection or validity of security interests; the time or order of filing or recording financing statements; or the time of making any advances or the amount of any advances made. The Agents agree that they shall not contest the validity or senior priority of Processor's liens and security interest in the Merchant Services Collateral and Processor agrees that it shall not contest the validity or senior priority of the Agents' liens and security interests in any assets of ISO, except to the extent it asserts its senior interest in the Merchant Services Collateral.

Lender Action. Each Agent further agrees that such Agent (a) will not sue for, liquidate, sell, foreclose, setoff, collect, accept a surrender, receive any proceeds, petition, commence or otherwise initiate any action to realize or seek to realize upon all or any part of the Merchant Services Collateral (an "Enforcement Action") at any time prior to (i) the occurrence of an "event of default" and expiration of any applicable cure period under the applicable Credit

2

Agreement (a "Credit Agreement Event of Default") and (ii) the date that is 5 days after the receipt by Processor of a written notice from an Agent describing the Credit Agreement Event of Default that forms the basis for the proposed Enforcement Action, specifying in reasonable detail the nature of such Credit Agreement Event of Default during which 30 day period Processor has the option, but not the obligation, of curing such Event of Default (which 5 day period may be shortened by a written agreement of both Processor and the Agents) and (b) will hold any proceeds of the Merchant Services Collateral received by such Agent in connection with an Enforcement Action in trust for Processor and will forward any such proceeds to Processor promptly upon its receipt of such proceeds until the payment in full in cash the First Priority Obligations outstanding at such time. Processor agrees that nothing contained herein shall prevent either Agent or any Bank from exercising any right of setoff with respect to funds on deposit in ISO's accounts with such Agent or any Bank, to receive any proceeds paid by Processor to ISO, or to receive and retain the proceeds of any collateral which does not constitute a portion of the Merchant Services Collateral.

Processor Action. Processor agrees that Processor (a) will not commence an Enforcement Action at any time prior to (i) the occurrence of a default and expiration of any applicable cure period under the MSA (the "MSA Event of Default") and (ii) the date that is 5 days after the receipt by the Agents of a written notice from Processor describing the MSA Event of Default that forms the basis for the proposed Enforcement Action, specifying in reasonable detail the nature of such MSA Event of Default during which 30 day period each Agent and the respective Banks have the option, but not the obligation, of curing such Event of Default (which 30 day period may be shortened by a written agreement of both Processor and the Agents) and (b) will remit to the Agents any proceeds received by Processor in connection with an Enforcement Action in excess of the proceeds necessary to pay in full in cash the amount of First Priority Obligations outstanding at such time. Each Agent agrees that nothing contained herein shall prevent Processor from exercising any rights of setoff with respect to and up to the amounts specified in the First Priority Obligations; provided, however, that nothing contained herein shall as between ISO and Processor impair Processor's right of setoff with respect to any such excess amounts following payment in full of all obligations of ISO to the Agents and the Banks under the Credit Agreements.

Cooperation. Subject to the limitations on the Agents' and Processor's rights set forth herein, (a) each Agent and Processor further agree that each party will have the right to exercise and enforce all rights and privileges with respect to the Merchant Services Collateral and Lender Collateral according to the exercise of its business judgment, including, without limitation, the right to foreclose on, sell, liquidate or otherwise dispose of the Merchant Services Collateral or Lender Collateral, (b) each Agent agrees to use its reasonable efforts to cooperate with Processor in the exercise of Processor's rights with respect to the Merchant Services Collateral and to take all actions reasonably requested by Processor to enable Processor to enforce its rights with respect to the Merchant Services Collateral, including the release of such Agent's lien on the Merchant Services Collateral in the event that such collateral is sold or otherwise transferred to a third party, (c) Processor agrees to use its reasonable efforts to cooperate with each Agent in the exercise of such Agent's rights with respect to the Lender Collateral and to take all actions reasonably requested by an Agent to enable such Agent to enforce its rights with respect to the Lender Collateral, including the release of Processor's lien on the Lender Collateral in the event

3

that such collateral is sold or otherwise transferred to a third party, (d) each party agrees that no rights of Processor or the Agents to enforce the subordinations provided herein shall at any time in any way be prejudiced or impaired by any act, or failure to act, by Processor or either Agent (or any Bank), or by any noncompliance by ISO with the terms and provisions in the Bank Group Agreements or the MSA. Each party agrees not to take any action to avoid or to seek to avoid the observance and performance of the terms and conditions hereof, and shall at all times in good faith carry out all such terms and conditions and take all such actions as may be necessary or appropriate to protect the other party against impairment.

Miscellaneous. By signing below the Agents, Processor and ISO each acknowledge and consent to this arrangement, the terms set forth here and the instructions contained in this letter agreement.

ISO agrees that this letter agreement and the contents hereof shall not be disclosed by ISO to any person not a party hereto without the prior written consent of Processor and the Agents, other than to ISO's attorneys and accountants, to the extent necessary in ISO's reasonable judgment.

THE PARTIES ACKNOWLEDGE THAT THE RIGHT TO TRIAL BY JURY IS A CONSTITUTIONAL ONE, BUT THAT IT MAY BE WAIVED. EACH PARTY, AFTER CONSULTING (OR HAVING HAD THE OPPORTUNITY TO CONSULT) WITH COUNSEL OF ITS CHOICE, KNOWINGLY AND VOLUNTARILY, AND FOR THE PARTIES' MUTUAL BENEFIT, WAIVES ANY RIGHT TO TRIAL BY JURY IN THE EVENT OF LITIGATION REGARDING THE PERFORMANCE OR ENFORCEMENT OF, OR IN ANY WAY RELATED TO, THIS AGREEMENT.

[Remainder of Page Intentionally Left Blank]

4

Detroit 855802.4

This letter agreement shall be governed by the laws of the State of Michigan, without giving effect to any conflicts of laws principles. This letter agreement may be executed in any number of counterparts, each of which shall be an original but all of which together shall constitute one and the same instrument.

Sincerely yours,

**COMERICA BANK**, as Cynergy Agent and Prosperity Agent

By: _____

Name: _DAN RIESNER_____

Title: _VICE PRESIDENT_____

**DYMAS FUNDING COMPANY, LLC,** as Dymas Agent

By: _____

Name: _____

Title: _____

Acknowledged and Agreed:

**CYNERGY DATA, LLC**

By: _____

Name: _____

Title: _____

**HARRIS N.A.**

By: _____

Name: _____

Title: _____

5

Detroit_855802_4

This letter agreement shall be governed by the laws of the State of Michigan, without giving effect to any conflicts of laws principles. This letter agreement may be executed in any number of counterparts, each of which shall be an original but all of which together shall constitute one and the same instrument.

Sincerely yours,

**COMERICA BANK,** as Cynergy Agent and Prosperity Agent

By: _____
Name: _____
Title: _____

**DYMAS FUNDING COMPANY, LLC,** as Dymas Agent

By: _____
Name: ~~KENNETH B. LEONARD~~
Title: ~~MANAGING DIRECTOR~~

Acknowledged and Agreed:

**CYNERGY DATA, LLC**

By: _____
Name: _____
Title: _____

**HARRIS N.A.**

By: _____
Name: _____
Title: _____

5

Detroit_855802_4

This letter agreement shall be governed by the laws of the State of Michigan, without giving effect to any conflicts of laws principles. This letter agreement may be executed in any number of counterparts, each of which shall be an original but all of which together shall constitute one and the same instrument.

Sincerely yours,

**COMERICA BANK,** as Cynergy Agent and Prosperity Agent

By: _____
Name: _____
Title: _____

**DYMAS FUNDING COMPANY, LLC,** as Dymas Agent

By: _____
Name: _____
Title: _____

Acknowledged and Agreed:

**CYNERGY DATA, LLC**

By: _____
Name: _MARCELO PALADINI_
Title: _CHIEF EXECUTIVE OFFICER_

**HARRIS N.A.**

By: _____
Name: _____
Title: _____

5

Detroit_855802_4

This letter agreement shall be governed by the laws of the State of Michigan, without giving effect to any conflicts of laws principles. This letter agreement may be executed in any number of counterparts, each of which shall be an original but all of which together shall constitute one and the same instrument.

Sincerely yours,

**COMERICA BANK,** as Cynergy Agent and Prosperity Agent

By: _____
Name: _____
Title: _____

**DYMAS FUNDING COMPANY, LLC,** as Dymas Agent

By: _____
Name: _____
Title: _____

Acknowledged and Agreed:

**CYNERGY DATA, LLC**

By: _____
Name: _____
Title: _____

**HARRIS N.A.**

By: _____
Name: _____GREG COHEN_____
Title: _____PRESIDENT_____

5

Detroit 855802 4